# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF KANSAS

LARRY A. LAWSON,

    *Plaintiff,*

vs.

    Case No. 18-cv-01100-EFM-KGS

SPIRIT AEROSYSTEMS, INC.,

    *Defendant.*

# MEMORANDUM AND ORDER

Plaintiff Larry Lawson was the President and Chief Executive Officer of Defendant Spirit AeroSystems, Inc. ("Spirit") from April 2013 until he retired in July 2016. On March 28, 2018, Lawson initiated this action against Spirit to recover more than $50 million in value related to cash payments and shares of Class A common stock of Spirit that he alleges has been improperly withheld from him. This matter comes before the Court on Spirit's Motion to Dismiss (Doc. 17). For the reasons stated below, Spirit's motion is granted in part and denied in part. The motion is granted as to Count II of Lawson's Complaint, and it is denied as to Count I.

# I. Factual and Procedural Background[1]

Spirit is a tier-one manufacturer of aerostructures and aircraft components for commercial and military aircraft.[2] Spirit is a Delaware corporation with its principal place of business in Wichita, Kansas. According to its most recent Form 10-K, Spirit manufactures: "(1) Fuselage Systems, which includes forward, mid and rear fuselage sections; (2) Propulsion Systems, which includes nacelles, struts/pylons and engine structural components; and (3) Wing Systems, which includes wing components, flight control surfaces and other miscellaneous structural parts."

Lawson, a Florida citizen, began service as Spirit's President and Chief Executive Officer and as a member of its board in April 2013. He brought with him more than 33 years of experience, having previously been President of Lockheed Martin Aeronautics Company and Executive Vice President of Lockheed Martin Corporation. Lawson was hired to "revitalize" Spirit, which was a "struggling tier one manufacturer" at the time he joined.

At the time he was hired by Spirit, Lawson entered into an agreement (the "Employment Agreement"), which contained non-compete obligations, among other things. The Employment Agreement provided for a compensation structure that included awards of time-based and performance-based restricted stock units ("LTI awards"). The Employment Agreement initially set an LTI award target of 400 percent of Lawson's base salary, but was increased to 500 percent in 2015 and to 535 percent in 2016. As of December 31, 2015, Lawson owned 386,989 LTI awards, of which he had already earned 374,715 by meeting performance targets. Beyond their

---

[1] For purposes of this motion, the Court accepts as true the facts as alleged in Lawson's Complaint and the exhibits attached thereto, and views them in the light most favorable to Lawson.

[2] According to the Complaint, "aerostructures" are "large, complex components of an aircraft's frame."

market value, these awards also gave Lawson voting rights as a Spirit shareholder because, upon vesting, they became Shares, which are entitled to one vote per Share.

Lawson's tenure at Spirit was "enormously successful." Under his leadership, Spirit became the world's largest tier-one aerostructures manufacturer. Spirit's revenue and net income increased, earnings per share grew, and stock price rose during his years with the company. After completing the "turnaround project" for which he was hired, Lawson retired on July 31, 2016.

At the time of his retirement, Lawson entered into an agreement (the "Retirement Agreement"), which provided Lawson with certain benefits and extended certain obligations in his Employment Agreement. As set forth in Paragraph 2 of the Retirement Agreement, Spirit agreed to pay Lawson approximately $4.7 million in cash and enabled him to vest in 408,596 Shares (with the opportunity to vest in an additional 129,564 Shares based on the future performance of Spirit) in a series of scheduled payments over three years, which included all of the unvested LTI awards that Lawson had previously earned for hitting his performance-based targets as CEO.[3]

Additionally, the Retirement Agreement extended Lawson's non-compete obligations for two years, until July 31, 2018. Section 2(g) of the Retirement Agreement provides that Lawson's "continuing entitlement to payments and/or vesting shall be conditioned upon his reaffirmation of this Agreement through the Retirement Date . . . and his continuing compliance with Paragraph[] . . . 7 . . . of [this] Agreement." Paragraph 7 then provides that Lawson "acknowledges and agrees that he shall continue to be bound by the terms and conditions of

---

[3] The LTI awards were due to vest on the following schedule: 31,374 awards on February 7, 2017; 39,281 awards on February 28, 2017; 64,010 awards on May 6, 2017; 85,126 awards on May 8, 2017; 87,861 awards on February 7, 2018; 39,287 awards on February 28, 2018; 31,370 awards on February 9, 2019; and 39,287 awards on February 28, 2019. Lawson claims that, as of the date of filing the Complaint, these awards are now worth more than $37 million.

