## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

**LARRY A. LAWSON,**

        **Plaintiff,**

**v.**

**SPIRIT AEROSYSTEMS, INC.,**

        **Defendant.**

Case No. 6:18-cv-01100-EFM-KGS

## DEFENDANT'S RESPONSE IN OPPOSITION
## TO PLAINTIFF'S MOTION TO COMPEL

Defendant Spirit AeroSystems, Inc. ("Defendant" or "Spirit") hereby submits this Response in Opposition to Plaintiff's Motion to Compel (Doc. 56) and the Memorandum of Law in Support of Larry A. Lawson's Motion to Compel (Doc. 57) filed by Plaintiff Larry A. Lawson ("Plaintiff" or "Lawson"). In his Motion and Memorandum, Lawson misstates the facts, law, and relevancy of the discovery sought, and ignores the proportionality requirement set forth in Rule 26. As explained below, Lawson's Motion and Memorandum lack merit and should be denied.

I. **<u>Preliminary Statement</u>**

Through his Motion and Memorandum, Lawson seeks to distort the discovery rules so they serve as an open-ended license to discover nearly every detail and communication about Spirit's day-to-day operations. Indeed, Lawson has propounded two expansive sets of discovery requests that are nothing short of a fishing expedition.[1] Lawson seeks every document and communication held by nearly seventy custodians (including every member of Spirit's board of directors and executive team) concerning every product that Spirit fabricates or sells and every business relationship Spirit has, and is demanding that Spirit search through millions of files for words like "fuselage" or "paint" – searches akin to asking Nike to search for the word "shoe."

The overbreadth of what Lawson seeks is not obvious from reading his Memorandum. Lawson steadfastly avoids quoting the requests themselves or the search terms – ninety of them – that he has demanded Spirit deploy. For example, Lawson requests that Spirit produce "all documents related to any actual, proposed, or contemplated business transaction submitted by Spirit to regulatory agencies," "all agreements to supply products or serves to *any entity*," and "all Documents and Communications relating to products or services" provided to *any entity* that

---

[1] *See* <u>Exs. A and B</u> to the Declaration of Ann Marie Arcadi ("Arcadi Decl."), filed concurrently herewith.

Spirit does business with.[2] Even more overreaching, he also seeks "all documents and communications relating to sales, purchases, and manufacturing since January 1, 2013 for any aerospace parts, structures, and components." Lawson, in other words, would like Spirit to produce virtually every document in the company.

This is unwarranted and improper. In 2015, the Federal Rules of Civil Procedures were amended to require that discovery not only be relevant, but also proportional to the needs of the case. Yet Lawson ignores the proportionality standard and cites just one case after its adoption – and with good reason. Courts uniformly find "every document in the business" requests like those made by Lawson here to be improper and disproportionate. Spirit has revenues in excess of $7 billion and employs thousands of employees around the world. Producing every document and communication about Spirit's products would literally take more than a year and cost Spirit millions of dollars. In the context of any case, this would be disproportionate; in the context of a case involving the Retirement Agreement of Spirit's former CEO, it is abusive.

Moreover, much of what Lawson seeks is irrelevant. The parameters of discovery regarding Spirit's "Business" for purposes of this dispute are the "specific products and services provided, marketed or sold by Spirit at the time of contracting, as well as the products Spirit later chooses to provide, market, or sell, if and when Spirit chooses to do so." Order, Doc. 25, at 16. Every single document about unrelated aspects of Spirit's business are neither relevant nor proportional to the needs of this dispute.

Lawson is using discovery for the sake of creating obvious burden. On January 9, 2019, Spirit served its objections and responses to Lawson's document requests. Over the next few weeks, the parties engaged in several meet and confers about Lawson's facially overbroad demands. All the while, Spirit produced documents – more than 21,000 pages to date – directly

---

[2] Arcadi Decl., Ex. A, RFP Nos. 33, 22, 23 (emphasis added).

relevant and responsive to Lawson's requests and the issues in dispute here. On February 25, Spirit provided a detailed written statement of its still unresolved objections and proposed once again that the parties narrow the search terms and custodians to focus discovery to relevant topics that are proportional to that which is at stake here. But Plaintiff would not budge.

Rather than seek every communication and document about every product that Spirit makes and every agreement Spirit has with its customers (to name just a few categories), and demanding Spirit search from the electronic files of some seventy custodians using ninety generic search terms, Lawson could have narrowed his proposals. Instead, Lawson moves this Court to compel Spirit to produce all documents and communications relating to multiple overly broad and irrelevant document requests, as well as produce documents and communications resulting from running the exact same search terms across the electronic files of the exact same custodians Lawson proposed to Spirit for the first time on January 28. Indeed, Lawson has refused to compromise on virtually anything.

## II.   <u>Factual Background</u>

Lawson was the CEO of Spirit from April 2013 to July 2016, when he retired from the company. In connection with his retirement, Lawson and Spirit, both represented by counsel, negotiated and entered into a Retirement Agreement. Pursuant to the Retirement Agreement, Spirit agreed to pay Lawson $4.7 million in cash and to grant him certain stock interests over time, provided that Lawson continued to abide by the restrictions in his Employment Agreement for two additional years. Doc. 1, Ex. A. In January 2017, a representative of Elliott Associates, L.P. and Elliott International, L. P. (together, "Elliott"), an investment management firm, requested Spirit's consent to Lawson becoming affiliated with Elliott and one of Elliott's

portfolio companies, Arconic, Inc. ("Arconic"). Given that Arconic is also a manufacturer of aircraft components, Spirit declined to give its consent.

Spirit later learned that—during the term of Lawson's non-compete and consulting agreement with Spirit—Lawson signed a consulting agreement (the "Consulting Agreement") with Elliott regarding a proxy contest involving Arconic, in which Elliott sought to obtain additional board seats and replace Arconic's then CEO. Doc. 1, Ex. B. Spirit also learned that Elliott's ultimate plan was to cause Lawson to become the new CEO of Arconic. During the numerous communications between Spirit and Elliott, Spirit repeatedly asked Elliott to provide information regarding the Consulting Agreement and Lawson's relationship with Elliott; however, Elliott refused to provide any specific details. Recognizing that accepting this engagement could result in his losing his ability to receive payments under the Retirement Agreement, Lawson also secured from Elliott an agreement to indemnify him against the loss of these benefits.[3] Arconic itself acknowledged that Lawson was legally restricted from taking the job as Arocnic's CEO, and was being paid $28 million by Elliott in order to breach his agreement with Spirit.[4]

In early February 2017, Spirit advised Lawson that he failed to comply with his restrictive covenant and that payments under the Retirement Agreement would cease as a result. Nonetheless, Lawson continued to proceed with his relationship with Elliott and with Elliott's plan for him to become the new CEO of Arconic. That plan ultimately failed, and Lawson subsequently filed this lawsuit.

