# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

|                          |   |                         |
|--------------------------|---|-------------------------|
| LARRY A. LAWSON,         | ) |                         |
|                          | ) |                         |
| Plaintiff,               | ) |                         |
|                          | ) |                         |
| v.                       | ) | Case No. 18-1100-EFM-ADM |
|                          | ) |                         |
| SPIRIT AEROSYSTEMS, INC.,| ) |                         |
|                          | ) |                         |
| Defendant.               | ) |                         |

## MEMORANDUM AND ORDER

This matter comes before the court on defendant Spirit AeroSystems, Inc.'s ("Spirit")
motion to compel. (ECF No. 105.) Spirit asks the court to compel plaintiff Larry A. Lawson
("Lawson") and third parties Elliott Associates, L.P. and Elliott International, L.P. (together,
"Elliott") to produce certain documents and redacted information that Lawson and Elliott contend
are protected by the attorney-client privilege, the work-product doctrine, the common-interest
doctrine, and/or the joint-client privilege. For the reasons discussed below, Spirit's motion is
granted in part, denied in part, and denied in part without prejudice. Lawson and Elliott shall
produce documents as set forth in this Memorandum and Order. The parties shall then meet and
confer about any disputes as to specific privilege log entries and, to the extent disagreements
remain as to particular documents, Spirit shall file a renewed motion to compel and the court will
conduct an *in camera* review of those documents.

## I.      BACKGROUND OF THE CASE

The background of this lawsuit is more thoroughly set forth in the court's Memorandum
and Order on Spirit's motion to dismiss. *See Lawson v. Spirit AeroSystems, Inc.*, No. 18-1100-
EFM, 2018 WL 3973150, at *1-*4 (D. Kan. Aug. 20, 2018). Highly summarized, Spirit is a tier-
one manufacturer of aerostructures and aircraft components. Lawson is Spirit's former chief

executive officer ("CEO"), who retired on July 31, 2016. His Retirement Agreement provided him with substantial financial benefits and extended his non-compete obligations for two years, until July 31, 2018.

At the heart of this lawsuit is Lawson's involvement with business dealings between Arconic, Inc. ("Arconic") and Elliott, which Spirit contends constituted a breach of Lawson's Retirement Agreement. Arconic is an aircraft component manufacturer, and Elliott is an investor in Arconic. In January of 2017, Elliott engaged Lawson to provide consulting services in connection with a proxy contest Elliott launched to replace five Arconic board members. Spirit contends that this arrangement violated Lawson's non-compete because Spirit and Arconic are in the same "business"—*i.e.*, Spirit and Arconic are competitors. Once Spirit learned about Lawson's consulting arrangement with Elliott regarding Arconic's board of directors, Spirit notified Lawson that this constituted a breach of his non-compete. Spirit stopped paying Lawson and demanded that he repay what the company had already paid him under the Retirement Agreement. Lawson disputes that he breached the non-compete. He filed this lawsuit against Spirit seeking to recover what he believes Spirit owes him under the terms of the Retirement Agreement.

Against this backdrop of the gist of the case in general, the court now turns to the present dispute. Spirit seeks to compel Lawson and Elliott to produce certain communications between them, including communications involving their attorneys. Lawson and Elliott have withheld these communications based on the attorney-client privilege, the work-product doctrine, the common-interest doctrine, and/or the joint-client privilege. In order to decide the issues raised, it is necessary to understand the detailed history behind Elliott and Lawson's relationship, as well as the respective lawyers and law firms involved.

## A. Elliott Retains Willkie Farr & Gallagher, LLP

On September 24, 2015, Elliott retained the law firm of Willkie Farr & Gallagher, LLP ("Willkie Farr"). (*See* ECF No. 103, at 28-32.[1]) Since then, Willkie Farr has represented Elliott in connection with various matters, including its investment in Arconic. (ECF No. 111-1 ¶ 3, at 1.)

## B. Elliott's Negotiations with Lawson in January of 2017

In January of 2017, Elliott identified Lawson as a potential candidate for Arconic's board of directors or its CEO. (*Id.* ¶ 4, at 1.) On January 10, 2017, Elliott and Lawson met. (*See* ECF No. 109-2, at 2.) That same day, Lawson initiated dialogue with Spirit about his proposed involvement with Elliott and Arconic; Spirit initially reacted with concern about potential overlap. (*See id.* at 1-2; ECF No. 111-1, at 5.)

On January 19, Willkie Farr attorney Maurice Lefkort reached out to Stacy Cozad, Spirit's General Counsel, regarding Lawson's Retirement Agreement and non-compete. (ECF No. 109-4, at 2.) Lefkort did so "on behalf of Elliott." (*Id.*) On January 23, Lefkort again clarified that Willkie Farr's role was as counsel to Elliott and not counsel to Lawson, but that Willkie Farr was authorized to submit a request to Spirit on Lawson's behalf because Lawson "understandably . . . wants to ensure there are no possible complications." (*Id.*) Lefkort asked Spirit to either (1) confirm that Lawson's service on Arconic's board of directors would not breach the Retirement Agreement, or (2) consent to Lawson serving on Arconic's board of directors and waive any provisions of the Retirement Agreement that Spirit would deem breached by such service. (*Id.*)

---

[1] Because some exhibits to the briefing were filed as a single PDF, the court cites the page numbers assigned by the CM/ECF system throughout this order. Cites to the parties' briefing, however, are to the documents' internal page numbers.

