# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF KANSAS

LARRY A. LAWSON,            )
                            )
       Plaintiff,      )
                            )
v.                          )   Case No. 18-1100-EFM-ADM
                            )
SPIRIT AEROSYSTEMS, INC.,   )
                            )
       Defendant.      )

## MEMORANDUM AND ORDER

This matter comes before the court on Non-Party Arconic Inc.'s ("Arconic") Motion to Quash Subpoena and Defendant Spirit AeroSystems, Inc.'s ("Spirit") Motion to Compel Production of Documents in Compliance With Subpoena. (ECF Nos. 177 & 186.) Spirit served the subject subpoena on Arconic seeking information to ascertain the business overlap between Spirit and Arconic, which is the central issue in this case. Arconic now moves to quash the subpoena, arguing it is a build-to-print supplier in the aerospace industry, which means that Arconic manufactures component parts based on its customers' own unique design specifications rather than manufacturing generic aerostructures or aircraft components for general sale. Arconic therefore objects to the subpoena on the grounds that (1) it seeks Arconic's customers' confidential and proprietary information and (2) compliance would be unduly burdensome.

Arconic's objections are largely without merit. Arconic has not established that compliance would be unduly burdensome, particularly considering the scope articulated by Spirit. Furthermore, Arconic has not shown that compliance would necessarily require production of confidential and proprietary information at all and, even if it would, why the protective order already in entered in this case does not adequately address any confidentiality concerns. The subject motions are therefore granted in part and denied in part as set forth below.

**I.     BACKGROUND**

The background of this lawsuit is more thoroughly set forth in the court's Memorandum and Order on Spirit's motion to dismiss. *See Lawson v. Spirit AeroSystems, Inc.*, No. 18-1100-EFM, 2018 WL 3973150, at *1-*4 (D. Kan. Aug. 20, 2018). Plaintiff Larry A. Lawson is Spirit's former President and Chief Executive Officer. Spirit claims that, after he retired from Spirit, he breached the non-compete provision in his Retirement Agreement ("Agreement") via his business dealings with Arconic. That Agreement prohibited him from serving in various capacities with any business that is "engaged, in whole or in part, in the Business, or any business that is competitive with the Business or any portion thereof." *Id.* at *2, *7. The Agreement defines the term "Business" as follows:

> We are engaged in the manufacture, fabrication, maintenance, repair, overhaul, and modification of aerostructures and aircraft components, and market and sell our products and services to customers throughout the world (. . . the "*Business*").

*Id.* at *2, *7 (emphasis in original). Spirit originally argued that "Business" should be broadly construed to encompass other aircraft component manufacturers, including Arconic. *Id.* at *7. But the court rejected this interpretation and held that the term "Business" means "the *specific* products and services provided, marketed, or sold by Spirit." *Id.* at *8 (emphasis in original).

Spirit's subpoena to Arconic contains ten document requests that relate primarily to the nature of Arconic's business. (*See* ECF No. 178-1, at 9-11.)[1] Arconic responded, stating that it

---

[1] Spirit's initial subpoena to Arconic specified New York City as the place of compliance. Spirit later re-issued the same subpoena but specified Wichita, Kansas, as the place of compliance. Because Spirit's second subpoena requires compliance in Kansas, the pending motions are properly before this court. *See* FED. R. CIV. P. 45(d)(2)(B)(i); 45(d)(3)(A) (the court for the district where compliance is required may quash or modify a subpoena).

has no documents responsive to Request Nos. 1, 9, and 10.[2] (ECF No. 178-2, at 3, 7.) Arconic agreed to produce documents responsive to Request Nos. 2 and 3, which seek documents relating to Arconic's manufacturing capabilities and aerospace certifications. (*See* ECF No. 178-2, at 3.) Arconic produced 75 pages of documents.

