## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

LARRY A. LAWSON,                )
                                )
                Plaintiff,       )
                                )
        v.                       )        Case No. 18-1100-EFM-ADM
                                )
SPIRIT AEROSYSTEMS, INC.,        )
                                )
                Defendant.       )

### MEMORANDUM AND ORDER

This matter comes before the court on Non-Party Arconic Inc.'s ("Arconic")[1] Motion to Quash Subpoena and for Protective Order (ECF No. 302) and defendant Spirit AeroSystems, Inc.'s ("Spirit") Motion to Compel Full Compliance with Order (Dkt. 224) Against Arconic (ECF No. 323). The subject motions relate to document and deposition subpoenas Spirit served on Arconic seeking information relating to the business overlap between the two companies, as well as plaintiff Larry A. Lawson's ("Lawson") involvement with Arconic—subjects that are central to the issues in this lawsuit.

Spirit and Arconic already engaged in motion practice over the document subpoena, and the court ordered Arconic to produce "documents . . . sufficient to show/identify whether Arconic manufactured, marketed, assembled, or sold and/or offered or provided the specific products and services that Spirit contends overlapped with its business during the relevant time period." *Lawson v. Spirit AeroSystems, Inc.*, No. 18-1100-EFM-ADM, 2020 WL 243598, at *6 (D. Kan. Jan. 16,

---

[1] According to Arconic, it separated into two companies on April 1, 2020—Howmet Aerospace Inc. and Arconic Corporation—and Arconic now calls itself "Howmet." (ECF No. 349, at 1 n.1.) For clarity of the record, the court declines to adopt this nomenclature because the subpoenas and the court's prior order were directed to Arconic Inc. This order likewise applies to Arconic Inc., including its successors in interest.

2020).  After Arconic produced documents relating to only one product (aircraft seat tracks), Spirit filed a renewed motion to compel because Spirit contends that Arconic failed to comply with the court's order.  Spirit points to various sources of information that suggest Arconic manufactured, marketed, and/or sold several additional products during the relevant time period.  (*See* ECF No. 323, at 2.)  As explained below, the court grants Spirit's motion because Arconic did not fully comply with the court's January 16 order.

Arconic's motion seeks to quash Spirit's Rule 30(b)(6) deposition subpoena to Arconic.  Arconic originally agreed to produce a Rule 30(b)(6) designee in response to the subpoena.  But, after Spirit took two Arconic fact witness depositions, Arconic reversed course and took the position that the Rule 30(b)(6) deposition was irrelevant and unnecessary because Spirit already deposed two witnesses on similar topics.  (*See* ECF No. 303, at 2-3.)  As explained below, the court disagrees.  Spirit is clearly entitled to the Rule 30(b)(6) deposition, and Arconic has not established that the deposition is unnecessary or that it will subject Arconic to undue burden.  The court therefore denies Arconic's motion to quash and for a protective order.

## I.     BACKGROUND

The background of this lawsuit is more thoroughly set forth in this court's prior orders, familiarity with which is presumed.  Lawson is Spirit's former chief executive officer who retired on July 31, 2016.  His Retirement Agreement ("Agreement") contained non-compete obligations for two years, until July 31, 2018.  In early 2017, Lawson engaged in business dealings with non-party investment firms Elliott Associates, L.P. and Elliott International, L.P. (collectively, "Elliott") to provide consulting services in connection with a proxy contest that Elliott launched to replace five board members of Arconic.  When Spirit learned about this, Spirit notified Lawson that his involvement with Arconic constituted a breach of his non-compete.

Lawson's Agreement prohibited him from serving in various capacities with any business that is "engaged, in whole or in part, in the Business, or any business that is competitive with the Business or any portion thereof." *Lawson v. Spirit AeroSystems, Inc.*, No. 18-1100-EFM, 2018 WL 3973150, at *2, *7 (D. Kan. Aug. 20, 2018).  The Agreement defines the term "Business" as follows:

> We are engaged in the manufacture, fabrication, maintenance, repair, overhaul, and modification of aerostructures and aircraft components, and market and sell our products and services to customers throughout the world (. . . the "*Business*").

*Id.* (emphasis in original).  Spirit originally argued that "Business" should be broadly construed to encompass other aircraft component manufacturers, including Arconic.  *Id.* at *7.  But the court rejected this interpretation and held that the term "Business" means "the *specific* products and services provided, marketed, or sold by Spirit."  *Id.* at *8 (emphasis in original).

After Lawson became involved with Elliott and Arconic, Spirit stopped paying Lawson and demanded that he repay what the company had already paid him under the Agreement.  Lawson disputes that he breached the non-compete.  He filed this lawsuit seeking to recover what he believes Spirit owes him.

### A.    Spirit's Document Subpoena and the Court's January 16 Order

In July 2019, Spirit served Arconic with a subpoena containing ten document requests relating primarily to the nature of Arconic's business.  (*See* ECF No. 323, at 3-4.)  Arconic initially served objections and responses, and it produced 75 pages of documents.  When Spirit and Arconic could not resolve their disputes over Arconic's objections, Arconic filed a motion to quash the document subpoena, and Spirit filed a cross-motion to compel the production of documents responsive to five of the requests.  (*See id.* at 4; ECF No. 177; ECF No. 186.)  Arconic primarily argued that the court should quash Spirit's subpoena because the requests at issue sought Arconic's

confidential and proprietary information as well as the confidential and proprietary information of its customers.   Arconic also argued that responding to the subpoena would impose an undue burden.   In response, Spirit argued that it was simply seeking documents sufficient to identify the aerostructures and aircraft components Arconic marketed, manufactured, or sold during the relevant time period and not confidential or proprietary customer-related information such as unique design specifications, pricing, sales volumes, or other sensitive information.

