## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

LARRY A. LAWSON,                              )
                                             )
                    Plaintiff,               )
                                             )
        v.                                   )        Case No. 18-1100-EFM-ADM
                                             )
SPIRIT AEROSYSTEMS, INC.,                    )
                                             )
                    Defendant.               )

## MEMORANDUM AND ORDER

This matter comes before the court on Defendant Spirit AeroSystems, Inc.'s ("Spirit") Application for TAR Expenses. (ECF 385.) The court previously granted Spirit's motion to shift the expenses it incurred in connection with a technology-assisted review ("TAR") of approximately 322,000 documents to plaintiff Larry A. Lawson ("Lawson"). After the parties could not reach agreement regarding the amount of those expenses, Spirit filed this application seeking $791,700.21 in expenses incurred in connection with the TAR. Spirit also seeks $83,000 in costs and fees incurred conferring with Lawson and preparing the briefing associated with its current application. Lawson objects to the amount Spirit seeks, arguing many of the expenses included in Spirit's calculation are unreasonable or outside the scope of the court's order. (ECF 397-1.) Lawson contends that Spirit's reasonable TAR expenses are no more than $330,000.

For the reasons discussed below, the court grants Spirit's application in part and denies it in part. Specifically, the court awards Spirit $754,029.46 in TAR expenses. The court also awards Spirit its expenses incurred in connection with the current application, but the court cannot determine the reasonable amount of those expenses based on the present record. The court will therefore allow Spirit to file a renewed application with the required fee detail.

# I.     BACKGROUND

Lawson is Spirit's former chief executive officer.  He filed this breach of contract action after Spirit stopped paying him under his Retirement Agreement because of his business dealings involving Arconic, Inc. ("Arconic"), which Spirit contends violated Lawson's non-compete.  At Lawson's request, the parties spent months engaged in an ESI discovery process regarding the issue of business overlap between Spirit and Arconic using traditional ESI methods involving custodians and search terms.  When that process repeatedly yielded low responsiveness rates, the court allowed the parties to proceed—again, at Lawson's request—with the TAR, with the caveat that the court would decide whether to allocate the TAR expenses to Lawson.  Spirit filed a motion to shift the TAR expenses to Lawson pursuant to Federal Rule of Civil Procedure 26(c), which authorizes a court to allocate discovery expenses upon a showing of good cause in order to protect a party from undue burden and expense.  FED. R. CIV. P. 26(c)(1)(B).  The court granted the motion, finding good cause to allocate the TAR expenses to Lawson because he insisted on pursuing the TAR after it became disproportional to the needs of the case.  *See Lawson v. Spirit AeroSystems, Inc.*, No. 18-1100-EFM-ADM, 2020 WL 3288058, at *22 (D. Kan. June 18, 2020).  The court ordered briefing to determine the specific dollar amount of those expenses.

Since that order, the parties' cross motions for summary judgment reinforced the court's determination that the TAR expenses were disproportionate to the needs of this case.  Those summary judgment motions are targeted, in part, to the issue of business overlap between Spirit and Arconic, which is the issue that was the subject of the TAR.  (ECF 432 & 435.)  Spirit's summary judgment response brief points out that "[o]f the 95 exhibits Lawson submitted in connection with his Motion for Summary Judgment, ***only one*** is from Spirit's TAR production."  (ECF 445, at 11 n.3 (emphasis in original).)  Furthermore, Lawson submitted this lone TAR

document to support an unremarkable factual contention about when Lawson began contemplating retirement, not the issue of business overlap between Spirit and Arconic that was the subject of the TAR. (*Id.*) This only served to confirm, once again, that Lawson's insistence on pursuing the TAR was disproportionate to the needs of the case.

Spirit has now filed the current application for the court to determine the amount of expenses to allocate to Lawson under the June 18 order. (ECF 385.) Spirit seeks $455,272.71 paid to its eDiscovery vendor, Legility; $172,871.50 in attorneys' fees paid to the Arcadi Jackson law firm; and $163,556 in attorneys' fees paid to the Foulston Siefkin law firm. Spirit also seeks $83,000 in costs and fees incurred leading up to and preparing the current application. Lawson opposes Spirit's application, arguing many of Spirit's expenses are unreasonable or outside the scope of the June 18 order. Lawson contends that reasonable TAR expenses should be reduced to no more than $330,000.

## II.    EXPENSES ALLOCATED TO LAWSON

To determine the amount of expenses to allocate to Lawson, the court must independently analyze the reasonableness of Spirit's expenses. *Cf. Pennsylvania v. Delaware Valley Citizens' Council for Clean Air*, 478 U.S. 546, 562 (1986) ("[T]he benchmark for the awards under nearly all of these statutes is that the attorney's fee must be 'reasonable.'"), *supplemented*, 483 U.S. 711 (1987); *see also Consumer Fin. Prot. Bureau v. Ocwen Fin. Corp.*, No. 9:17-CV-80495, 2018 WL 6843629, at *2 (S.D. Fla. Dec. 21, 2018) (stating the court would determine the reasonable and necessary costs pursuant to Rule 26(c)(1)(B)); *Flowserve US Inc. v. Optimux Controls, LLC*, No. 2:13-CV-1073, 2017 WL 1240205, at *2 (D. Utah Mar. 31, 2017) (analyzing whether the defendants' expenses allocated to plaintiff under Rule 26(c)(1)(B) were reasonable); *Marens v.*

*Carrabba's Italian Grill, Inc.*, 196 F.R.D. 35, 37-38 (D. Md. 2000) ("The court is given great flexibility to . . . apportion costs and burdens in a way that is fair and reasonable.").

A.    **Legility Expenses**

Spirit retained Legility as its eDiscovery vendor in this case.  To begin the TAR, Legility received the 322,524-document TAR dataset, copied it to its network, and staged (*i.e.*, intermediately stored) the data for processing and filtering.  (ECF 388-1 ¶ 16.)  Legility then processed the TAR dataset into an application called Venio to remove documents that were duplicative or outside the relevant time range and to extract text and metadata for keyword searching.  Legility performed an early case assessment within Venio to identify potentially responsive documents to promote into the TAR.  Data and documents processed for analysis and review remained in Venio in a "nearline" state (*i.e.*, more easily accessible than offline storage) in case the scope of discovery changed and additional data and documents needed to be promoted into the TAR.

To initiate the TAR, Legility loaded potentially responsive documents into a document review system called Catalyst that includes a tool called "Predict," which uses continuous active learning to code documents for responsiveness.  After the system created an index of the TAR documents, Legility's managed review team of contract attorneys and Arcadi Jackson attorneys began reviewing and coding documents in order to "train" Predict to code additional documents.  After Predict was trained and could rank documents from the most likely responsive to the least, Legility's managed review team preliminary coded documents for responsiveness, confidentiality, and privilege according to the review protocol that Arcadi Jackson created.  Responsive TAR documents were then subject to a second-level review by Arcadi Jackson or Foulston Siefkin attorneys before they were produced.

During the review process, Legility collected and analyzed metrics to evaluate the efficacy of the TAR workflow and the quality of the datasets to be reviewed.  Legility also imposed quality control measures to ensure that only responsive and non-privileged documents would be produced and conducted a final quality control check prior to production.  To produce the TAR documents, Legility converted the documents to TIFF format, bates labeled and stamped them with an appropriate designation, and produced them to Lawson according to the parties' agreed specifications.

Spirit seeks the following categories of TAR-related expenses that it paid to Legility:

| EXPENSE DESCRIPTION | AMOUNT |
|---|---|
| TAR-related fees for document review team | $216,252.00 |
| TAR project management fees | 67,021.56 |
| TAR-related fees for data processing/hosting/user fees/near line data/productions (including hosting fees through December 2020) | 171,999.15 |
| TOTAL: | $455,272.71 |

(ECF 386, at 8.)  Lawson proposes that he pay only $141,636.78 of Legility's fees, which equals 50% of the document review team and project management fees.  (ECF 395, at 4.)

### 1.    Lawson's Objection to TAR 2.0 vs. TAR 1.0

The court turns first to Lawson's contention that Spirit should have used a TAR 1.0 tool rather than Predict, which is a TAR 2.0 tool.  In tools commonly marketed as "TAR 1.0," software training begins by taking a random sample of documents from the entire TAR set.  A human then reviews and codes those documents and, based on the coding in that seed set, the software generates a predictive model that is then applied across all relevant documents.  *See* BOLCH JUDICIAL INST. & DUKE LAW, TECHNOLOGY ASSISTED REVIEW (TAR) GUIDELINES 4-5 (Jan. 2019)

[hereinafter TAR GUIDELINES].[1]  In contrast, with a TAR 2.0 tool, the human review and software training are melded together in a way that they occur simultaneously.  *See id.* at 4-5.  From the outset, human coding decisions are submitted to the software, which continuously analyzes the entire document collection and ranks (and re-ranks) the documents for relevancy and then presents additional documents that it predicts to be most likely relevant back to the human for review and coding.  *Id.*  Predict is a TAR 2.0 tool that uses this type of continuous active learning.  (ECF 415-1 ¶ 5; ECF 416 ¶ 6); *see also Lawson*, 2020 WL 3288058, at *6.