Paragraph 4 of the Employment Agreement . . . provided, however, that [Lawson] further acknowledges and agrees that the noncompetition and non-solicitation periods as set forth under Paragraphs 4(c) and (d) of the Employment Agreement shall be extended [for a period of two years]."

> Paragraph 4(c) of the Employment Agreement, in turn, provides that:
>
> Neither [Lawson] nor an individual, corporation, partnership, limited liability company, trust, estate, joint venture, or other organization or association ("Person") with [Lawson's] assistance nor any Person in which [Lawson] directly or indirectly [has] any interest of any kind (without limitation) will, anywhere in the world, directly or indirectly own, manage, operate, control, be employed by, serve as an officer or director of, solicit sales for, invest in, participate in, advise, consult with, or be connected with the ownership, management, operation, or control of any business that is engaged, in whole or in part, in the Business, or any business that is competitive with the Business or any portion thereof, except for our exclusive benefit.

The Employment Agreement defines the term "Business" as follows:

> We are engaged in the manufacture, fabrication, maintenance, repair, overhaul, and modification of aerostructures and aircraft components, and market and sell our products and services to customers throughout the world (together with any other businesses in which Spirit may in the future engage, by acquisition or otherwise, the "*Business*").

On January 31, 2017, Lawson entered into a contract (the "Lawson Agreement") with Elliott Associates, L.P. and Elliott International, L.P. (together, "Elliott"), an investment firm. Elliott essentially retained Lawson in the hopes that he might become a candidate for CEO of Arconic, Inc. ("Arconic") in the event that Elliott was successful in an attendant proxy contest it launched to replace certain Arconic board members. Specifically, the Lawson Agreement provided that Lawson "shall provide general advisory and professional consulting services . . . in connection with Elliott's nomination of individuals for election to the board of directors of Arconic . . . at the 2017 annual meeting of shareholders of Arconic." Elliott made clear to Lawson

that his services would not include, among other things, providing any confidential information regarding Spirit, any information regarding Spirit's relationship with Arconic, or any assistance with the management or ownership of Arconic or Elliott's Arconic investment.

Arconic is a supplier to, rather than a competitor of, Spirit.[4] It does not and never has manufactured large aerostructures. Rather, Arconic has positioned itself as a manufacturer of lightweight engineered metal components for sale to tier one and tier two buyers in the aerospace and automotive industries. Specifically, Arconic creates small components that end up in airplanes—like small fasteners, connectors, engine components, and other lightweight alloy materials. At no time did Arconic manufacture aircraft fuselages, wings, engine nacelles or other complex aerostructures that Spirit manufactures.

On January 31, 2017, the same day that Lawson and Elliott entered into the Lawson Agreement, Elliott commenced its proxy contest for seats on the Arconic board.[5] In a presentation to Arconic's shareholders, Elliott announced that it had "engaged Mr. Lawson as a consultant on its investment in Arconic and believes that Mr. Lawson should be a leading candidate to become the Company's CEO, as he has the ideal set of skills needed to turn around Arconic's woefully and continually underperforming business."[6] Elliott recommended that Lawson, or a similarly-qualified candidate, be the next CEO of Arconic. However, Arconic's board reacted unfavorably,

---

[4] Neither Spirit nor Arconic lists the other as a competitor in its respective SEC filings. Indeed, among the companies Spirit lists as its competitors in SEC filings, none of these companies discusses Arconic as a competitor. And similarly, among the companies Arconic lists as its competitors, none discusses Spirit as a competitor. The parts manufactured by Arconic and the products made by Spirit are incorporated at entirely different stages of the construction of an airplane. Their products do not compete with each other.

[5] In its proxy materials, Elliott disclosed that Lawson had been retained by Elliott.