---

[3] In connection with the negotiation of the Agreed Protective Order, counsel for Lawson requested that Lawson's unnamed "indemnitee" be added as an entity that had permission to review documents produced in this matter designated as "Confidential" or "Attorneys' Eyes' Only." Only when asked who that "indemnitee" was, did counsel for Lawson admit that Lawson was being indemnified by Elliott. Counsel for Lawson produced the Indemnification Agreement nearly two years after it was requested. Elliott is a party to the Agreed Protective Order in this matter, and is represented in this matter by the same counsel as Lawson. Doc. 41. *See* Arcadi Decl. ¶ 6 and Exs. D and E.
[4] *See* Arcadi Decl., Exs. D and E.

At its core, this lawsuit is about whether Lawson violated the conditions precedent to receiving certain payments under the Retirement Agreement by consulting with Elliott about Elliott's investment in Arconic and by agreeing to serve as the CEO of Arconic. In making that determination, the Court must decide (1) whether Arconic is in the "Business" or "any business that is competitive with the Business or any portion thereof" and (2) whether Lawson complied with his obligations under the Retirement Agreement. Doc. 1, Ex. 3 p. 7.

### III.   Discovery Dispute

On October 29, 2018, Spirit and Lawson conducted a Rule 26(f) conference. At that conference, counsel for Lawson provided counsel for Spirit with preliminary search terms, for discussion purposes only, and specifically told counsel for Spirit not to proceed with any actions based on those terms.[5] Of course, no action would have been appropriate, as no discovery requests had been served, and no scheduling order was in place.

On November 30, 2018, Lawson served his First Set of Requests for Production on Spirit. Despite the fact that Lawson's RFPs are unquestionably overbroad and seek largely irrelevant information, Spirit began collecting documents responsive to the RFPs and/or relevant to this dispute for review and production in December 2018. Spirit has collected (and reviewed, or is in the processing of reviewing) documents from twenty-nine individuals, providing many specific details about the products and services that it offers. Moreover, Spirit has produced and/or agreed to produce spreadsheets which set forth: (a) all parts built in-house by Spirit's fabrication division from 2014-2018; (b) all capital expenditures made in Spirit's fabrication division from 2014-2018; (c) all parts purchased from Arconic from 2014-2018; and (d) all parts manufactured by Spirit from 2014-2018. To date, Spirit has made eight document productions, totaling over 21,000 pages.

---

[5] Arcadi Decl. ¶ 7.

Lawson's requests for production seek virtually every document in Spirit's possession or control, such as "any and all agreements to supply products or services to any entity" as well as all related documents and communications about such products and services, "all Documents related to any actual, proposed, or contemplated business transaction submitted by Spirit to regulatory agencies," and "all Documents and Communications relating to sales, purchases, and manufacturing since January 1, 2013 for **_any_** aerospace parts, structures, and components."[6] None of the requests included any limiters to exclude information unrelated to the dispute, and Lawson was unwilling to negotiate the same.

For example, RFP No. 4 would require Spirit to produce all communications about Lawson's contractual obligations to provide consulting services to Spirit and return company property upon his retirement, even though neither consulting services nor the return of property has anything to do with the parties' dispute.[7] Likewise, RFP No. 37 would have Spirit comb through its files for every single document and communication related to the certification of every single product that Spirit has manufactured over a five-year period. RFP No. 39 (which, perhaps Lawson has given up on, since it is not discussed in his Motion or Memorandum) seeks the "educational and professional qualifications and employment history of Spirit's officers, directors, and anyone employed by Spirit having the ability to direct, influence, or make decisions about Spirit's manufacture, sales, or purchase" of countless items -- stating the obvious, the resumes of dozens of Spirit's officers, directors, and employees has no relevance to this dispute whatsoever.

---

[6] Arcadi Decl., Ex. A at RFP Nos. 22-23, 33, 34 (emphasis added).
[7] Doc. 1, Ex. A, §§ 2(a), 10(d).

On January 9, 2019, Spirit served written objections and responses to Lawson's requests for production.[8] Notwithstanding Lawson's sweeping requests, Spirit agreed to produce all documents responsive to sixteen requests[9] and documents sufficient to show the information requested in eleven additional requests (subject to, for three requests, compliance with Spirit's confidentiality obligations to third parties).[10] Spirit also directed Lawson to publicly available information responsive to two requests.[11]

Spirit declined, however, to produce documents responsive to Lawson's burdensome requests for "any and all documents" pertaining to Spirit's agreements "to supply products or services to any entity,"[12] "all documents" pertaining to "any actual, proposed, or contemplated business transaction submitted by Spirit to regulatory agencies," including any planned transaction involving Asco,[13] "all Documents and Communications relating to sales, purchases and manufacturing since January 1, 2013 for any aerospace parts, structures, and components,"[14] and "all Documents and Communications" relating to Arconic.[15] At no time during the meet and confer process did Lawson narrow any of these requests, which is of course evident by the discovery he seeks to compel through his Motion and Memorandum. On February 1, 2019, Spirit served its Amended Objections and Responses to Plaintiff's First Request for Production of Documents.[16]

---

[8] Doc. 58, Declaration of Jonathan Waisnor ("Waisnor Decl."), Ex. E.
[9] *See id* at RFP Nos. 1-5, 8-17, 24, 30.
[10] *Id.* at RFP Nos. 19, 25-26, 34-37.
[11] *Id.* at RFP Nos. 7, 20.
[12] *Id.* at RFP Nos. 21-23.
[13] *Id.* at RFP Nos. 31-33.
[14] *Id.* at RFP Nos. 34-38.
[15] *Id.* at RFP Nos. 19, 25-30.
[16] *See* Doc. 58, Waisnor Decl., Ex. I.

On January 28, 2018, Lawson provided his first set of proposed search terms and first list of proposed custodians.[17] Lawson's proposed list contains 69 custodians and 90 search terms. Conferring with Lawson's counsel on these proposed lists has been an exercise in futility. For example, Lawson originally insisted that Spirit search for potentially responsive documents from 69 custodians _and_ their administrative assistants.[18] Spirit explained to Lawson's counsel that it is not the practice of Spirit's employees to forward or share their electronically stored information (including but not limited to e-mails) with their administrative assistants, and after speaking to various personnel about this issue, Spirit had no reason to believe that any administrative assistant at Spirit would have information that is responsive to the RFPs or relevant to this dispute that would not be contained in the information maintained by the custodians themselves. Only when Lawson filed his Motion and Memorandum did Spirit become aware that Lawson had dropped his overreaching claim that the 69 administrative assistants were appropriate custodians for this lawsuit. Spirit also informed Lawson that Spirit did not believe that Lawson's proposed 69 custodians are likely to have relevant information, and in any event are not proportional to the needs of this case. Spirit proposed 8 custodians who Spirit knows maintain information relevant to this dispute.[19] Lawson did not move from his position, however, and now asks this Court to compel Spirit to search the files of the same 69 custodians using the same 90 search terms Lawson first proposed on January 28.