On January 26, Cozad responded. (*Id.* at 1.) She stated that Spirit reviewed Lawson's request and concluded that he would violate his Retirement Agreement if he were to serve on Arconic's board of directors, or otherwise provide services directly or indirectly to Arconic. (*Id.*) Furthermore, she stated that "if Arconic or Elliott engages with Mr. Lawson to violate his obligations, [Spirit] will take all appropriate actions – and seek all available remedies – against Mr. Lawson and against anyone that tortiously interferes with Mr. Lawson's contractual obligations." (*Id.*) Elliott then made an offer to Spirit (the terms of which are presently unknown), which Spirit rejected on January 29 when it declined to waive the terms of Lawson's Retirement Agreement or release him from his non-compete obligations. (ECF No. 109-5, at 1.)

## C. Elliott Engages Lawson as a Consultant

On January 31, Lawson and Elliott entered into two agreements: (1) a Consulting Agreement, and (2) an Indemnification Agreement. The Consulting Agreement required Lawson to "provide to Elliott general advisory and professional consulting services . . .[2] in connection with Elliott's nomination of individuals for election to the board of directors of Arconic." (ECF No. 111-1 § 2, at 12.) Lawson's engagement expired by default on May 31, 2017, if not properly terminated sooner or renewed. (*Id.* § 7(a), at 14.) The Consulting Agreement provided for certain additional payouts depending on whether Lawson was Arconic's CEO by July 31, 2017. (*See id.* § 3(c)-(d), at 12.) The Consulting Agreement required Elliott to indemnify Lawson "as set forth in that certain Indemnification Agreement . . . by and between Elliott and [Lawson]." (*Id.* § 8, at

---

[2] Here, the Consulting Agreement states "including, but not limited to." But the record on the current motion does not contain any evidence showing Lawson's scope of services was broader than articulated in the Consulting Agreement—that is, "in connection with Elliott's nomination of individuals for election to the board of directors of Arconic." The court therefore concludes based on the record that this is the full scope of services Lawson was contractually bound to provide to Elliott under the Consulting Agreement.

14.)  Notices under the Consulting Agreement were to be copied to the receiving party's separate counsel: Willkie Farr for Elliott, and Cadwalader, Wickersham & Taft LLP ("Cadwalader") for Lawson.  (*Id.* § 11, at 15-16.)

The Indemnification Agreement required Elliott to indemnify Lawson as follows:

> In the event [Lawson] . . . becomes a party to . . . a Claim by reason of . . . an Indemnifiable Event, Elliott, to the fullest extent permitted by applicable law, shall indemnify and hold harmless [Lawson] from and against any and all Losses suffered, incurred or sustained by [him] or to which [he] becomes subject, resulting from, arising out of or relating to such Claim . . . .

(ECF No. 123-1 § 2(a), at 2.)  It defines a "Claim" as:

> any threatened, pending or completed action, suit, . . . or proceeding . . . or setoff or failure to pay amounts otherwise due and payable, whether instituted by Elliott, [Arconic] or any other party, or any inquiry or investigation that [Lawson] in good faith believes might lead to the institution of any such action, suit or proceeding, setoff or failure to pay.

(*Id.* § 1, at 1.)  And it defines an "Indemnifiable Event" as an event or occurrence relating to or arising out of Lawson's consulting services, the Arconic proxy contest, and "Elliott's announcement of its intention to propose [Lawson] as an employee, officer or director of [Arconic], including any breach or alleged breach of any non-competition or non-solicitation obligations . . . to which [Lawson] is subject pursuant to any agreement with Spirit."  (*Id.* § 1, at 1-2.)

The Indemnification Agreement did not require Elliott to assume the defense of covered Claims.  Rather, it stated that "[i]n the case of the commencement of any Claim against [Lawson] in respect of which he may seek indemnification from Elliott hereunder, Elliott will be entitled to participate therein, including, without limitation, with respect to the negotiation and approval of any settlement of such action."  (*Id.* § 2(b), at 3.)  Elliott could choose to "assume the defense of any Claim against [Lawson] in respect of which [he] may seek indemnification from Elliott

hereunder" by giving "written notice of Elliott's election to so assume the defense of such Claim."
(*Id.*)  The Indemnification Agreement further provided that, if Elliott made indemnification
payments to Lawson, "Elliott shall be subrogated to the extent of such payment to all of the rights
of recovery of [Lawson]."  (*Id.* § 9(a), at 5.)

That same day, Elliott issued a press release announcing that it had nominated five
candidates to Arconic's board.  (ECF No. 111-1, at 20.)  In addition, Elliott announced that it had
engaged Lawson as a consultant.  (*Id.*)  The press release highlighted his "extensive executive
leadership experience," touting that he "'has the ideal set of skills needed to turnaround [sic]
Arconic's woefully and continually underperforming business.'"  (*Id.*)

### D. Spirit Alleges Breach

On February 2, Spirit notified Lawson that his "engagement by Elliott constitutes an
egregious violation of . . . the [Retirement] Agreement."  (ECF No. 111-1, at 10.)  Spirit ceased
making payments to Lawson under the Retirement Agreement and terminated his right to continue
vesting in Spirit shares under a long-term incentive plan.  (*See id.*)  Spirit also demanded that
Lawson tender back to the company all payments made to him under the Retirement Agreement,
as well as $2 million that Lawson had received pursuant to a deferred compensation plan.  (*Id.*)

### E. Lawson Retains Willkie Farr Under the Terms of a Joint Representation with Elliott

On February 21, 2017, Lawson signed an engagement letter retaining Willkie Farr to
represent him "in connection with a dispute with his former employer, Spirit."  (ECF No. 103, at
22.)  The engagement letter stated that Willkie Farr represented Elliott with respect to the same
dispute, and that Willkie Farr was "not aware of any conflict of interest that would preclude [it]
from representing both [Lawson and Elliott]."  (*Id.* at 23-24.)  Lawson agreed to joint
representation and, in doing so, he acknowledged that in such a relationship, "each of the

participating clients is entitled to know what any of the other clients has told [Willkie Farr]" and that "all participating clients [must] take common positions as to all issues." (*Id.* at 24.) Under the terms of the engagement letter, Elliott agreed to pay Willkie Farr's fees associated with the joint representation. (*Id.* at 23.)