Arconic objected to producing documents responsive to the other five Requests (ECF No. 178-2, at 3-7), which are at issue here. They seek the following:

> **Request No. 4:** Marketing materials and/or presentations provided to actual or potential customers regarding aerostructures and aircraft components manufactured, marketed, assembled and/or sold by Arconic, excluding fasteners and raw materials, from April 1, 2013 to July 31, 2018.
>
> **Request No. 5:** Catalogues, inventory lists, or other Documents sufficient to identify all aerospace/aircraft services offered or provided by Arconic from April 1, 2013 to July 31, 2018, as well as the customers/end users of those services.
>
> **Request No. 6:** Catalogues, inventory lists, or other Documents sufficient to identify all aerostructures and aircraft components that Arconic manufactured, marketed, assembled and/or sold to customers, excluding fasteners and raw materials, from April 1, 2013 to July 31, 2018, as well as the customers/end users of those products.
>
> **Request No. 7:** Catalogues, inventory lists, or other Documents sufficient to show Arconic's manufacturing, marketing, assembling, and/or selling of the following aircraft components:
>
> 1. Bay frames
> 2. Bird strike panel
> 3. Bonded assemblies
> 4. Bulkheads
> 5. Clam shells
> 6. Crack stopper
> 7. Crown frames
> 8. Doors
> 9. Door frames, surrounds
> 10. Edge frames
> 11. Fan cowl doors and hinges
> 12. Flaps
> 13. Flap track

---

[2] Request No. 9 seeks documents "discussing or identifying any overlap in business or competition between Arconic and Spirit in the aerospace industry." (ECF No. 178-1, at 11.)

3

14. Flight deck components
15. Floors
16. Fuselage chords
17. Fuselage frames, panels, and/or kits
18. Fuselage skins
19. Fuselage stringers
20. Fuselage-to-wing connection
21. Keel beam
22. Landing gear
23. Lavatory access panel
24. Leading edge skins
25. Nacelle bulkhead
26. Nacelle structure, skins and doors
27. Nose doubler
28. Pylon bulkheads and spars
29. Pylon components (including fittings and heat shields)
30. Pylon fairing
31. Seat tracks
32. Shear ties
33. Splice strap
34. Spoilers/Flaps
35. Stanchions
36. Structural hook pressure relief
37. Tailcone frames
38. Thrust reversers
39. Trailing edge flaps and ailerons
40. Window frames
41. Wing components (including ribs and skins)
42. Wing spars
43. Winglet tip caps

**Request No. 8:** Documents sufficient to describe or identify in more detail the aerostructures and aircraft components identified on the "We're On It" document (Metallic-CFRP Aircraft portion), attached hereto as Exhibit 1, that Arconic manufactured, marketed, assembled and/or sold to customers from April 1, 2013 to July 31, 2018, as well as the customers/end users of those products.

(ECF No. 178-1, at 9-10.)

Arconic asks the court to quash these Requests because Arconic manufactures components that are "made-to-order" for its customers, and therefore these Requests seek confidential and proprietary materials relating to Arconic's customers' own unique design specifications. Arconic contends that the subject marketing materials and presentations would reveal not only *Arconic's*

confidential and proprietary materials, but also Arconic's *customers'* specifications for parts and aerostructures. According to Arconic, the Requests would necessarily require it to produce its customers' proprietary materials, which would violate Arconic's confidentiality agreements with its customers and ultimately erode Arconic's competitive commercial advantage in the aviation industry because it has developed sophisticated components that outperform those produced by other companies. Arconic further contends that these Requests impose an undue burden because compliance would require a wholesale search of customer files, sales files, manufacturing records, and any documentation related to products or services offered to customers, potential customers, and end-users over a five-year period.

In response, Spirit argues that it has repeatedly told Arconic that it is simply seeking documents sufficient to identify the aerostructures and aircraft components Arconic marketed, manufactured, or sold during the relevant time period. Spirit is not seeking confidential or proprietary customer documents or information such as unique design specifications, pricing, sales volumes, or other sensitive information. Spirit only needs information that is germane to the issue of "Business" overlap. Furthermore, Spirit advised Arconic that its confidentiality concerns can be addressed by the Agreed Protective Order governing discovery in this case. (*See* ECF No. 41.) Spirit states that it is amenable to considering additional protection if Arconic so desires.