The court determined that "Arconic's objections [were] largely without merit."  *Lawson*, 2020 WL 243598, at *1.   The court found that, to the extent Spirit was seeking to identify the aerostructures and aircraft components made, manufactured, or sold by both companies, the requests at issue were relevant and proportional to the needs of the case.  *Id.* at *4.   Especially in light of that narrow scope, the court further found that Arconic had not substantiated its claims of undue burden, nor had Arconic shown that complying with the subpoena would require disclosure of confidential information or that any confidentiality concerns could not be adequately addressed by the protective order in this case.  *Id.* at *5-*6.   The court ordered Arconic to produce, by January 31, 2020, "documents . . . sufficient to show/identify whether Arconic manufactured, marketed, assembled, or sold and/or offered or provided the specific products and services that Spirit contends overlapped with its business during the relevant time period." *Id.* at *6.   Those products that Spirit contended might overlap included 43 aircraft components listed in its Request No. 7 and aerostructures and aircraft components identified in advertising material created by Arconic (Request No. 8).  *See id.*

### B.      Spirit's Depositions of Arconic Witnesses

In early December 2019, Spirit informed Arconic that it intended to take a Rule 30(b)(6) deposition and individual depositions of former Arconic board members Patricia Russo ("Russo")

and Arthur Collins ("Collins"), and a former Arconic employee named Rodney Heiple ("Heiple"). (ECF No. 318, at 4; ECF No. 319-1.)  After Arconic informed Spirit that Russo's testimony would be duplicative of Collins' testimony, Spirit agreed not to pursue her deposition at that time.  (ECF No. 318, at 4; ECF No. 319-2.)  Arconic otherwise agreed to produce Collins, Heiple, and a Rule 30(b)(6) designee.  (*See* ECF No. 318, at 4-5.)  During the month of December 2019, Spirit and Arconic conferred about the Rule 30(b)(6) deposition topics.  Arconic had no objection to five of Spirit's nine proposed topics, but did raise challenges to the remaining four.  (ECF No. 318, at 5; ECF No. 319-7, at 1.)  Spirit narrowed those topics and served Arconic with the subpoenas for Rule 30(b)(6) and individual testimony on December 31.  (ECF No. 318, at 5; ECF No. 319-8.)

Spirit deposed Collins on February 5.  (*See* ECF No. 303-2.)  Collins served on Arconic's board of directors from 2010 to 2019.  (ECF No. 303, at 8.)  He served on various board committees, including a special committee convened to search for a new chief executive officer that interviewed Lawson for the position in 2017.  (*See id.*)  Spirit questioned Collins primarily about Elliott's proxy contest and the process for selecting a new chief executive officer, including Lawson's involvement in that process.  (*See id.*)  On February 12, Spirit deposed Heiple.  (ECF No. 303-3.)  Before Heiple retired, he was Arconic's Director of Research and Development in the company's Engineered Products and Solutions business unit.  (*Id.*)  Spirit questioned Heiple primarily about Arconic's business and the products it manufactured and sold.  (*See id.* at 8-9.) These two witnesses prepared for their depositions by meeting with counsel only briefly; they did not review documents or reach out to anyone else to gather information to prepare for their depositions.  (*See* ECF No. 303-2, at 4; ECF No. 303-3, at 4-5.)

On February 12, Arconic informed Spirit that John Roggenburk ("Roggenburk") would be its Rule 30(b)(6) witness.  (ECF No. 381, at 5; ECF No. 319-9, at 9.)  Spirit and Arconic conferred

on a date and location for the deposition but did not reach agreement.  (*See* ECF No. 319 ¶ 14, at 2.)  Later, Arconic offered to designate Collins' and Heiple's testimony as Rule 30(b)(6) testimony in lieu of deposing Arconic's corporate representative, but Spirit declined this offer.  (ECF No. 303, at 7 n.1; ECF No. 318, at 5.)

## II.   SPIRIT'S MOTION TO COMPEL

The court first turns to Spirit's motion to compel full compliance with the court's January 16 order.  As explained above, in late 2019, Arconic filed a motion to quash Spirit's document subpoena, and Spirit filed a motion to compel Arconic to respond.  The court granted both motions in part and compelled Arconic to produce limited documentation in response to Spirit's Request Nos. 4-8, which sought information relating to the business overlap between Spirit and Arconic. *See Lawson*, 2020 WL 243598, at *6.  Specifically, the court ordered Arconic to produce the following by January 31:

> documents . . . sufficient to show/identify whether Arconic manufactured, marketed, assembled, or sold and/or offered or provided the specific products and services that Spirit contends overlapped with its business during the relevant time period— namely, those products and services listed in Request No. 7 or referenced in Request No. 8 with respect to the "*We're on it*" document attached . . . to the subpoena.

(*Id.*)  Request No. 7 listed 43 specific aircraft components: bay frames, bird strike panels; bonded assemblies; bulkheads; clam shells; crack stoppers; crown frames; doors; door frames, surrounds; edge frames; fan cowl doors and hinges; flaps; flap tracks; flight deck components; floors; fuselage chords; fuselage frames, panels, and/or kits; fuselage skins; fuselage stringers; fuselage-to-wing connections; keel beams; landing gear; lavatory access panels; leading edge skins; nacelle bulkheads; nacelle structure, skins and doors; nose doublers; pylon bulkheads and spars; pylon components (including fittings and heat shields); pylon fairings; seat tracks; shear ties; splice straps; spoilers/flaps; stanchions; structural hook pressure relief; tailcone frames; thrust reversers;

trailing edge flaps and ailerons; window frames; wing components (including ribs and skins); wing spars; and winglet tip caps. *Id.* at *2. The "*We're on it*" document—created by Arconic—similarly listed aircraft components and stated "[Arconic's] solutions power the skies." (ECF No. 178-1, at 12.)