Lawson contends that the Predict TAR 2.0 tool was not cost effective.  In support, Lawson relies on a declaration submitted by Jeffrey Grobart with Lawson's eDiscovery vendor in this case, H5 Technologies ("H5").  (ECF 394-1.)  Grobart states that H5 would have recommended using a TAR 1.0 model instead because a TAR 2.0 model like Predict "is often inefficient and requires significant review of false-positive documents in sets with low responsiveness."  (*Id.* ¶ 8.)  He contends that, with TAR 1.0, reviewers could code a limited set of 12,000 documents to train the tool that, when applied to the dataset, would ultimately result in a smaller pool of documents for first-level review.  (*Id.*)

In response, Spirit relies on a declaration from Legility Senior eDiscovery Consultant Jeff Stoneking.  (ECF 415-1.)  Stoneking explains that TAR 1.0 would not have resulted in cost savings because the subject matter experts (*i.e.*, Spirit's outside counsel) would have had to review thousands of documents to create the seed set.  (*Id.* ¶ 10.)  Grobart explains that Spirit would incur significant costs if its outside counsel were to review 12,000 documents, even at an aggressive pace.  (*Id.*)  For example, assuming 50 documents reviewed per hour and a $400 per hour billing

---

[1] Available at https://judicialstudies.duke.edu/wp-content/uploads/2019/02/TAR-Guidelines-Final-1.pdf (last visited Oct. 26, 2020).

rate, it would cost $96,000 just to create the seed set.  The court also notes that one of the downsides to using a TAR 1.0 tool is undertraining, which results in "an unnecessarily large number of nonrelevant documents . . . reviewed to reach the desired recall."  TAR GUIDELINES, at 4.  Given the low responsiveness rate in the TAR dataset in this case, this could have further driven up the costs of creating an effective seed set.  Stoneking also explains that Legility's review platform Catalyst does not include a TAR 1.0 tool, so Legility would have had to host the TAR dataset in a different database from the rest of the documents in the case, which also would have created inefficiencies.  (ECF 415-1 ¶ 11.)

The court is unpersuaded by Lawson's argument that Spirit's document review costs are unreasonable because Legility used a TAR 2.0 tool rather than a TAR 1.0 tool.  In support of this argument, Lawson relies on a declaration from its eDiscovery vendor who, not surprisingly, claims that H5 could have done it better and cheaper.  Meanwhile, Stoneking has adequately explained why Predict was appropriate under the circumstances and was just as cost-effective, if not more so.  Grobart's opinion is further undermined by the fact that Lawson agreed to Spirit using Predict, *see Lawson*, 2020 WL 3288058, at *6, and H5 was involved in conferences between the parties before TAR began and did not propose using TAR 1.0 at that time (ECF 415-1 ¶¶ 5-6; ECF 416 ¶¶ 6-7).  If Grobart or H5 genuinely believed Spirit should have used a TAR 1.0 tool, they should have raised that issue before the TAR began rather than months after the review was complete.  The court therefore finds Grobart's declaration on this point to be unpersuasive.

### 2. Document Review Team Fees

#### a. Review Time

Turning next to document review team fees, Spirit seeks $172,343.50 in fees paid to Legility for 2,970.5 hours of preliminary document review.  Legility worked on the TAR from

September 2019 to January 2020.  The managed review team completed its preliminary review in October and November.  Seventeen contract attorneys worked on the managed review team and largely billed at $55 per hour.  One individual billed at $75 per hour for certain activities.[2]  The Team Lead also conducted preliminary document review and billed at $85 per hour.  Many review team members had knowledge about Spirit from prior work for the company.

Lawson argues Spirit's requested expenses should be reduced by 50% because Legility "conducted the first-level review at an unreasonably slow pace."  (ECF 397-1, at 4.)  The average rate of document review "can vary considerably based on the complexity of the documents and the experience of the reviewers."  *See Brown v. Barnes & Noble, Inc.*, No. 116CV07333RAKHP, 2019 WL 7168146, at *3 (S.D.N.Y. Dec. 23, 2019).  A common range is 30 to 100 documents per hour. *See id.* (noting an average rate of review is about 40-60 documents per hour); NICHOLAS M. PACE & LAURA ZAKARAS, WHERE THE MONEY GOES: UNDERSTANDING LITIGANT EXPENDITURES FOR PRODUCING ELECTRONIC DISCOVERY 44, 50 (2012) (discussing reported review rates varying from 31 to 100 documents per hour, with 50 documents being a common rate)[3]; Ralph C. Losey, *Predictive Coding and the Proportionality Doctrine: A Marriage Made in Big Data*, 26 REGENT U. L. REV. 7, 63 (2014) (stating that a "first-pass relevancy review typically goes at a rate of 50 to 100 files per hour"); Peter J. Corcoran, III, *Strategies to Save Resources and Reduce E-Discovery*

---

[2] Legility billed Spirit directly for its services.  The court treats the contract attorneys' fees as an expense and does not include them in the lodestar calculation discussed below.  *See Ark. Teacher Ret. Sys. v. State St. Bank & Tr. Co.*, No. CV 11-10230-MLW, 2020 WL 949885, at *50 (D. Mass. Feb. 27, 2020) (characterizing fees of contract attorneys hired to do first-level document review as an expense); *Dial Corp. v. News Corp.*, 317 F.R.D. 426, 438 (S.D.N.Y. 2016) (awarding contract attorney fees as expenses).

[3] Available at https://www.rand.org/pubs/monographs/MG1208.html (last visited Oct. 26, 2020).

*Costs in Patent Litigation*, 21 TEX. INTELL. PROP. L.J. 103, 108 (2013) (discussing estimated document review rates of 40-50 documents per hour).

Here, Lawson contends that Legility reviewed documents at an unreasonable rate of 15 per hour. The court has reviewed Legility's invoices. In the court's calculation, the review team's preliminary review of 76,802 documents took 2,970.5 hours, counting time spent on quality assurance. (ECF 388-1, at 110-32 (the sum of hours recorded for "Primary Review"); ECF 415-1 ¶ 12.) Thus, Legility's first-level review pace was approximately 26 documents per hour. As Spirit points out, the Lawson-designed TAR dataset consisted of ESI "taken from the files of Spirit's most senior executives (including its CEO)" and included "numerous lengthy presentations, multi-sheet Excel spreadsheets with sensitive financial data, technical data, specifications, and information, confidential information belonging to Spirit's customers and/or subject to non-disclosure agreements, and highly sensitive business and strategy information." (ECF 386, at 10; ECF 388-2 ¶ 20.) In addition, reviewers coded for more than just responsiveness. They also coded for confidentiality, which would have complicated review because they were required to decipher between two levels of confidentiality under the two-tiered protective order in this case. (ECF 41 ¶ 1(j); *see, e.g.*, ECF 388-1, at 39 (review team time entries).) In addition, they reviewed for privilege, with over 2,000 TAR documents reportedly identified as privileged. (ECF 388-1 ¶ 7; ECF 386, at 10.) Under these circumstances, a 26-document-per-hour rate is not unreasonable. Indeed, it is not far from 30-document-per-hour rate that Grobart says is "typical" for commercial litigation involving lengthy, complex documents. (ECF 394-1 ¶ 6.)

Lawson further argues the pace of first-level review should have been faster because Spirit claims most of the TAR documents were not responsive, and many of those that were technically responsive were not relevant to the parties' dispute. (ECF 397-1, at 4-5.) But, as explained above,

Predict ranked documents from most likely responsive to least.  In other words, Predict "promoted" the documents that it predicted were most likely to be responsive to the top for human review, so the first-level reviewers were primarily focused on reviewing documents that were presumably responsive.  They were not conducting a linear review of all documents in the TAR dataset that was bloated with non-responsive documents.  Regardless of whether a reviewer ultimately determined that a particular document was non-responsive, the reviewer still had to take time to examine the document to determine whether responsive information appeared anywhere in it.

Lawson also contends that his proposed reduction is appropriate because Legility charged above-market rates.  (*Id.* at 5.)  Legility's review team, which is located in Nashville, billed at rates between $55-85 per hour.  Most of the first-level review—2,633 hours—was completed at $55 per hour.  Grobart argues $40-50 per hour would be more typical for a responsive review in the Nashville market and $80 per hour would be a median rate for a privilege log review.  (ECF 394-1 ¶ 7.)  In contrast, Stoneking states that Legility "actively monitors competitive rates nationwide" in an effort to ensure its price structure is viable in the marketplace and that its rates are "consistent with the market and are reasonable."   (ECF 388-1 ¶ 20.)

The court finds Legility's rates to be reasonable.  Contract attorney rates vary widely.  *See In re Citigroup Inc. Sec. Litig.*, 965 F. Supp. 2d 369, 396-99 (S.D.N.Y. 2013).  Legility's contract attorney rates fall in the vicinity of rates that courts have discussed and/or approved.  *See, e.g.*, *Ark. Teacher Ret. Sys.*, 2020 WL 949885, at *49 (discussing the special master's recommendation that "contract attorneys be treated as an expense at the rate of $50 an hour"); *United Supreme Council v. United Supreme Council of Ancient Accepted Scottish Rite for 33 Degree of Freemasonry*, No. 1:16-CV-1103, 2019 WL 3848784, at *2 (E.D. Va. Aug. 15, 2019) (approving $46 per hour for contract attorneys conducting document review); *Barranco v. 3D Sys. Corp.*, No.