[6] By this time, Elliott owned a 12.3% economic interest in Arconic. This was Elliott's full economic position in Arconic except for minor subsequent fluctuations, which would not otherwise change after Elliott's retention of Lawson.

rejecting Elliott's suggestion, and Lawson was never hired by Arconic. On May 22, 2017, Elliott settled with Arconic's board, terminating the proxy contest, and on October 23, 2017, Chip Blankenship was appointed as Arconic's CEO.

On February 2, 2017, within 48 hours of Elliott announcing its retention of Lawson, Spirit wrote a letter asserting that Lawson had "forfeited any continuing entitlement to payment" of the Shares and cash Spirit still owed him, and demanded that Lawson repay approximately $2.68 million that Spirit had already paid. The letter states, in relevant part:

> Spirit has reviewed the various pronouncements issued on January 31, 2017 by [Elliott]. Lawson's engagement by Elliott constitutes an egregious violation of Section 7 of the [Retirement] Agreement. Accordingly, effective as of January 31, 2017, and, consistent with Section 2(g) of the [Retirement] Agreement, we are notifying you that Lawson has forfeited any continuing entitlement to payments, any continuing COBRA premium supplement payments, and any vesting, each as provided for under Section 2 of the [Retirement] Agreement. Further, pursuant to Section 14 of the [Retirement] Agreement, Lawson is obligated to tender back all payments made to him under the [Retirement] Agreement to date (other than $1,000), including any payments resulting from vesting of any awards.

On February 6, 2017, Lawson's counsel responded to Spirit's letter, explaining that Lawson's retention by Elliott was not a breach of Lawson's non-competition obligations to Spirit. The letter went on to state that Spirit's refusal to honor its payment and vesting obligations to Lawson would "constitute a material breach and repudiation of the [Retirement] Agreement." Spirit's counsel responded on February 8, 2017. Spirit claimed to be entitled to cease making the payments and vesting awards Spirit was obligated to make pursuant to Section 2(g) of the Retirement Agreement.

Lawson claims that the clear understanding between him and Elliott was that he was retained by Elliott only for the purposes of remaining available to become CEO of Arconic, and to meet Arconic shareholders in that capacity. Elliott reaffirmed this belief when Elliott sent a letter

to Lawson reiterating the scope of the Lawson Agreement. In the February 17 Letter, Elliott clarified that it was "not asking [Lawson] to . . . assist with the ownership, management, operation, or control of Arconic," or "advise Elliott concerning Arconic's relationship with Spirit, including but not limited to any potential competition with Spirit," or to "provide, use or rely upon any information inconsistent with [Lawson's] obligations under any agreements with Spirit."

By February 21, 2017, Spirit had paid Lawson only $2.7 million of the $4.7 million owed under the Retirement Agreement and released none of his stock awards. To date, Spirit has not paid any of the remaining cash or stock owed under the Retirement Agreement.

Lawson filed the Complaint on March 28, 2018, advancing two claims.[7] In Count I, Lawson brings a claim for breach of contract. Lawson alleges that he did not breach his non-competition obligation, and Spirit therefore had no basis to repudiate its payment and Share issuance obligations. The Complaint explains that neither Elliott nor Arconic are engaged in the same "Business" as Spirit, and they do not compete with Spirit. Arconic creates some small components that end up in airplanes—like small fasteners, connectors, engine components, and other lightweight alloy materials, and many other automotive and construction products. And Elliott is an investment firm that does not compete with Spirit.

Count II is a declaratory judgment claim. Lawson alleges that Spirit's interpretation of the non-compete provisions is incorrect and overly broad and would effectively deprive Lawson of the ability to be employed by, consult with, or invest in any manufacturing enterprise that touches upon the literally hundreds of thousands of inputs to an aircraft. Thus, Lawson claims that he is

---

[7] Lawson attached to the Complaint copies of the Retirement Agreement, the Lawson Agreement, and the Employment Agreement.

entitled to a declaration that, as applied by Spirit, the non-competition obligations in the Employment Agreement are overbroad, invalid, and violate public policy.

Spirit filed the present motion to dismiss on May 2, 2018. Having been fully briefed, Spirit's motion is ripe for the Court's consideration.