Spirit retained Legility, Inc. ("Legility"), a litigation support firm, to assist with electronic discovery in this matter.[20] Legility suggested that, consistent with industry practices, a sampling exercise should be conducted to determine whether applying Lawson's proposed

---

[17] Arcadi Decl., Ex. G.
[18] Arcadi Decl., Ex. H, January 28, 2019 e-mail from Jonathan Waisnor.
[19] Arcadi Decl. Ex. I, February 4, 2019 e-mail from Seema Tendolkar.
[20] Declaration of Jeff Stoneking ("Stoneking Decl."), filed concurrently herewith, at ¶ 5.

search terms to a sample of four custodians would result in documents that were relevant to the subject matter of the dispute, responsive to Lawson's Requests for Production, and proportional to the needs of the lawsuit.[21] Spirit selected four custodians, each of whom has a very different role at the company, on which to run a sampling exercise using Lawson's proposed search terms. Legility processed and hosted the entire electronic mail file for the four custodians, and ran Lawson's proposed search terms against those files, which resulted in 320,784 document hits, and 409,784 document hits including "families."[22] Of the 320,784 documents, Legility's processing tool generated a random sample of nearly 400 documents for review.[23] Each of these documents was reviewed, and it was determined that 85% were not responsive to Lawson's Requests for Production or otherwise relevant to the dispute.[24] Of the 15% that were technically responsive to one or more of Lawson's RFPs, many documents were still irrelevant to the claims and defense asserted in this dispute.[25] Collecting, processing, hosting, searching, and reviewing the documents for this sampling exercise took approximately two weeks and cost approximately $30,000.[26]

Based on the average number of documents that Legility currently has from other Spirit custodians, utilizing Lawson's First List of Custodian and First List of Search Terms would require Spirit to collect, process, host, and search 4,866 GB or 21,034,305 documents, and review for potential production over 7 million electronic documents, at least 85% of which are likely to be irrelevant to the subject matter of the dispute and not responsive to Lawson's discovery requests.[27] The costs to collect, process, host, analyze, and search 4,866 GB or

---

[21] Stoneking Decl. at ¶ 7.
[22] *Id.* at ¶ 12 and Ex. A.
[23] *Id.* at ¶ 13.
[24] *Id.*
[25] *Id.* at ¶ 14.
[26] *Id*. at ¶ 16.
[27] *Id*. at ¶ 18.

21,034,305 documents files, and review over 7 million documents is estimated to be over $11 million.[28] Legility expects this process will take approximately 77 weeks, using a team of 60 attorneys to review the documents.[29] This is simply disproportional to the needs of this case involving one executive's Retirement Agreement, where 85% of these documents are likely to be neither responsive to Lawson's requests for production nor relevant to the subject matter of this dispute, and a portion of the remaining 15% may be technically responsive to an RFP but irrelevant to the subject matter of this lawsuit.

Lawson's discovery requests and proposed search parameters are not only unworkable, but also include documents that are irrelevant, unnecessary, and clearly not proportional to the needs of the case. In fact, the issues of what constitutes Spirit's "Business" as well as whether Arconic is in the "Business" or "any business that is competitive with the Business or any portion thereof" can be determined through far less burdensome means, including through the documents that Spirit has already produced, those it continues to produce, as well as via depositions and a review of publicly available materials such as the SEC filings and websites of Spirit and Arconic. There is simply no reason for Spirit to be put through the incredibly expensive and time-consuming tasks of producing the millions of documents that fall within the scope of Lawson's RFPs and proposed search parameters.

## IV.    <u>Legal Standard</u>

More than three years ago, FRCP 26 was amended to limit discovery to any:

> non-privileged matter that is relevant to any party's claim or defense and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit.

---

[28] *Id.* at ¶ 19.
[29] *Id.*

Fed. R. Civ. P. § 26(b)(1).[30] "Discovery of ESI – especially in cases where the parties anticipate a large amount of ESI to be searched, reviewed and produced – makes proportionality considerations particularly significant."[31]

The proportionality requirement "is intended to encourage judges to be more aggressive in identifying and discouraging discovery overuse,"[32] and "impose [a] careful and realistic assessment of actual need" for requested information."[33] Notwithstanding that proportionality has been an express part of the Rule 26 analysis since 2015, Lawson does not even attempt in his Memorandum to demonstrate how the disputed RFPs, search terms, and custodians are proportional to the needs of this case. Instead, he relies entirely on the pre-2015 standard, which was supplanted with the 2015 amendment.

The proportionality inquiry requires the Court to balance "the degree to which the proposed [discovery] will aid in the search for truth against the burden . . . created by it."[34] When a request is not proportional to the needs of the case, courts will deny discovery, even if the documents are deemed relevant.[35]

---

[30] *Guidelines for Cases Involving Electronically Stored Information*, at 1, D. Ka. (Dec 1, 2015) ("[P]roportionality [is] now an express component of the scope of discoverable evidence."); *Pipeline Prods., Inc. v. Madison Companies, LLC*, No. 15-4890-KHV, 2018 WL 3055869, at *2 (D. Kan. June 20, 2018) ("Considerations of both relevance and proportionality now govern the scope of discovery.").

[31] *In re Epipen Mktg., Sales Practices & Antitrust Lit.*, MDL No. 2785, Case No. 17-md-2785-DDC-TJJ, 2018 WL 1440923, *1 (D. Kan. Mar. 15, 2018).

[32] *See* Advisory Committee Note to 2015 Amendment of Fed. R. Civ. P. § 26(b)(1).

[33] *Swasey v. W. Valley City*, 2:13-CV-769 DN, 2016 WL 6947021, at *1 (D. Utah Sept. 6, 2016) (quoting Chief Justice Roberts).

[34] *Nat'l R.R. Passenger Corp. v. Cimarron Crossing Feeders, LLC*, No. 16-CV-1094-JTM-TJJ, 2017 WL 4770702, at *4 (D. Kan. Oct. 19, 2017) (internal citation omitted).

[35] *See, e.g., In re Epipen Mktg., Sales Practices & Antitrust Lit.,* MDL No. 2785, Case No. 17-md-2785-DDC-TJJ, 2018 WL 3818914, *5 (D. Kan. Aug. 10, 2018) (declining to compel production of relevant documents because request for production was not proportional); *Nat'l R.R. Passenger Corp. v. Cimarron Crossing Feeders, LLC*, No. 16-CV-1094-JTM-TJJ, 2017 WL 4770702, at *5-6 (D. Kan. Oct. 19, 2017) (same); *hibu Inc. v. Peck*, No. 16-CV-1055-JTM-TJJ, 2017 WL 2472548, at *3 (D. Kan. June 8, 2017) (same); *Panel Specialists, Inc. v. Tenawa Haven Processing, LLC*, No. 16-4140-SAC, 2017 WL 3503354, at *3 (D. Kan. Aug. 16, 2017) (same); *Gilmore v. L.D. Drilling, Inc.*, No. 16-CV-2416-JAR-TJJ, 2017 WL 2439552, at *4 (D. Kan. June 6, 2017) (same).