### F. Lawson and Elliott's Joint Defense Agreement

Over a year later, on March 28, 2018, Lawson and Elliott entered into a Common Interest and Joint Defense Agreement. (*See* ECF No. 103, at 33-43.) The agreement governs the joint defense of "Indemnification Claims," defined as "any 'Claim' (as that term is defined by the Indemnification Agreement) for which Lawson may seek indemnification, including in connection with Spirit." (*Id.* at 33.) The agreement recites that Lawson and Elliott have a common interest regarding these claims and that "Elliott assumed the defense of the Indemnification Claims by letter dated February 3, 2017." (*Id.*) Elliott selected Willkie Farr "to act as litigation counsel . . . to the Parties with respect to the Indemnification Claims." (*Id.*)

As further recited in the agreement, Lawson, his personal counsel Shearman & Sterling LLP ("Shearman"), Elliott, and Willkie Farr had "collaborated and intend to continue to collaborate . . . with respect to the Indemnification Claims" and this lawsuit. (*Id.* at 34.) In connection with this collaboration, Lawson and Elliott agreed that they, along with Shearman and Willkie Farr, could

> share information that is protected by the common interest privilege, the attorney-client privilege, the attorney work product doctrine, or any other applicable privileges and immunities to facilitate the rendering of professional legal services to the Parties and in furtherance of the Parties' rights and obligations pursuant to the Indemnification Agreement.

(*Id.* § 1, at 34-35.) They further agreed that disclosure of materials under the agreement was "not intended to waive any applicable privilege." (*Id.*) They agreed that "[t]o the extent that the Parties

and/or their counsel have already been in communication with one another regarding the Indemnification Claims, all such communications and shared work product" exchanged previously were subject to the agreement. (*Id.* § 2, at 35-36.)

The same day Lawson and Elliott executed the Common Interest and Joint Defense Agreement, Lawson filed this lawsuit to recover amounts due and owing under his Retirement Agreement. Spirit did not assert any counterclaims. Elliott is not a party to the lawsuit.

### G. Spirit's Discovery to Lawson and Elliott

Spirit served discovery on Lawson and Elliott seeking, *inter alia*, documents exchanged between them and relating to their relationship. Lawson and Elliott objected to the extent these document requests called for "the disclosure of any privileged information, including, without limitation, attorney-client communications and attorney-work product information." (*See, e.g.*, ECF No. 111-1, at 27, 64.) In a discovery conference with the parties on June 6, 2019, Spirit stated that it believed Lawson and Elliott were improperly withholding or redacting documents based on the common-interest doctrine. The court ordered Lawson and Elliott to produce privilege logs listing documents they had redacted or withheld pursuant the common-interest doctrine by June 28, 2019, and set a briefing schedule.

On June 28, Lawson and Elliott produced a log of documents withheld pursuant to the common-interest doctrine. (*See* ECF No. 103, at 1-9.) On July 8, they served an amended log of documents redacted pursuant to the common-interest doctrine. (*See id.* at 9-12.) The documents included on these logs date from January 2017 through February 17, 2017. Lawson and Elliott did not include documents dated after February 21, 2017. Because both Lawson and Elliott were represented by Willkie Farr as of that date, they claim that communications on and after that date

are subject to "attorney client privilege as well as a joint defense agreement, joint representation privilege, and work product privilege."  (ECF No. 105-3, at 2.)

Spirit has now filed a motion to compel production of documents that it contends Lawson and/or Elliott have improperly withheld or redacted, as follows:

(1)  communications prior to January 31, 2017;

(2)  communications between Lawson and Willkie Farr prior to February 21, 2017;

(3)  communications between Lawson and Elliott where no attorneys are copied; and

(4)  communications between Lawson, Elliott, and Willkie Farr that Spirit argues do not involve seeking or providing legal advice.

Lawson responded, arguing the documents at issue relate to his and Elliott's shared efforts to resolve a dispute with Spirit and are privileged or protected by the work-product doctrine.

## II.    DISCUSSION

### A.    Choice of Law

The court first addresses choice of law.  Lawson contends that, to the extent that there is a conflict between Kansas and New York laws regarding the attorney-client privilege, New York law should apply.  (*See* Pl.'s Opp. (ECF No. 111), at 5.)  The court disagrees.  The court applies the choice-of-law rules of the forum state (Kansas) to determine which state's law governs.  *See Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941).  "When addressing choice of law issues, Kansas appellate courts still follow the Restatement (First) of Conflict of Laws (1934)." *ARY Jewelers, L.L.C. v. Krigel*, 85 P.3d 1151, 1161 (Kan. 2004).  The First Restatement provides that "[t]he law of the forum determines the admissibility of a particular piece of evidence." RESTATEMENT (FIRST) OF CONFLICT OF LAWS § 597 (1934).  The court concludes that the Kansas Supreme Court would apply Kansas law to resolve the matters of privilege at issue in this case, as

other judges in this district have concluded previously. *See Becker v. Estivo*, No. 14-2531-JAR-JPO, 2015 WL 758220, at *1 (D. Kan. Feb. 23, 2015) (applying Kansas law to determine whether physician-patient privilege protected the plaintiff's medical records); *Skepnek v. Roper & Twardowsky, LLC*, No. 11-4102-DDC-JPO, 2014 WL 4377706, at *4 (D. Kan. Sept. 4, 2014) (applying Kansas law to determine whether emails were privileged, even though the emails involved "New Jersey clients communicating with their New Jersey law firm about a New Jersey lawsuit").