## II. UNDUE BURDEN

Federal Rule of Civil Procedure 45 governs subpoenas to non-parties. The court must quash or modify a subpoena that subjects the recipient to undue burden. FED. R. CIV. P. 45(d)(3)(A)(iii)-(iv). Although Rule 45 does not specifically include relevance or overbreadth as grounds to quash a subpoena, the scope of discovery under a subpoena is the same as the scope of discovery under Rule 26(b) and Rule 34. *See Carter v. Spirit AeroSystems, Inc.*, No. 16-1350-

EFM-GEB, 2018 WL 6249991, at *1 (D. Kan. Nov. 29, 2018) (quotations and citations omitted); *XPO Logistics Freight, Inc. v. YRC, Inc.*, No. 16-mc-224-CM-TJJ, 2016 WL 6996275, at *3 (D. Kan. Nov. 30, 2016).

### A. The Documents Sought are Relevant and Proportional

The scope of discovery encompasses "any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case." FED. R. CIV. P. 26(b)(1). Relevance is "construed broadly to encompass any matter that bears on, or that reasonably could lead to other matter that could bear on, any issue that is or may be in the case." *Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 351 (1978); *see also In re Syngenta AG MIR 162 Corn Litig.*, MDL No. 2591, No. 15-9900-JWL, 2019 WL 5622318, at *2 & n.7 (D. Kan. Oct. 31, 2019) (recognizing the *Oppenheimer* relevance standard still exists after the 2015 amendments to Rule 26(b)(1)). The party seeking discovery has the initial burden to establish that the documents sought are relevant under Rule 26(b)(1). *See Mylan Inc. v. Analysis Grp., Inc.*, No. 18-MC-209-DDC-TJJ, 2018 WL 4063496, at *2 (D. Kan. Aug. 27, 2018); *XPO Logistics Freight, Inc.*, 2016 WL 696275, at *4.

Spirit has met its initial burden to show that Request Nos. 4-8 seek relevant information. The court has already held that the term "Business" in Mr. Lawson's Retirement Agreement "refers to the *specific* products and services provided, marketed, or sold by Spirit at the time of contracting." *Lawson*, 2018 WL 3973150, at *8 (emphasis in original). The Requests seek documents showing what aerostructures and aircraft components Arconic manufactured, marketed, assembled, and/or sold during the relevant time period. Responsive information would bear on the issue of Spirit and Arconic's "Business" overlap. This is the main issue in this case to

resolve whether Mr. Lawson violated the non-compete in his Retirement Agreement. Indeed, Arconic concedes that the requests seek relevant information. (*See* ECF No. 193, at 2.)

Arconic instead argues that the Requests "seek a disproportionate amount of documents in light of the purpose for which they are being requested." (*Id.*) The court should always consider Rule 26(b)(1) proportionality standards in resolving discovery disputes. FED. R. CIV. P. 26 advisory committee's notes to the 2015 amendment (court has a "responsibility to consider the proportionality of all discovery and consider it in resolving discovery disputes"). To determine whether discovery sought is proportional to the needs of the case, the court considers "the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit." FED. R. CIV. P. 26(b)(1).

Spirit explains that "[w]hile Spirit's Requests suggest that the discovery may come in the form of catalogues, inventory lists, and/or marketing materials, the Requests make clear (and Spirit has confirmed during multiple meet and confer calls) that Arconic can provide any documentation that sufficiently identifies the products marketed, manufactured, or sold by and services provided by Arconic during the relevant time period." (ECF No. 186, at 8.) As articulated by Spirit in this summary form, the court agrees that the Requests are relevant and proportional to the needs of the case because Spirit is seeking to identify several aerostructures and aircraft components that Arconic apparently markets, manufactures, or sells that Spirit also makes, manufactures, or sells. All of the Requests seek information that is important to resolving these areas of potential product overlap, and Arconic is uniquely positioned to have superior access to this relevant information that Spirit does not. However, to the extent that the Requests are broader than Spirit's summary

7

characterization as to what it needs, certain aspects of the Requests are facially irrelevant and/or not proportional to the needs of the case.

Specifically, the Requests are relevant and proportional to the needs of the case in the following respects:

- Request No. 4 seeks "[m]arketing materials and/or presentations . . . regarding aerostructures and aircraft components" (excluding fasteners and raw materials) that Arconic manufactured, marketed, assembled, or sold from April 1, 2013, to July 31, 2018. (ECF No. 178-1, at 9.)