On April 2, Spirit filed a motion to compel Arconic to fully comply with the court's January 16 order. (*See* ECF No. 323.) According to Spirit, on January 31, "Arconic produced 32 pages of redacted documents, all of which appear to be documents evidencing the sale of one product: aircraft seat tracks." (*Id.* at 5; *see also* ECF No. 324-1.) Spirit believes Arconic failed to produce documents sufficient to identify *all* overlapping products. In support of this argument, Spirit relies on multiple sources, including Arconic press releases, industry publications, Arconic's representations to Spirit about its capabilities, documents Boeing produced to Spirit in this litigation, and Heiple's deposition testimony. Spirit asks the court to enter another order compelling Arconic to promptly and fully comply with the January 16 order. (ECF No. 323, at 12.)

Arconic's response admits that, in addition to aircraft seat tracks, it should have produced documents regarding five more overlapping products and it has now agreed to do so. (ECF No. 349, at 1.) As to the other aircraft components listed in Spirit's Request No. 7 and the "*We're on it*" document, Arconic contends that it does not actually create those products, but rather only raw materials and component parts that are then used by other companies to make the aircraft components and aerostructures themselves. (*See id.* at 5.) Arconic contends that Spirit has misconstrued the documents and testimony it relies on to argue that Arconic manufactured, marketed, assembled, or sold and/or offered or provided any additional overlapping products.

### A.    Spirit's Motion is Granted to the Extent It Is Unopposed

Spirit's motion is granted to the extent it is unopposed.  After Arconic produced documents that evidenced only its manufacture and sale of aircraft seat tracks, on January 31 Spirit inquired whether Arconic would be producing additional documents pursuant to the January 16 order.  (*See* ECF No. 324-5, at 4-5.)  In February, Spirit identified other Arconic products it believed fell within the scope of the court's order that it had learned about through other documents.  (*Id.* at 1-3.)  But Arconic still did not produce any additional documents.  Spirit therefore filed its renewed motion to compel on April 2.  After the court's preliminary review of the motion, the court was concerned that Arconic had not complied with the court's January 16 order and, if so, that another order compelling production might be futile.  Therefore, the court granted Spirit leave to seek any sanctions it believed were appropriate.  (ECF No. 329.)  As allowed by the court's order, Spirit filed a motion to hold Arconic in contempt in which Spirit also seeks monetary sanctions against Arconic of at least $35,000 and an adverse inference instruction.[2]  (ECF No. 338, at 6.)

Only then did Arconic admit for the first time in its response to Spirit's motion to compel that it should have produced documents sufficient to show "that it actually makes fully assembled (a) fan cowl doors and hinges; (b) lavatory access panels; (c) spoilers/flaps; (d) structural hook pressure relief; and (e) trailing edge flaps and ailerons."  (ECF No. 349, at 1.)  Roggenburk provided a declaration in support of Arconic's response in which he explains that he was involved in collecting documents responsive to the January 16 order.  (ECF No. 350 ¶ 5, at 2.)  He states that Arconic has "worldwide facilities in hundreds of locations" and Roggenburk apparently only looked at what some of Arconic's facilities produce when he initially collected documents.  (*Id.*)

---

[2] As explained below, Spirit's motion to hold Arconic in contempt is still pending and will be taken up by the court in a separate order.

Roggenburk later "expanded the search to other facilities and conferred with additional individuals" and learned of the five additional overlapping products. (*Id.*) Arconic claims that its failure to produce all responsive documents was an unintentional oversight, and it states that it intends to "immediately produce documents to Spirit reflecting the manufacture, marketing, assembling, or sale of [the five] additional products." (ECF No. 349, at 3.) On April 23 and 24, Arconic produced 250 pages of additional documents to Spirit. (*See* ECF No. 355, at 2 n.2; ECF Nos. 356-1 & 356-2.)

In light of Arconic's admission and subsequent document production, the court grants Spirit's motion as unopposed with respect to fan cowl doors and hinges, lavatory access panels, spoilers/flaps, structural hook pressure relief, and trailing edge flaps and ailerons.

### B.      Spirit's Motion Is Otherwise Granted

To the extent that Arconic opposes Spirit's motion, Spirit's motion is also granted. Even with the additional documents Arconic has now produced, the court is not convinced that Arconic has applied the correct standards to comply with the court's January 16 order. Spirit provided the court with multiple examples of Arconic advertising and/or selling products that Spirit alleges overlap with its business (in addition to the six products Arconic now admits that it manufactures and sells). For example, Arconic issued a press release in 2014 stating that it entered into a "long-term contract to supply aluminum sheet and plate products to Boeing" and that Arconic would be the "sole supplier to Boeing for wing skins." (ECF No. 324-3, at 1.) A year later, Arconic issued a press release stating that it would be forging titanium bulkheads for Lockheed Martin. (ECF No. 324-4, at 1-2.) And Heiple confirmed in his deposition that Arconic supplied wing skins to Boeing and titanium bulkheads to Lockheed Martin. (*See* ECF No. 303-3, at 10, 15.)