CV 13-00412 LEK-RLP, 2018 WL 4512186, at *5 (D. Haw. June 15, 2018) (same, $75 per hour), *report and recommendation adopted as modified*, 2018 WL 3957046 (D. Haw. Aug. 16, 2018); *Banas v. Volcano Corp.*, 47 F. Supp. 3d 957, 970 (N.D. Cal. 2014) (stating defendant appropriately elected to use contract attorneys for document review at rates of $47-59 per hour); *see also* David Degnan, *Accounting for the Costs of Electronic Discovery*, 12 MINN. J.L. SCI. & TECH. 151, 164 (2011) (recognizing the cost for staffing document review attorneys 9 years ago ranged from $40-65 per hour, with a mid-range of $52.50).   Further, the Legility review team coded for both responsiveness and privilege at rates that were for, the most part, far less than the $80-per-hour rate that Grobart contends is a median rate for privilege review.[4]

In sum, Spirit's expenses for first-level review by Legility's contract attorneys were reasonable.  The court therefore allocates the $172,343.50 for that review to Lawson.

> **b.      Support Activities**

In addition to the hours spent on initial review, Spirit seeks expenses related to a number of activities that supported the TAR.

> **i.      Training, Downtime, Meetings, and Communications**

Spirit seeks the following expenses relating to training, downtime, meetings, and communications billed by review team members:

- $3,245 for 59 hours of training, billed at $55 per hour.

- $963 for 17 hours of downtime due to technical issues, billed at $55-85 per hour.

- $1,351 for 17.8 hours relating to meetings and communications, billed at $55-85 per hour.

---

[4] Contract attorney rates of $55-85 per hour are generally lower than reasonable rates for paralegals in this district.  *See, e.g.*, *Animal Legal Def. Fund v. Kelly*, No. CV 18-2657-KHV, 2020 WL 4000905, at *9 (D. Kan. July 15, 2020) (finding $125 per hour for a paralegal reasonable); *Torkelson v. Jimick Prod., Inc.*, No. 12-1052-EFM, 2012 WL 6623911, at *2 (D. Kan. Dec. 19, 2012) (finding $100 per hour for a paralegal reasonable).

Lawson objects to the training hours as excessively billed, the downtime hours as outside of the scope of the June 18 order, and the time entries relating to meetings and communications as vague.  Lawson also contends the review team members' rates were unreasonably high.

These objections are unpersuasive.  As discussed above, the review team members' rates were reasonable.  And the hours spent on these activities were necessary to the TAR and not excessively billed, particularly in view of the number of team members and the project's length. Document reviewers must be trained to make sure they understand the review standards and apply them consistently.  Furthermore, some downtime to account for technical issues is inevitable in a review of this scope, and 17 hours for such technical issues over the course of a few months is not unreasonable.  Periodic touchpoints throughout the review (*e.g.*, meetings and communications) are likewise typical.  The court therefore allocates these costs to Lawson.

### ii.        Management and Metrics

Spirit also seeks the following expenses relating to work performed by supervisory and specialized Legility employees:

- $11,309.50 for 129.3 hours relating to team lead support and management activities, billed by the Team Lead at $85 per hour and another employee at $75 per hour.

- $1,768 for 20.8 hours relating to metrics and reporting, billed by the Team Lead at $85 per hour.

- $13,648.50 for 101.1 hours relating to project management, billed by the Project Manager at $135 per hour.[5]

- $7,640 for 38.2 hours relating to technical project management, billed by a Litigation and Technology Specialist at $200 per hour.

---

[5] According to Legility's invoices, 6.1 hours of the Project Manager's time in November 2019 was not charged to Spirit.  The court therefore does not include that time here.

Lawson objects to the Team Lead's time on metrics and reporting as outside the scope of the June 18 order.  Lawson also objects to the time entries for team lead support and management activities as vague, and the Project Manager and Litigation and Technology Specialist's time entries as vague and excessively billed.  Lawson further objects to time billed after January 15, 2020 (the date Spirit completed its TAR production) as outside the scope of the June 18 order. Lawson also contends that the billing rates for all of the activities performed by these Legility employees were unreasonably high.

Again, these objections are unpersuasive.  It is common on a document review project of this type and magnitude to have active involvement by team leaders, project managers, and technology support specialists to supervise and coordinate the workflow and to liaise with litigation counsel.  Furthermore, time spent on metrics and reporting is both reasonable and compensable under the June 18 order.  As discussed above, Legility gathered and analyzed metrics to evaluate the effectiveness of the TAR as it progressed as well as the quality of the dataset subject to review.  This analysis was integral to ensuring the TAR's validity and that review goals were achieved.  *See* TAR GUIDELINES, at 24 ("Whatever software is utilized, it must generate, or allow for the generation of metrics or effectiveness measures, which allow the team to evaluate the workflow and determine if the review goals have been met.").  It is appropriate to allocate these expenses to Lawson, including the Litigation and Technology Specialist's final analyses of the TAR in late January 2020.  These are appropriate wrap-up expenses.

The rates for the Legility attorneys who performed these activities are reasonable, both in the court's experience and according to Stoneking's declaration.  (ECF 388-1 ¶ 20.)  The Team Lead has worked for Legility for 6 years and has 24 years of legal experience.  He was responsible for implementing TAR workflows, processes, and protocols with the review team, managing the

team's day-to-day operations, and serving as the primary liaison between the team and Spirit's counsel. The Project Manager has worked for Legility for 8 years and has 11 years of legal experience. He managed the review team and was responsible for developing workflows, processes, and protocols to maximize the TAR's efficiency. The Litigation and Technology Specialist has worked for Legility for 4 years and has 7 years of legal experience. He is experienced in developing eDiscovery software for law firms. He was responsible for tracking metrics and assisting with ensuring the TAR's efficacy. The Team Lead, Project Manager, and Litigation and Technology Specialist are all attorneys. Rates of $75-200 per hour are reasonable for these support activities, which are supervisory in nature and/or require more specialized knowledge. *See, e.g.*, *FDIC v. Johnson*, No. 2:12-CV-00209-KJD, 2013 WL 1195698, at *1 (D. Nev. Mar. 22, 2013) (adopting ESI protocol that required defendants to pay a per-page fee that reflected "labor costs ranging from $35/hr. to $300/hr. for technical time, quality control group viewers, and project managers"); *see also* Rob Robinson, *What is the Price of Admission? Summer 2019 eDiscovery Pricing Survey Results*, COMPLEX DISCOVERY (June 7, 2019) (showing that 59.2% of 81 survey participants charged between $100-200 per hour for project management support, and 27.2% charged over $200 per hour).[6]

The court has reviewed the time entries for these team lead and project management activities, including what these activities entailed. The time spent was reasonable and compensable, especially considering that the hours—approximately 230 total—were billed over approximately 3.5 months. The court will allocate these expenses to Lawson.

---

[6] Available at https://complexdiscovery.com/what-is-the-price-of-admission-summer-2019-ediscovery-pricing-survey-results/ (last visited Oct. 26, 2020).

### iii. Privilege Log

Spirit also seeks $3,160 for Legility expenses relating to the TAR privilege log.  A Legility Senior Solutions Architect spent 15.8 hours implementing and managing development of Spirit's TAR privilege log, billed at a rate of $200 per hour.  Lawson objects to the Senior Solutions Architect's time entries as outside the scope of the June 18 order, excessively billed, and vague, and contends that his billing rate is unreasonably high.

Again, these objections are unpersuasive.  As discussed below, expenses for the TAR privilege log are appropriately shifted to Lawson under the June 18 order.  The Senior Solutions Architect's rate is reasonable for the specialized work he performed.  He has worked for Legility for 11 years, has 14 years of legal experience, and has 25 years of technical development and support experience.  The 15.8 hours he spent on the TAR privilege log was reasonable.  The court will allocate these expenses to Lawson.

### 3. Project Management Fees

Spirit seeks $67,021.56 in additional project management fees billed by Project Manager Laura Hale at $250 per hour and another Legility employee at $225 per hour.  (*See* 388-1, at 143.) Hale worked 294.5 hours on the TAR, and the other employee worked 17.75 hours.  Hale is a Certified E-Discovery Specialist[7] with 18 years of industry experience.  She was responsible for providing database support to the review team and Spirit's counsel, performing complex searching, generating samples, analyzing the richness of sample datasets, providing feedback and recommendations on TAR workflows, performing quality and discrepancy checks on productions,

---

[7] To become a Certified E-Discovery Specialist, a candidate must pass an exam; establish a minimum level of relevant experience, education, and training; and provide professional references.  *See CEDS Eligibility*, ASSOCIATION OF CERTIFIED E-DISCOVERY SPECIALISTS, https://www.aceds.org/page/eligibility (last visited Oct. 8, 2020).

and generating and transmitting productions to Lawson.  Lawson objects to some of these project management time entries as vague and block billed.  Lawson also contends that all project management expenses incurred after January 15, 2020, are outside the scope of the June 18 order because the TAR productions were complete by then.  And, once again, Lawson contends that the rates billed are unreasonably high.