## II. Legal Standard

Under Fed. R. Civ. P. 12(b)(6), a defendant may move to dismiss a claim for which a plaintiff "fail[s] to state a claim upon which relief can be granted." A complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' "[8] A claim is facially plausible if the court can reasonably infer that the defendant is liable from the facts pleaded.[9] The plausibility standard reflects the Rule 8 requirement that pleadings must provide defendants with fair notice of the claims, as well as the grounds upon which the claims rest.[10] The Court accepts all factual allegations in the complaint as true and views them in the light most favorable to the plaintiff.[11] "In addition to the allegations contained in the complaint," the Court "may consider attached exhibits and documents incorporated into the complaint, so long as the parties do not dispute the documents' authenticity."[12] The Court does not "weigh potential evidence that the parties might present at trial," but assesses whether the complaint "alone is legally sufficient to state a claim for which relief may be granted."[13]

---

[8] *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

[9] *Id.* at 678 (citing *Twombly*, 550 U.S. at 556).

[10] *See Robbins v. Oklahoma*, 519 F.3d 1242, 1246–47 (10th Cir. 2008).

[11] *Ridge at Red Hawk, L.L.C. v. Schneider*, 493 F.3d 1174, 1177 (10th Cir. 2007).

[12] *Kerber v. Qwest Grp. Life Ins. Plan*, 647 F.3d 950, 959 (10th Cir. 2011) (citing *Smith v. United States*, 561 F.3d 1090, 1098 (10th Cir. 2009)).

[13] *Dubbs v. Head Start, Inc.*, 336 F.3d 1194, 1201 (10th Cir. 2003) (quotation omitted).

### III. Discussion

**A.     Breach of Contract**

Spirit first moves to dismiss Lawson's claim for breach of contract. To state a claim for breach of contract under Kansas law, the plaintiff must plead five elements: "(1) the existence of a contract between the parties; (2) sufficient consideration to support the contract; (3) the plaintiff's performance or willingness to perform in compliance with the contract; (4) the defendant's breach of the contract; and (5) damages to the plaintiff caused by the breach."[14]

Spirit does not dispute the existence of the contract, or the sufficiency of the consideration. Spirit argues only that Lawson's Complaint fails to establish that Spirit breached the Retirement Agreement. More specifically, Spirit argues that (1) under the terms of the Retirement Agreement, Lawson's compliance with the non-compete clause was a condition precedent to his entitlement to cash payments and vesting; and (2) the Complaint establishes that Lawson violated the non-compete clause, thereby relieving Spirit of its duty to issue the remaining payments to Lawson. Thus, Spirit concludes, Lawson cannot prove that Spirit breached the Retirement Agreement and his breach of contract claim must be dismissed.

Lawson counters that the non-compete clause is not a condition precedent, but rather, that it is a condition subsequent. According to Lawson, his right to payments and vesting of shares under the Retirement Agreement took effect upon his retirement, as evidenced by the fact that Spirit has already paid him $2.7 million in cash compensation that he was owed under it.

---

[14] *Madison, Inc. v. W. Plains Reg'l Hosp.*, 2018 WL 928822, at *4 (D. Kan. 2018) (quoting *Stechschulte v. Jennings*, 297 Kan. 2, 298 P.3d 1083, 1098 (2013)).

The Court must first resolve the issue of whether Lawson's compliance with the non-compete clause was a condition precedent to his entitlement to continued payments and/or vesting. If his compliance was a condition precedent to his entitlement to payments, then the Court must determine whether the pleaded facts conclusively show that Lawson violated the non-compete clause. If so, then Lawson would not be able to recover for breach of contract.[15]

These issues require the Court to interpret the parties' agreements. The construction and interpretation of a contract is a question of law that properly may be determined on a motion to dismiss.[16] "The primary rule for interpreting written contracts is to ascertain the parties' intent. If the terms of the contract are clear, the intent of the parties is to be determined from the language of the contract without applying rules of construction."[17] To interpret a written contract, the Court will assign terms their plain, general, and common meaning.[18]

    *1.*    *Lawson's compliance with the non-compete clause was a condition precedent to continued payment*

The first issue to address is whether Lawson's compliance with the non-compete clause was a condition precedent to continued payment. Under Kansas law, "[c]onditions precedent to performance under an existing contract arise from the terms of a valid contract and define an event that must occur before a right or obligation matures under the contract."[19] In other words,

---

[15] *See* 5B Charles Alan Wright & Arthur R. Miller, *Federal Practice & Procedure* § 1357 (3d ed. 2004) ("A dismissal under Rule 12(b)(6) is likely to be granted by the district court when the plaintiff includes allegations that show on the face of the complaint that there is some insuperable bar to securing relief.").