V.    **Lawson's Seeks Discovery That is Irrelevant and Not Proportional to the Needs of this Case**

Lawson asks this Court to compel Spirit to produce four categories of documents sought through eighteen requests: (1) all documents and communications relating to Spirit's contracts and business with Boeing and Airbus; (2) all documents and communications relating to Spirit's actual and potential mergers and acquisitions; (3) all documents and communications relating to Spirit's manufacture and sale of products identified in Spirit's Answer to Lawson's Complaint; and (4) all documents and communications relating to Spirit's relationship with Arconic. Lawson also asks this Court to compel Spirit to run over 90 search terms across the electronic files of 69 custodians. As explained below, Lawson's wish list will result in discovery that is not relevant to the claims and defenses in this matter and not proportional to the needs of this case.[36]

A.    **Spirit's Agreements with Boeing, Airbus, and all other Customers, along with All Documents and Communications Related Thereto, are Neither Relevant to this Dispute Nor Proportional to the Needs of this Case**

Lawson's Memorandum states that he merely requests "contracts with Boeing and Airbus" and unspecified "documents relating to the products and components it manufactures for those entities."[37] But through Requests 20-23, Lawson asks Spirit to produce all agreements with Boeing, Airbus, and any other entity with which Spirit does business, as well all documents and communications relating thereto:

> **REQUEST FOR PRODUCTION NO. 20:** Any and all agreements between Boeing and Spirit, including the Special Business Provisions Agreement, General Terms Agreement, and any amendments, addenda, exhibits, schedules, data compilations, or lists related to those agreements.

---

[36] The Requests identified in this Response in Opposition correspond to the broad categories of documents that Lawson asks this Court to compel through his Motion and Memorandum. Because the Motion and Memorandum largely fail to identify the specific requests at issue, Spirit has attempted to identify for this Court the requests that correspond with the items Lawson seeks to compel in his Motion and Memorandum.

[37] Doc. 57 at 1; *see also id.* at 8 (saying Lawson seeks "documents related to Spirit's contracts with its two largest customers"); *id.* at 11 (same).

**REQUEST FOR PRODUCTION NO. 21:** Any and all agreements between Airbus and Spirit, and any amendments, addenda, exhibits, schedules, data compilations, or lists related to those agreements.

**REQUEST FOR PRODUCTION NO. 22:** Any and all agreements to supply products or services to any entity, and any amendments, addenda, exhibits, schedules, data compilations, or lists related to those agreements.

**REQUEST FOR PRODUCTION NO. 23:** All Documents and Communications relating to products or services to be provided in connection with any of the agreements responsive to Document Requests 20 through 22.[38]

These requests do not merely seek contracts and some related documents. They ask for every single document and communication "relating to products or services to be provided in connection with any of the agreements." The requests call for design documents, engineering and manufacturing documents, maintenance requests, financial information, marketing materials, project correspondence, regulatory filings, e-mails between engineers, suppliers, and customers, sales forecasts, contract drafts, meeting minutes, inventory lists – literally everything in Spirit's possession that relates to these arrangements and the products and services provided through these arrangements.

As Spirit made clear to Lawson in its written responses to these requests and during the meet and confer process, these requests are overly broad, unduly burdensome, not relevant to the claims and defenses in this matter, and not proportional to the needs of the case. Additionally, and importantly, some of these documents also contain confidentiality obligations with third parties, and therefore cannot be produced regardless of the existence of a protective order in this matter.

---

[38] Arcadi Decl., Ex A.

It is undisputed that Boeing and Airbus are Spirit's customers.[39] It is also undisputed that Boeing and Airbus are Arconic's customers.[40] The specific terms of the relationships between Spirit and Boeing and Airbus (as well as any other entity to which Spirit provides products or services) are not relevant to this dispute and are, by their terms, confidential between the various parties. And the efforts necessary to identify and produce the documents within the scope of Lawson's requests are not proportional to the needs of this case. The issues identified by the Court as relevant can be litigated through the production of documents and information in a much less expensive and more reasonable manner than reflected in Lawson's requests.

This Court has already ruled that for purposes of this dispute, the term "Business" means the "specific products and services provided, marketed or sold by Spirit at the time of contracting, as well as the products Spirit later chooses to provide, market, or sell, if and when Spirit chooses to do so" and the Court need only determine what the "Business" of Spirit is, and whether Arconic is in the "Business" or "any business that is competitive with the Business or any portion thereof." Doc. 25 at 16; Doc. 1, Ex. 3 at 7.

Nowhere in the Court's Order or the Retirement Agreement does it indicate that any and all documents related to the quantity, pricing, customers, contractual terms, or any other details of Spirit's "Business" are relevant to this dispute. As stated above, Spirit has agreed to produce or has already produced a list of all parts manufactured by Spirit from 2014-2018, a list of all parts built in-house by Spirit's fabrication division from 2014-2018, and a list of all parts purchased from Arconic from 2014-2018. This, coupled with information from Arconic regarding Arconic's product and service offerings, is more than enough to show the "Business"

---

[39] *Id.*, Ex. J, p. 3.
[40] *Id.*, Ex. K, p. 3.

of Spirit and whether Arconic is in the "Business" or "any business that is competitive with the Business or any portion thereof."

Lawson argues that documents responsive to these RFPs must be produced because "Lawson expects these contracts will establish that Spirit's relationship to the OEM's is fundamentally different from Arconic's position as a Tier 3 or 4 aerospace aluminum supplier, because, among other things, OEMs do not exert the same level of influence over aerospace suppliers in other tiers, like Arconic, nor do they rely on these lower-tier suppliers to a comparable extent." Doc. 57 at 16. But even assuming these documents would answer that question, that is not an issue in this lawsuit. "Business" is not defined as an "entity with a similar relationship to Boeing and Airbus" or an "entity that an OEM exerts the same level of influence over" or an "entity that is a Tier 1 supplier" and the Court's Order does nothing to support Lawson's position.[41]

Moreover, Lawson's justification for his requests appear to be based on the demonstrably incorrect view that an aerospace manufacturer can exist in and provide products that only fall into one "Tier" of the supply chain. Entities in the aerospace industry can have business operations in more than just one Tier. And Spirit does not claim that there is a 100% overlap in the parts that Spirit manufactures with those built by Arconic. Nor does Spirit deny that Spirit and Arconic may, depending on the nature of parts being manufactured, sell to customers that are generally viewed as existing in different "Tiers" in the supply chain. But the relevant inquiry here is whether these entities are in the "Business," and no such showing is necessary to

---

[41] Lawson makes much ado about "Tiers" in the aerospace industry. "Tiers" are simply supply chain nomenclature. This nomenclature is not relevant (let alone dispositive) to any issue in this lawsuit, as it is not referenced as such in the Retirement Agreement, Employment Agreement, or Court's Order (Doc. 25), and is merely used by analysts and industry participants as descriptive terms.

establish that fact. Spirit and Arconic's "Business" is more properly viewed as concentric circles with a portion of overlap:



If there is any rationale (other than harassment) for these requests, it seems to be the misguided notion that if Lawson can show that Spirit is engaged in enough lines of business that *differ* from Arconic's, then Lawson can prove that his conduct did not violate the terms of his Retirement Agreement. But this is wrong. This Court must only determine what the "Business" of Spirit is, and whether Arconic is in the "Business" or "any business that is competitive with the Business or any portion thereof." Doc. 1, Ex. 3 p. 7; Doc. 25 at 16. The contracts and communications requested by Lawson are not needed to make this showing.