Furthermore, Lawson concedes that "[n]o material conflict exists between Kansas and New York law regarding the common interest doctrine." (Pl.'s Opp. (ECF No. 111), at 5.) The court therefore also applies Kansas law regarding the common-interest doctrine. *Brenner v. Oppenheimer & Co.*, 44 P.3d 364, 372 (Kan. 2002) (stating that if Kansas law is "not in conflict with any of the other jurisdictions connected to the suit, then there [is] no injury in applying the law of Kansas" (alteration in original)).

## B.    Lawson's Asserted Grounds of Protection

Lawson argues the subject documents are protected from disclosure for essentially three reasons. First, Lawson contends they contain information covered by Elliott's attorney-client privilege because Willkie Farr advised Elliott regarding the Arconic proxy contest, which encompassed the dispute with Spirit related to Lawson's purported violation of his non-compete obligations. Second, Lawson contends that these documents are protected by the work-product doctrine, for essentially the same reasons. And, third, Lawson contends that he and Elliott had a common legal interest regarding (a) potential litigation with Spirit, and (b) the Arconic proxy contest. The court will address each of these arguments, in turn.

### 1. Attorney-Client Privilege (Aside from Common Interest)

The court first evaluates whether the attorney-client privilege protects the subject communications—separate and apart from the common-interest doctrine. In Kansas, the attorney-client privilege is codified at KAN. STAT. ANN. § 60-426. Under the statute, with few exceptions, "communications found by the judge to have been between [a] lawyer and his or her client in the course of that relationship and in professional confidence, are privileged." *State v. Gonzalez*, 234 P.3d 1, 10 (Kan. 2010). The term "communication" includes "advice given by the attorney in the course of representing the client and . . . disclosures of the client to a representative, associate or employee of the attorney incidental to the professional relationship." KAN. STAT. ANN. § 60-426(c)(2). The party asserting attorney-client privilege bears the burden to establish that it applies. *In re Grand Jury Proceedings*, 616 F.3d 1172, 1183 (10th Cir. 2010); *Cypress Media, Inc. v. City of Overland Park*, 997 P.2d 681, 693 (Kan. 2000). This burden includes showing the privilege has not been waived. *See Johnson v. Gmeinder*, 191 F.R.D. 638, 642 (D. Kan. 2000).

The privilege log entries begin on January 12, 2017. As of that date, Willkie Farr had an attorney-client relationship with Elliott, but not with Lawson. Willkie Farr's attorney-client relationship with Lawson did not begin until they executed their engagement letter on February 21, 2017. Therefore, for purposes of the current analysis the court focuses on the time period from January 12 to February 21, 2017. Generally, when a client communicates with his or her attorney in the presence of a third party or voluntarily discloses privileged communications, attorney-client privilege is waived. *See State ex rel. Stovall v. Meneley*, 22 P.3d 124, 141-42 (Kan. 2001). Between January 12 and February 21, 2017, Lawson was not a party to Willkie Farr and Elliott's attorney-client relationship. Therefore, Lawson and Elliott have the burden to show that Elliott did not waive the attorney-client privilege by including Lawson in their communications during that time period.

Lawson has not met that burden. To the contrary, Lawson does not raise any meaningful non-waiver argument other than invoking the common-interest doctrine. The court has liberally construed Lawson's arguments to search for whether any other non-waiver principle may apply here. This includes considering Lawson's generalized argument that he served as a consultant to Elliott (albeit Lawson raises this argument only as it relates to the common-interest doctrine). However, the record contains no evidence from which the court could find that Lawson was a consultant for Elliott prior to January 31, 2017, which is the date of the Consulting Agreement and Elliott's press release announcing his role as a consultant.

Furthermore, once Elliott retained Lawson as a consultant on January 31, 2017, the scope of his role as a consultant was limited to providing "Elliott general advisory and professional consulting services . . . in connection with Elliott's nomination of individuals for election to the board of directors of Arconic." (ECF No. 111-1 § 2, at 12.) The court certainly recognizes the possibility that a non-employee consultant can serve as the "client" seeking legal advice on behalf of a corporation. *See, e.g.*, *Pipeline Prods., Inc. v. Madison Cos.*, No. 15-4890-KHV-ADM, 2019 WL 1900341, at *2-*3 (D. Kan. Apr. 29, 2019) (finding communications between an independent contractor and attorneys were covered by the attorney-client privilege). However, the party asserting privilege bears the burden to establish that it applies. This includes submitting a factual record from which the court can find that the corporation authorized the independent contractor to consult with attorneys for the purpose of securing legal advice for the corporation. *See id.* (finding communications between a consultant and the party's attorneys privileged where the party presented a detailed factual affidavit explaining the consultant's authority to seek legal advice for the corporation). Lawson has submitted no such factual record here. The Consulting Agreement does not indicate that Lawson was authorized to communicate with Willkie Farr for the purpose

of seeking legal advice on Elliott's behalf regarding the proxy contest, nor has Lawson presented any other evidence suggesting this was so. Communications such as the January 29, 2017 emails between Lawson and Elliott's counsel regarding "disclosure issues" that appear as entries 12 and 13 on the June 28 privilege log are not protected by the attorney-client privilege. (*See* ECF No. 103, at 1.)