- Request Nos. 5 and 6 seek catalogues, inventory lists, or other documents "sufficient to identify . . . aerospace/aircraft services" offered or provided by Arconic and "sufficient to identify . . . aerostructures and aircraft components that Arconic manufactured, marketed, assembled and/or sold" during that time period. (*Id.*)

- Request No. 7 seeks documents "sufficient to show Arconic's manufacturing, marketing, assembling, and/or selling" of 47 listed aircraft components that track the structures and components that Spirit's interrogatory responses identify as the alleged areas of product overlap between Spirit and Arconic. (*Id.* at 9-10.)

- Request No. 8 seeks documents "sufficient to describe or identify in more detail the aerostructures and aircraft components identified on the '*We're on it*' document (Metallic-CFRP Aircraft portion), attached [to the subpoena] as Exhibit 1, that Arconic manufactured, marketed, assembled and/or sold to customers from April 1, 2013 to July 31, 2018." (*Id.* at 10.)

To that extent, the court denies Arconic's motion to quash and grants Spirit's motion to compel.

However, the Requests are not proportional to the needs of the case in other respects. Specifically:

- Request No. 4 is not relevant and proportional to the needs of the case to the extent that it is not limited to materials "sufficient to show" or "sufficient to identify" aerostructures and aircraft components that Arconic manufactured, marketed, assembled, and/or sold during the relevant time period.

- Request Nos. 5, 6, and 8 are not relevant and proportional to the needs of the case to the extent that they seek documents regarding the customers/end users of Arconic's products and services.

- Request Nos. 4-6 are not relevant and proportional to the needs of the case to the extent that they seek "all" such documents and/or are not limited to the areas of

8

- alleged product or service overlap identified in Request No. 7 and Request No. 8 (which incorporates portions of Exhibit 1 to the subpoena).

- Request No. 7 is not relevant and proportional to the needs of the case to the extent that it is unlimited in time.

- And all of the Requests are not relevant and proportional to the extent that they seek documents that would be duplicative for evidentiary purposes.

To that extent, the court grants Arconic's motion to quash and denies Spirit's motion to compel.

In sum, Arconic must produce documents responsive to Request No. 4-8, but only documents sufficient to show/identify whether Arconic manufactured, marketed, assembled, or sold and/or offered or provided specific products and services that Spirit contends overlapped with its business during the relevant time period—namely, those products and services listed in Request No. 7 or referenced in Request No. 8 with respect to the "*We're on it*" document attached to the subpoena as Exhibit 1. Arconic does not need to produce "all" such documents that would be duplicative for evidentiary purposes. For example, Arconic does not need to produce exhaustive documents showing every variation of a bird strike panel that it has made and sold. Rather, it only needs to produce documents sufficient to show that it manufactured and sold a bird strike panel during the relevant time period. And so on as to the other structures and components.

### B. <u>Arconic Has Not Shown That Compliance Would Cause Undue Burden</u>

The burden then shifts to Arconic, as the nonparty resisting discovery, to show that compliance would cause undue burden. *See Mylan*, 2018 WL 4063496, at *2; *XPO Logistics Freight, Inc.*, 2016 WL 696275, at *4. Compliance with a subpoena necessarily involves some measure of burden to the producing party. *See EEOC v. Citicorp Diners Club, Inc.*, 985 F.2d 1036, 1040 (10th Cir. 1993). The court will not deny discovery simply because compliance will inconvenience a nonparty or subject it to some expense. *In re EpiPen Mktg., Sales Practices and Antitrust Litig.*, MDL No. 2785, Case No. 17-md-2785, 2019 WL 1004145, at *3 (D. Kan. Feb.