A 2017 email from an Arconic employee to Spirit (and attached Arconic materials) also appear to confirm that Arconic manufactures more overlapping products than it now admits.  In that email, the Arconic employee describes the capabilities of Arconic's two complex machining facilities in Minnesota and Quebec and states that Arconic could engage in "monolithic conversion, machining and integrated assemblies of" pylons, spoilers, ailerons, trailing edge flaps, trailing edge ailerons, vertical leading edges; horizontal wing tips, winglet tip caps, spars, wing ribs, shear ties; bulkheads, fuselage frames, access doors; and floors, engine and turbine bases. (ECF No. 325-2, at 1.)  Spirit also represents that Boeing has produced documents in this litigation showing that Arconic sold Boeing "bulkhead forgings, rib assemblies, nacelle support assemblies, and trunnions."  (ECF No. 323, at 9.)

In response to these examples, Arconic repeatedly tries to distinguish between its products that are "assembly-ready" and those that are not.  (*See* ECF No. 349, at 12.)  With respect to wing skins, for example, Arconic contends that its 2014 press release discusses a contract for aluminum sheet and plate products, which Boeing or a third party would then use to create wing skins; Arconic states that it did not supply fully assembled and finished wing skins directly to Boeing. (*Id.* at 8; ECF No. 350 ¶ 9, at 3-4.)  Similarly, Arconic contends that the 2015 press release discusses a contract to supply titanium raw material.  (ECF No. 349, at 10.)  Arconic argues that the bulkheads referenced were "unfinished bulkheads that are built for a particular purchaser (in this case, Lockheed Martin), which then are customized by the end user to suit their needs."  (*Id.*; *see also* ECF No. 350 ¶ 10, at 4.)  The bulkheads supplied are "five to ten times the weight" of the finished bulkheads that would eventually be installed into aircraft.  (ECF No. 349, at 10; ECF No. 350 ¶ 10, at 4.)  Ultimately, Arconic appears to believe that only documents relating to "assembly-ready" products must be produced under the January 16 order, and documents relating to products

that must be "processed and customized before [they] can be installed in an aircraft" are beyond the order's scope.  (ECF No. 349, at 12 & 12 n.3.)

Arconic has self-imposed an improper restrictive gloss on the court's order.  The court did not order Arconic to produce documents sufficient to show that it manufactured, marketed, assembled, or sold and/or offered or provided only *assembly-ready* aerostructures or aircraft components.  Rather, the court ordered Arconic to produce documents related to specifically-named products.  The record evidences that Arconic manufactured, marketed, assembled, or sold and/or offered or provided at least some of the products described above, even if it did not consider them to be assembly-ready.  Arconic tries to distinguish between "assembly-ready" products and raw materials by arguing that it cannot be considered to manufacture aircraft doors when all it manufactures is "the screws and raw metallic materials used to form a door."  (ECF No. 349, at 12.)  This attempted distinction is inapposite because it bears no resemblance to the distinctions Arconic has actually drawn.

For example, Heiple testified that Arconic manufactured and sold titanium bulkheads to Lockheed Martin in the relevant time period:

> Q.    So Alcoa was providing the -- or [Arconic] was making the
>        large titanium bulkheads which are the backbone for the
>        aircraft structure for the F-35; is that right?
>
> A.    That's correct.

(ECF No. 303-3, at 15.)  Arconic tries to discount this testimony because it contends that it manufactures and sells unfinished bulkheads (*e.g.*, to Lockheed Martin) that are then customized by the end user to suit their needs.  It points to the following comparison between the bulkhead that Arconic supplies and the finished bulkhead that Lockheed Martin eventually uses, as refined by a third party and installed by Lockheed Martin:



*Raw Material*
*(Produced by Arconic)*

*Finished Product*
*(Not Produced By Arconic)*

But the fact that Lockheed Martin (or a third party) may perform additional machining or other operations prior to installing the bulkhead in an aircraft is immaterial. At the end of the day, it is obvious that Arconic manufactured and sold a "bulkhead." The same is presumably true for wing skins, which Heiple testified would require "[a]dditional fabrication steps, including machining and drilling," prior to installation on an aircraft. (*Id.* at 12.) If that is all that was required, Arconic still manufactured and sold "wing skins." These examples are wildly different than Arconic's aircraft door illustration because Arconic was not manufacturing and selling screws, fasteners, and raw materials that a customer later used to create its own bulkheads or wing skins. Arconic must produce documents relating to these products.

But even under Arconic's "assembly-ready" distinction (again, a distinction that does not apply here), the court is not persuaded that Arconic has necessarily produced all responsive documents. Spirit cites aerospace industry reports prepared by Counterpoint Market Intelligence Limited ("Counterpoint") that appear to confirm that Arconic manufactured more "assembly-ready" products than it admits in its response. Counterpoint defines "aerostructures" as "parts [that] must be 'assembly ready.'" (ECF No. 339-3, at 4.) Counterpoint specifically includes wing skins as an aerostructure, and lists Arconic's contracts to manufacture wing skins for Boeing and

Airbus.  (*Id.* at 4-6.)  Counterpoint's 2016 report also lists various aerostructures contracts entered into by RTI International Metals, a company that Arconic acquired in 2015.  (ECF No. 339-1, at 9-10.)   In 2017 and 2018, Counterpoint estimates that Arconic generated $190 million in aerostructures sales.  (ECF No. 339-2, at 4; ECF No. 339-3, at 4.)