These objections are largely without merit.  According to Stoneking's declaration, Legility's project management fees are "consistent with the market and are reasonable and customary in the industry."  (ECF 388-1 ¶ 20.)  Lawson has not pointed to any evidence suggesting otherwise.  A rate of $225-250 per hour is not unreasonable in the court's experience and in view of publicly available rate information.  *See, e.g.*, *Johnson*, 2013 WL 1195698, at *1 (adopting the FDIC's proposed ESI protocol where the defendant's cost per page reflected "labor costs ranging from $35/hr. to $300/hr. for technical time, quality control group viewers, and project managers"); *see also* Robinson, *supra* (showing 27.2% of survey participants charged over $200 per hour for project management support).  Furthermore, Hale's experience and credentials support a higher hourly rate.

The court has reviewed the time entries for these project management expenses in Legility's invoices.  They adequately describe TAR-related work and are not unreasonably vague.  With respect to the entries to which Lawson objects as block billed, all of the tasks appear to be TAR-related even if they describe more than one task.  Furthermore, Spirit has already reviewed and excluded any non-TAR-related time from its calculations and does not seek those expenses.  A reduction for impermissible block billing is therefore not warranted.

The court will, however, exclude the time Hale billed in February 2020.  When viewed in conjunction with Spirit's attorneys' fees in February, those expenses appear to be related to Spirit's

response to Lawson's Motion to Compel the Production of Non-Privileged Documents (ECF 261). As discussed in further detail below, expenses related to that motion are outside the scope of the June 18 order.

Thus, the court will allocate $62,571.56 of the project management expenses to Lawson.

### 4.    Processing, Hosting, and Production Fees

Spirit seeks $36,540 in processing expenses, $42,869.52 in Catalyst and near-line data hosting expenses through January 2020, and $7,177.60 in production expenses.  (ECF 388-1, at 143.)  Spirit also seeks $7,764.73 per month in near-line data hosting expenses from February through December 2020.  (*Id.* ¶ 14.)  Lawson argues these expenses are outside of the scope of the June 18 order because "Spirit would have searched and hosted this ESI without performing TAR" if the ESI protocol had been successful.  (ECF 397-1, at 9.)

The court's ESI protocol in April 2019 allowed Lawson to select 10 custodians and propose search terms.  In May 2019, Spirit collected ESI from the 10 custodians whose data was eventually subjected to the TAR.  (ECF 135 ¶ 7.)  As explained in the June 18 order, Spirit conducted sampling exercises with Lawson's proposed search terms in an effort to refine the search terms to achieve an 85% responsiveness rate.  *See Lawson*, 2020 WL 3288058, at *4-*5.  By September 2019, the parties abandoned efforts to meet the 85% responsiveness-rate goal and, at Lawson's insistence, agreed to proceed with the TAR instead.  At that point, "Spirit had already spent hundreds of thousands of dollars on document collection, processing, and hosting, as well as the sampling exercises."  *Id.* at *6.

The processing, hosting, and production expenses that Spirit now seeks are properly allocated to Lawson under the June 18 order.  Spirit does not request any expenses that it incurred before the TAR began.  Rather, Spirit seeks expenses beginning September 30, 2019, when Spirit

first processed the TAR dataset into Venio and Catalyst.  Spirit could not have conducted the TAR without incurring these expenses, including the expenses for Catalyst user licenses for document reviewers.  And the production-related fees were also necessarily incurred to complete Spirit's rolling production of TAR documents.

The court will also allocate to Lawson the hosting costs Spirit seeks from February through December 2020.  As Grobart explains, Spirit would have to delete this data to avoid ongoing hosting costs, and parties generally "do not delete data while litigation is ongoing."  (ECF 394-1 ¶ 11.)  Furthermore, contrary to Lawson's arguments, there is no evidence that Spirit would have collected all of the TAR custodians' data in the absence of the TAR.  To the contrary, as discussed in the court's June 18 order, of the 10 custodians Lawson selected whose data was subject to the TAR, Spirit did not identify 7 of them as likely to have relevant ESI.  *Lawson*, 2020 WL 3288058, at *5.  Lawson should therefore bear these hosting costs.

### 5.   Total Legility Costs Allocated to Lawson

In sum, the court allocates the following Legility expenses reasonably incurred by Spirit to Lawson pursuant to the court's June 18 order:

| EXPENSE DESCRIPTION | AMOUNT |
|---|---|
| TAR-related fees for document review team | $215,428.50 |
| Project management fees for TAR | 62,571.56 |
| TAR-related fees for data processing/hosting/user fees/near line data/productions (including hosting fees through December 2020) | 171,999.15 |
| **TOTAL:** | **$449,999.21** |

### B.   Attorneys' Fees

"The proper procedure for determining a reasonable attorneys' fee is to arrive at a lodestar figure by multiplying the hours . . . counsel reasonably spent . . . by a reasonable hourly rate."

*Praseuth v. Rubbermaid, Inc.*, 406 F.3d 1245, 1257 (10th Cir. 2005) (analyzing the attorneys' fees awarded to a prevailing employment plaintiff); *accord Case v. Unified Sch. Dist. No. 233*, 157 F.3d 1243, 1249 (10th Cir. 1998) (same, in a 42 U.S.C. § 1983 case); *see also, e.g., Flowserve US*, 2017 WL 1240205, at *2 (using the lodestar method to calculate an attorneys' fees award pursuant to Rule 26(c)(1)(B)).

Spirit seeks the following attorneys' fees for work performed by its litigation counsel at the Arcadi Jackson law firm:

| EXPENSE DESCRIPTION | AMOUNT |
|---|---|
| TAR-related fees | $116,440.50 |
| Fees for Spirit's Motion to Shift Costs (ECF 133) | 32,821.00 |
| Fees for responding to Lawson's Motion to Compel the Production of Responsive Documents (ECF 226) | 16,205.50 |
| 50% of Arcadi Jackson's fees for responding to Lawson's Motion to Compel the Production of Non-Privileged Documents (ECF 261) | 7,404.50 |
| **TOTAL:** | **$172,871.50** |

(ECF 386, at 6.)  Spirit also seeks the following attorneys' fees for work performed by its litigation counsel at the Foulston Siefkin law firm:

| EXPENSE DESCRIPTION | AMOUNT |
|---|---|
| TAR-related fees | $109,217.26 |
| Fees for Spirit's Motion to Shift Costs (ECF 133) | 5,654.69 |
| Fees in connection with the TAR privilege log | 42,481.25 |
| Fees in Dec. 2019-Jan. 2020 relating to Lawson's Motions to Compel | 6,202.80 |
| **TOTAL:** | **$163,556.00** |

(*Id.* at 7.)  In addition, Spirit seeks $83,000 in fees incurred leading up to and preparing this fee application.

### 1.    Other Motions and Privilege Logs

Lawson contends that Spirit's attorneys' fees incurred in opposing Lawson's motions and creating privilege logs are not properly within the scope of the court's June 18 order.  That order allocated Spirit's "actual expenses incurred in connection with the TAR process."  *Lawson*, 2020 WL 3288058, at *22.  This would include expenses Spirit incurred in responding to Lawson's Motion to Compel the Production of Responsive Documents (ECF 226).  In that motion, Lawson sought an order to compel Spirit to perpetuate the TAR review.  Spirit had completed its TAR production in January 2020 after reaching an 85% recall rate, *i.e.*, the TAR algorithm correctly identified 85% of the responsive documents in the TAR set.  At that point, Lawson filed this motion seeking to compel Spirit to produce the "residual TAR documents."  Lawson's motion and Spirit's opposition were directly related to the parameters of the TAR process.  Spirit's expenses for that motion were therefore incurred in connection with the TAR process.  As a result, they are within the scope of the court's June 18 order and should be allocated to Lawson.

The court will also allocate Spirit's expenses relating to the TAR privilege log to Lawson.  Once Spirit was obliged to produce responsive documents from the TAR, it was equally obliged to create and produce a privilege log for any documents it withheld as privileged from its TAR production.  Expenses associated with the TAR privilege log were therefore incurred in connection with the TAR process and are within the June 18 order's scope.

However, the court agrees that the expenses Spirit incurred in preparing its non-TAR privilege log are outside the scope of the June 18 order.  The court also will not allocate to Lawson the $385 in expenses that Spirit incurred in reviewing Lawson's privilege log for deficiencies.

Lawson argues that fees related to Lawson's motions to compel are outside the scope of the June 18 order. The court agrees that fees relating to Lawson's Motion to Compel the Production of Non-Privileged Documents (ECF 261) and Motion to Compel the Production of Clawed Back Documents (ECF 231) are not within the scope of the court's June 18 order. Although these motions may have arisen as a result of documents being produced through the TAR process, the onus was nevertheless on Spirit to establish that it properly withheld the documents that were the subject of these motions as privileged and/or work-product. If Spirit believed that it was entitled to fees in connection with those motions, it should have moved for fees under Federal Rule of Civil Procedure 37. The court will therefore not allocate the $10,838.50 in attorneys' fees Spirit seeks relating to these motions to Lawson. Nor will the court include $1,661 in fees for counsel to appear at the January 10 discovery conference, which related primarily to Spirit's clawed-back documents. (*See* ECF 221, at 3.)