[16] *See Am. States Ins. Co. v. Farmers Alliance Mut. Ins. Co.*, 28 Kan. App. 2d 754, 20 P.3d 743, 758 (2001).

[17] *Anderson v. Dillard's, Inc.*, 283 Kan. 432, 153 P.3d 550, 554 (2007) (citing *Liggatt v. Emp'rs Mut. Cas. Co.*, 273 Kan. 915, 46 P.3d 1120, 1125 (2002)).

[18] *Doce Ltd. P'ship v. Sandridge Expl. & Prod., LLC*, 2017 WL 1836977, at *3 (D. Kan. 2017) (citing *Wood River Pipeline Co. v. Willbros Energy Servs. Co.*, 241 Kan. 580, 738 P.2d 866, 871 (1987)).

[19] *M West, Inc. v. Oak Park Mall, L.L.C.*, 44 Kan. App. 2d 35, 234 P.3d 833, 843 (2010).

"[p]arties to an agreement may make one party's performance contingent on satisfaction of a condition."[20] "If the condition does not occur, then performance is not required."[21] "An intention to make a duty conditional may be manifested by the general nature of an agreement, as well as by specific language."[22]

Spirit's argument turns on Paragraph 2 of the Retirement Agreement. Paragraph 2(a) through (f) sets forth Spirit's payment obligations to Lawson. Spirit agreed to compensate Lawson for consulting services, payable in equal installments over a two-year period, and to provide Lawson with a severance payment, payable in equal installments over a one-year period. Spirit also agreed to provide stock awards of 408,596 Shares (with the opportunity to vest in an additional 129,564 Shares based on the future performance of Spirit) as if he were an active employee.

Paragraph 2 then concludes with Sub-Paragraph (g), which explains that Lawson's "continuing entitlement to payments and/or vesting under this Paragraph 2 *shall be conditioned upon* . . . his continuing compliance with Paragraph[] . . . 7 . . . of [this] Agreement." Paragraph 7 then provides that Lawson "acknowledges and agrees that he shall continue to be bound by the terms and conditions of Paragraph 4 of the Employment Agreement . . . provided, however, that [Lawson] further acknowledges and agrees that the noncompetition and non-solicitation periods as set forth under Paragraphs 4(c) and (d) of the Employment Agreement shall be extended [for a period of two years]."

---

[20] *Kan. Hous. Res. Corp. v. N.E.A.R., Inc.*, 2006 WL 208690, at *2 (D. Kan. 2006) (citing *Sternberg v. Sec'y, Dep't of Health & Human Servs.*, 299 F.3d 1201, 1207 (10th Cir. 2002)).

[21] *Id.* (citing *Sternberg*, 299 F.3d at 1207).

[22] Restatement (Second) of Contracts § 226 (2018 Update).

In other words, Lawson's "continuing entitlement to payments and/or vesting under this Paragraph 2 *shall be conditioned upon* . . . his continuing compliance with" the non-compete obligations set forth in Paragraph 4(c) of the Employment Agreement for a period of two years after his retirement. Thus, the Retirement Agreement's language clearly and expressly conditioned Lawson's entitlement to payments and/or vesting on his continued compliance with the terms of his non-compete for two years.[23] The phrase "shall be conditioned upon" makes Lawson's compliance a condition precedent to Spirit's payment obligations.[24] Spirit's performance (to pay Lawson) was therefore contingent on satisfaction of a condition—Lawson's continued compliance with the non-compete clause.[25] Thus, if the condition does not occur (if Lawson violates the non-compete clause), then Spirit's performance is no longer required.[26]

2.  *The Complaint does not establish that Lawson violated the non-compete*

Because Lawson's compliance with the non-compete was a condition precedent to his entitlement to payments, the Court must determine whether the pleaded facts conclusively show that Lawson violated the non-compete clause. More specifically, the issue is whether Lawson's involvement with Elliott and/or Arconic, as alleged in the Complaint, constituted a violation of the

---

[23] *See Kan. Hous. Res. Corp.*, 2006 WL 208690, at *2.