**B.** **Lawson's Requests for Every Single Document and Communication Relating to Any Regulatory Filing by Spirit in Connection with Any Actual, Proposed or Contemplated Business Transaction are Irrelevant and Grossly Disproportionate to the Needs of this Case**

Lawson next says that Spirit should be compelled to produce "antitrust filings . . . specifically relating to its acquisition of another aerospace company."[42] But this is what Lawson actually requested:

**REQUEST FOR PRODUCTION NO. 31:** All Documents and Communications relating to Spirit's planned acquisition or combination with Asco.

**REQUEST FOR PRODUCTION NO. 32:** All Documents related to Spirit's planned acquisition or combination with Asco submitted by Spirit or Asco to

---

[42] Doc. 57 at 1; *see also id.* at 8 (saying Request Nos. 31-33 seek "antitrust filings and documents related to [Spirit's] planned acquisition of Asco"); *id.* at 16 (same).

regulatory agencies, including but not limited to the United States Federal Trade Commission, United States Department of Justice, the European Commission, or agencies tasked with enforcing antitrust or competition laws in any other jurisdictions, and any Documents and Communications relating to those submissions.

**REQUEST FOR PRODUCTION NO. 33:** All Documents related to any actual, proposed, or contemplated business transaction submitted by Spirit to regulatory agencies, including but not limited to the United States Federal Trade Commission, United States Department of Justice, the European Commission, or agencies tasked with enforcing antitrust or competition laws in any other jurisdictions, and any Documents and Communications relating to those submissions.[43]

Here again, Lawson glosses over the breadth of the documents actually sought: every single regulatory filing concerning _any_ transaction at any time over five years, including every communication or document concerning such filings, _and_, separately, every single document or communication concerning the Asco acquisition. Based on his Memorandum, Lawson now seems prepared to limit theses requests to antitrust filings for one acquisition announced in May 2018. But even this should be denied.

As an initial matter, Hart Scott Rodino ("HSR") filings are highly confidential.  The HSR Act itself provides that "[a]ny information or documentary material filed . . . pursuant to this section shall be exempt from disclosure . . . and no such information or documentary material may be made public."  15 U.S.C. §18a(h).[44] Such filings are even exempt from FOIA requests.[45]

---

[43] Arcadi Decl., Ex. A.

[44] Such materials may be disclosed by the government in connection with judicial proceedings, but only in judicial proceedings to which the government is a party.  _Antitrust Division Manual_ III-30 (5th ed. 2018).

[45] _See Antitrust Division Manual_ III at 31 (5th ed. 2018). According to the Antitrust Division Manual: "HSR material is expressly exempted from disclosure under the FOIA. It may not be disclosed to state or foreign enforcement agencies or to third parties during depositions or interviews without the consent of the party producing the material. The Division has taken the position that it will not disclose HSR material to other Federal agencies (outside of the DOJ) except the FTC itself. The confidentiality constraints apply not only to HSR information contained in HSR filings, second request responses and information provided voluntarily by the merger partners during an HSR investigation, but also to the fact that an HSR filing has been made, the fact that a second request has been issued, and the date the waiting period expires." _Id._

Lawson nonetheless says he should get such highly sensitive information because Spirit's FTC filings "are directly relevant . . . [to] Spirit's own representations to the federal government as to how it defines its 'Business'." Doc. 57 at 16. This argument conflates (a) information about the products that Spirit sells with (b) information about Spirit's market share, and then bundles both under the title of Spirit's "Business." Taken to its logical conclusion, this argument would permit Lawson to discover literally *anything* in Spirit's possession or control because, in some way, it *all* relates to Spirit's "Business."

Again, this Court has already ruled that for purposes of this dispute, the term "Business" means the "specific products and services provided, marketed or sold by Spirit at the time of contracting, as well as the products Spirit later chooses to provide, market, or sell, if and when Spirit chooses to do so." Doc. 25 at 16. The Court must only determine what the "Business" of Spirit is, and whether Arconic is in the "Business" or "any business that is competitive with the Business or any portion thereof." Doc. 1, Ex. C p. 7. This information can be obtained from the detailed and comprehensive product lists and marketing materials that Spirit has or will produce, as well as publicly available information describing the goods and services that Spirit and Arconic provide.[46]

Lawson argues that these documents are relevant because "they contain Spirit's own representations to the federal government as to how it defines its "Business," who it considers its competitors to be, which markets it operates in, and where it would like to operate. In these filings, Spirit would have had to include "all studies, surveys, analyses and reports which were prepared . . . for the purpose of evaluating or analyzing the acquisition with respect to market shares, competition, competitors, markets, potential for sales growth or expansion into product or

---

[46] *See, e.g.,* Arcadi Decl, <u>Ex. C</u>.

geographic markets." Doc. 57 at 20. Again, this provides no support for Lawson's request to compel production of these documents.

Spirit has agreed to produce a list of all parts built in-house by Spirit's fabrication division from 2014-2018, a list of all parts manufactured by Spirit from 2014-2018, and has already produced over 21,000 pages of documents regarding Spirit's "Business" and other issues relevant to this dispute (and has agreed to search for and produce additional such documents).

C. **Lawson's Request for Production of Every Single Document and Communication Relating to Every Product and Service Provided by Spirit Is Completely Unreasonable and Not Proportional to the Needs of this Case**

In the next category of information sought, Lawson says that he asks for "[d]ocuments related to alleged overlaps between Spirit and Arconic, including the alleged overlaps listed in paragraph 8 [of Spirit's Answer]." Doc. 57 at 8. Here is what Lawson actually requests:

> **REQUEST FOR PRODUCTION NO. 34:** All Documents and Communications relating to sales, purchases, and manufacturing since January 1, 2013 for any aerospace parts, structures, and components, including but not limited to the following categories: (a) fuselage frames, (b) fuselage kits, (c) fuselage panels, (d) flight critical parts, (e) wing ribs, (f) wing boxes, (g) shear ties, (h) pallet assemblies, (i) spoilers, (j) access doors, (k) helicopter floors, (l) engine/turbine bases and structures, (m) window frames, (n) seat tracks, (o) pylons, and (p) bulkheads.