Accordingly, absent some other exception to non-waiver (such as common interest), the attorney-client privilege does not protect communications between Elliott, Willkie Farr, and Lawson between January 12 and February 21, 2017. Elliott waived the attorney-client privilege by including Lawson in those communications.

### 2.     Work-Product Protection

The court turns next to Lawson's argument that some of the subject communications are protected work product. The court analyzes work-product protection under Federal Rule of Civil Procedure 26(b)(3). *See Frontier Ref., Inc. v. Gorman-Rupp Co.*, 136 F.3d 695, 702 n.10 (10th Cir. 1998) ("Unlike the attorney client privilege, the work product privilege is governed, even in diversity cases, by a uniform federal standard embodied in Fed. R. Civ. P. 26(b)(3) . . . ."). That rule provides that a party ordinarily "may not discover documents and tangible things that are prepared in anticipation of litigation or for trial by or for another party or its representative (including the other party's attorney, consultant, surety, indemnitor, insurer, or agent)." FED. R. CIV. P. 26(b)(3).

Like the attorney-client privilege, the party asserting work-product protection must make a "clear showing" that it applies. *U.S. Fire Ins. Co. v. Bunge N. Am., Inc.*, 247 F.R.D. 656, 658 (D. Kan. 2007). Blanket claims or conclusory assertions that the work-product doctrine applies do not satisfy the burden of proof. *See id.* Instead, a party must make an evidentiary showing that work-product protection applies based on competent evidence. *See id.* "The work product

standard has two components." *Id.* First, "the document in question [must] be produced *because of* the anticipation of litigation, i.e., to prepare for litigation or for trial." *Id.* (emphasis added). Second, the court analyzes whether the party's anticipation of litigation is reasonable. "The inchoate possibility, or even the likely chance of litigation, does not give rise to work product." *Id.* Rather, "the threat of litigation must be 'real and imminent.'" *Id.*

The court has considered the possibility that Lawson reasonably anticipated litigation as of January 26, which is the date Spirit notified Elliott that Lawson would violate his Retirement Agreement if he were to serve on Arconic's board of directors, or otherwise provide services directly or indirectly to Arconic. (ECF No. 109-4, at 1.) After all, it was on that date that Spirit threatened litigation against Lawson *if* he breached his Retirement Agreement and against any entity (presumably including Elliott) that tortiously interfered with Lawson's contractual obligations. (*See id.*) But the court ultimately rejects January 26 as the triggering date for work-product protection because the record contains no evidence from which the court can find that Lawson and Elliott had already decided to move forward with their business arrangement on that date regardless of Spirit's response, thus making litigation real and imminent. To the contrary, in the days immediately following, Spirit and Elliott continued to communicate about a potential amicable resolution. (*See* ECF No. 109-5 (January 29 email where Spirit declined to waive the terms of Lawson's Retirement Agreement or release him from his non-compete obligations in response to an offer from Elliott).) Where parties continue to negotiate to resolve disagreements amicably, litigation is "not a substantial and significant threat." *Woodard v. Victory Records, Inc.*, No. 14 CV 1887, 2014 WL 2118799, at *9 (N.D. Ill. May 21, 2014); *see also St. Paul Reinsurance Co. v. Commercial Fin. Corp.*, 197 F.R.D. 620, 638 (N.D. Iowa 2000) (noting that parties "do not necessarily 'anticipate litigation' if they continue to explore amicable resolution"); *Sun Capital*

*Partners, Inc. v. Twin City Fire Ins. Co.*, No. 12-81397-CIV, 2015 WL 9257019, at *5-*6 (S.D.

Fla. Dec. 18, 2015) (finding the plaintiff did not reasonably anticipate litigation when "the parties

were negotiating and attempting to resolve their differences in the normal course of business").

The record reflects that Lawson and Elliott decided to cease efforts to negotiate a resolution

and move ahead—despite Spirit's threat—on January 31, 2017. That is the day the record reflects

that they negotiated and executed the Consultant Agreement and the Indemnification Agreement.

That same day, Elliott issued a press release announcing Lawson's new role as a consultant with

respect to the proxy contest. At that point, Lawson and Elliott reasonably anticipated litigation

over Lawson's Retirement Agreement and Elliott's related actions in allegedly tortiously

interfering with Lawson's contractual obligations. The court therefore finds that work-product

protection for materials relating to potential litigation with Spirit over Lawson's Retirement

Agreement began on January 31, 2017.

### a. Documents Not Protected by the Work-Product Doctrine

The fact that Lawson and Elliott reasonably anticipated litigation over Lawson's

Retirement Agreement as of January 31, however, does not mean that every document prepared

by or for their attorneys thereafter qualifies as work product. *See Kannaday v. Ball*, 292 F.R.D.

640, 649 (D. Kan. 2013). "A party claiming work-product protection still must demonstrate the

document was prepared principally or exclusively to assist in anticipated or ongoing litigation and

establish the underlying nexus between the preparation of the document and the specific

litigation." *Id.* Documents prepared "in the ordinary course of business or for other non-litigation

purposes are not protected by the work-product doctrine." *Id.*

Here, Lawson and Elliott claim work-product protection over documents relating to the

proxy contest. (*See, e.g.*, ECF No. 103, log entries 2-3, at 1 (documents relating to the proxy

contest); log entries 30-34, at 2 (draft agreements relating to the proxy contest and "potential litigation with Spirit").)  But Lawson has not established that he or Elliott reasonably anticipated litigation relating to the proxy contest at the time the documents at issue were created.  Therefore, the proxy contest documents listed on the privilege logs are not work product.