28, 2019). A nonparty "objecting to a subpoena has the burden to show that compliance would cause undue burden, typically by presenting an affidavit or other evidentiary proof of the time and expense involved in responding to the subpoena." *Id.*; *accord XPO Logistics Freight, Inc.*, 2016 WL 6718076, at *5; *Ficep Corp. v. Haas Metal Engineering, Inc.*, No. 14-243-CM-JPO, 2015 WL 566988, at *3 (D. Kan. Feb. 11, 2015). The nonparty must submit "a particular and specific demonstration of fact, as distinguished from stereotyped and conclusory statements." *Ensminger v. Credit Law Ctr., LLC*, No. 19-2147-JWL-JPO, 2019 WL 6327421, at *3 (D. Kan. Nov. 26, 2019). At a minimum, the nonparty must provide a "detailed explanation as to the nature and extent of the claimed burden or expense." *Id.*

Arconic has not established that compliance would cause it undue burden. Arconic offers no affidavits or declarations. Arconic provides no detailed explanation as to the nature and extent of the claimed burden or expense. Instead, Arconic argues that in order to "properly respond to each request, Arconic will be forced to carry out a full-scale search . . . to uncover every piece of marketing or presentation provided to current, former, or potential customers," and that Arconic "would also be forced to produce any document that identifies services offered or rendered to customers, and identifies any aircraft or aerospace components that have been manufactured, marketed, assembled, and/or sold to any of Arconic's customers." (ECF No. 178, at 9.) Arconic estimates that this would require "hundreds of hours and many thousands of dollars." (*Id.*) These arguments are conclusory and exaggerated, particularly in light of the narrowed scope set forth above. Such conclusory arguments are insufficient to establish undue burden. *See, e.g.*, *EpiPen Mktg., Sales Practices and Antitrust Litig.*, 2019 WL 1004145, at *3 (overruling undue burden objection where subpoena recipient offered "no affidavit or other form of evidentiary proof to demonstrate that identifying and collecting the subpoenaed data would impose additional costs"

10

and its "boilerplate" objections lacked specificity); *XPO Logistics Freight, Inc.*, 2016 WL 6718076, at *5 (same, where subpoena recipient provided only conclusory allegations without providing any detailed explanation, affidavit, or other evidence demonstrating that it would suffer undue burden and expense complying with the subpoena); *Ficep Corp.*, 2015 WL 566988, at *3 (same); *Speed Trac Techs., Inc. v. Estes Exp. Lines, Inc.*, No. 08-212-KHV, 2008 WL 2309011, at *5 (D. Kan. June 3, 2008) (same). Accordingly, Arconic's undue burden objection is overruled.

## III. ARCONIC'S CONFIDENTIALITY OBJECTIONS

The court "may," but is not required to, quash or modify a subpoena that requires disclosure of "a trade secret or other confidential research, development, or commercial information." FED. R. CIV. P. 45(d)(3)(B)(i). "[T]here is no absolute privilege for trade secrets and similar confidential information." *Fed. Open Mkt. Comm. of Fed. Reserve Sys. v. Merrill*, 443 U.S. 340, 362 (1979). The standards for granting a protective order under Rule 26(c) apply to determine whether to quash a subpoena under Rule 45(d)(3)(B)(i). *See Centurion Indus., Inc. v. Warren Steurer & Assocs.*, 665 F.2d 323, 325-26 (10th Cir. 1981). The nonparty has the burden to show that the information sought constitutes a trade secret or other confidential information and that its disclosure "will result in a clearly defined and serious injury." *Transcor, Inc. v. Furney Charters, Inc.*, 212 F.R.D. 588, 592 (D. Kan. 2003). A "serious injury" includes competitive harm that results from disclosure. *See In re Syngenta AG MIR 162 Corn Litig.*, No. 14-MD-2591-JWL, 2017 WL 1106257, at *12 (D. Kan. Mar. 24, 2017). To establish such an injury, the nonparty must make "a particular and specific demonstration of fact, as distinguished from stereotyped and conclusory statements." *Id.*

Here, Arconic has not established that compliance with the subpoena (particularly as clarified by Spirit and by the court as set forth above) would necessarily require disclosure of confidential information at all. Arconic asserts in conclusory fashion that it is prohibited by