Arconic also appears to ignore the fact that documents relating to alleged overlapping products *marketed* by Arconic also fall within the scope of the January 16 order.  As noted above, Spirit received an email from an Arconic employee stating that the company had two facilities capable of producing pylons, spoilers, ailerons, trailing edge flaps, trailing edge ailerons, vertical leading edges; horizontal wing tips, winglet tip caps, spars, wing ribs, shear ties; bulkheads, fuselage frames, access doors; and floors, engine and turbine bases.  (ECF No. 325-2, at 1.)  Again, Arconic's argument that it did not manufacture, market, assemble, or offer the majority of the "finished and fully assembled components" listed in this email does not comply with the court's order.  (ECF No. 349, at 11; *see also* ECF No. 350 ¶ 8, at 3.)  Arconic argues that the email merely "illustrates the products for which [Arconic] could create the unfinished component."  (ECF No. 349, at 11; *see also* ECF No. 350 ¶ 8, at 3.)  Arconic also states that the "*We're on it*" document was not designed to market that Arconic manufactured all of the components or aerostructures listed; rather, its "purpose is to show products that [Arconic] could make."  (ECF No. 349, at 6.)  The court rejects Arconic's attempts to frame these documents as something other than marketing.  The email and the "*We're on it*" document clearly market Arconic's capabilities with respect to producing aircraft components and aerostructures, not merely raw materials.  And, the court notes that the "*We're on it*" document markets the five products that Arconic now admits that it also manufactures and sells.  The court's January 16 order did not make any distinction between products that Arconic manufactured and sold versus those products that Arconic only *marketed*.

The court's order, by its plain terms, ordered Arconic to produce documents sufficient to show the extent to which it marketed the alleged overlapping products, whether or not it considered those products to be "assembly-ready" and whether or not they were ever actually manufactured.

Arconic failed to comply with the court's January 16 order. Although Arconic has since produced some additional documents, it still has not fully complied because of its flawed interpretation of the order's language. The court therefore grants Spirit's motion to compel. To be clear, Arconic is ordered to produce documents sufficient to show whether it has done any one or more of the following with respect to each of the aircraft components and aerostructures that Spirit has identified as allegedly overlapping:

- Manufactured
- Marketed
- Assembled
- Sold
- Offered
- Provided

By **May 15, 2020**, Arconic must produce documents in compliance with the court's January 16 order and this order, without regard to whether it considers the alleged overlapping products to be "assembly-ready" and without regard to whether overlapping products were only marketed (and not actually manufactured/sold). At a minimum, it appears that Arconic's supplemental document production should include documents relating to the following products Spirit identified in its motion: pylon components, winglet tip caps, spars, wing ribs, shear ties, bulkheads, fuselage frames, doors, floors, and wing skins. There may be more.

The court is concerned about Arconic's intransigence in failing to comply with Spirit's document subpoena—initially, throughout the meet-and-confer process, and in putting an improper restrictive gloss on the court's January 16 order. And although the court is certainly glad that Arconic belatedly agreed to produce additional documents, Arconic dug in its heels for months

insisting that it did not have any other documents to produce, then reversed course and admitted that it had more responsive documents just days after the court invited Spirit to seek sanctions for Arconic's noncompliance with the court's January 16 order.  At that point, Arconic produced over twice as many documents as it had previously produced.  And, even now, Arconic continues to rely on false distinctions that do not exist in the court's January 16 order.  The court therefore orders Arconic to file a certification on **May 15, 2020**, signed by a party representative of Arconic under penalty of perjury and signed by all counsel of record for Arconic in this action.  That certification must confirm that Arconic's document production is complete; that Arconic has fully complied with the court's orders compelling production of documents; and it must describe the timing, volume, and substance of Arconic's productions.

## III.   ARCONIC'S MOTION TO QUASH AND FOR PROTECTIVE ORDER

The court turns next to Arconic's motion to quash the Rule 30(b)(6) deposition.  Spirit seeks to depose an Arconic corporate representative on the following topics:

> 1. Arconic's internal discussions and communications with [Elliott] in 2017 regarding (1) whether and why [Lawson] was or was not a good candidate for Arconic's CEO and/or a member of Arconic's Board of Directors; and (2) whether Lawson had continuing obligations to Spirit that would restrict or prohibit him from becoming Arconic's CEO and/or a member of Arconic's Board of Directors.
> 2. Equipment utilized by Arconic for the manufacture of aerostructures and aircraft components from April 1, 2013 to July 31, 2018.
> 3. Aerostructures and aircraft components manufactured, marketed, assembled, and/or sold to customers by Arconic (excluding fasteners and raw materials) from April 1, 2013 to July 31, 2018, including but not limited to those that are listed on [the attached exhibit].
> 4. With respect to the potential joint development agreement between Spirit and Arconic in 2018 ("JDA"), (1) the purpose and goal of the JDA, (2) the reason the JDA was not finalized, and (3) any areas of overlap in business, competition or potential

15

competition between Spirit and Arconic that formed, in whole or in part, the basis for discontinuing pursuit of the JDA.

5. Any areas of competition and/or business overlap between Arconic and Spirit from April 1, 2013 to July 31, 2018.

6. Specific products manufactured, marketed, assembled, and/or sold to by Arconic to Boeing or Airbus from April 1, 2013 to July 31, 2018.

7. Any agreements between Arconic on the one hand, and Lawson and/or Elliott on the other hand, relating to the following during 2017 or 2018: (1) Lawson's provision of services to Arconic, (2) Lawson's provision of services to Elliott, or (3) Elliott's provision of services to Arconic.

8. Any meetings between Arconic and Lawson from December 1, 2016 through October 31, 2017 regarding the potential of Lawson becoming Arconic's CEO and/or a member of Arconic's Board of Directors.