## 2. Reasonable Time Expended

The court will now analyze the fees Spirit seeks directly relating to the TAR, Spirit's Motion to Shift Costs, Lawson's Motion to Compel the Production of Responsive Documents, and the instant application. To demonstrate reasonable time expended, the party seeking fees must submit "meticulous, contemporaneous time records that reveal all hours for which compensation is requested and how those hours were allotted to specific tasks." *Cadena v. Pacesetter Corp.*, 224 F.3d 1203, 1215 (10th Cir. 2000). Fee applicants should exercise billing judgment with respect to the number of hours worked and billed. *Hensley v. Eckerhart*, 461 U.S. 424, 437 (1983). Billing judgment consists of winnowing hours actually expended down to hours reasonably expended. *Praseuth*, 406 F.3d at 1257. If an attorney's hours would not have been properly billed to a client,

they "cannot reasonably be billed to the adverse party, making certain time presumptively unreasonable." *Case*, 157 F.3d at 1250.

Where the hours claimed by counsel include those that are "unnecessary, irrelevant and duplicative," the court may reduce the reasonable hours awarded. *Id.* A court is also "justified in reducing the reasonable number of hours if the attorney's time records are sloppy and imprecise and fail to document adequately how he or she utilized large blocks of time." *Id.* (quotation omitted). But the Tenth Circuit "has not established a rule mandating reduction or denial of a fee request if [a] party submits attorney-records which reflect block billing." *Cadena*, 224 F.3d at 1215. The court is not required to "identify and justify each disallowed hour. Nor is [there] any requirement that district courts announce what hours are permitted for each legal task." *Case*, 157 F.3d at 1250 (quotation omitted). The court may instead, for sufficient reasons, impose a "general reduction of hours claimed in order to achieve what the court determines to be a reasonable number." *Id.* The court has discretion to determine how many hours a party should have expended on particular tasks. *See id.*

### a.    TAR Direction and Supervision Expenses

Spirit's counsel spent 105.7 hours on tasks related to planning and initiating the TAR. This includes conferring with Lawson's counsel regarding TAR parameters, supervising and directing Legility throughout the TAR, and coordinating the TAR production. Arcadi Jackson partner Ann Marie Arcadi spent 22.6 hours on these activities, associate Lee Budner spent 43.4 hours, and of counsel attorney Seema Tendolkar spent 12.3 hours. Foulston Siefkin partners Jeff DeGraffenreid and Charles McClellan spent 23.8 hours and 3.6 hours on these activities, respectively.

Lawson objects to a number of these time entries as vague, outside the scope of the June 18 order, and/or block billed. Lawson's point has some merit because the invoices contain a

number of block-billed and/or vague time entries, especially for Arcadi and DeGraffenreid.  But, as to Arcadi's time entries, she explains that some time entries contain multiple tasks if they were all related to the same overarching "ABA Uniform Task-Based Litigation Codes (*e.g.*, discovery motions (L350), document production (L320), etc.)."  (ECF 388-2 ¶ 27.)  She states that, to the extent that dissimilar tasks were block billed, she reviewed her firm's time entries and excluded the unrelated time from the expenses Spirit seeks.  (*Id.*)  Indeed, it is apparent from the face of the invoices that these time entries were adjusted.  The court therefore agrees that Arcadi and the other Arcadi Jackson attorneys' time entries all appear to be related to the TAR, even where a single time entry includes multiple tasks.

That is not the case, however, with some of DeGraffenreid's time entries.  Many of his time entries reference dissimilar tasks and vague "discovery issues."  DeGraffenreid explains that almost all discovery work from late September 2019 to January 2020 was related to the TAR process.  (ECF 415-2 ¶ 5.)  The court credits this explanation and finds it reasonable to believe that much of this time was related to the TAR, but the court is unable to determine the extent to which these time entries may have involved other case-related activities.  The court will therefore reduce DeGraffenreid's time entries for TAR direction and supervision by 25% to account for vague and block-billed time entries.  The remaining hours for these activities appear reasonable.

### b.    Second-Level Review

Spirit's counsel spent 650.4 hours conducting a second-level review of the TAR documents and other activities to support document review, including training.  Out of these hours, 398.4 hours—or approximately 61%—consist of associate time.  Lawson does not object to most of these time entries.  However, Lawson objects to some of them as outside the scope of the June 18 order,

vague, and/or impermissibly block billed.  The court has reviewed these time entries and finds Lawson's objections to be without merit.

Lawson generally objects to hours spent on second-level review on the grounds that Spirit unjustifiably used senior attorneys with high billing rates.  (ECF 397-1, at 5.)  DeGraffenreid spent 80.2 hours conducting second-level document review, including 2.3 hours training others.  Spirit justifies DeGraffenreid's involvement based on his "significant experience with Spirit and familiarity with the types of documents and information at issue, many of which related to internal Spirit matters on which [he] personally worked" when he was employed as in-house counsel.  (ECF 388 ¶ 11.)  DeGraffenreid states his involvement in the second-level review was ultimately cost-effective because of his "knowledge and understanding of the underlying documents, as well as the significant privilege confidentiality, [International Traffic in Arms Regulations ('ITAR')], and other issues potentially contained within the documents."  (*Id.*)  Two other Foulston Siefkin partners—Tara Eberline and Matthew Stromberg—spent 73.7 hours.  Arcadi Jackson of counsel attorneys John M. Farrell and Seema Tendolkar spent 61.4 hours and 36.7 hours, respectively, conducting second-level document review and related activities, including training and responding to associate reviewers' questions.  Spirit does not specifically justify Farrell, Tendolkar, Eberline, or Stromberg's involvement but does argue that the senior attorneys involved "were well-acquainted with Spirit's business, the documents, and issues in this case."  (ECF 415, at 4.)

Lawson also argues that if the TAR documents "were as obviously non-responsive as Spirit contends," it was unreasonable to use senior attorneys for document review.  (ECF 397-1, at 6.) The court disagrees.  The second-level reviewers looked at documents that Predict had identified as potentially responsive and then Legility first-level reviewers had coded as responsive.  So second-level reviewers were not conducting a linear review of all documents in the TAR dataset.

Rather, they were confirming the documents coded as responsive were in fact responsive, and they also reviewed the documents for confidentiality, privilege, and ITAR compliance.  *See Lawson v. Spirit AeroSystems, Inc.*, No. 18-1100-EFM-ADM, 2020 WL 1813395, at *5, *8 (D. Kan. Apr. 9, 2020).  To the extent the second-level reviewers looked at non-responsive documents, they did so at Lawson's request.  *See id.* at *8 (discussing Lawson's request that "Spirit's second-level reviewers look at representative samples of documents marked non-responsive to ensure that first-level reviewers were not undercoding responsive documents").

The court also recognizes that tasks that are easily delegable to non-professionals or less experienced associates should not be billed at a higher hourly rate.  *N.M. Citizens for Clean Air & Water v. Espanola Mercantile Co.*, 72 F.3d 830, 835 (10th Cir. 1996); *see also Ursic v. Bethlehem Mines*, 719 F.2d 670, 677 (3d Cir. 1983) ("Nor do we approve the wasteful use of highly skilled and highly priced talent for matters easily delegable to non-professionals or less experienced associates. . . . A Michelangelo should not charge Sistine Chapel rates for painting a farmer's barn.").  However, a party is not required to entirely exclude mid- and senior-level attorneys from high-level involvement in document review.  Here, the TAR documents came from senior executives, including the CEO, and contained confidential and sensitive information.  (*See* ECF 386, at 10; ECF 388-2 ¶ 20.)  Mid- and senior-level attorneys with experience and knowledge of the issues in the case were appropriately involved in the TAR to ensure that lower-level reviewers were correctly and uniformly coding documents for responsiveness, and also to make final decisions on privilege, confidentiality, and ITAR compliance.  Spirit's litigation team, including the attorneys making litigation strategy decisions, would need to provide input on sensitive issues that may come up during document review and develop some level of familiarity with the general nature of the documents produced through the TAR.

25

The court has reviewed the second-level review time entries for these senior attorneys. Tendolkar's time was spent primarily on tasks appropriate for a senior level, including training others and responding to questions. The limited time she spent on document review was reasonable. Spirit has also adequately justified the time DeGraffenreid spent on document review, which ultimately was less than 15% of the total second-level review time. His hours were reasonable, with the exception of the two-hour entry on December 5, 2019, that relates to reviewing non-TAR documents.

Spirit, however, has not explained why Farrell, Eberline, or Stromberg's time for second-level review was necessary at partner rates. These more senior attorneys' only role in the TAR was document review, and it does not appear that they have otherwise been particularly involved with the case such that they would have provided subject matter or strategic expertise. The time they spent on second-level review was not necessarily unreasonable, but it appears their work could have been done at associate rates. The court will therefore assign a billing rate of $275 to their time spent on second-level review. This rate is at the high end of the range for Foulston Siefkin second-level review associates, which accounts for these attorneys' greater experience and is a reasonable market rate for the reasons discussed below.