[24] *See Mirrow v. Barreto*, 80 F. App'x 616, 618 (10th Cir. 2003) (concluding that contractual language expressly stating that duty to perform was "conditioned upon" a specific event unambiguously created a condition precedent and not a promise); *Cf. Matter of Estate of Koch*, 18 Kan. App. 2d 188, 849 P.2d 977, 989 (1993) (noting that the right of testator's son to inherit under the testator's will was "*conditioned upon*" that son dismissing litigation pending at the time of her death and "is clearly a condition precedent to inheritance") (emphasis added).

[25] *See Kan. Hous. Res. Corp.*, 2006 WL 208690, at *2.

[26] *Id.* (citing *Sternberg*, 299 F.3d at 1207). This conclusion is further supported by Paragraph 14 of the Retirement Agreement, which provides that if Lawson "is in breach of or breaches [Paragraph 7] of this Agreement"—the provision extending Lawson's non-compete obligations for two years—Lawson "shall be obligated to tender back to [Spirit] . . . all payments made to him" under Paragraph 2. The parties clearly intended that Lawson was not to receive any compensation under Paragraph 2 unless he honored his non-compete clause for the entire two-year period.

non-compete clause. The Court must interpret the language of the non-compete clause to resolve this issue. The non-compete clause provides:

> [N]either [Lawson] nor any [Person] with your assistance nor any Person in which you directly or indirectly have any interest of any kind (without limitation) will, anywhere in the world, directly or indirectly own, manage, operate, control, be employed by, serve as an officer or director of, solicit sales for, invest in, participate in, advise, consult with, or be connected with the ownership, management, operation, or control of any business that is engaged, in whole or in part, in the Business, or any business that is competitive with the Business or any portion thereof, except for our exclusive benefit.

a. The "Business"

The parties' dispute centers on how the "Business" should be interpreted. The "Business," as referenced by the non-compete clause, is defined by Spirit on the first page of the Employment Agreement. The provision reads:

> We are engaged in the manufacture, fabrication, maintenance, repair, overhaul, and modification of aerostructures and aircraft components, and market and sell our products and services to customers throughout the world (together with any other businesses in which Spirit may in the future engage, by acquisition or otherwise, the "*Business*").

Spirit asserts that the non-compete clause should be interpreted broadly, because the "Business" encompasses every manufacturer of aircraft components, which includes Arconic. But Lawson counters that the "Business," as it is defined, is limited to manufacturers of those parts of the aircraft Spirit makes—such as wings, fuselages, nacelles, struts, wing assemblies, and flight control systems. Because Arconic does not manufacture these types of aircraft components, Lawson argues that Arconic is not in the "Business."

In defining the "Business," instead of using a generic definition that would apply to the aircraft industry as a whole, Spirit references itself in the first person to refer to its actual business. The definition begins: "*we* are engaged in the manufacture . . . of aerostructures and aircraft

components . . . ." The subject of the sentence, "we," is a first-person pronoun unambiguously referring to Spirit. The first subject-verb pair, then, is "we *are engaged in*," meaning "we involve ourselves in," or "we take part in."[27] The direct objects, or noun phrases in a sentence that directly receive the action of the verb, are "aerostructures and aircraft components." The use of "we" necessarily limits or restricts the definition of "aerostructures" and "aircraft components" because Spirit does not "involve itself" with all types of aerostructures and aircraft components. Nor does Spirit "take part in" the "manufacture, fabrication, maintenance," etc. of all types of aerostructures and aircraft components. This deliberate language shows that the parties did not intend for the "Business" to encompass every business that manufactures any type of aircraft components, but instead intended for the "Business" to encompass only those businesses that manufacture the same types of aircraft components that Spirit does.

Moreover, "in construing a written instrument, language used anywhere in the instrument should be considered and construed in harmony with all provisions and not in isolation."[28] The clause begins by explaining Spirit's current business, but includes a parenthetical at the end "(together with any other businesses in which Spirit may in the future engage, by acquisition or otherwise . . . )." If the parties intended for "aerostructures" and "aircraft components" to refer to aerostructures and aircraft components generally, without reference to Spirit's actual business, then the parenthetical would be unnecessary. By including the parenthetical, Spirit is tacitly admitting that the terms "aerostructures" and "aircraft components" mean those specific types that

---

[27] The word "engaged" is a verb; it means [t]o employ or involve oneself; to take part in; to embark on." *Engage*, Black's Law Dictionary (8th ed. 2004).