> **REQUEST FOR PRODUCTION NO. 35:** All Documents and Communications related to any machine fabrication and chemical processing procedures since January 1, 2013, including but not limited to the following categories: (a) 5-axis aluminum machining, (b) Diffusion bonding, (c) 5-axis laser and water-jet cutting, (d) Chemical milling, (e) Stretch form, (f) Hard and soft metal machining, (g) Chromic acid anodizing, (h) Passivation, (i) Chemical conversion, and (j) Titanium etching.

**REQUEST FOR PRODUCTION NO. 36:** All Documents and Communications related to sourcing, purchasing, sales, and utilization of any equipment since January 1, 2013, including, but not limited to, the following equipment: (a) Makino A77, (b) Makino T2, (c) High Velocity Forest Line, (d) Makino Mag3 EX, (e) Cincinnati multi-spindle high torque-hard metal gantry machines, (f) Cincinnati multi-spindle high speed gantry machines, (g) Extrusion machining (Cinetic, Chiron, Modig HHV's and FlexMills), (h) Henri Line single spindle high rail gantry machine, (i) 3-, 4-, and 5-axis 500mm, 600mm, and 800mm hard and soft metal machining center of all brands, including but limited to: Makino, Okuma, Matsuura, SNK, and Mazak, and Nomura, DeVleg or DeVlieg, (j) Toshiba precision boring equipment, (k) Norsk Additive Manufacturing, (l) Stretch Forming, (m) Joule Forming, (n) Heat treat, (o) Shot peening, (p) Hand forming, and (q) Paint.

**REQUEST FOR PRODUCTION NO. 37:** All Documents and Communications related to aerospace certifications since January 1, 2013, including but not limited to the following: (a) ISO 9001, and (b) AS9100C.

**REQUEST FOR PRODUCTION NO. 38:** For each product, part, structure, service, procedure, or component responsive to Document Request 34 through 36, Documents or Communications sufficient to show the following information for the last five years: (a) Spirit's sales to all customers, stated separately in units and dollars; (b) The portion of Spirit's sales to customers, stated separately in units and dollars, that were of products, parts, structures, or components, purchased from sources outside Spirit and resold by Spirit, rather than of products, parts, structures, or components manufactured by Spirit; (c) The names and addresses of the 100 persons or companies who purchased the greatest unit and dollar amounts of the products, parts, structures, services, or components from the company; (d) All contracts for each customer; (e) The names, addresses, estimated sales, and estimated market share of Spirit and each of Spirit's competitors for each product, part, structure, service, procedure, or component.[47]

This is the definition of abusive discovery. These requests encompass virtually every document at Spirit. Courts routinely reject such discovery gamesmanship.[48] Spirit's Answer

---

[47] Arcadi Decl., Ex. A.

[48] *See, e.g.*, *Lavigne v. Cajun Deep Foundations, LLC*, CIV.A. 12-441-BAJ, 2014 WL 811578, at *2 (M.D. La. Feb. 28, 2014) (finding requests for production to be disproportionate where they "encompass virtually every document related to every job and employee of the defendant during the tenure of the plaintiff's employment"); *Diesel Power Source v. Crazy Carl's Turbos*, 2:14-CV-826 DN, 2017 WL 57791, at *2 (D. Utah Jan. 5, 2017) (granting protective order where search terms submitted by plaintiffs were "overly generic and result in an undue burden placed on Defendants," and did not comport with the principle of proportionality).

(Doc. 29 at ¶ 8) lists some areas of overlap or potential overlap between Spirit and Arconic. Lawson has taken this portion of the Answer as carte blanche to demand "all documents and communications" relating to each area of overlap. Again, there is nothing in the Retirement Agreement or the Court's Order indicating that every single document and communication relating to Spirit's operations or the overlap between Spirit and Arconic is necessary to establish that Arconic is in the "Business" or "any business that is competitive with the Business or any portion thereof."

Moreover, to state the obvious, this would be a time-consuming, costly, and unhelpful exercise. Spirit's e-discovery consulting firm has determined that retrieving this information through Lawson's proposed custodians and search terms (which are apparently intended to *narrow* the actual requests) would take approximately 77 weeks, using a team of 60 attorneys, at a cost of over $11 million.[49] Submitted concurrently herewith as Ex. F to the Arcadi Decl. is Spirit's proposal as to which custodians' files should be search for documents that will be responsive to these requests, relevant to this dispute, and proportional to the needs of this case. Spirit asks that this Court deny Lawson's Motion regarding these Requests, based on the reasonableness of Spirit's proposed custodians and search terms regarding the same.

### D. Lawson's Requests for Every Single Document and Communication Regarding Arconic are Not Proportional to the Needs of this Case

Finally, Lawson asks Spirit to produce "[d]ocuments related to Spirit's relationship with Arconic, including Spirit's contracts with Arconic." Here are the actual requests, which stand in stark contrast to Lawson's characterization of his requests in the Memorandum:

**REQUEST FOR PRODUCTION NO. 19:** All Documents and Communications relating to whether either Elliott or Arconic engage in the "Business" referenced in section 4(c) of the Employment Agreement.

---

[49] Stoneking Decl. at ¶ 19.

**REQUEST FOR PRODUCTION NO. 25:** All Documents and Communications relating to aerospace products, parts, components, or structures manufactured or assembled by Arconic.

**REQUEST FOR PRODUCTION NO. 27:** All Documents and Communications relating to machine fabrication or chemical processing used by Arconic.

**REQUEST FOR PRODUCTION NO. 28:** All Documents and Communications relating to equipment used by Arconic.

**REQUEST FOR PRODUCTION NO. 29:** All Documents and Communications relating to certifications maintained by Arconic.

**REQUEST FOR PRODUCTION NO. 30:** All Documents and Communications relating to Arconic's past, present, or future customers, clients, or potential customer or clients.[50]

This set of requests, like the others, is far too broad. It is simply impractical for Spirit to produce every single document and piece of correspondence concerning its relationship with Arconic. However, Spirit agreed to produce a list of all parts purchased from Arconic. Spirit has also agreed to run search terms against the e-mails of Wendy Crossman, who manages Spirit's relationship with Arconic, along with the files of two other custodians (Kevin Matthies and Alan Young) who are likely to have information responsive to these requests. Submitted concurrently herewith as Ex. F to the Arcadi Declaration is Spirit's proposed list of search terms, which will capture documents sufficient to show whether Arconic is in the "Business" or "any business that is competitive with the Business or any portion thereof."

The Court has not provided Lawson with an open-ended license to obtain every single document and communication about Spirit and Arconic, and the federal rules obviously do not contemplate, or tolerate, such requests. As with Lawson's other requests, the intention here appears to be to harass Spirit and force Spirit to produce an enormous amount of documents, when just a fraction of that will suffice. Because Spirit's proposed approach is proportional to the

---

[50] Arcadi Decl., Ex. A.

needs of this case, and Lawson's approach is completely untethered from such needs, Lawson's motion to compel the production of documents responsive to RFP Nos. 19 and 25-30 should also be denied.