### b.     Waiver of Work Product

Neither party addresses work-product waiver.  Although voluntarily disclosing attorney-client privileged communications to third parties generally waives privilege, "it does not necessarily waive work-product protection."  *Pipeline Prods., Inc. v. Madison Cos.*, No. 15-4890-KHV-ADM, 2019 WL 2106111, at *3 (D. Kan. May 14, 2019).  Courts generally consider instead "whether the voluntarily disclosure was 'to an adversary or a conduit to an adversary[.]'"  *Id.* (alteration in original).  "[O]nly disclosures that are 'inconsistent with the adversary system' are deemed to waive work-product protection."  *Id.* (quoting 2 EDNA SELAN EPSTEIN, THE ATTORNEY-CLIENT PRIVILEGE AND THE WORK-PRODUCT DOCTRINE 1286 (6th ed. 2017)).  The party claiming waiver of work-product protection has the burden to establish waiver.  *Johnson*, 191 F.R.D. at 643. Here, Spirit does not claim that Lawson and Elliott were ever adversaries, or that they disclosed work-product protected documents to adversaries.  To the extent that Spirit argues that Lawson or Elliott has waived work-product protection as to the documents listed on the privilege logs, the court finds that Spirit has not met its burden.

### 3.     Common Interest Doctrine

The common-interest doctrine is the heart of Lawson's argument in response to Spirit's motion to compel.  Lawson argues that he "and Elliott shared an identical legal interest in responding to Spirit's assertion that Lawson's agreement to consult with Elliott breached his non-compete obligations to Spirit."  (Pl.'s Opp. (ECF No. 111), at 1.)  The common-interest doctrine is an exception to waiver that may protect information and documents shared outside of the

attorney-client relationship. *See In re Teleglobe Commc'ns Corp.*, 493 F.3d 345, 362-66 (3d Cir. 2007) (discussing the history and the contours of the joint-client and common-interest doctrines); *see also In re Qwest Commc'ns Int'l Inc.*, 450 F.3d 1179, 1195 (10th Cir. 2006) ("[T]he 'joint defense' or 'common interest' doctrine provides an exception to waiver . . . .").[3] To be protected, communications must be made in the course of a "joint effort with respect to a common legal interest" and for the purpose of furthering that effort. *United States v. BDO Seidman, LLP*, 492 F.3d 806, 815-16 (7th Cir. 2007). Courts have generally required that the nature of the parties' common interest "be identical, not similar, and be legal, not solely commercial." *Teleglobe Commc'ns*, 493 F.3d at 365 (quoting *Duplan Corp. v. Deering Milliken, Inc.*, 397 F. Supp. 1146, 1172 (D.S.C. 1974)); *see also Frontier*, 136 F.3d at 705 (relying on a case applying *Duplan*).

Lawson argues the common-interest doctrine preserves Elliott's attorney-client privileged communications and information shared with him prior to February 21, 2017. He identifies two common interests: (1) potential litigation with Spirit, and (2) the Arconic proxy contest. (*See* Pl.'s Opp. (ECF No. 111), at 8.) Spirit argues the common-interest doctrine does not apply.

### a. Potential Litigation with Spirit

Elliott and Lawson did not have an identical legal interest in the potential litigation with Spirit during their ongoing negotiations in January. During that time period, Lawson initiated dialogue with Spirit about his proposed involvement with Elliott and Arconic, and Spirit initially reacted with concern about potential overlap. Separately, Willkie Farr attorney Lefkort reached

---

[3] Kansas state courts have not explicitly recognized the common-interest doctrine. However, the court believes that Kansas state courts would follow the weight of authority and apply the doctrine to prevent waiver of attorney-client privilege where parties share a common interest. *See, e.g.*, *hibu Inc. v. Peck*, No. 16-cv-1055-JTM-TJJ, 2016 WL 6804996, at *5 (D. Kan. Nov. 17, 2016) (applying the common-interest doctrine in a diversity case where Kansas law governed); *Sawyer v. Sw. Airlines*, No. 01-2385-KHV-DJW, 2002 WL 31928442, at *3 (D. Kan. Dec. 23, 2002) (same).

out to Spirit's General Counsel about Lawson's Retirement Agreement and non-compete. Lefkort ensured that Cozad knew he did not serve as Lawson's counsel, when he clarified in writing on January 23 that Willkie Farr's role was as counsel to Elliott and *not* counsel to Lawson; rather, Willkie Farr was merely authorized to discuss the Retirement Agreement with Spirit on Lawson's behalf because Lawson wanted to ensure that there were no possible complications.

The privilege log itself reveals the lack of a common legal interest during this time period. For example, Lawson and Elliott claim the common-interest doctrine applies to emails between their respective counsel that appear to reflect negotiations regarding the terms of the Consulting Agreement and Indemnification Agreement. (*See, e.g.*, ECF No. 103, log entry 23, at 2 (email between Cadwalader and Willkie Farr attorneys regarding a draft agreement).) When parties engage in arms-length bargaining, they do not have a common interest. *See Katz v. AT&T Corp.*, 191 F.R.D. 433, 438 (E.D. Pa. 2000) (finding no common interest between parties before they reached a licensing agreement because such negotiations do show an identity of legal interests).