11

confidentiality agreements with its customers from divulging many of the documents Spirit seeks. But, as explained above, Arconic exaggerates the scope of the subpoena rather than focusing what Spirit actually seeks—namely, "only limited documents . . . necessary to further confirm the areas of overlap in 'Business' and specific products between Spirit and Arconic." (ECF No. 186, at 5.) Spirit explains that it only "seeks documents 'sufficient to show/identify'—**not** all documents relating to—the particular aerostructures and aircraft components marketed, manufactured, or sold by Arconic during the relevant time period." (*Id.* (emphasis in original).) Arconic has not shown that it cannot comply with this narrowed scope without divulging confidential customer information. Indeed, Spirit repeatedly clarified during the meet-and-confer process that it was not seeking Arconic's "confidential or proprietary information . . . regarding its pricing, sales volume, designs, specifications, diagrams, or the terms of Arconic's customer contracts, as this level of detail is unnecessary to determine whether both entities are engaged in the 'Business.'" (*Id.* at 5-6.) Arconic therefore has not shown that compliance will necessarily implicate confidential and proprietary information.

But even if compliance would require Arconic to produce some confidential and proprietary information, the court "must balance the need for the trade secrets against the claim of injury resulting from disclosure." *Centurion*, 665 F.2d at 325. "[I]f relevancy and need are shown, the trade secrets should be disclosed, unless they are privileged or the subpoenas are unreasonable, oppressive, annoying, or embarrassing." *Id.* at 326. As explained above, Spirit has shown relevancy and need. And so the court must balance that need against Arconic's claim of injury resulting from disclosure. Arconic has not established that disclosure will result in a clearly defined and serious injury. Instead, Arconic merely speculates that "it can be reasonably foreseen that Arconic's customers would likely terminate their business relationship with Arconic if it were

to disclose proprietary materials, and that any disclosure would adversely affect Arconic's business reputation and ability to operate in the aerospace industry in the future." (ECF No. 193, at 3.) This argument is speculative and conclusory. It does not rise to the level of a particular and specific demonstration of fact sufficient to substantiate Arconic's hypothetical claim of injury.

But perhaps most obviously, the burden of a nonparty opposing a subpoena "is particularly heavy to support a motion to quash as contrasted to some more limited protection such as a protective order." *In re Domestic Drywall Antitrust Litig.*, 300 F.R.D. 234, 239 (E.D. Pa. May 15, 2014). Arconic has not met that heavy burden here. Arconic does not explain why the agreed protective order in this case is not sufficient to address any confidentiality concerns. Indeed, courts routinely deny motions to quash subpoenas seeking confidential material when there is a protective order already in place that will present the issuing party from misusing the information. *See, e.g.*, *Aquastar Pool Prods. Inc. v. Paramount Pool & Spa Systems*, No. 19-00257, 2019 WL 250429, at *3-*4 (D. Ariz. Jan. 17, 2019) (denying motion to quash where subpoena recipient did not show why a protective order was not sufficient to address its confidentiality concerns); *Mylan*, 2018 WL 4063496, at *5 (same); *In re Ex Parte Application of Kleimar N.V.*, 220 F. Supp. 2d 517, 521 (S.D.N.Y. 2016) (same); *Arcelormittal Indiana Harbor LLC v. Amex Nooter, LLC*, No. 2:15-cv-195, 2015 WL 6554436, at *3 (N.D. Ind. Oct. 28, 2015) (same). Arconic's confidentiality objections are therefore overruled.

**IT IS THEREFORE ORDERED** that Arconic's Motion to Quash Subpoena and Spirit's Motion to Compel Production of Documents in Compliance With Subpoena (ECF Nos. 177 & 186) are granted in part and denied in part. Arconic is ordered to produce, on or before **January 31, 2020**, documents responsive to Request No. 4-8 sufficient to show/identify whether Arconic manufactured, marketed, assembled, or sold and/or offered or provided the specific products and

services that Spirit contends overlapped with its business during the relevant time period—namely, those products and services listed in Request No. 7 or referenced in Request No. 8 with respect to the "*We're on it*" document attached as Exhibit 1 to the subpoena.

**IT IS SO ORDERED.**

Dated January 16, 2020, at Topeka, Kansas.

s/Angel D. Mitchell  
Angel D. Mitchell  
U.S. Magistrate Judge