9. The specific aerostructures and aircraft components identified on the "*We're On It*" document (Metallic-CFRP Aircraft portion) . . . that Arconic manufactured, marketed, assembled and/or sold from April 1, 2013 to July 31, 2018, as well as the customers/end users of those products (if known).

(ECF No. 303-1, at 5.)

Arconic originally agreed to a corporate representative deposition and, on February 12, 2020, Arconic informed Spirit that Roggenburk would be its Rule 30(b)(6) designee. Arconic later reversed course and has now filed a motion asking the court to quash Spirit's Rule 30(b)(6) deposition subpoena and issue a protective order. (ECF No. 302.) Arconic argues it should not be required to produce a Rule 30(b)(6) witness because the listed topics are cumulative and duplicative of other discovery Spirit has already obtained—specifically, Collins and Heiple's testimony and documents produced by Arconic—and disproportionate to the needs of the case. (ECF No. 303, at 5-12.) Arconic also contends that the issue of whether it competes with Spirit is irrelevant to the parties' dispute because Lawson never actually became an Arconic board member or Arconic's chief executive officer. (*Id.* at 12.)

16

Spirit opposes Arconic's motion.  Spirit argues the nine deposition topics seek information relevant to the overlap in Spirit's and Arconic's products and services or information relevant to whether Lawson was in breach of his non-compete through his involvement with Elliott and Arconic.  (ECF No. 318, at 6-9.)  Spirit further argues that the Rule 30(b)(6) testimony it seeks is not cumulative or duplicative of Collins and Heiple's testimony because Arconic did not designate them as corporate representatives, they did not prepare for their depositions like a corporate representative would be required to under the Federal Rules, and they had gaps in their knowledge. (*See id.* at 10-13.)  Spirit further contends that Arconic's document production cannot render a corporate representative deposition cumulative and duplicative because the production was so deficient that Spirit was forced to file a second motion to compel Arconic to produce documents. (*Id.* at 13.)  Spirit also argues that Arconic has failed to establish that producing a corporate representative is unduly burdensome.  (*Id.* at 9-10.)

## A.   Legal Standards

A party may issue a deposition subpoena to a corporation under Rule 30(b)(6) and Rule 45.  The scope of discovery for a deposition subpoena is the same as the scope of discovery under Rule 26(b).  *See Centurion Indus., Inc. v. Warren Steurer & Assocs.*, 665 F.2d 323, 325 (10th Cir. 1981); *In re Syngenta Ag Mir 162 Corn Litig.*, No. 14-MD-2591-JWL, 2017 WL 386835, at *3 (D. Kan. Jan. 27, 2017).  "Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case."  FED. R. CIV. P. 26(b)(1).  In other words, considerations of both relevance and proportionality now expressly govern the scope of discovery.  FED. R. CIV. P. 26(b)(1) advisory committee's note to the 2015 amendment.  Relevance is "construed broadly to encompass any matter that bears on, or that reasonably could lead to other matter that could bear on, any issue that is or may be in the case."

*Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 351 (1978); *see Rowan v. Sunflower Elec. Power Corp.*, No. 15-9227, 2016 WL 3745680, at *2 (D. Kan. July 13, 2016) (applying *Oppenheimer* after the 2015 amendment); *see also Kennicott v. Sandia Corp.*, 327 F.R.D. 454, 469 (D.N.M. 2018) (analyzing the 2015 amendment and concluding that it did not change discovery's scope but clarified it, and therefore *Oppenheimer* still applies).  In evaluating proportionality, the court considers "the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit."  FED. R. CIV. P. 26(b)(1).

While the scope of discovery is broad, it is not unlimited.  Rule 26(b)(2)(C) requires that the court "limit the frequency or extent of discovery" if the court determines that "(i) the discovery sought is unreasonably cumulative or duplicative, or can be obtained from some other source that is more convenient, less burdensome, or less expensive; (ii) the party seeking discovery has had ample opportunity to obtain the information by discovery in the action; or (iii) the proposed discovery is outside the scope permitted by Rule 26(b)(1)."  This rule incorporates the Rule 26(b)(1) proportionality standard.  *See Victor Stanley, Inc. v. Creative Pipe, Inc.*, 269 F.R.D. 497, 523 (D. Md. 2010) ("Fed. R. Civ. P. 26(b)(2)(C) cautions that all permissible discovery must be measured against the yardstick of proportionality.").  The court may also grant a protective order to limit discovery under Rule 26(c)(1).  Under that rule, the court may, for good cause, issue an order "to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense."  FED. R. CIV. P. 26(c)(1).  The court must also quash or modify a subpoena that subjects the recipient to undue burden.  FED. R. CIV. P. 45(d)(3)(A)(iv).

**B.      Relevance**

"When the discovery sought appears relevant on its face, the party resisting the discovery has the burden to establish that the requested discovery does not come within the scope of relevance as defined under Rule 26(b)(1), or is of such marginal relevance that the potential harm occasioned by the discovery would outweigh the ordinary presumption in favor of broad disclosure." *McBride v. Medicalodges, Inc.*, 250 F.R.D. 581, 586 (D. Kan. 2008). If relevance is not apparent on the face of a request, "the party seeking the discovery has the burden to show the relevancy of the request." *Id.*

Arconic argues the testimony Spirit seeks on whether the two companies are in the same "Business" is irrelevant because it is undisputed that Lawson "was never hired as a board member or as the chief executive officer" and he "had no relationship with Arconic whatsoever." (ECF No. 303, at 12.) Arconic also briefly argues that the testimony relating to Arconic's search for a new chief executive officer is also irrelevant for essentially the same reason, *i.e.* Lawson was never selected for the role. (ECF No. 334, at 2.)