### c.    TAR Privilege Log

Spirit's counsel spent 160.4 hours creating privilege logs, with most of those hours billed by McClellan and 7 hours billed by DeGraffenreid. According to DeGraffenreid, "of the approximately 2,500 privilege log entries, the vast majority (2,154) were related to the TAR production." (ECF 388 ¶ 13.) When the parties conferred about the amount of expenses to allocate to Lawson before filing the instant application, Spirit suggested that Lawson pay only half the amount of expenses related to Spirit's privilege logs. (*Id.*)

Lawson objects to a number of privilege-related time entries as outside of the scope of the June 18 order, block billed, and/or vague.  As explained above, Spirit's time spent preparing the TAR privilege log is appropriately within the scope of the June 18 order.  But time related to preparing Spirit's non-TAR privilege log is not.  The time entries to which Lawson objects on this basis do not specify whether the time was spent on the TAR privilege log, non-TAR privilege log, or both.  The court has also reviewed the privilege logs submitted to the court in February 2020. Despite DeGraffenreid's assertion, the privilege logs contain a similar number of entries: 1077 entries on the TAR log and 1003 entries on the non-TAR log, including the entries for documents with respect to which Spirit withdrew its privilege objection.

After considering the time entries, the privilege logs, and Spirit's prior offer, the court will reduce McClellan's and DeGraffenreid's time spent on privilege logs by 50% because Spirit has not established that all 160.4 hours were spent specifically on the TAR privilege log as opposed to the non-TAR privilege log.  This reduction also accounts for DeGraffenreid's block billed and vague time entries, including those referencing "discovery issues" and Rule 30(b)(6) issues.  The court finds the reduced hours reasonable for tasks relating to the TAR privilege log.

### d.       Motion to Shift Costs

The court granted Spirit's Motion to Shift Costs of Technology Assisted Review of ESI to Plaintiff Larry A. Lawson (ECF 133) in full, allocating Spirit's "actual expenses incurred in connection with the TAR process, including vendor costs and attorneys' fees" to Lawson.  *Lawson*, 2020 WL 3288058, at *22.  At that time, however, the court did not decide whether the expenses associated with the motion should be included the amount awarded to Spirit.  *See id.*  Generally, where a court grants a motion for a protective order under Rule 26(c), the prevailing party may recover associated fees.  *See* FED. R. CIV. P. 37(a)(5)(A) (stating the court "must" impose fees

where a motion is granted unless the movant filed the motion before conferring in good faith, the opposing party's response was substantially justified, or other circumstances make an award of expenses unjust); *see also* FED. R. CIV. P. 26(c)(3) (stating that "Rule 37(a)(5) applies to the award of expenses" for motions for protective orders under Rule 26(c)).

The court considers the specifics of the individual case in determining whether to award fees under Rule 37. *See Josendis v. Wall to Wall Residence Repairs, Inc.*, 662 F.3d 1292, 1314 (11th Cir. 2011). Rule 37(a)(5)(A) and Rule 26(c)(3) provide that if a motion for a protective order under Rule 26(c) is granted, the court "must" award the movant its reasonable expenses incurred in making the motion, including attorneys' fees unless: (1) the movant filed the motion before attempting to confer; (2) "the opposing party's nondisclosure, response, or objection was substantially justified"; or (3) "other circumstances make an award of expenses unjust." The party opposing the fee request bears the burden of showing that one of these exceptions applies. *See* 8B CHARLES ALAN WRIGHT & ARTHUR R. MILLER, ET AL., FEDERAL PRACTICE AND PROCEDURE § 2288 (3d ed.) (stating the losing party bears the burden to avoid being assessed expenses and fees).

Lawson has not met his burden to show that an award of expenses is unwarranted. To the contrary, Lawson does not address Rule 37 at all and instead appears to concede that some award of expenses incurred in connection with the motion to shift costs is appropriate. (*See* ECF 395, at 4 (proposing that the court award Spirit 70% of the fees it seeks relating to the cost-shifting motion).) The court agrees. None of the exceptions listed in Rule 37(a)(5)(A) apply. Spirit exhausted all efforts to meet and confer. It filed the motion to shift costs only after spending months trying to appease Lawson's ESI demands, during which Spirit participated in multiple conferences with Lawson and the court. *See Lawson*, 2020 WL 3288058, at *3-*7 (setting forth the history leading to the TAR). Lawson's position was not substantially justified—for all the

reasons set forth in the June 18 order.  As but one highlight, unbeknownst to the court at the time, Spirit had served interrogatory responses that included a detailed, 3-page list of products that Spirit contended overlapped with Arconic products, and that list included citations to bates numbered supporting documents.  *See id.* at *12.  Yet Lawson continued to insist on proceeding with the TAR.  There is nothing unjust about awarding Spirit its cost-shifting motion expenses.  Spirit's long-time contention that the TAR process would not be an efficient or effective way to locate information on business overlap appears to have been borne out, as reinforced by the fact that Lawson used only one TAR document in his summary judgment briefing to support a fact unrelated to the issue of business overlap.  (*See* ECF 445, at 11 n.3.)  For all of these reasons, the court will award Spirit its reasonable expenses incurred for the motion to shift costs.

Spirit's counsel spent 94.3 hours on tasks relating to this motion, including correspondence with Lawson's counsel to try to avoid the TAR- and motion-related expenses.  Most of the time—72.6 hours—was billed by Budner and Tendolkar.[8]  Arcadi and DeGraffenreid billed 8 and 11.2 hours respectively, and Arcadi Jackson partner Greg Jackson billed an additional 1.1 hours.[9]  Arcadi Jackson paralegal Cynthia Partin also billed 1.2 hours relating to the motion.  And Foulston Siefkin partner Gary Ayers contributed 0.2 hours.

Lawson objects to a number of these time entries as block billed and/or vague.  The court has reviewed them and overrules Lawson's objections as to the Arcadi Jackson attorneys and

---

[8] The expenses Spirit seeks include those related to 3 hours Budner spent working on a motion to compel in late September 2019, around the time Spirit's counsel was also drafting the motion to shift costs.  Spirit appears to have included these hours in its application by mistake because Spirit did not file a TAR-related motion to compel.  The court therefore excludes these hours.

[9] DeGraffenreid states that Spirit inadvertently included in the instant application an October 25, 2019 time entry mentioning the reply brief, but it primarily related to a separate document review.  (ECF 415-2 ¶ 6, at 2.)  The court therefore does not include these hours in its discussion. The court also does not include DeGraffenreid's time entries from January 20, 2020 relating to a "cost recovery" motion because briefing on the motion to shift costs was finished at that point.

Partin for reasons similar to those discussed above.  Again, Arcadi excluded unrelated time from the expense Spirit seeks, and the remaining tasks in these time entries all appear to be related to the motion to shift costs.  But the court will again reduce DeGraffenreid's time entries by 25% to account for block-billed time entries, including those that vaguely reference "discovery issues" and reviewing "discovery responses," in addition to motion-related tasks.  This reduction also accounts for clerical work billed by DeGraffenreid—specifically, communicating with the court regarding filing.  *See Fox v. Pittsburg State Univ.*, 258 F. Supp. 3d 1243, 1256 (D. Kan. 2017) ("The court must deduct [t]asks that amount to filing . . . ." (quotation omitted)).

The court will also exclude the time billed by Jackson and Ayers.  Arcadi and DeGraffenreid exercised primary supervisory roles with respect to the motion to shift costs, and a review of Jackson's and Ayers' time entries does not suggest that their work was necessary.  Indeed, it is not clear why Ayers' billed any time.  He appears only once on the invoices Spirit submitted, billing 0.2 hours for "[r]eview[ing] email and brief."  It does not appear that he was otherwise involved in any TAR-related tasks.

The remaining attorney and paralegal time is reasonable.  In evaluating the hours expended on the motion to shift costs, the court has considered the length of the briefs, their substance, the supporting materials submitted, and the court-imposed briefing schedule and page limits.  The motion involved a lengthy factual background, detailed technical information about the parties' eDiscovery efforts, and some arguably unique legal issues.  The court therefore does not find any further reduction is warranted.

### e.  Motion to Compel Production of Responsive Documents

Spirit also seeks expenses related to opposing Lawson's Motion to Compel the Production of Responsive Documents (ECF 226).  In January 2020, Spirit ceased producing responsive

documents through the TAR process after reaching an 85% recall rate, meaning that the TAR algorithm had correctly identified 85% of the responsive documents in the data set.  At that point, Lawson filed a motion to compel Spirit to produce approximately 1,850 additional documents that the Legility first-level review team had identified as potentially responsive.  The court denied Lawson's motion, finding that "second-level review and production of the residual TAR documents [was] not proportional to the needs of the case under Rule 26(b)(1)."  *Lawson*, 2020 WL 1813395, at *9.