[28] *Wood River Pipeline*, 738 P.2d at 871 (citing *Kennedy v. Classic Designs, Inc.*, 239 Kan. 540, 722 P.2d 504 (1986)).

Spirit actually "takes part in" manufacturing, maintaining, repairing, etc.—but acknowledging that it may expand its operation in the future. Thus, adopting Spirit's interpretation would render the parenthetical superfluous. It would simply be without any meaning or effect, because a broad interpretation of "aerostructures" and "aircraft components" would sufficiently encompass every business in the aerospace industry. "This violates the rule set out in the Restatement (Second) of Contracts § 203(a) . . . that an interpretation giving reasonable, effective meaning to all terms is preferred to one that leaves some terms with no effect."[29] Thus, "aerostructures" and "aircraft components" must refer to those that Spirit actually manufactures, maintains, repairs, etc.

Even so, Spirit argues that the "Business" is not limited to only Spirit's current business, but includes "any other businesses in which Spirit *may in the future* engage." Spirit is essentially arguing that, at the point of contracting, the "Business" was defined to encompass the entire aerospace industry. The Court disagrees. Spirit's argument requires the parenthetical to be read in isolation. But the provisions must be construed in harmony. Here, the "Business" is defined in two parts: (1) the main text describes Spirit's actual business at the time of contracting; (2) the parenthetical includes businesses Spirit may engage in the future. The clause clearly states that the main text, "together with" the parenthetical is the "Business." But under Spirit's interpretation, the main text is without effect, because the parenthetical is sufficient to encompass the entire aerospace industry.

To construe these provisions in harmony, the parenthetical cannot be interpreted to mean "any other businesses in which Spirit could possibly engage." It must be interpreted on an ongoing

---

[29] *Dillard Dep't Stores, Inc. v. State, Dep't of Human Res.*, 28 Kan. App. 2d 229, 13 P.3d 358, 364 (2000) (citing *Mastrobuono v. Shearson Lehman Hutton, Inc.*, 514 U.S. 52, 63 (1995)).

basis; when Spirit does engage in a new business, then it becomes part of the "Business." Rather than providing a static definition, the parties clearly intended for "the Business" to have a definition capable of evolving over time. For purposes of the non-compete clause, this would allow a former employee to make an informed decision about whether he was prohibited from engaging with another entity.

Accordingly, the plain language of the Employment Agreement must be read to mean that "the Business" refers to the *specific* products and services provided, marketed, or sold by Spirit at the time of contracting, as well as the products and services Spirit later chooses to provide, market, or sell, if and when Spirit chooses to do so.

          b.        Applying the contract to the facts alleged in the Complaint

With the "Business" defined, the Court can now determine whether the facts alleged in the Complaint establish a violation of the non-compete clause. The non-compete provision only applies to businesses that are "engaged, in whole or in part, in the Business," or businesses that are "competitive with the Business or any portion thereof."

The facts alleged in the Complaint, however, do not establish that either Elliott or Arconic are engaged in the "Business," or that the companies are competitive with the "Business." As explained in the Complaint, Spirit is the largest independent tier one manufacturer of aerostructures and aircraft components. Spirit builds (1) Fuselage Systems, which includes forward, mid and rear fuselage sections; (2) Propulsion Systems, which includes nacelles, struts/pylons and engine structural components; and (3) Wing Systems, which includes wing components, flight control surfaces and other miscellaneous structural parts.

Arconic, on the other hand, is a "tier three or tier four supplier of lightweight metal fasteners and metal cast parts." It has positioned itself as a manufacturer of lightweight engineered

metal components for sale to tier two and tier one buyers in the aerospace industry. Arconic creates some small components that end up in airplanes—like small fasteners, connectors, bolts, engine components, fan blades, and other lightweight alloy materials. The products that Arconic manufactures are used by tier one suppliers like Spirit to manufacture tier one products.