### E.   Lawson's Proposed Custodians and Search Terms Are Grossly Disproportional to the Needs of this Case

Lawson's demand that Spirit run 90 search queries on the documents of 69 current and former employees is entirely disproportionate to the needs of the case and intended to harass Spirit rather than identify information that bears on the issues here.

In preparing his First List of Custodians, Lawson appears to have made no effort whatsoever, much less a good faith effort, to identify and remove duplicative or tangential custodians, and the perfunctory explanation in his Memorandum provides no justification for failing to do so. For example, Lawson claims he is entitled to discovery from "senior managers" responsible for the Boeing and Airbus relationships (Doc. 57 at  21) but offers no explanation for why he needs discovery from eighteen people who work on those programs. Lawson claims the members of Spirit's sourcing, fabrication, and operations departments will have information responsive to the Lawson's requests regarding Arconic (Doc. 57 at 21-22), but does not explain why the three custodians from these departments on Spirit's proposed list (who are also on Lawson's list) are unsatisfactory.[51] And, he insists he is entitled to discovery from Spirit's Board of Directors and CEO because they will have information about "the decision to stop making payments due to Lawson . . . and Spirit's competitive position in the aerospace industry" (Doc. 57 at 23), but never tells us why he needs discovery from the entire ten-member Board and ten-member executive team. Moreover, throughout the too-little, too-late explanation for his 69-custodian list, Lawson never explains why he has included individuals who do not appear to fall

---

[51] Waisnor Decl., Ex. J (listing Kevin Matthies (Senior VP Global Fabrication), Alan Young (VP Wichita Fabrication Operations), and Wendy Crossman (Senior Director Global SCM Sourcing Management)).

into any of his proposed categories of custodians and who, at best, have only tangential (and duplicative) knowledge of the issues in dispute, including without limitation the Corporate Controller, the Chief Information Officer, the Vice President of Kinston & France Operations, and the Vice President/General Manager of the United Kingdom & Malaysia.

Lawson's proposed search terms are equally overbroad and unworkable. Lawson actually proposes that Spirit search its employees' electronically stored information for words such as "fuselage," "aerostructure," and "component," while a significant portion of Spirit's business involves manufacturing fuselages, other aerostructures, and their component parts. It is almost impossible to fathom the number of times the words "sell" or "sale" appear in documents held by Spirit's Vice President of Global Customer Sales & Support, or the word "supplier" appears in documents held by the Vice President of Global Supply Chain & Logistics. Lawson nonetheless included these words as standalone queries on his proposed search term list, and both of these individuals are on his proposed custodian list. Likewise, the e-mail signature block for employees involved in fabrication, sales, and contracts, often include the terms "fabrication," "sales," and "contracts" and thus Lawson's proposed search for these words will yield hundreds of thousands of hits that are entirely irrelevant to this dispute.

Spirit initially gave Lawson the benefit of the doubt and assumed that the overly inclusive lists were merely intended to open a conversation. Lawson's conduct since he provided the lists, however, has proven that Spirit's trust was misplaced. Spirit made a counterproposal of eight employees selected because of their different roles in the company vis-à-vis the issues in the case (Arcadi Decl., Ex. I), consistent with the well-settled theory that the producing party is "typically in the best position to know and identify those individuals within its organization likely to have

information relevant to the case."[52] Lawson responded by claiming that he was essentially entitled to discovery from every single person on Spirit's organizational charts whose job title appeared to touch, in any way whatsoever, the issues in this case, and refused to modify his 69-person list in any way.[53]

Spirit engaged in the widely accepted eDiscovery practice of sampling,[54] by testing the proposed search terms on four custodians' electronic data, and informed Lawson that the exercise had yielded 320,000 documents (excluding families) of which a mere 15% were technically responsive to his Requests for Production.[55] Lawson responded by demanding that Spirit run the sampling exercise on all 69 proposed custodians (which position Lawson apparently still thinks is reasonable). Doc. 57 at 24. Lawson's demand relating to the sampling exercise is unworkable and not proportional to the needs of the case.[56] It would require collecting, processing, hosting, searching, and reviewing documents from all 69 custodians, which is estimated to take 2-3 months and cost $250,000.[57] Moreover, as Lawson and his counsel are surely aware, it is not common industry practice to conduct such an exercise across all proposed custodians.[58] The purpose of a sampling exercise is to test the appropriateness of

---

[52] *In re Epipen*, 2018 WL 1440923, *2; *see also The Sedona Principles, Third Edition: Best Practices, Recommendations & Principles for Addressing Electronic Document Production*, 19 Sedona Conf. J. 1, 52 (2018) (producing party is best equipped "to evaluate the procedures, methodologies, and technologies appropriate for . . . producing their own electronically stored information"); *Sprint Communications Co., L.P. v. Comcast Cable Communications, LLC*, 11-2694-JWL, 2014 WL 1794552, at *5 (D. Kan. May 6, 2014) (63 custodians were disproportionate to case needs).

[53] Doc. 58, Waisnor Dec., Ex. J.

[54] Fed. R. Civ. P. § 26(b)(2) Advisory Committee Note ("[T]he parties may need some focused discovery, which may include sampling of the sources, to learn more about what burdens and costs are involved in accessing the information, what the information consists of, and how valuable it is for the litigation . . ."); *see also* Stoneking Decl. at ¶¶ 7-9, 15.

[55] Stoneking Decl. at ¶ 13-14; Doc. 58, Waisnor Decl, Ex. M.

[56] *Sprint*, 2014 WL 1794552, at *5 (noting that Rule 26 "eliminates the possibly that all sixty-three custodians identified by defendants should have their documents searched" because such discovery would not be proportional to the needs of the case).

[57] Stoneking Decl. at ¶ 16.

[58] *Id.* at ¶ 8.

proposed terms on a subset of proposed custodians.[59] Indeed, a significant portion of the cost of e-discovery is simply collecting, processing, and hosting data, all of which has to be done in order to conduct a sampling exercise.[60]

If Lawson were really interested in accessing data germane to the issues, he could have taken an entirely different course of action:  he could have reviewed the list of eight custodians and proposed the addition of others he thought were important; he could have asked Spirit to review a larger sample of documents from the selected four custodians; he could have agreed to remove assistants from the custodian list in exchange for expanding the list of eight. He could have taken all these steps and even reserved his right to request additional discovery should he conclude, upon his review of the productions Spirit made subject to these parameters, that he needed additional information. That he chose not to do so leaves no question as to his real objective here: to harass Spirit with burdensome and costly discovery in the hopes of forcing Spirit into a settlement. Lawson should not be permitted to violate Rule 26 in this manner.