Elliott and Lawson also did not have an identical legal interest in the potential litigation with Spirit once they executed the Consulting Agreement and Indemnification Agreement on January 31, 2019. At that point, Elliott was obligated to indemnify Lawson for losses and expenses arising out of covered Claims, but the terms of the Indemnification Agreement still gave Elliott the option whether to assume Lawson's defense, if any. Elliott therefore had only a commercial or financial interest with respect to litigation with Spirit over Lawson's Retirement Agreement as of January 31. *See Progressive Cas. Ins. Co. v. F.D.I.C.*, 49 F. Supp. 3d 545, 558 (N.D. Iowa 2014) (affirming a magistrate judge's conclusion that the relationship between an insurer and reinsurer was commercial and financial, where reinsurers had an obligation to pay the insurer's losses and had the ability to participate in litigation, but there was no evidence of "joint legal

strategy or legal enterprise").  While Lawson and Elliott no doubt had a shared desire for Lawson to prevail in litigation at that time, that does not amount to a common legal interest justifying application of the common-interest doctrine.  *See In re Pac. Pictures Corp.*, 679 F.3d 1121, 1129 (9th Cir. 2012) ("[A] shared desire to see the same outcome in a legal matter is insufficient to bring a communication between two parties within [the common interest] exception."); *Gulf Islands Leasing, Inc. v. Bombardier Capital, Inc.*, 215 F.R.D. 466, 473 (S.D.N.Y. 2003) ("A concern shared by parties regarding litigation does not establish by itself that the parties held a common legal interest.").

When Elliott actually assumed Lawson's defense, however, their legal interests became truly aligned.  The only evidence in the record as to when this occurred appears in the later-executed Common Interest and Joint Defense Agreement, where the "Recitals" reflect that "Elliott assumed the defense of the Indemnification Claims by letter dated February 3."  (ECF No. 103, at 33.)  When Elliott assumed Lawson's defense, their relationship became akin to that of an insurer and its insured.  In those contexts, *i.e.*, where the insurer has a duty to defend its insured, courts have found an identical legal interest sufficient to warrant application of the common-interest doctrine.  *See, e.g.*, *Kansas City Power & Light Co. v. United States*, 139 Fed. Cl. 546, 576 (2018) (discussing cases in the insurer/insured context); *Sawyer v. Sw. Airlines*, No. 01-2385, 2002 WL 31928442, at *3 (D. Kan. Dec. 23, 2002) (finding common-interest exception to attorney-client privilege applied where insurer and insured had a common legal interest, including the insured's duty to defend).  Because Lawson and Elliott's legal interests with respect to Claims became identical on February 3, 2017, privileged communications relating to litigation—including potential litigation—with Spirit as of that date are protected by the common-interest doctrine.

### b. Arconic Proxy Contest

Lawson also argues that he and Elliott shared an identical legal interest in the Arconic proxy contest. But Lawson has not met his burden to prove this. The record shows only that Lawson acted as a consultant to Elliott on proxy contest matters, and not that he jointly launched a bid to take control of Arconic with Elliott. Lawson has therefore not shown that he had any legal interest in complying with regulations governing proxy disclosures that would have been identical to Elliott's legal interest. Lawson and Elliott, however, have listed proxy-related documents on their privilege logs. For example, entries 6 and 9-10 on the June 28 log are all January 2017 emails sent between Lawson, Elliott, and Elliott's attorneys involving legal advice regarding the proxy contest or disclosure issues. (*See* ECF No. 103, at 1.) Including Lawson on these emails waived any attorney-client privilege that otherwise would have attached. Accordingly, documents relating to the proxy contest and disclosure issues must be produced.

### C. Specific Categories of Documents that Spirit Argues are Not Privileged

Spirit also asks the court to compel production of two categories of documents that it contends are not privileged at all: (1) communications between Lawson and Elliott where no attorneys are copied, and (2) communications between Lawson, Elliott, and Willkie Farr that Spirit argues do not involve seeking or providing legal advice.

### 1. Communications Not Involving Attorneys

Communications between non-attorneys may be privileged in certain circumstances. *See United States v. Adlman*, 68 F.3d 1495, 1499 (2d Cir. 1995) (noting that communications with non-attorneys made for the purpose of assisting an attorney in rendering advice to the client may be privileged). In the common-interest context, courts are split as to whether clients represented by separate attorneys may communicate amongst themselves to seek or discuss legal advice without destroying attorney-client privilege. Some courts have held that the parties' respective

attorneys must share information to maintain privilege, not the clients themselves. *Teleglobe Commc'ns*, 493 F.3d at 364. This approach has "roots in the old joint-defense privilege, which . . . was developed to allow attorneys to coordinate their clients' criminal defense strategies." *Id.* The weight of newer authority, however, recognizes that clients themselves may share privileged information. *See Crane Sec. Techs., Inc. v. Rolling Optics, AB*, 230 F. Supp. 3d 10, 22 (D. Mass. 2017) (collecting cases). The court believes that Kansas state courts would follow this approach, which accounts for the "realities of communications between attorneys and clients and between non-lawyers who share a common legal interest." *Id.* at 21.

Spirit identifies four examples of communications between Lawson and an Elliott employee, not involving counsel, where portions have been redacted as privileged. (*See* Def.'s Mot. (ECF No. 105), at 6 & n.16.) One example is an email dated February 8, 2017, from Lawson to an Elliott employee. (*See* ECF No. 123-2.) Lawson and Elliott contend that this email reflects the legal advice of a Willkie Farr attorney regarding "potential litigation with Spirit." (ECF No. 103, log entry 38, at 12.) By February 8, Lawson and Elliott had a common legal interest with respect to litigation with Spirit, as discussed *supra*, so they could discuss legal advice amongst themselves without waiving privilege if they did so in furtherance of their common interest.