These arguments are without merit. Spirit does not contend that Lawson breached his non-compete by becoming an Arconic board member or officer. Instead, Spirit alleges that Lawson's role as an Elliott consultant in connection with the Arconic proxy contest breached the non-compete because Spirit and Arconic are in the same "Business." *See Lawson v. Spirit AeroSystems, Inc.*, 410 F. Supp. 3d 1195, 1200 (D. Kan. 2019). The court has already found that discovery relating to whether Spirit and Arconic are in the same "Business" is relevant. *See, e.g.*, *Lawson*, 2020 WL 243598, at *3 (stating that whether Spirit and Arconic were in the same "Business" during the relevant time period is "the main issue in this case"). The testimony Spirit seeks on business overlap (Topics 2-6 and 9) is highly relevant.

Spirit also seeks corporate representative testimony on communications between Arconic and Elliott regarding Lawson, agreements between Arconic and Lawson and/or Elliott, and meetings between Arconic and Lawson regarding his potential service as an officer or board member (Topics 1, 7, and 8). (*See* ECF No. 318, at 9.) Spirit argues these topics seek relevant discovery regarding the assistance Lawson provided to Elliott and actions Lawson may have taken in breach of his non-compete. (*See id.*) The court agrees with Spirit. Although Lawson never became an Arconic officer or board member, other actions that shed light on the nature and extent of his involvement with Elliott and Arconic are clearly relevant to whether his involvement with them constituted a breach of his non-compete.

### C.    Proportionality

Discovery must not only be relevant, it must also be proportional. FED. R. CIV. P. 26(b)(1). Arconic primarily argues that the court should quash Spirit's subpoena because the testimony sought is "unreasonably cumulative and duplicative of other discovery Spirit has already taken" and therefore not proportional to the needs of the case. (ECF No. 303, at 5.) Arconic states that Collins and Heiple have already "testified on the subject matter of the topics now set forth in the Rule 30(b)(6) Subpoena; they answered the questions Spirit asked with knowledge of the issues." (*Id.* at 6.) Arconic also states that it has produced documents related to Spirit's Rule 30(b)(6) topics. (*Id.* at 9.) Arconic characterizes Spirit's pursuit of a Rule 30(b)(6) deposition as an attempt to take "a third bite at the apple . . . to . . . discover that which Spirit could have, and should have, already discovered." (*Id.* at 3.) In response, Spirit argues that deposing Collins and Heiple should not preclude Spirit from deposing Arconic's corporate representative. (ECF No. 318, at 10.) Spirit's response points out that neither witness was designated as a corporate representative and neither prepared for their respective depositions as a Rule 30(b)(6) designee would be required to

20

prepare.  (*Id.* at 11.)  Spirit identifies multiple instances where Collins and Heiple's testimony revealed their lack of knowledge.  (*Id.* at 11-12.)

Rule 30(b)(6) requires a corporation to "designate one or more officers, directors, or managing agents, or designate other persons who consent to testify on its behalf" to "testify about information known or reasonably available to the organization."  Fed. R. Civ. P. 30(b)(6).  The party responding to a Rule 30(b)(6) deposition subpoena "must make a conscientious, good-faith endeavor to designate the persons having knowledge of the matters sought and to prepare those persons in order that they can answer fully, completely, and in a non-evasive manner, the questions as to the relevant subject matters."  *McBride*, 250 F.R.D. at 584.  "[T]he fact that a company's employee was deposed under Rule 30(b)(1) does not insulate the company from producing the same—or another—individual as a corporate representative to give a Rule 30(b)(6) deposition on the same topic."  *Sprint Commc'ns Co., L.P. v. Comcast Cable Commc'ns, LLC*, No. 11-2684-JWL-JPO, 2015 WL 3742929, at *8 (D. Kan. June 15, 2015); *see also, e.g.*, *New Jersey v. Sprint Corp.*, No. 03–2071-JWL-JPO, 2010 WL 610671, at *2 (D. Kan. Feb. 19, 2010) ("Even if the substance of the information ultimately provided mirrors that of the testimony given by Sprint's former directors and employees, plaintiff is still entitled to tie down the definitive positions of Sprint itself, rather than that of the individuals who work for Sprint."); *In re Motor Fuel Temperature Sales Practices Litig.*, No. 07–MD–1840–KHV, 2009 WL 5064441, at *2 (D. Kan. Dec. 16, 2009) ("[T]he fact that [the witnesses] addressed the noticed topics when testifying in their individual capacities is of no consequence.").

The court finds the Rule 30(b)(6) deposition Spirit seeks is not unreasonably cumulative or duplicative of other discovery from Arconic.  Arconic did not designate Collins and Heiple as Rule 30(b)(6) designees in advance of their depositions, but instead told Spirit that Roggenburk