Spirit's expenses for this motion fall within the scope of the June 18 order.  In addition, if a motion to compel is denied, the court "must, after giving an opportunity to be heard, require the movant, the attorney filing the motion, or both to pay the party . . . who opposed the motion its reasonable expenses incurred in opposing the motion, including attorney's fees."  FED. R. CIV. P. 37(a)(5)(B).  "But the court must not order this payment if the motion was substantially justified or other circumstances make an award of expenses unjust."  *Id.*  Again, the party opposing the request for fees bears the burden of showing that these exceptions apply.  *See* 8B WRIGHT & MILLER, § 2288 (losing party bears the burden to avoid being assessed expenses and fees).

Lawson has not met his burden.  His motion was not substantially justified.  He essentially asked the court to compel Spirit to reach a 100% TAR recall rate, yet Lawson cited no authority suggesting that such a rate was reasonable or that any court had ever required a 100% recall rate. *See Lawson*, 2020 WL 1813395, at *7-*8 (discussing recall rates and guidance suggesting that "rates of 75-85% are appropriate in many cases").  Further, no circumstances would make an award for these fees and expenses unjust.  To the contrary, the court observed that Lawson's lack of reasonableness with respect to ESI "bordered on the abusive."  *Id.* at *9.  The court will therefore award Spirit its reasonable expenses incurred in opposing Lawson's motion to compel.

Spirit's counsel spent 42.9 hours on tasks relating to opposing Lawson's motion. Most of this time—30.2 hours—was billed by Budner. In addition, Tendolkar billed 7 hours, Arcadi billed 1.8 hours, and DeGraffenreid billed 3.4 hours. Partin also billed 0.5 hours for the opposition.

Lawson objects to a number of time entries as block billed and to DeGraffenreid's time entries as both block billed and vague. The court has reviewed these time entries and finds that Lawson's objections have some merit. Budner's 4-hour time entry from January 17, 2020, and DeGraffenreid's time entries also reflect non-compensable time spent on Spirit's opposition to Lawson's Motion to Compel the Production of Clawed Back Documents (ECF 231). The court will therefore reduce these time entries by 50% to account for the block billing.

The remaining attorney and paralegal time is reasonable and compensable. Again, the court has considered the length of the opposition brief, its substance, the supporting materials submitted, and the court-imposed briefing schedule and page limits. Like the motion to shift costs, the opposition involved a complex factual background, detailed technical information on the parties' eDiscovery efforts, and some unique legal issues. The court therefore does not find any further reduction is warranted.

### f.    Total Reasonable Hours

In summary, the court finds that the following hours were reasonably spent by Spirit's attorneys and paralegal on TAR-related tasks:

| TIMEKEEPER | HOURS |
|---|---|
| Ann Marie Arcadi (Partner, Arcadi Jackson) | 32.4 |
| Seema Tendolkar (Of Counsel, Arcadi Jackson) | 89.3 |
| John M. Farrell (Of Counsel, Arcadi Jackson) | 61.4 |
| Lee Budner (Associate, Arcadi Jackson) | 230.8 |
| Jeff DeGraffenreid (Partner, Foulston Siefkin) | 111.65 |
| Charles McClellan (Partner, Foulston Siefkin) | 80.3 |

| | |
|---|---|
| Foulston Siefkin Document Review Partners (Eberline, Stromberg) | 73.7 |
| Foulston Siefkin Document Review Associates (Turner, Green, Frobisher, Stula, Mannebach, Rose, Hanson, Otto, Koehler, Hammes) | 278.5 |
| Cynthia Partin (Paralegal, Arcadi Jackson) | 1.7 |
| **TOTAL:** | **959.75** |

### 3.    Reasonable Hourly Rate

The court turns next to the reasonable hourly rates for these attorneys.  Spirit requests the following rates for Foulston Siefkin attorneys in the firm's Wichita and Overland Park offices:

| NAME | POSITION | EXPERIENCE | HOURLY RATE |
|---|---|---|---|
| Jeff DeGraffenreid | Partner | 28 years | $375 |
| Tara Eberline | Partner | 14 years | $340 |
| Charles McClellan | Partner | 12 years | $275 |
| Matthew Stromberg | Partner | 12 years | $310 |
| Eric Turner | Associate | 9 years | $250 |
| David Green | Associate | 6 years | $275 |
| Kelsey Frobisher | Associate | 5 years | $250 |
| Sarah Stula | Associate | 4 years | $225 |
| Nathan Mannebach | Associate | 3 years | $225 |
| Niki Rose | Associate | 3 years | $225 |
| Travis Hanson | Associate | 3 years | $225 |
| Sarah Otto | Associate | 2 years | $225 |
| Jeremy Koehler | Associate | 1 year | $225 |
| Morgan Hammes | Associate | 1 year | $225 |

Spirit also requests the following rates for Dallas-based Arcadi Jackson attorneys and a paralegal:

| NAME | POSITION | EXPERIENCE | HOURLY RATE |
|---|---|---|---|
| Ann Marie Arcadi | Partner | 27 years | $625 |
| John M. Farrell | Of Counsel | 13 years | $425 |
| Seema Tendolkar | Of Counsel | 18 years | $415 |

33

| Lee Budner | Associate | 7 years | $350 |
| Cynthia Partin | Paralegal | 27 years | $185 |

"To determine what constitutes a reasonable rate, the district court considers the prevailing market rate of the relevant community." *Lippoldt v. Cole*, 468 F.3d 1204, 1224 (10th Cir. 2006) (internal quotations omitted); *see also Perdue v. Kenney*, 559 U.S. 542 (2010) (same). The relevant community is "the area in which the litigation occurs" or "the area in which the court sits." *Ramos v. Lamm*, 713 F.2d 546, 555 (10th Cir. 1983); *Case*, 157 F.3d at 1256. The party seeking fees "must provide evidence of the prevailing market rate for similar services by 'lawyers of reasonably comparable skill, experience, and reputation' in the relevant community." *Lippoldt*, 468 F.3d at 1224-25 (quoting *Blum v. Stenson*, 465 U.S. 886, 895 n.11 (1984)). An attorney's customary rate is relevant but not conclusive. *Ellis v. Univ. of Kan. Med. Ctr.*, 163 F.3d 1186, 1203 (10th Cir. 1998).

In support of the reasonableness of the requested hourly rates, DeGraffenreid states that the "rates charged by Foulston and Arcadi Jackson . . . are generally consistent with market rates in Kansas and Sedgwick County, which can range from approximately $150 to $350 per hour for associates and $250 to $650 per hour for partners." (ECF 388 ¶ 9.) He states that rates at the higher end of these ranges are appropriate because of the nature of the claims in this case. (*Id.*) His opinion is based on his experience and familiarity with hourly rates charged for business litigation in state and federal court by attorneys in Kansas and Sedgwick County and a review of rates in published Kansas opinions. (*Id.*) In addition, Spirit points out that Lawson's lead counsel at Willkie Farr & Gallagher in New York City charge rates that far exceed those of Spirit's attorneys. According to Lawson's engagement letter with the firm in 2017, Willkie Farr's standard hourly rates are $995-1,425 per hour for partners and of counsel attorneys, $330-965 for associates, and $230-380 for legal assistants. (ECF 416-1, at 2.) As Spirit points out, many of the rates at

issue in Spirit's fee application "are similar to those charged by Willkie Farr for its *paralegals* and are a fraction of the rates charged for its attorneys."  (ECF 415, at 4 (emphasis in original).)

The "relevant community" for determining the prevailing market rate in this case is the entire District of Kansas.  Although Wichita is the place of trial where Spirit's headquarters are located, "the Tenth Circuit has not held that the relevant community is limited to a specific metropolitan area where the case is designated for trial." *In re Twiford Enters., Inc.*, No. BAP WY-19-037, 2020 WL 6075691, at *9 (B.A.P. 10th Cir. Oct. 15, 2020) (quoting *Pipeline Prods., Inc. v. Madison Cos.*, No. 15-4890-KHV-ADM, 2019 WL 3252743, at *4 (D. Kan. July 19, 2019)). This lawsuit is not particularly Wichita- or Kansas-centered, but rather is essentially national in scope.  Lawson is a Florida citizen.  (ECF 1 ¶ 26.)  The other major players in this litigation include third-parties Elliott Associates, L.P. and Elliott International, L.P. (together, "Elliott"), which are headquartered in New York,[10] and Arconic, which has its principal place of business in Pittsburgh, Pennsylvania.  All of these parties engaged national counsel—Lawson and Elliott's lead counsel in New York, Spirit's lead counsel in Dallas, and Arconic's lead counsel in Florida.  They therefore all appear to view the relevant market to be national legal market.  Furthermore, the dynamics of this case support hiring top-tier employment litigators from anywhere within the District given "the importance of the litigation to Spirit and the complexity of and amount in controversy in the case—after all, this is a case brought by Spirit's former CEO, who seeks tens of millions of dollar in damages, and involves a violation of the restrictive covenant within his Retirement Agreement." (ECF 386, at 5.)

---

[10] Elliott Management Corporation, About Elliott, available at https://www.elliottmgmt.com/about-elliott/ (last visited Oct. 27, 2020) (noting Elliott is headquartered in New York).