The Complaint alleges that Arconic does not and never has manufactured large aerostructures and is in fact a supplier to, rather than a competitor of, Spirit. At no time did Arconic manufacture aircraft fuselages, wings, engine nacelles or other complex aerostructures. Thus, the "aircraft components" that Arconic manufactures are separate and distinct from the "aerosystems" and "aircraft components" that Spirit manufactures.

The Complaint also alleges that Arconic is not a competitor of Spirit. Neither company lists the other as a competitor in its respective SEC filings. Indeed, among the companies Spirit lists as its competitors in SEC filings, none of these companies discusses Arconic as a competitor. Similarly, among the companies Arconic lists as its competitors, none discusses Spirit as a competitor. Additionally, Elliott is an investment firm; there are no facts that would suggest that Elliott is a competitor of Spirit.

Based off the facts alleged in the Complaint, Arconic and Elliott are not engaged in the "Business," and they are not competitive with the "Business." Accordingly, the Complaint does not establish that Lawson violated the non-compete clause, thereby relieving Spirit of its duty to issue the remaining payments to Lawson. Thus, Lawson's claim for breach of contract will not be dismissed at this stage.

**B.     Declaratory Judgment**

Second, Spirit moves to dismiss Lawson's claim for declaratory judgment. Spirit argues that, based off the facts alleged in the Complaint, Lawson failed to comply with the non-compete

condition precedent, and Spirit then ceased payments. Accordingly, Spirit argues, there is no reason for the Court to address further any of Lawson's arguments that the non-compete is "overly broad," and Lawson's declaratory judgment claim should be dismissed as moot and/or not ripe. This argument is premised on the Court concluding that Lawson did not comply with his non-compete obligations. Of course, the Court did not reach that conclusion based off the facts alleged in the Complaint.

However, the Court still agrees that the declaratory judgment claim should be dismissed as moot. Lawson brought the declaratory judgment claim seeking a declaration that, as applied by Spirit, the non-competition obligations in the Employment Agreement are overbroad, invalid, and violate public policy. According to Lawson, Spirit's interpretation was incorrect and overly broad, and would unreasonably interfere with his future business opportunities. But the Retirement Agreement extended Lawson's non-compete obligations for two years, until July 31, 2018—which has since passed.

Under the general rule of mootness, Lawson's claim to declaratory judgment on the non-compete clause is moot since that provision expired under the terms of the Retirement Agreement.[30] The question is no longer live because even a favorable decision would not afford Lawson any relief. Accordingly, Lawson's claim for declaratory judgment is dismissed as moot.

---

[30] *See Hodges v. Schlinkert Sports Assocs., Inc.*, 89 F.3d 310, 312 (6th Cir. 1996) (holding that defendants' claim to enforcement of the non-compete clause was moot since the provision expired; the question was no longer live because even a favorable decision would not entitle defendants to plaintiff's noncompetition ); *Utah Animal Rights Coal. v. Salt Lake City Corp.*, 371 F.3d 1248, 1256 (10th Cir. 2004) (concluding that declaratory judgment claim was mooted because plaintiff's requested declaration involved past conduct not likely to reoccur).

## IV. Conclusion

In moving to dismiss Lawson's breach of contract claim, Spirit argued that the facts alleged in the Complaint conclusively established that Lawson violated his non-compete obligations, thereby relieving Spirit from its obligation to continue issuing payments to Lawson. But the Complaint does not establish that Lawson violated the non-compete. Accordingly, Lawson's breach of contract claim may proceed on the theory that Spirit breached the Retirement Agreement when it stopped issuing Lawson's scheduled payments.

Count II, however, sought declaratory judgment on a contract provision Lawson alleged was interfering with his business opportunities. That contract provision has since expired, so the claim is now moot. Accordingly, Count II is dismissed.

**IT IS THEREFORE ORDERED** that Defendant's Motion to Dismiss for Failure to State a Claim (Doc. 17) is **GRANTED IN PART AND DENIED IN PART**.

The motion is denied with respect to Count I (breach of contract claim). The motion is granted with respect to Count II (declaratory judgment claim). Count II is the only claim that is dismissed.

**IT IS SO ORDERED.**

Dated this 20th day of August, 2018.

*/s/ Eric F. Melgren*
ERIC F. MELGREN
UNITED STATES DISTRICT JUDGE