As previously mentioned, based on the average number of documents that Legility currently has from other Spirit custodians, utilizing Lawson's proposed First List of Custodian and Lawson's proposed First List of Search Terms would require Spirit to collect, process, host, and search 4,866 GB or 21,034,305 documents, and review for potential production over 7 million electronic documents, at least 85% of which are likely to be irrelevant to the subject matter of the dispute and non-responsive to Lawson's Requests for Production.[61] The costs to collect, process, host, analyze, and search 4,866 GB or 21,034,305 documents files, and review over 7 million documents is estimated to be over $11 million.[62]  Legility expects this process

---

[59] *Id.* at ¶ 7.
[60] *Id.* at ¶ 9.
[61] *Id.* at ¶ 18.
[62] *Id.* at ¶ 19.

will take approximately 77 weeks, using a team of 60 attorneys to review the documents.[63] This is clearly not proportional to the needs of a case involving one executive's Retirement Agreement, especially when it is likely that 85% of these documents will be non-responsive to Lawson's requests and irrelevant to the subject matter of the dispute.

       As the party responding to discovery requests, Spirit is not "cherry picking" custodians as Lawson would have this Court believe. Rather, Spirit is fulfilling its obligations to identify custodians who are likely to have relevant information because "absent agreement among the parties, the party who will be responding to discovery requests is entitled to select the custodians it deems 'most likely to possess responsive information and to search the files of those individuals.'"[64] Moreover, "unless the [responding] party's choice is 'manifestly unreasonable or the requesting party demonstrates that the resulting production is deficient,' the court should not dictate the designation of ESI custodians."[65] Additionally, "the party seeking to compel the designation of a particular additional ESI custodian has the initial threshold burden of showing that the disputed custodian's ESI likely includes information relevant to the claims or defenses in the case. This is because the party responding to discovery requests is typically in the best position to know and identify those individuals within its organization likely to have information relevant to the case."[66]

       Lawson comes nowhere close to showing this Court that all 69 custodians, because of their titles alone, have ESI that likely includes information relevant to the claims or defenses in this case, let alone are proportional to the needs of this dispute. Moreover, this number of

---

[63] *See id.*
[64] *In re Epipen*, 2018 WL 1440923, *2.
[65] *Id.*
[66] *Id.*

custodians is simply not reasonable or consistent with industry practices in e-discovery for a case of this size.[67]

Lawson also falsely claims that his search terms "are likely to return hundreds of thousands of relevant documents." Doc. 57 at 25. Quite the opposite, Lawson's search terms are likely to result in hundreds of thousands of irrelevant documents that bear no relationship to this case whatsoever, but may be technically responsive to Lawson's overly broad RFPs and happen to contain one or more of Lawson's proposed generic search terms. Moreover, to find these technically responsive but irrelevant documents, Spirit would have to take the time and money to collect, process, host, search, and review millions of documents that are even less relevant. There is no basis whatsoever to proceed down such a path.

Again, submitted herewith is Spirit's list of proposed custodians, as well as what search terms (if any) are appropriate for such custodians based on their role within the company, the way in which they personally maintain their electronic files, and the information they are likely to possess that is relevant and proportional to the needs of this dispute. Arcadi Decl., Ex. F.

Of course, it is in Spirit's own interest to produce documents sufficient to establish what the "Business" of Spirit is, and whether Arconic is in the "Business" or "any business that is competitive with the Business or any portion thereof." Indeed, Spirit has already gone to great lengths to identify, collect, review, and produce documents relevant to this dispute, and will continue to do so in order to fulfill its discovery obligations. Lawson's proposed custodians and search terms do nothing to advance the ball, and rather require Spirit to conduct expensive and time-consuming endeavors that are not proportional to the needs of the case. Lawson's RFPs,

---

[67] Stoneking Decl., ¶ 20.

proposed custodians, and proposed search terms are exactly the type of discovery Rule 26(b)(1) seeks to guard against.[68]

### F.   Lawson's Request for Attorneys' Fees Should Be Denied

Under Rule 37(a)(5)(A), the Court cannot order attorneys' fees if the responding party's objections are substantially justified. A discovery objection is substantially justified if it is "justified to a degree that could satisfy a reasonable person."[69]

Here, Spirit's position is more than substantially justified. Lawson has served 40 overly broad RFPs, seeking "any and all" documents regarding countless irrelevant categories, and he has also demanded that Spirit run 90 search terms on the ESI of 69 current and former employees to provide discovery on virtually every aspect of Spirit's business. Spirit has engaged in good faith efforts to reach agreement on the appropriate scope of discovery. As part of those efforts, Spirit has made numerous compromises, including offering to create a spreadsheet of information responsive to certain requests for which document production would be incredibly burdensome (Doc 58, Waisnor Decl., Ex. K at 1), as well as agreeing to provide information "sufficient to show" other topics. Spirit has also invested substantial resources in resolving the parties' discovery disputes, including without limitation conducting a sampling exercise to test the efficacy of the search terms. Lawson, on the other hand, has done nothing to streamline the discovery process or to solve the outstanding disputes. Accordingly, Lawson's request for attorneys' fees should be denied.

---

[68]*Lavigne*, 2014 WL 811578, at *2 (finding requests for production to be disproportionate where they "encompass virtually every document related to every job and employee of the defendant during the tenure of the plaintiff's employment").
[69] *Hamner v. Associated Wholesale Grocers, Inc.*, No. 07-CV-2314-KHV-DJW, 2008 WL 917900, at *1–2 (D. Kan. Mar. 31, 2008) (internal citations omitted).

VI.     **Conclusion**

For the reasons set forth herein, Spirit respectfully requests that the relief sought by Lawson through his Motion and Memorandum be denied by this Court, and for all such other relief that the Court deems appropriate.

Date: April 2, 2019                                  Respectfully submitted,

                                                     */s/Jeff P. DeGraffenreid*
                                                     Jeff DeGraffenreid, KS #15694
                                                     jdegraffenreid@foulston.com
                                                     Gary L. Ayers, KS #10345
                                                     gayers@foulston.com
                                                     FOULSTON SIEFKIN, LLP
                                                     1551 N. Waterfront Parkway, Suite 100
                                                     Wichita, KS 67206-4466
                                                     Telephone: (316) 291-9530
                                                     Facsimile: (866) 346-1938

                                                     Ann Marie Arcadi (admitted *pro hac vice*)
                                                     annmarie.arcadi@arcadijackson.com
                                                     T. Gregory Jackson (admitted *pro hac vice*)
                                                     greg.jackson@arcadijackson.com
                                                     Seema Tendolkar (admitted *pro hac vice*)
                                                     seema.tendolkar@arcadijackson.com
                                                     ARCADI JACKSON, LLP
                                                     2911 Turtle Creek Blvd., Suite 800
                                                     Dallas, TX 75219
                                                     Telephone: 214.865.6458
                                                     Facsimile: 214.865.6522

                                                     *Attorneys for Defendant Spirit AeroSystems, Inc.*

### CERTIFICATE OF SERVICE

I hereby certify that on this 2nd day of April 2019, I presented the foregoing to the Clerk of the Court by electronic transmission for filing with the Court, which will send notice of electronic filing to all counsel of record.

                                                     */s/ Jeff P. DeGraffenreid*
                                                     Jeff P. DeGraffenreid