Spirit identifies three other examples that post-date February 21, 2017, and are not included on the privilege logs. (*See* ECF No. 103, at 45-47; ECF No. 123-3; ECF No. 123-4.) The court therefore does not have enough information to evaluate whether these documents were appropriately redacted. To the extent that Lawson and Elliott communicated about legal advice in furtherance of their common interest, those communications may be privileged. The court directs the parties to apply the court's ruling herein to the remainder of the documents listed on the privilege logs and determine what may be withheld or redacted, consistent with that ruling.

## 2. Communications Not Seeking or Providing Legal Advice

Not all communications involving attorneys are privileged. *See Motley v. Marathon Oil Co.*, 71 F.3d 1547, 1550–51 (10th Cir. 1995) ("[T]he mere fact that an attorney was involved in a communication does not automatically render the communication subject to the attorney-client privilege."). To be privileged, communications must be confidential and involve the requesting or giving of legal advice. *See* KAN. STAT. ANN. § 60-426. Legal advice must predominate; attorney-client privilege does not attach if legal advice is incidental to business advice. *In re Universal Serv. Fund Tel. Billing Practices Litig.*, 232 F.R.D. 669, 675 (D. Kan. 2005). Further, underlying facts do not become privileged merely because they are conveyed between attorney and client. *Grand Jury Proceedings*, 616 F.3d at 1182.

Spirit identifies documents Lawson and Elliott have withheld or redacted regarding the "Bain Report" as examples of documents that do not involve legal advice. (*See* Def.'s Reply (ECF No. 116), at 1.) The Bain Report is a report Elliott asked Bain & Company to prepare in January 2017 regarding the overlap between Spirit and Arconic's respective business. (*See* ECF No. 123-8; ECF No. 123-9.) Lawson and Elliott redacted a January 21, 2017, email that mentions the Bain Report sent by an Elliott employee to Lawson, copying a Willkie Farr attorney. (*See* ECF No. 103, at 51.) Lawson and Elliott contend that the email reflects a Willkie Farr attorney's legal advice regarding "potential litigation with Spirit." (*Id.* log entry 2, at 10.) If the email contained any privileged information, the privilege was waived through disclosure to Lawson for the reasons discussed *supra*, which is that Lawson and Elliott did not have a common legal interest with respect to litigation with Spirit until February 3, 2017. The email must be produced without redactions. To the extent that Lawson or Elliott claim attorney-client privilege over similar communications regarding the Bain Report from January 2017, those documents must be produced. The court

directs the parties to apply the court's ruling herein to the remainder of the documents listed on the privilege logs and determine what must be produced, consistent with that ruling.

### D. Documents Dated On or After February 21, 2017

On June 7, 2019, the court ordered Lawson and Elliott to produce logs of documents redacted or withheld pursuant to the common-interest doctrine. (ECF No. 88.) Lawson and Elliott did not interpret that order to require logging documents dating from when Lawson became a Willkie Farr client on February 21, 2017, to the present. They contend that these documents are protected by the joint-client doctrine, rather than the common-interest doctrine. (*See* ECF No. 105-3, at 2.) Neither has produced a privilege log listing documents redacted or withheld pursuant to the joint-client doctrine. Spirit now moves the court to compel production and/or a privilege log of those documents.

Documents dating after February 21, 2017, are not per se privileged merely because Lawson and Elliott became joint clients of Willkie Farr on that date. However, the court acknowledges that there are likely numerous communications from that day forward that are protected communications, consistent with the court's above rulings. And it is not readily apparent to the court what types of non-privileged, non-work-product, non-common-interest documents after that date might exist that would actually be relevant to the issues in the case so as to justify imposing the burden on Lawson and Elliott to collect, produce, and generate a privilege log for any documents withheld. The court therefore directs the parties to meet and confer regarding this issue and, to the extent that they cannot resolve this issue, to request a discovery conference with the court.[4]

---

[4] In so ruling, the court is not deciding at this time whether the joint-client doctrine applies to documents dating from February 21, 2017. The parties' briefs raise only cursory arguments in this respect and it is not apparent to the court how they believe the joint-client doctrine provides any broader protection than the common-interest doctrine. Further, the court cannot evaluate whether

## IV.   CONCLUSION

The court appreciates that the parties have not fully briefed the issues of how the categorical rulings set forth herein apply to particular privilege log entries.  The court therefore directs Lawson and Elliott to apply these rulings and produce all documents consistent with those rulings by **October 21, 2019**.  The parties shall then meet and confer about disputes as to specific privilege log entries and, to the extent disagreements remain as to particular documents, Spirit shall file a renewed motion to compel by **November 1, 2019**, that identifies the specific documents that are still at issue.  Spirit's memorandum in support of the motion shall not exceed 10 pages.  Lawson shall file its response on or before **November 18, 2019**, including submitting the identified documents to the court for *in camera* review.  Lawson's response brief shall not exceed 10 pages. Spirit shall file a reply brief by **November 26, 2019**, not to exceed 3 pages.

Accordingly,

**IT IS THEREFORE ORDERED** that defendant Spirit AeroSystems, Inc.'s motion to compel (ECF No. 105) is granted in part, denied in part, and denied in part without prejudice to be renewed as set forth above.

**IT IS SO ORDERED.**

Dated October 8, 2019, at Topeka, Kansas.


s/ Angel D. Mitchell
Angel D. Mitchell
U.S. Magistrate Judge

---

the joint-client doctrine applies as to any particular document where no privilege logs or specific examples have been submitted by the parties.  The court will therefore refrain from ruling as to the joint-client doctrine given the underdeveloped record on the issue.  However, should Spirit renew its motion, the court is willing to reconsider the issue based on more cogent legal arguments and a more developed factual record.