would be Arconic's Rule 30(b)(6) designee.  The court has carefully reviewed Collins and Heiple's deposition transcripts.  They had limited knowledge and were in no way prepared to testify as Rule 30(b)(6) designees.  Collins was an Arconic board member who was not involved in the company's day-to-day operations and did not have knowledge of the specific products that Arconic supplied to various industries.  (ECF No. 302-2, at 8.)  He had some knowledge about Arconic's CEO search, including its interview of Lawson, because Collins was involved in the process.  However, he did not know anything about Lawson's non-compete with Spirit or Arconic's apparent determination that Lawson was legally restricted from serving as Arconic's CEO.  (*Id.* at 17-21.)  Heiple had knowledge about Arconic's internal, technological capabilities.  But he admitted that he would not be the best person to talk about what aircraft components Arconic was actually making and he repeatedly testified that he did not know "one way or the other" about what aircraft components or aerostructures Arconic contracted to supply to its customers because that was beyond his job responsibilities.  (*See, e.g.*, ECF No. 303-3, at 9, 11, 16-17, 19, 24, 29.)  Likewise, Arconic's document production also is not an adequate substitute for the Rule 30(b)(6) deposition. As discussed above, Arconic's document production was deficient at the time Spirit took those depositions.  And, even once it is complete, Spirit is entitled to question a witness about those documents.  The other discovery Arconic has provided (or will provide) in no way serves as a fair substitute for a proper Rule 30(b)(6) deposition.  Spirit therefore understandably rejected Arconic's after-the-fact offer to designate Collins and Heiple's testimony as its Rule 30(b)(6) deposition testimony.  (ECF No. 303, at 7 n.1.)  The deposition is proportional to the needs of the case.

### D.      Undue Burden

Arconic also argues the Rule 30(b)(6) deposition subpoena would subject it to undue burden.  Non-parties responding to Rule 45 subpoenas are generally afforded heightened

protection from discovery abuse. *Speed Trac Techs., Inc. v. Estes Exp. Lines, Inc.*, No. 08-212-KHV-JPO, 2008 WL 2309011, at \*2 (D. Kan. June 3, 2008).  A non-party seeking a protective order or to quash a deposition subpoena, however, "carries the burden to show good cause and/or the right to be protected." *Simmons Foods, Inc. v. Willis*, 191 F.R.D. 625, 630 (D. Kan. 2000).  Compliance with a subpoena necessarily involves some measure of burden to the producing party.  *See EEOC v. Citicorp Diners Club, Inc.*, 985 F.2d 1036, 1040 (10th Cir. 1993).  The court will not deny discovery simply because compliance will inconvenience a nonparty or subject it to some expense.  *See In re EpiPen Mktg., Sales Practices and Antitrust Litig.*, MDL No. 2785, Case No. 17-md-2785, 2019 WL 1004145, at \*3 (D. Kan. Feb. 28, 2019).  A nonparty "objecting to a subpoena has the burden to show that compliance would cause undue burden, typically by presenting an affidavit or other evidentiary proof of the time and expense involved in responding to the subpoena." *Id.*

Arconic has made no such showing here.  Arconic again primarily argues that Spirit's Rule 30(b)(6) deposition subpoena is unduly burdensome because of the discovery it has already provided Spirit.  The court rejects this argument for the same reasons discussed above.  At the time Arconic filed its motion, it had produced only approximately 100 pages of documents and two witnesses—both without significant prior preparation—for approximately five and-a-half hours of deposition time.[3]  (*See* ECF No. 318, at 3-4; ECF Nos. 303-2 & 303-3.)  Indeed, Arconic initially agreed to the deposition and designated Roggenburk to testify on behalf of the company.  (*See* ECF No. 318, at 5.)  By contrast, Spirit notes that Boeing produced over 900 pages of documents

---

[3] As discussed *supra*, Arconic produced an additional 250 pages of documents on April 23 and 24.  Any additional productions do not change the court's conclusion as to whether Arconic has established undue burden.

to Spirit without seeking court intervention.  (ECF No. 318, at 13.)  Arconic has not established that Spirit's Rule 30(b)(6) deposition subpoena is unduly burdensome.

* * * * *

In sum, the court finds that Spirit's Rule 30(b)(6) deposition subpoena to Arconic seeks relevant, non-cumulative, and non-duplicative information that is proportional to the needs of the case.  Arconic has not established that producing a corporate representative would subject it to undue burden.  The court therefore denies Arconic's motion on that basis, and orders Arconic to adequately prepare and produce Roggenburk to testify as its Rule 30(b)(6) designee after Spirit has had a reasonable opportunity to review Arconic's supplemental document production.[4]  Spirit is directed to submit Roggenburk's deposition transcript to the undersigned's chambers as soon as practicable thereafter, whether a rough draft or a final.

## IV. SPIRIT'S MOTION TO HOLD ARCONIC IN CONTEMPT AND FOR SANCTIONS

The court notes that Spirit's Motion to Hold Arconic in Contempt (ECF No. 338) and for other sanctions for Arconic's failure to comply with the court's January 16 order remains pending. The court will await receipt of Arconic's certification that its document production is complete, as well as Roggenburk's deposition transcript.  Once the court receives both of those, the court will take them into consideration in ruling on this motion.

**IT IS THEREFORE ORDERED** that Non-Party Arconic Inc.'s Motion to Quash Subpoena and for Protective Order (ECF No. 302) is denied.

**IT IS FURTHER ORDERED** that defendant Spirit AeroSystems, Inc.'s Motion to Compel Full Compliance with Order (Dkt. 224) Against Arconic (ECF No. 323) is granted.  By

---

[4] The court encourages Spirit and Arconic to try to reach agreement on a deposition date.  If it is not feasible to complete the deposition before the close of fact discovery, the court would be amenable to a reasonable extension for this deposition.

**May 15, 2020**, Arconic must produce all responsive documents and certify compliance as set forth above.

      **IT IS SO ORDERED.**

      Dated April 30, 2020, at Topeka, Kansas.

s/ Angel D. Mitchell
Angel D. Mitchell
U.S. Magistrate Judge