Although this case is not particularly Wichita- or Kansas-centered, the relevant market is no broader than the District of Kansas.  For example, Spirit also submitted a declaration from Arcadi in which she states that Arcadi Jackson's rates are below market in Dallas for similar work.  (ECF 388-2 ¶ 16.)  But unless a case "is so unusual or requires such special skills that only an out-of-state attorney possesses, the fee rates of the local area should be applied even when the lawyers seeking fees are from another area."  *Lippoldt*, 468 F.3d at 1225.  Here, this litigation is not so unusual and it does not require such special skills that only an out-of-district attorney could handle the case.  There are sufficient skilled and reputable lawyers within the District who could handle this case.  Therefore, the court does not rely on the reasonableness of Arcadi Jackson's rates in the Dallas market, but rather considers prevailing market rates from anywhere within the District.

Based on this relevant market, the court finds Spirit's requested rates are reasonable for essentially two reasons.  First, Lawson does not argue that Spirit's counsel's rates are unreasonable, nor does he submit any evidence of market rates.  Thus, given the lack of evidence to contradict Spirit's record about the reasonableness of its requested rates, the court finds those rates to be reasonable.  *See, e.g.*, *SFF-TIR, LLC v. Stephenson*, 452 F. Supp. 3d 1058, 1196 (N.D. Okla. 2020) ("[T]he Plaintiffs do not object to the hourly rates that the Defendants' counsel requests.  The Court therefore will use [those] hourly rates . . . .").

Second, the court finds the requested rates to be reasonable in view of Spirit's record and the court's own experience.  The rates for Foulston Siefkin attorneys ($275-375 for partners and $225-275 for associates) are commensurate with top-tier Wichita rates, and the rates for Arcadi Jackson attorneys ($625 for partner Arcadi, $415-425 for of counsel, and $350 for associate Budner) are commensurate with top-tier employment litigation rates in the Kansas City metropolitan area.  *See Fox*, 258 F. Supp. 3d at 1264 (considering Kansas City metropolitan area

rates because those practitioners typically practice in both Kansas and Missouri and do not differentiate their rates based on where the case is filed). The court has accounted for the disparity between Foulston Siefkin rates and Arcadi Jackson rates by considering the relative distribution of hours between the two firms and the overall division of labor amongst attorneys throughout the TAR review process. For example, Arcadi has the highest billing rate at $625, but her 32.4 hours accounted for only 3% of the total hours. She was not involved in reviewing, tagging, or producing TAR documents except for limited instances in which she responded to specific questions. (ECF 388-2 ¶ 21.) The Arcadi Jackson of counsel attorneys ($415-425/hour) accounted for 16% of the total hours. Arcadi Jackson associate Budner and Foulston Siefkin partner DeGraffenreid ($350-375/hour) accounted for 36% of the total hours. And lower-rate attorneys (predominantly associates) at Foulston Siefkin and a paralegal accounted for the remaining 45% of the total hours. Thus, it appears that Spirit responsibly managed expenses by trying to push work down, to the extent practicable, to the attorneys with the lowest billing rates. Overall, this resulted in a blended rate of approximately $327, which is imminently reasonable given the nature and extent of litigation counsel's overall involvement in the TAR review process. *See, e.g.*, *United States ex rel. Awad v. Coffey Health Sys.*, No. 16-2034-CM-JPO, 2019 WL 6910280, at *5 (D. Kan. Dec. 19, 2019) (approving $425 per hour for partner with 25 years of experience and $335 per hour for an associate with 14 years of experience in complex litigation in a False Claims Act case); *Pipeline*, 2019 WL 3252743, at *6-*8 (approving $550 and $450 per hour for attorneys with 15 years of experience in a complex contract dispute); *Hoffman v. Poulsen Pizza LLC*, No. 15-2640-DDC-KGG, 2017 WL 25386, at *6-*7 (D. Kan. Jan. 3, 2017) (finding $600 per hour for a managing partner and $400-450 for other experienced attorneys to be reasonable in a Fair Labor Standards Act ("FLSA") case); *Barbosa v. Nat'l Beef Packing Co.*, No. 12-2311-KHV, 2015 WL 4920292,

at *9-*10 (D. Kan. Aug. 18, 2015) (approving $325 per hour in an FLSA case for an attorney with 14 years of experience); *Rogers v. Bank of Am., N.A.*, No. 13-1333-CM-TJJ, 2014 WL 6632944, at *2 (D. Kan. Nov. 21, 2014) (approving $225 per hour for an associate).

### 4. Lodestar Calculation

In view of the above, following is the appropriate lodestar calculation:

| TIMEKEEPER | HOURS | RATES | TOTAL |
|---|---|---|---|
| Ann Marie Arcadi | 32.4 | $625 | $20,250.00 |
| Seema Tendolkar | 89.3 | $415 | 37,059.50 |
| John M. Farrell | 61.4 | $275 | 16,885.00 |
| Lee Budner | 230.8 | $350 | 80,780.00 |
| Cynthia Partin | 1.7 | $185 | 314.50 |
| Jeff DeGraffenreid | 111.65 | $375 | 41,868.75 |
| Charles McClellan | 80.3 | $275 | 22,082.50 |
| Foulston Siefkin Document Review Partners | 73.7 | $275 | 20,267.50 |
| Foulston Siefkin Document Review Associates | 278.5 | $225-275 | 64,522.50 |
| | | TOTAL: | **$304,030.25** |

The lodestar amount is presumed to be a reasonable fee. *Robinson v. City of Edmond*, 160 F.3d 1275, 1281 (10th Cir. 1998).  The court may adjust this lodestar amount based on the factors set forth in *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714, 717-19 (5th Cir. 1974).  *See Brown v. Phillips Petro. Co.*, 838 F.2d 451, 454-55 (10th Cir. 1988) (approving the *Johnson* factors to determine a reasonable fee in a common fund case).  The lodestar analysis, however, remains the primary consideration when determining a reasonable fee and often subsumes the *Johnson* factors.  *See Fox*, 258 F. Supp. 3d at 1254.  Here, neither party expressly addresses the *Johnson* factors, and the court therefore finds no adjustment based on those factors is warranted.

### III.     EXPENSES RELATING TO THE CURRENT APPLICATION

Spirit seeks $83,000 in costs and fees that it incurred corresponding and conferring with Lawson after the June 18 order, reviewing and redacting invoices, and otherwise preparing the instant application. (ECF 386, at 11; ECF 415, at 6.)  The hours spent in preparing a fee application are generally compensable.  *See Case*, 157 F.3d at 1254 (award of fees to the prevailing party in a civil rights case could include work performed in preparing the application); *see also Ad Astra Recovery Servs., Inc. v. Heath*, No. 18-1145-JWB-ADM, 2020 WL 4346965, at *8 (D. Kan. July 29, 2020) (awarding fees incurred in preparing a motion seeking attorneys' fees pursuant to Rule 37(a)(5)).  Based on the court's experience with similar briefing exercises, this appears to be a reasonable range because of the nature of the issues and the details involved with preparing the current fee application and replying to Lawson's response brief.  However, the court is unable to make this determination based on the present record because Spirit did not submit billing records, declarations, or other evidence showing how many hours Spirit's attorneys spent on the application or their billed rates, as required by governing law.

Accordingly, the court provisionally grants Spirit's application with respect to its expenses incurred in submitting the current fee application.  This includes time spent reviewing and redacting invoices, corresponding and conferring with Lawson as required by the court's June 18 order, and otherwise preparing the current application and reply brief; it may also include Spirit's expenses incurred in preparing the renewed application.  To that end, the court directs Spirit to prepare a renewed application for these expenses not to exceed 3 pages.  The renewed application must contain the information needed for the court to conduct a lodestar analysis—namely, a chart that summarizes the numbers of hours billed by each timekeeper and their respective rates—and attach the supporting time entries.  For the most recent expenses (*e.g.*, those incurred in preparing the renewed application), Spirit does not need to submit time entries but may instead rely on

attorney declaration(s) explaining number of hours and hourly rates for each timekeeper. Spirit must serve the renewed motion on Lawson by **November 12, 2020**. No later than **November 17, 2020**, Lawson must notify Spirit whether he agrees to pay the amount sought. If not, Spirit may file the renewed application no later than **November 18, 2020**. Lawson must file his response to the renewed application no later than **November 24, 2020**. Lawson's response must not exceed 3 pages, and Lawson must attach an annotated exhibit that identifies the time entries to which he objects and the grounds for each objection, similar to Lawson's Annotated TAR Exhibits (ECF 409). No reply will be allowed.

## IV.     CONCLUSION

The court court finds that Spirit reasonably incurred $449,999.21 in expenses paid to Legility and $304,030.25 in attorneys' fees, totaling $754,029.46. The court will also provisionally grant Spirit its expenses reasonably incurred in preparing the current application, but the court cannot determine a specific dollar amount at this time. Spirit is therefore directed to prepare a renewed application for expenses and follow the procedure set forth above.

**IT IS THEREFORE ORDERED** that Spirit AeroSystems, Inc.'s Application for TAR Expenses (ECF 385) is granted in part and denied in part as set forth above.

**IT IS SO ORDERED.**

Dated October 29, 2020, at Topeka, Kansas.

s/ Angel D. Mitchell
Angel D. Mitchell
U.S. Magistrate Judge