**THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS**

LARRY A. LAWSON,

                    Plaintiff,

        v.

SPIRIT AEROSYSTEMS, INC.,

                    Defendant.

Civil Action No. 6:18-cv-01100-EFM-ADM

CONFIDENTIAL – PURSUANT TO
PROTECTIVE ORDER
FILED UNDER SEAL

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF LARRY A. LAWSON'S
<u>MOTION FOR SUMMARY JUDGMENT</u>**

HITE, FANNING & HONEYMAN L.L.P.
100 N. Broadway, Suite 950
Wichita, KS 67202
Telephone: 316-265-7741
Facsimile: 316-267-7803

WILLKIE FARR & GALLAGHER LLP
787 Seventh Avenue
New York, NY 10019
Telephone: 212-728-8000
Facsimile: 212-728-8111

Attorneys for Plaintiff Larry A. Lawson

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ...................................................................................1

STATEMENT OF UNDISPUTED MATERIAL FACTS ........................................6

   I.      LAWSON'S SUCCESSFUL TENURE AS CEO OF SPIRIT........................6

   II.     LAWSON'S RETIREMENT FROM SPIRIT AND COMPLIANCE WITH HIS OBLIGATIONS..............................................................................8

   III.    ELLIOTT RETAINS LAWSON. ................................................................10

   IV.    SPIRIT'S BREACH OF THE RETIREMENT AGREEMENT....................12

   V.      THE PROXY CONTEST. ...........................................................................16

   VI.    THE ARCONIC CEO SEARCH. ................................................................18

   VII.   SPIRIT'S RELATIONSHIP WITH ARCONIC.........................................19

   VIII.  LAWSON'S DAMAGES FROM SPIRIT'S BREACH................................22

ARGUMENT ...........................................................................................................25

   I.      THE SUMMARY JUDGMENT STANDARD.............................................25

   II.     THE FACTS UNDERLYING LAWSON'S BREACH OF CONTRACT CLAIM ARE UNDISPUTED. ................................................................26

   III.    SPIRIT HAS FAILED TO DEMONSTRATE THAT LAWSON BREACHED THE NON-COMPETE PROVISION IN HIS RETIREMENT AGREEMENT....................31

    A.     The Summary Judgment Burden Shifting Analysis Applies to Spirit's Non-Compete Defense. ..................................................................33

    B.     Spirit Cannot Demonstrate That Application of The Non-Compete Provision is Reasonable Under the Circumstances..........................................34

       1.    Application of the Non-Compete Provision Under the Circumstances Does Not Protect Spirit's Legitimate Business Interests. ....................................35

          (a)    *Lawson's Agreement with Elliott to Remain Available as a Potential CEO Candidate Did Not Harm Spirit's Legitimate Business Interests.*....................36

          (b)    *Elliott Never Owned, Operated, Managed or Controlled Arconic.*..................40

          (c)    *Arconic is Not in the Business.* ..........................................43

       2.    The Remaining Non-Compete Factors Support Summary Judgment........................48

CONCLUSION.........................................................................................................50

## TABLE OF AUTHORITIES

**Cases**                                                                     **Page(s)**

*Adler v. Wal-Mart Stores, Inc.,*
    144 F.3d 664 (10th Cir. 1998) ..................................................................25, 26, 33

*Allen, Gibbs & Houlik, L.C. v. Ristow,*
    32 Kan. App. 2d 1051, 94 P.3d 724 (2004) ..........................................36, 39, 44, 49

*Anderson v. Liberty Lobby, Inc.,*
    477 U.S. 242 (1986)..................................................................................................46

*API Americas Inc. v. Miller,*
    380 F. Supp. 3d 1141 (D. Kan. 2019)......................................................................26

*Ardurra Group, Inc. v. Gerrity,*
    19-cv-3238, 2019 WL 6698208 (E.D. Pa. Dec. 9, 2019) .......................................43

*Bank Midwest, N.A. v. Millard,*
    No. 10-2387-JR, 2012 WL 4359060 (D. Kan. Sept. 24, 2012) .........................25, 33

*Bones v. Honeywell Int'l, Inc.,*
    366 F.3d 869 (10th Cir. 2004) .................................................................................25

*Bradbury Co. v. Teissier-duCros,*
    413 F. Supp. 2d 1209 (D. Kan. 2006)......................................................................34

*Celotex Corp. v. Catrett,*
    477 U.S. 317 (1986)............................................................................................25, 33

*Cravotta v. Deggingers' Foundry, Inc.,*
    42 Kan. App. 2d 700, 215 P.3d 636 (2009) ............................................................33

*Digital Ally, Inc. v. Corum,*
    No. 17-cv-02026, 2017 WL 1545671 (D. Kan. Apr. 28, 2017)...........................37, 39, 48, 49

*E.T. Products, LLC v. D.E. Miller Holdings, Inc.,*
    872 F.3d 464 (7th Cir. 2017) ............................................................................ *passim*

*Idbeis v. Wichita Surgical Specialists, P.A.,*
    279 Kan. 755, 112 P.3d 81 (2005)..............................................................35, 36, 37

*Jensen Int'l., Inc. v. Kelley,*
    29 Kan. App. 2d 836, 32 P.3d 1205 (2001) .......................................40, 41, 43, 45

*Lexington Ins. Co. v. Western Roofing Co.,*
  316 F. Supp. 2d 1142 (D. Kan. 2004) ..............................................................30, 31

*Libertarian Party of N.M. v. Herrera,*
  506 F.3d 1303 (10th Cir. 2007) ...............................................................26, 27, 33

*Life Image, Inc. v. Shockman,*
  272 F. Supp. 3d 231 (D. Mass. 2017) ...................................................................37

*Metoyer v. Auto Club Family Ins. Co.,*
  536 F. Supp. 2d 664 (E.D. La. 2008) ....................................................................31

*Monsour's Inc. v. Menu Maker Foods, Inc.,*
  No. 05-1204-JTM, 2008 WL 941212 (D. Kan. Apr. 7, 2008)................................44

*Mowery Clinic, L.L.C. v. Hofer,*
  122 P.3d 838, 2005 WL 3098729 (Kan. Ct. App. 2005) ............................... *passim*

*MQ Associates, Inc. v. North Bay Imaging, LLC,*
  270 F. App'x 761 (11th Cir. 2008) ..................................................................40, 45

*Presbyterian Manors, Inc. v. Simplexgrinnell, L.P.,*
  No. 09-2656-KHV, 2010 WL 3880027 (D. Kan. Sept. 28, 2010).........................30

*Source Direct, Inc. v. Mantell,*
  19 Kan. App. 2d 399, 870 P.2d 686 (1994) .....................................................27, 33

*Tapia v. City of Albuquerque,*
  170 F. App'x. 529 (10th Cir. 2006) .......................................................................34

*Teran v. GB Int'l, S.p.A.,*
  652 F. App'x 660 (10th Cir. 2016) ........................................................................38

*Transformer Disposal Specialists, Inc. v. Trinity Techs., Inc.,*
  No. 15-1056-EFM, 2016 WL 7386447 (D. Kan. Dec. 21, 2016)..........................26

*United States v. Chauvin,*
  No. 12-1315-CM, 2013 WL 5314432 (D. Kan. Sept. 23, 2013) ...........................26

*Vitkus v. Beatrice Co.,*
  11 F.3d 1535 (10th Cir. 1993) ...............................................................................34

*W. W. Roller & Co. v. Ott,*
  14 Kan. 609 (1875) ................................................................................................49

*Weber v. Tillman,*
  259 Kan. 457, 913 P.2d 84 (1996) ...................................................35, 36, 48, 49

*Wichita Clinic, P.A. v. Louis,*
    39 Kan. App. 2d 848, 854,185 P.3d 946 (2008) .................................................................35

*Wright ex rel. Tr. Co. of Kan. v. Abbott Labs., Inc.,*
    259 F.3d 1226 (10th Cir. 2001) ....................................................................................25, 37

## PRELIMINARY STATEMENT

In February 2017, Defendant Spirit AeroSystems, Inc. ("Spirit") breached its contract with Plaintiff Larry A. Lawson ("Lawson") and cancelled retirement benefits it owed to him because it contended, wrongly, that he had agreed to indirectly provide services to Arconic Inc. ("Arconic"),[1] an alleged competitor. Spirit was wrong then, and discovery has demonstrated that Spirit's repudiation of Lawson's retirement agreement (the "Retirement Agreement") was improper. Arconic is a not a competitor to Spirit, and more importantly, Lawson never agreed to provide and never provided any services to Arconic. Instead, Lawson agreed with Elliott Associates, L.P. and Elliott International, L.P. (together, "Elliott") to be available as a CEO candidate in connection with Elliott's insurgent proxy campaign to replace five directors of Arconic and persuade Arconic to replace its incumbent CEO. Arconic never offered Lawson any employment. In fact, other than incidental duties to Elliott, such as a handful of meetings with Arconic's stockholders and with Elliott personnel, Lawson performed no duties whatsoever. The undisputed facts demonstrate that simply by saying he would be willing to become Arconic's CEO—if Arconic's board of directors ever offered him the job—Lawson did not threaten any legitimate business interest that could justify Spirit's breach or its cancellation of his retirement payments.

Lawson brought this lawsuit to remedy Spirit's unjustified and admitted breach of the Retirement Agreement. When Lawson retired as Spirit's CEO in 2016, Spirit agreed to pay him cash and stock awards that are now worth over $50 million, including interest. It is undisputed that Spirit remains in breach of its obligation to pay these amounts. Spirit does not dispute any

---

[1] Arconic recently completed a reorganization in which certain aspects of its business were spun off. The aerospace business of Arconic is now called Howmet Aerospace ("Howmet"). The defined term "Arconic" refers to the combined business that operated from 2016 to 2019 as Arconic Inc., and to Howmet.

element of Lawson's *prima facie* case for breach of contract:  the Retirement Agreement was a valid contract supported by consideration, Lawson took steps to perform whenever called upon by Spirit, Spirit breached the contract, and Lawson suffered damages as a result.

Instead, Spirit attempts to excuse its non-performance by asserting as an affirmative defense that Lawson failed to comply with the non-compete provision in the Retirement Agreement.  Spirit contends that Arconic is its "direct competitor" and that Lawson's agreement with Elliott constituted prohibited "assistance" to, or an impermissible "interest" in, an entity that invests in Arconic.  Spirit, however, cannot meet its burden of proof.  The only thing Lawson ever agreed to do for Elliott—and the only thing he ever did—is submit himself to public scrutiny as a potential candidate to be the CEO of Arconic.  Elliott never controlled Arconic, had no role in its management or operations and could not get Lawson appointed as Arconic's CEO.  In fact, Arconic bitterly opposed Elliott's proxy contest and Lawson's candidacy.  Lawson was not selected to be the CEO of Arconic.  Given the extremely limited scope of Lawson's role, Elliott's lack of control over Arconic, and the absence of any benefit conferred to Arconic by Lawson, there is simply no basis to contend that Lawson violated his non-compete obligations.

In fact, Spirit's decision to breach the Retirement Agreement was not animated by fear that Lawson would assist a purported competitor.  Rather, Spirit feared shareholder reaction to forthcoming mandatory proxy disclosures that would publicly reveal Lawson's substantial retirement compensation.  Through the Retirement Agreement, Spirit awarded Lawson an early retirement package that was tens of millions of dollars greater than he would otherwise have received if he had stayed on as CEO and retired later as planned.  This enhanced package certainly was well-deserved:  Lawson turned Spirit around and made it the world's foremost independent Tier 1 manufacturer of aerostructures.  But in 2016, Spirit had a successor CEO, Tom Gentile,

waiting in the wings.  In recognition of Lawson's service to Spirit, and in light of its desire to have Gentile take the reins sooner, Spirit offered Lawson a lucrative package of cash and stock awards.  The enhanced package was contingent on Lawson's agreement to retire from his position earlier than he had intended.  Lawson agreed, but shortly thereafter, Spirit developed buyer's remorse.

Spirit was apprehensive about the disclosure of Lawson's enhanced severance package in its 2017 proxy.  Spirit concluded that there was little it could do to mitigate the criticism it expected to receive, as the compensation package was contrary to proxy advisor guidelines not to enhance severance beyond what is contractually specified.  So Spirit, conveniently and before it was required to make the disclosure, repudiated the Retirement Agreement.  Spirit's stated justification reflected a mistaken belief about competition, but it received an undeniable side-benefit.  The breach allowed Spirit to disclose that it was no longer planning to pay Lawson's compensation, which, in turn, allowed the company to avoid negative reactions from shareholders and perhaps a proxy contest of its own.  Notably, the decision to breach was made not by Spirit's CEO or the Compensation Committee of Spirit's board of directors, but rather by the Corporate Governance and Nominating Committee (the "Governance Committee")—the same committee charged with overseeing Spirit's proxy disclosures and relations with investors.  Recouping Lawson's severance appears to have been a strategic step for Spirit, and Lawson's consulting relationship with Elliott offered a timely excuse.

But Spirit miscalculated badly.  Lawson's consulting role with Elliott plainly did not violate the non-compete provision of the Retirement Agreement.  *First*, Lawson's service to Elliott—remaining available to potentially serve as CEO if Arconic agreed to hire him—provided no competitive benefit to Arconic at Spirit's expense.  Lawson's only obligation was to open

himself up to questioning and scrutiny on his background, leadership style, and vision. In fact, Lawson and Elliott specifically agreed and represented to Spirit that Lawson would not perform any acts that could constitute a violation of his non-compete obligations. Spirit cannot credibly argue that Lawson put its trade secrets, sensitive information, or client relationships at risk of disclosure to Arconic. Lawson never provided any services to Arconic—whether direct or indirect—and his engagement certainly did not benefit Arconic at Spirit's expense.

*Second*, Elliott's investment in Arconic did not threaten any business interest of Spirit. Elliott is an investment firm that had a minority position in Arconic and no control over Arconic's business. Nor did Elliott have the power to select the next Arconic CEO. This is clear from the very fact that Elliott engaged Lawson as part of *a hostile proxy contest*, which Arconic aggressively opposed. Elliott's aim was to replace five incumbent members of the Arconic board with new directors that it identified, and to convince Arconic's board of directors to replace the existing CEO, Klaus Kleinfeld. Arconic reacted with outright hostility to Elliott's proposals. Through a series of letters to shareholders, proxy disclosures, corporate governance changes, and press releases, Arconic sought to ensure that Elliott could not influence the direction of the company. These measures succeeded until Kleinfeld, the incumbent CEO, resigned for unrelated reasons. But even in accepting Kleinfeld's resignation, Arconic took pains to note that Kleinfeld's resignation was not in response to Elliot's proxy efforts. In the end, Elliott chose to settle its dispute with Arconic, only three of its candidates were nominated for the board, and the Arconic board rejected Lawson as a CEO candidate.

On these facts, interpreting the non-compete provision broadly to prohibit what Lawson did for Elliott would violate longstanding principles of Kansas law strongly discouraging the broad application of non-competition agreements, as well as this Court's own prior interpretation

of the non-compete provision in its order denying Spirit's motion to dismiss.  Both limit the applicability of the clause to situations involving *actual competition*, which is not present here. The Court need not even reach the question of whether Arconic is a competitor of Spirit because Lawson never worked for Arconic.

But Spirit's non-compete defense also fails for the independent reason that Spirit cannot raise a genuine factual dispute contesting the reality that it did not compete with Arconic in any line of business that both companies engaged in during the term specified in the non-compete provision.   Spirit's notion of business competition is based solely on Arconic's *potential capability* to make, market or sell competing products—as Spirit understands those capabilities based on Arconic marketing documents—rather than on actual competition between the two companies.  The hypothetical competition Spirit places at the heart of its defense is categorically insufficient to trigger the non-compete provision.

Spirit has attempted to supplement this notion by pointing to a set of broadly defined aircraft product categories within which both Spirit and Arconic allegedly make, manufacture or sell parts, but there is no evidence that the companies' respective offerings within any product category are actually the same or similar, as the non-compete provision requires.  Spirit's own expert witness and its CEO do not rely on these parts in postulating that the two companies are competitors.  In fact, many of the products that Spirit listed as overlapping between the two companies are components manufactured by Arconic that Spirit sources from Arconic and then incorporates into its larger aerostructures or distributes as part of its products in the aftermarket. Far from supporting its non-compete defense, Spirit's reliance on such products demonstrates what Lawson has argued all along:  Arconic is a supplier to Spirit, not a competitor.

The undisputed facts set forth above establish two things: first, that Spirit breached its obligations to Lawson under the Retirement Agreement by withholding cash payments and long-term stock awards, and second, that Spirit failed as a matter of law to demonstrate that Lawson's agreement with Elliott violated the terms of his non-compete agreement with Spirit.

Accordingly, and for the reasons set forth more fully below, the Court should grant summary judgment in favor of Lawson.

## STATEMENT OF UNDISPUTED MATERIAL FACTS

### I.    LAWSON'S SUCCESSFUL TENURE AS CEO OF SPIRIT.

1.      Prior to hiring Lawson as CEO, Spirit was struggling with declining profits, high costs, and a dropping share price.  In need of a change, Spirit decided to hire Lawson—who had successfully turned around Lockheed Martin's struggling F-22 and F-35 programs (Ex. 6, Katz Tr. at 205:22–25)—as its CEO and President and tasked him with turning the company around. Lawson also served as a member of Spirit's Executive Leadership Team and Board of Directors. (Ex. 7, Lawson Tr. at 16:2–17:2; Pretrial Order (ECF No. 429) ("PTO") at 2, ¶¶ 2(a)(1)–(2).)

2.      On March 18, 2013, Lawson was hired by Spirit as its Chief Executive Officer. (PTO at 2, ¶ 2(a)(3).)   In connection with his hiring, Spirit and Lawson entered into an Employment Agreement, which was effective April 6, 2013.  (Ex. 15; PTO at 2, ¶ 2(a)(3).)

3.      Section 4(c) ("*Non-Compete*") of the Employment Agreement imposed non-competition obligations on Lawson.  (Ex. 15 at § 4(c).)  It provides that:

> [N]either you nor any individual, corporation, partnership, limited liability company, trust, estate, joint venture, or other organization or association ("Person") with your assistance nor any Person in which you directly or indirectly have any interest of any kind (without limitation) will, anywhere in the world, directly or indirectly own, manage, operate, control, be employed by, serve as an officer or director of, solicit sales for, invest in, participate in, advise, consult with, or be connected with the ownership, management, operation, or control of any business that is engaged, in whole or in part, in the Business, or any business that

is competitive with the Business or any portion thereof, except for our exclusive benefit.  (*Id.*)

4.      The "Business" was defined, in Recital A of the Employment Agreement:

We are engaged in the manufacture, fabrication, maintenance, repair, overhaul, and modification of aerostructures and aircraft components, and market and sell our products and services to customers throughout the world (together with any other businesses in which Spirit may in the future engage, by acquisition or otherwise, the "Business").  (*Id.* at Recital A.)

5.      Upon being hired as CEO, Lawson immediately improved the company's fortunes. In 2012, Spirit only had $34.8 million in net income—compared to $265 million in 2008—and its stock price had fallen to under $15/share by the end of the year. (Ex. 14 at 48, 51.)  Under Lawson's leadership, Spirit's share price increased to over $55/share and its profits grew to $788.7 million by the end of 2015, Lawson's last full year as CEO.  (Ex. 53 at 35, 38.)  This cemented Lawson's reputation as a corporate turnaround artist.  (Ex. 6, Katz Tr. at 205:22–206:2, 207:6–208:4.)

6.      By early 2016, the turnaround was complete.  Spirit's 2016 Form 10-K described its business as follows: "We are one of the largest independent non-OEM aircraft parts designers and manufacturers of commercial aerostructures in the world, based on annual revenues, as well as the largest independent supplier of aerostructures to Boeing."  (Ex. 53 at 3.)  Spirit was also "one of the largest independent suppliers of aerostructures to Airbus."  (*Id.*)  Spirit claimed expertise "in designing, engineering and manufacturing large-scale, complex aerostructures." (*Id.* at 13.)  "Aerostructures are structural components such as fuselages, propulsion systems and wing systems for commercial and military aircraft."  (*Id.* at 3.)  Spirit derived its "revenues primarily through long-term supply agreements with Boeing and Airbus." (*Id.*)  Spirit was then "the sole-source supplier for nearly all of the products we sell to Boeing and Airbus."  (*Id.* at 9.)  Notably, Spirit did not list Arconic as one of its competitors in the 2016 10-K.  (*Id.* at 14.)

7.      Because Lawson had achieved his objectives by 2016, he began to contemplate retirement from Spirit.  (Ex. 25 at 392.)  As part of its succession planning, Spirit hired Tom Gentile in April 2016 as its Chief Operating Officer with the intention that he would transition to CEO when Lawson retired.  (Ex. 11, Gentile Tr. at 25:18–24; Ex. 21 at 486–87.)

8.      While Lawson wished to retire at the end of 2016, Spirit's board hoped that Gentile would take over as soon as July.  (Ex. 23 at 501.)  In exchange for Lawson retiring earlier than he initially planned, Spirit agreed to "enhance" Lawson's potential severance package. (*Id.* at 540 ("the enhanced package . . . is contingent on [Lawson's] cooperation and concurrence with [Spirit's] proposed timeline and plan.").)  The compensation package was awarded through Lawson's Retirement Agreement.

## II.    LAWSON'S RETIREMENT FROM SPIRIT AND COMPLIANCE WITH HIS OBLIGATIONS.

9.      On June 7, 2016, Lawson and Spirit entered into a Retirement and Consulting Agreement and General Release (the "Retirement Agreement"), which made his retirement effective July 31, 2016 (the "Retirement Date").  (Ex. 24; *see also* PTO at 2, ¶ 2(a)(4).)

10.     In recognition of his outstanding service to Spirit and his willingness to retire earlier than anticipated, the Retirement Agreement granted Lawson a substantially enhanced severance package.  The Retirement Agreement allowed Lawson to continue participating in Spirit's Long-Term Incentive Plan ("LTIP").  Lawson's LTIP share entitlement was set forth in Exhibit A to the contract, which was expressly made part of the agreement.  (Ex. 24 at § 2(c).) Exhibit A awarded Lawson 408,596 unvested LTIP shares, in which he was entitled to vest "as if

he were an active employee."  Spirit also agreed to make cash payments to Lawson over a period of two years.[2]  (*Id.*)

11.     The Retirement Agreement also imposed certain obligations on Lawson.  Section 2(a) of the Retirement Agreement called on Lawson to perform "consulting and transition services" for Spirit, for a period of two years after the effective date.  (*Id.* at § 2(a).)

12.     Following the Retirement Date, Lawson worked as a consultant for Spirit, conducted reviews of certain financial documents, had phone calls with Gentile and other Spirit executives, and participated in a celebration at Spirit for the 787 program.  (Ex. 11, Gentile Tr. 152:7–153:22; *see also* Ex. 7, Lawson Tr. at 122:6–123:17.)  Lawson was available for consulting services whenever Spirit needed him and never refused to consult for Spirit.  (Ex. 11, Gentile Tr. 151:18–25, 152:7–16; *see also* Ex. 4, Marnick Tr. 53:12–19.)

13.     Section 7 of the Retirement Agreement incorporated the non-compete provision from Lawson's Employment Agreement and extended its term to July 31, 2018.  (Ex. 24 at § 7; see also PTO at 2, ¶ 2(a)(5).)

14.     After he retired, Lawson sought Spirit's prior approval whenever he was interested in doing consulting work for other companies.  (Ex. 4, Marnick Tr. at 50:11–13; 211:8–212:3; *see also* Ex. 7, Lawson Tr. 173:10–21.)  On one occasion, Lawson was approached by L3 Technologies, an aerospace and defense company.  Before he agreed to consult with L3, Lawson

---

[2] It is notable that in multiple presentations discussing this enhanced severance package, Spirit repeatedly expressed concern about the reactions of proxy advisory services and shareholder activists if it had to publicly disclose the arrangement in its next definitive proxy statement.  (Ex. 22 at 21149, 21152.)  Specifically, Spirit observed that (i) "providing incremental benefits of roughly $20mm could draw negative attention from shareholders and proxy advisors"; (ii) incremental compensation would be visible to investors; and (iii) "[i]n general, ISS and Glass Lewis are against incremental severance benefits beyond what is contractually specified."  (*Id.* at 21152.)  Spirit further noted that it likely could not mitigate proxy advisors' negative reaction to a disclosure about Lawson's enhanced severance, but that including a clawback provision (through which it could recoup the enhanced severance) would be helpful.  (*Id.* at 21149.)  After breaching the Retirement Agreement, s*ee infra*, Statement of Undisputed Material Facts at Point IV, Spirit instead disclosed that, although it awarded Lawson an enhanced severance package, it did not plan to honor its payment obligations.  (Ex. 62 at 15, 16 n.13, 53–54.)

spoke with Samantha Marnick, at the time a Spirit senior executive in charge of human resources and a liaison to the Spirit board of directors, to seek authorization.  (Ex. 26.)  Spirit approved Lawson's consulting role with L3.  (Ex. 27.)

## III.   ELLIOTT RETAINS LAWSON.

15.     In late 2016, Korn Ferry, an executive search firm, connected Elliott with Lawson. (Ex. 30; Ex. 6, Katz Tr. at 40:25–41:3; Ex. 7, Lawson Tr. at 164:18–22.)  On December 1, 2016, Lawson and Adam Katz, at the time an investment analyst at Elliott, spoke over the phone about the potential of Lawson serving in a leadership role at Arconic.  (Ex. 31.)

16.     Elliott is an investment firm whose business is "to invest [its] investors' money in a way so as to seek to achieve an attractive risk adjusted return over time."  (Ex. 2, Miller Tr. at 21:21–22:2.)

17.     As of 2016, Arconic described itself as "a global leader in lightweight metals engineering and manufacturing.  Arconic's innovative, multi-material products, which include aluminum, titanium, and nickel, are used worldwide in aerospace, automotive, commercial transportation, packaging, building and construction, oil and gas, defense, consumer electronics, and industrial applications."  (Ex. 55 at 1.)  Arconic provided parts to the aerospace industry through its "Global Rolled Products" segment and its "Engineered Products and Solutions" segment.  (*Id.* at 3–8.)  For each of these segments, Arconic did not list Spirit as a competitor in its Form 10-K.  (*Id.* at 11–14.)

18.     Arconic is a supplier to Spirit for raw materials, forgings, castings, and fasteners. (Ex. 36 at 520.)  In a January 2017 internal profile of Arconic, describing "the critical issues that might be in play," Spirit described the relationship as good and did not describe the companies as competitors, or identify Arconic as posing any competitive threat.  (*Id.* at 525; Ex. 11, Gentile Tr.

at 203:4–218:11.) ████████████████████████████████████

████████████████████████

19.     By the time Elliott reached out to Lawson, it had already held its position in Arconic for over a year.  Elliott first took a position in Alcoa Inc., the predecessor of Arconic, in 2015.[3]  (Ex. 6, Katz Tr. at 30:6–31:17; Ex. 2, Miller Tr. at 25:22–25.)  On November 4, 2016, shortly after Arconic spun off its raw materials business and renamed itself,  Elliott increased its holdings in the newly named Arconic from 7.5% to 9%.  (*See* Ex. 29.)  Lawson was "irrelevant" to Elliott's decision to invest in Alcoa, or to continue its investment in Arconic.  (Ex. 6, Katz Tr. at 276:4–23.)

20.     After the spinoff, Arconic underperformed and Elliott believed that a change in leadership was needed.  (Ex. 2, Miller Tr. at 33:25–34:3; *see also* Ex. 3, Camporin Tr. at 18:20–19:18.)  In particular, Elliott determined that Arconic would be best served by replacing its CEO, Klaus Kleinfeld.  (Ex. 6, Katz Tr. at 33:16–34:10.)  Because Arconic was unwilling to implement Elliott's proposals, Elliott determined that a proxy contest might be necessary to influence Arconic to make changes.  (Ex. 6, Katz Tr. at 32:20–33:15.)  The goal of the proxy contest was to nominate new independent directors to the Arconic board who would, ideally, agree with Elliott's position that the CEO needed to be removed.  (*Id.*)

21.     Elliott was attracted to Lawson as a potential board or CEO candidate for Arconic because of his experience turning around Spirit and Lockheed's F-15 and F-22 programs.  (Ex. 6, Katz Tr. at 206:12–208:4; Ex. 32.)  After their initial conversation on December 1, 2016 and a few more phone calls, Lawson met with Katz and others at Elliott on January 10, 2017 to continue the discussion.  (Ex. 6, Katz Tr. at 56:6–22; Ex. 32; Ex. 35.)

---

[3] On November 1, 2016, Alcoa Inc. renamed itself Arconic and spun off part of the former Alcoa Inc. into a new company called Alcoa Corp.  (Ex. 28.)

## IV.    SPIRIT'S BREACH OF THE RETIREMENT AGREEMENT.

22.    In late December 2016 or early January 2017, when his discussions with Elliott had advanced to the point that an agreement seemed possible, Lawson reached out to Samantha Marnick—as he had done with L3—to discuss the possibility of serving on Elliott's proxy slate as a candidate for Arconic's board of directors and to obtain approval from Spirit.  (Ex. 7, Lawson Tr. at 168:13–169:4.)  Marnick initially told him that there would not be an "issue" with him serving on Arconic's board.  (Ex. 7, Lawson Tr. at 173:10–21; Ex. 34.)  However, on January 10, 2017, Marnick told Lawson that "Tom and the board are concerned about Arconic for various reasons" of which Marnick was not aware.  (Ex. 34.)

23.    Adam Katz then reached out to Spirit Chairman Bob Johnson, who told Katz that Spirit was not concerned about Lawson participating in Elliott's proxy contest with Arconic and that "Arconic and Spirit [are] in completely different businesses."  (Ex. 6, Katz Tr. at 104:19–107:7.)  Although Johnson expressed concern that it could be "embarrass[ing]" to Spirit if Lawson were to work for Arconic because of the size of Lawson's severance package, he was optimistic that Lawson, Spirit, and Elliott could find a mutually agreeable solution.  (*Id.*)

24.    ████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████

25.    On January 23, 2017, Elliott made a formal request to Spirit to authorize Lawson to be a candidate on Elliott's slate of director nominees.  (Ex. 39 at 968–69.)  Spirit's general

counsel responded on January 26 that if Lawson "were to serve on the board of directors of Arconic, or otherwise provide services to Arconic, Spirit would view Lawson's inclusion on Elliott's slate of directors as a breach of his non-compete obligations." (*Id.* at 967.)

26. When a Korn Ferry representative engaged in a follow-up discussion with Samantha Marnick regarding the rationale for Spirit's decision, Marnick informed him that the Governance Committee of Spirit's board made the final determination not to authorize Lawson's appearance on the proxy slate because of the size of his compensation package and the shareholder criticisms surrounding it. (Ex. 40; Ex. 4, Marnick Tr. at 228:4–231:21.)

27. After Spirit refused to allow Lawson to serve as a nominee on Elliott's proxy slate, Lawson and Elliott decided that Elliott would publicly announce him as a possible CEO candidate for consideration by Arconic's board, but that he would not run for election to its Board of Directors or take a proactive role in the proxy contest. (Ex. 7, Lawson Tr. at 231:3–20.)

28. On January 31, 2017, Elliott formally launched its proxy contest to replace Arconic's CEO and nominate directors for seats on Arconic's board. (Ex. 45.) All of Elliott's board nominees signed independence agreements confirming that they would not act at Elliott's direction if elected to the board. (Exs. 37, 38, 41, 42, 43.) As of January 31, 2017, Elliott held approximately 12.1% of Arconic's common stock. (Ex. 45.)

29. Also on January 31, 2017, Lawson and Elliott entered into a Consulting Agreement in which Lawson agreed to provide "general advisory and professional consulting services . . . in connection with Elliott's nomination of individuals for election to the board of directors of Arconic." (Ex. 46.) Elliott publicly announced that it had retained Lawson as a consultant. (Ex. 45.)

30.     Under the Consulting Agreement, Lawson's responsibility was to be the "face of the campaign" as the "potential alternative" to Kleinfeld.  (Ex. 7, Lawson Tr. 140:6–18.)  Because Elliott's goal in the proxy contest was to replace the existing CEO of Arconic, it needed to identify a possible candidate to replace him, ideally someone with relevant experience.  (Ex. 6, Katz Tr. at 280:8–284:11.)  Lawson fit that role.  (*Id.*)  The only services that Lawson agreed to perform for Elliott were to "mak[e] himself available to be considered to be the CEO of Arconic [and to] subject[] himself to public scrutiny and criticism."  (Ex. 2, Miller Tr. at 70:24–71:19.)

31.     Lawson and Elliott also entered into an indemnification agreement (the "Indemnification Agreement").  (Ex. 47.)  Elliott agreed to indemnify Lawson for the remaining compensation owed to him under the Retirement Agreement in the event that Spirit did not fulfill its obligations.  (*Id.*)  In return, Elliott received a right of subrogation.  (*Id.* at § 9.)  Under the terms of the Indemnification Agreement, Elliott agreed to pay Lawson any outstanding cash payments that Spirit failed to make, and $24,331,891.80 in cash in consideration of the remaining unvested stock awards that Spirit withheld.  (*Id.* at §§ 3, 4.)

32.     Upon learning through press releases that Elliott had retained Lawson, Spirit decided to breach Lawson's Retirement Agreement.  (Ex. 49; Ex. 4, Marnick Tr. at 204:10–210:12.)  On February 2, 2017, Spirit sent a letter to Lawson alleging that he had breached his non-compete obligation and that it would not pay him the remaining money or allow to vest the remaining shares due to him under the Retirement Agreement.  (Ex. 49.)  Spirit's Rule 30(b)(6) corporate representative testified that the basis for the decision to breach the Retirement Agreement was Spirit's incorrect determination that Lawson was "looking at being on the board of Arconic."  (Ex. 4, Marnick Tr. at 204:10–210:12.)

33.     In light of Spirit's misunderstanding about the scope of Lawson's role, and the fact that he had not agreed to provide any services to Arconic, Lawson and Elliott believed that the situation still could be resolved amicably.  To that end, on February 17, 2017, Lawson and Elliott entered into a side agreement (the "Side Agreement") confirming that the services provided by Lawson under the Consulting Agreement were "limited to providing information to Elliott, Arconic's shareholders, proxy advisor services and/or the public concerning [Lawson's] prospective service as CEO of Arconic, and how [Lawson] believe[d] [he] could improve Arconic's performance."  (Ex. 54 at 2.)

34.     In the Side Agreement, Lawson and Elliott specifically represented and agreed that Elliott was not asking Lawson to:

- provide, use, or rely upon any trade secrets or confidential information belonging to Spirit AeroSystems, Inc. ("Spirit") or any information he obtained during his tenure at Spirit;

- provide or disclose to Elliott, or analyze for Elliott, information regarding the manufacture, fabrication, maintenance, repair, overhaul, or modification of aerostructures and aircraft components;

- assist with the ownership, management, operation, or control of Arconic; advise Elliott concerning Arconic's relationship with Spirit, including but not limited to any potential competition with Spirit; or

- provide, use, or rely upon any information inconsistent with his obligations under any agreements with Spirit.  (*Id.* at 2–3.)

35.     Lawson shared the Side Agreement with Spirit on February 21, 2017.  (*Id.* at 1–3.)  Despite receiving assurances that Lawson's role in the proxy contest was passive and that he was not performing services on behalf of Arconic, Spirit did not resume payments to Lawson. (Ex. 90 at Responses 19, 21; PTO at 11.)

- 15 -

V.     **THE PROXY CONTEST.**

36.     Elliott proceeded with its proxy contest, and Lawson's role was indeed limited to serving as a possible CEO candidate.  On March 6, 2017, Elliott filed a preliminary proxy statement (the "Preliminary Proxy") with the Securities and Exchange Commission ("SEC"), which explained Lawson's role as a CEO candidate and disclosed Spirit's objection.  (Ex. 58 at 37–38.)

37.     Elliott's proposals for change were met with strong opposition from Arconic.  From the beginning of Elliott's proxy campaign, Arconic's incumbent board publicly announced that it would not implement any of Elliott's suggestions.  (Ex. 48.)  The board oversaw the issuance of numerous press releases and letters to shareholders opposing the Elliott proxy campaign and explaining why it would not consider replacing Kleinfeld with anyone, especially Lawson.  (Exs. 51, 56, 59, 61, 63, 64, 65, 66, 70, 71, 73, 74, 75.)

38.     Arconic also implemented corporate governance procedures to block Elliott's proposed changes.  One of those procedures was a voting agreement with Oak Hill Capital Partners to lock up significant votes in favor of the company's slate of directors.  (Ex. 61.)  Another was the activation of a "change in control" provision that would trigger a $500 million charge to the company if Elliott's proxy contest was successful.  (Ex. 67.)  Arconic's preliminary and definitive proxy statements also urged shareholders to vote for the company's slate and against Elliott's slate.  (Ex. 57 at 6; Ex. 60 at 9.)

39.     During the proxy contest, and throughout his engagement with Elliott, Lawson did not provide any services to Arconic.  (Ex. 7, Lawson Tr. at 140:6–18.)  Lawson did not provide input into Elliott's shareholder communications and did not meet with the media to discuss Elliott's campaign.  (*Id.* at 299:3–15, 302:11–305:10.)  While Lawson met or spoke to Elliott personnel during the proxy fight, many of those meetings were social, and in the others, Lawson

provided some comments related to his written biography, commented on an infographic describing the publicly available data concerning Spirit's performance during his tenure, and provided his general views on leadership.  (Ex. 6, Katz Tr. at 226:9–229:18; Ex. 2, Miller Tr. at 72:6–19.)  On one occasion Lawson had dinner with Chris Ayers, one of Elliott's nominees for the Arconic board.  (Ex. 6, Katz Tr. at 258:14–260:14.)  This was Lawson's only meeting with a member of the Elliott slate of director nominees.  (*Id.*)

40.    Lawson also met with various Arconic shareholders—including BlackRock, Orbis, Sasco, Harris Associates, and Oak Hill.  (Ex. 6, Katz Tr. at 289:14–20, 280:8–284:11, 296:3–4, 297:18–21, 298:7–13, 300:6–302:3.)[4]  The purpose of these meetings was to encourage shareholders to side with Elliott in the proxy contest.  (*Id.* at 280:8–284:11).  Lawson talked in general terms about how Arconic should be performing and explained his willingness to serve as CEO.  (*Id.* at 280:8–284:11; 290:12–291:12.)  But at no point did Lawson provide any insight into Spirit's business or Arconic's business, nor did he provide any insight into the business operations of any original equipment manufacturers ("OEMs") in the aerospace industry.  (*Id.* at 227:1–229:18.)  And none of these shareholder meetings had any impact on Arconic's strident opposition to his candidacy.  (Ex. 66.)

41.    Arconic remained resolutely committed to Kleinfeld until April 17, 2017.  On that date, Arconic disclosed that Kleinfeld had sent an unauthorized letter to Elliott, which the Arconic board determined showed poor judgment.  (Ex. 68.)  The letter was, in fact, a veiled threat against Elliott's founder.  (Ex. 69 at 6 (attaching letter from Kleinfeld).)  In light of the letter, Arconic had no choice but to accept Kleinfeld's resignation, but the press release announcing his departure made clear that the "decision was not made in response to the proxy fight or Elliott Management's

---

[4] Lawson also had dinner with some people from Hound and Partners, who had been investors in Spirit, but this was unrelated to Arconic.  (Ex. 6, Katz Tr. at 293:12–295:7; Ex. 7, Lawson Tr. at 74:24–81:10.)

criticisms of the Company's strategy, leadership or performance." (Ex. 68.) The board also made clear that it continued to oppose Elliott's proxy campaign, and by extension, Lawson's candidacy for CEO. (*Id.*)

42.     On May 22, 2017, Arconic and Elliott entered into a settlement agreement pursuant to which they agreed to a single slate of director nominees. As a result of the agreement, only three of the five Elliott nominees were selected for inclusion on the slate. Elliott nominated Christopher L. Ayers, Elmer L. Doty and Patrice E. Merrin for election as directors; Arconic nominated David P. Hess and Ulrich R. Schmidt for election; and all other director nominees were withdrawn. (Ex. 76.)

## VI.     THE ARCONIC CEO SEARCH.

43.     In the proxy settlement press release, Arconic announced the creation of a search committee to select the next Arconic CEO. (Ex. 76.) Only one of Elliott's director nominees was included on the search committee. (*Id.*) The announcement noted that Lawson would be among the candidates considered by the committee, but he was not described as the presumptive CEO or even as a leading candidate. (*Id.*)

44.     Lawson was one of many candidates interviewed by the search committee. (Ex. 1, Collins Tr. at 38:17–23.) Lawson met with the search committee's executive recruiting firm, Heidrick & Struggles, on July 12, 2017. (Ex. 78.) Thereafter, different members of the search committee interviewed Lawson on two separate occasions, but the committee never seriously pursued him as a CEO candidate. (Ex. 79; Ex. 80 at 931; Ex. 1, Collins Tr. at 53:3–12.) And although Elliott continued to hope for Lawson's eventual selection, it did not attempt to intervene in the search committee's process or lobby the committee members for Lawson's candidacy. (Ex. 1, Collins Tr. at 61:5–17.) One member of the search committee, Art Collins, did not even know

anything about Larry Lawson apart from his name and the fact that he was the former CEO of Spirit.  (*Id.* at 37:2–38:14.)

45.    The search committee eventually selected Chip Blankenship as its next CEO on October 23, 2017.  (Ex. 83; PTO at 2, ¶ 2(a)(7).)  Nevertheless, after it became clear that Lawson would never be the CEO of Arconic, Spirit did not resume payments owed to him under the Retirement Agreement.  (Ex. 90 at Response 23; PTO at 11.)

## VII.    SPIRIT'S RELATIONSHIP WITH ARCONIC.



48.    Spirit's expert witness, Richard Aboulafia, testified that he did not verify whether Spirit and Arconic actually competed as to the product categories alleged to be overlapping in Exhibit A to Spirit's third amended objections and responses to Lawson's First Set of Interrogatories ("Exhibit A"), and that this list was not important to his opinion on competition.  (Ex. 13, Aboulafia Tr. at 131:4–132:13.)  Aboulafia believes that everyone in the aerostructures supply chain (from raw materials and component makers to large integrators like Spirit) is in competition with everyone else in the supply chain.  (*Id.* at 147:2–150:25.)

49.    Spirit's CEO, Tom Gentile, agreed with Aboulafia that Arconic's perceived capabilities and purported future business plans were what made it a competitor:

████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████

Gentile developed his understanding not from talking to Arconic, but from "observing their behavior and again reading some of the publicly available materials about what they were doing." (*Id.* at 186:5–21.)

50.     After Lawson filed his lawsuit, Spirit added additional theories of possible overlap, alleging that "Spirit and Arconic both (1) sourced, purchased, owned and/or utilized the same or similar machines and equipment to manufacture, fabricate, maintain, repair, overhaul, or modify the same or similar aerostructures and aircraft components; (2) committed significant capital and other resources for the development of advanced technology innovations and applications for the manufacturing, fabrication, maintenance, repair, overhaul, or modification of aerostructures and aircraft components; (3) maintained relationships with, and/or sought aerostructures or aircraft component business from, the same or similar customers (*e.g.*, Boeing, Airbus); and (4) executed the same or similar contracts with the same or similar customers and suppliers relating to aerostructures or aircraft components." (PTO at 14.)

51.     As for specific product competition, Spirit has not identified any particular, discrete product overlap forming the basis of Spirit's allegation that Arconic was a competitor between the Retirement Date and the expiration of the non-compete provision. (Ex. 13, Aboulafia Tr. at 132:14–138:25; Ex. 93 at 14–17; Ex. 11, Gentile Tr. at 160:13–167:4, 240:10–247:12.) Rather, Spirit falls back on Arconic's alleged capability to produce similar products. (Ex. 93 at 16.)[5]

---

[5] ████████████████████████████████████████████████
████████████████████████████████████████████████

52.     While Spirit has not disclosed specific parts that overlap with Arconic's parts, it has listed certain aerospace product *categories* that both companies allegedly make, market or sell.  In Exhibit A to its second and third amended responses to Lawson's First Interrogatories, Spirit included 47 such product categories.  (Ex. 92 at Exhibit A; Ex. 93 at Exhibit A.)  Kevin Matthies, a Spirit senior executive who signed the third amended interrogatory responses, testified about this list of categories.  He confirmed that the list shown in Exhibit A was prepared based on Arconic marketing documents.  (Ex. 5, Matthies Individual Tr. at 22:20–26:19.)  Moreover, to the extent Arconic sold components to Spirit that are incorporated into Spirit aerostructures, Spirit listed those products in Exhibit A.  (*See, e.g*., Ex. 9, Matthies 30(b)(6) Tr. at 212:2–213:3.)[6]

53.     Matthies further testified that one can determine whether two aircraft parts are similar by considering whether they serve the same function or meet the same need of the OEM.  (*Id.* at 69:10–25.)  But in identifying the parts shown in Exhibit A, Spirit *did not* engage in an analysis to determine the function of the Arconic parts, or on which aircraft they could be installed.  (*Id.* at 192:14–198:5.)  Rather, Exhibit A merely shows that Arconic holds itself out as providing aircraft parts or raw materials for parts that fit within certain named categories.  (*Id.* at 190:12–198:15.)  As such, Spirit did not investigate whether it lost any business to Arconic with respect to the products in Exhibit A, or competed with Arconic to supply the products to a customer during the time the non-compete clause was in force.  (Ex. 9, Matthies Individual Tr. at

---

[6] For example, Matthies testified that "lavatory access panels" were included on Exhibit A because they are part of the aerostructure that Spirit manufactures, but he did not know whether or not Arconic supplies the "lavatory access panel" that is included in Spirit's aerostructure.  (*Id.*)

29:3–13,  36:3–19,  55:2–58:18,  66:8–68:15,  80:9–22,  93:6–94:21,  103:18–20,  106:20–107:13,

114:16–117:12, 176:21–177:13.)

54.     In a separate list, set forth in Exhibit B to its second and third amended responses

to Lawson's First Interrogatories, Spirit included the part numbers for products that it alleges both

Spirit and Arconic provide to Boeing.  (Ex. 91 at Exhibit B; Ex. 92 at Exhibit B.)  But, in fact, all

the parts listed in Exhibit B are Arconic products, which Spirit buys and then distributes in the

aftermarket as part of its own larger products.  (Ex. 8, Rabe Tr. at 83:3–85:8.)

55.     Spirit also contends that certain information Arconic has produced supports its

non-compete defense.  Arconic provided a declaration by one of its employees, John Roggenburk

(the "Roggenburk Declaration"), listing six product categories for which it provides finished

parts.  (ECF No. 350.)  Those categories are:  fan cowl doors, lavatory access panels, seat tracks,

spoilers/flaps, structural pressure relief, trailing edge flaps and ailerons.

56.     Roggenburk  also  was  designated  as  Arconic's  corporate  representative  on  the

product categories identified in his Declaration.  He testified that "most every part we machine

would be unique for an aircraft," meaning that it was designed for a specific aircraft.  (Ex. 12,

Roggenburk Day 2 Tr. at 332:4–19.)  With regard to the six product categories identified in the

Roggenburk Declaration, he does not know whether any of those products could be sold to other

customers or used on other planes, apart from the ones for which they are designed.  (Ex. 10,

Roggenburk Day 1 Tr. at 78:3–16, 79:20–25, 91:11–22, 104:16–107:4.)

## VIII.   LAWSON'S DAMAGES FROM SPIRIT'S BREACH.

57.     Spirit's  decision  to  breach  the  Retirement  Agreement  deprived  Lawson  of

significant cash and share awards.  The majority of Lawson's damages arise from Spirit's failure

to allow Lawson to continue vesting in the LTIP awards to which he was entitled.  (Ex. 95 at 2.)

58.    During his tenure as CEO, Spirit granted Lawson a mix of time-based restricted stock and performance-based restricted stock.  (Ex. 62 at 37.)  Lawson's time-based shares were scheduled to vest in installments over a period of three to four years, depending on what year they were granted.  (*Id.*)  Lawson's performance-based shares ("PSUs") were scheduled to vest on the three-year anniversary of the grant dates, and the amount of shares that vest in connection with each PSU award is calculated based on Spirit's total shareholder return ("TSR") relative to its peers over the three-year tracking period.  (*Id.*)  PSU awards are initially awarded at a "target" amount, and depending on Spirit's relative TSR, they may vest at up to 200% of the target amount. (*Id.*)

59.    ███████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████  ████  ███████████████

████████████████████████████████████████████████████

████████████████████████████████

60.    Section 2(c) of the Retirement Agreement states that Lawson's entitlement to LTIP shares is "set forth in Exhibit A."  (Ex. 24 at § 2(c).)  Section 2(c) also incorporates Exhibit A into the Retirement Agreement.  (*Id.*)  Exhibit A is a chart entitled "Unvested LTIP Awards." (*Id.*)  It lists a total of 408,596 unvested awards, consisting of the following awards for each year: (i) 64,010 unvested 2013 awards; (ii) 85,126 unvested 2014 awards; (iii) 110,235 unvested 2015 awards; and (iv) 149,235 unvested 2016 awards.  (*Id.* at Exhibit A.)  The amounts shown in

Exhibit A were the deliberate result of express, arm's-length negotiation between the parties.  (Ex. 4, Marnick Tr. at 162:4–163:18.)

61.     The difference between Lawson's unvested LTIP holdings immediately before entering into the Retirement Agreement and the amount shown in Exhibit A is 49,097 shares. Specifically, Exhibit A shows 25,353 additional shares for 2014 and 23,744 additional shares for 2015.  These additional amounts exactly reflect Lawson's pre-retirement holdings of unvested 2014 and 2015 performance-based shares.  In other words, the Retirement Agreement doubled Lawson's holding of unvested 2014 and 2015 PSUs.

62.     Thus, the Retirement Agreement granted Lawson 50,706 unvested 2014 PSUs, 47,488 unvested 2015 PSUs, and 31,370 unvested 2016 PSUs.  The 2014 PSUs should have vested at 200% of target, for 101,412 shares.  (Ex. 85 at 54 n.4; Ex. 72.)  The 2015 PSUs should have vested at 192.5%, for 91,414 shares.  (Ex. 87 at 56 n.4; Ex. 84.)  The 2016 PSUs should have vested at 100% of target, for 31,370 shares.  (Ex. 89 at 60 n.3; Ex. 86.)  Adding these to Lawson's time-based restricted stock, Lawson would have vested in a total of 503,288 LTIP shares if Spirit had not breached its obligations.

63.     The Retirement Agreement also entitled Lawson to certain cash payments.  Spirit agreed to pay Lawson $150,000 per year for two years ($300,000 total) in biweekly payments as consulting fees.  (Ex. 24 at § 2(a).)  Spirit agreed to pay Lawson a total of $1,274,000 in biweekly payments over one year as severance payments.  (*Id.* at § 2(b).)  Finally, Spirit agreed to pay Lawson $1,115,000 as a prorated 2016 bonus on February 10, 2017.  (*Id.* at § 2(d).)

64.     As of the date of Spirit's breach on February 2, 2017, Spirit still owed Lawson $2,009,861 in cash, consisting of his STIP bonus of $1,115,000, unpaid consulting fees in the amount of $228,461, and $666,400 in unpaid severance payments.  (Ex. 95 at 14–15; Ex. 50.)

Spirit continues to withhold unpaid cash and share amounts that were outstanding as of February 2, 2017.  (Ex. 90 at Responses 19, 21, 23; PTO at 11.)

## ARGUMENT

## I.     THE SUMMARY JUDGMENT STANDARD.

Under Federal Rule of Civil Procedure 56(c), a court may grant summary judgment where there is no genuine dispute of material fact, and the moving party is entitled to judgment as a matter of law.[7]  "There is no genuine [dispute] of material fact unless the evidence, construed in the light most favorable to the non-moving party, is such that a reasonable jury could return a verdict for the non-moving party."[8]  A fact is "material" if, under the applicable substantive law, it is "essential to the proper disposition of the claim."[9]  An issue of fact is "genuine" if "there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way."[10]

The movant bears the initial burden of making a prima facie demonstration of the absence of a genuine issue of material fact.[11]  But if the movant does not bear the burden of persuasion at trial on a given claim or defense, it is not required "to produce evidence showing the absence of a genuine issue of material fact" as to that claim or defense.[12]  Instead, as the Supreme Court explained in *Celotex*, the "burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case."[13]

---

[7] Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).

[8] *Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 255 (1986)).

[9] *Wright ex rel. Tr. Co. of Kan. v. Abbott Labs., Inc.*, 259 F.3d 1226, 1231–32 (10th Cir. 2001) (citing *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998)).

[10] *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d at 670.

[11] *Celotex*, 477 U.S. at 323.

[12] *Id*. at 325.

[13] *Id*.; *see Adler*, 144 F.3d at 670 (following *Celotex*, 477 U.S. at 325); *see also Bank Midwest, N.A. v. Millard*, No. 10-2387-JR, 2012 WL 4359060 (D. Kan. Sept. 24, 2012) (entering summary judgment on affirmative defenses based on defendant's lack of evidence).

The burden then shifts to the non-movant, who must "set forth specific facts from which a rational trier of fact could find for" it.[14]  The non-movant must identify those facts "by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein."[15]  "The natural consequence of this shifted burden of production to the non-movant is, of course, that the non-movant must produce."[16]  "The non-movant acts, or fails to act, at its peril."[17]

## II. THE FACTS UNDERLYING LAWSON'S BREACH OF CONTRACT CLAIM ARE UNDISPUTED.

Lawson has made a *prima facie* demonstration that Spirit breached the Retirement Agreement.  And after substantial discovery, there is no genuine factual dispute as to any of the elements of Lawson's claim.  Under Kansas law, a plaintiff must prove five elements to establish a prima facie case of breach of contract: "(1) the existence of a contract between the parties; (2) sufficient consideration to support the contract; (3) the plaintiff's performance or willingness to perform in compliance with the contract; (4) the defendant's breach of the contract; and (5) damages to the plaintiff caused by the breach."[18]  When a plaintiff provides evidence of all five elements, the burden shifts to defendant to set forth specific facts demonstrating that a genuine issue of material fact exists such that a reasonable fact finder could rule in defendant's favor.[19]

Here, the parties have stipulated to the first two elements—a valid contract supported by consideration existed between the parties, Lawson's Retirement Agreement.  (PTO at 2, ¶ 2(a)(4).)  As to the remaining three elements, discovery revealed that no factual dispute exists.  With respect to the third factor—Lawson's compliance with his obligations under the Retirement

---

[14] *Libertarian Party of N.M. v. Herrera*, 506 F.3d 1303, 1309 (10th Cir. 2007).
[15] *Adler*, 144 F.3d at 671.
[16] *Id.* at 671 n.1.
[17] *Id.* at 672.
[18] *API Americas Inc. v. Miller*, 380 F. Supp. 3d 1141, 1152 (D. Kan. 2019) (denying defendant's motion for summary judgement as to the breach of contract claim because plaintiff proved all five elements); *Transformer Disposal Specialists, Inc. v. Trinity Techs., Inc.*, No. 15-1056-EFM, 2016 WL 7386447, at *6 (D. Kan. Dec. 21, 2016) (same).
[19] *United States v. Chauvin*, No. 12-1315-CM, 2013 WL 5314432, at *2 (D. Kan. Sept. 23, 2013).

Agreement—the parties agree that Lawson provided consulting services to Spirit whenever he was asked.  In his deposition, Tom Gentile testified that Lawson worked as a consultant for Spirit following his retirement when he conducted reviews of certain financial documents and participated in a celebration at Spirit for the 787 program.  (Ex. 11, Gentile Tr. 152:7–153:22.) Gentile further testified that Lawson "was available for consulting services if we needed him" and that he could not recall any occasion on which Lawson refused to consult for Spirit.  (*Id.* at 151:23–25, 152:7–16; *see also* Ex. 4, Marnick Tr. 53:12–19.)

To ensure he complied with his non-compete obligations, Lawson also sought Spirit's prior approval on the occasions on which he considered doing consulting work for other companies.  For example, Samantha Marnick testified, as Spirit's corporate representative, that Lawson reached out to Spirit to "check that it was okay for him to do some work for L3 consulting."  (Ex. 4, Marnick Tr. at 50:11–13.)  Marnick also testified that Lawson followed the same process of checking for conflicts when he was considering being on the board of Arconic. (*Id.* at 211:8–212:3; *see also* Ex. 7, Lawson Tr. 173:10–21.)  And once they learned that Spirit was taking the position that service on the Arconic board would be a violation of his obligations, Lawson and Elliott agreed that he would not be a board nominee, and instead would take a background role in the proxy contest.  (Lawson Tr. at 231:3–20.)  The foregoing undisputed facts establish that Lawson performed, and was willing to continue performing, in accordance with his obligations under the Retirement Agreement.[20]

---

[20] Lawson has established a prima facie case of compliance with the Retirement Agreement, and Spirit bears the burden to prove that Lawson was not in compliance with his restrictive covenant, which was a condition precedent. *Source Direct, Inc. v. Mantell*, 19 Kan. App. 2d 399, 407, 870 P.2d 686 (1994) ("A complaining party must affirmatively show that "(1) the condition precedent actually failed and (2) because of such failure, the contract will not be performed.").  Lawson satisfies his "burden" with respect to Spirit's defense by pointing to the lack of evidence supporting it, *Herrera*, 506 F.3d at 1309, and he has done so.  *See infra*, Argument Point III.

As to the fourth element—Spirit's breach of the Agreement—Spirit cannot and does not deny that in February 2017, it ceased making payments to Lawson under the Retirement Agreement.  (Ex. 52 at 5373 ("Spirit is rightfully withholding payments and vesting at this time.").)  And Spirit has continued to withhold payments from Lawson ever since.  (Ex. 90 at Responses 19, 21, 23; PTO at 11.)  Thus, it is undisputed that Spirit failed to perform.

As to damages, the fifth and final element, the parties agree that the Retirement Agreement sets forth the amounts that Spirit was obligated to pay Lawson.  (Ex. 4, Marnick Tr. 157:2–158:10.)  The Retirement Agreement states that Lawson was entitled to $150,000 per year for consulting and transition services, his then-current base salary of $1,274,000 and COBRA benefits for twelve months following the Retirement Date, a bonus payment of $1,115,000 under Spirit's Short Term Incentive Plan ("STIP"), $2,000,000 in deferred compensation credit, and the ability to vest in the 408,596 LTIP awards listed in Exhibit A to the Retirement Agreement as if he were an active employee.  (Ex. 24 at § 2(a)–(f), Exhibit A.)  On February 2, 2017, Spirit informed Lawson that it would cease making payments under the Retirement Agreement.  (Ex. 49.)  To date, Spirit has failed to pay Lawson his STIP bonus of $1,115,000, $228,461 in consulting fees, and $666,400 in separation payments, and has failed to allow Lawson to vest in any of the LTIP shares awarded to him by the Retirement Agreement.  (Ex. 95 at 14–15; Ex. 50.)  Spirit does not contest these facts.  (Ex. 90 at RFA Responses 19, 21; PTO at 11.)

The primary dispute as to damages arises from the parties' different legal interpretations of Exhibit A to the Retirement Agreement, which lists the unvested LTIP awards in which Lawson was entitled to continue vesting as if he were an active employee.  In June 2016, before Lawson retired, Lawson held 279,032 unvested time-lapse restricted shares and 80,467 unvested performance shares, for a total of 359,499 unvested LTIP shares.  (*See supra*, Statement of

Undisputed Facts, at ¶ 59.)   Upon entering into the Retirement Agreement, the parties memorialized in Exhibit A that Lawson was entitled to 408,596 shares.  The difference between these amounts—49,047 shares—is the sum of Lawson's unvested 2014 and 2015 PSUs.  Thus, the 408,596 shares listed in Exhibit A reflect the doubling of Lawson's holdings of unvested 2014 and 2015 PSUs.

The decision to list 408,596 shares as the amount of unvested LTIP awards granted to Lawson was deliberate, and it was an express deal point that Spirit and Lawson negotiated at arm's length.  (Ex. 4, Marnick Tr. at 162:4–163:18.)  Moreover, the chart shown in Exhibit A was expressly made part of the contract.  (Ex. 24 at § 2(c).)  Thus, by its plain terms, the Retirement Agreement reflects that Spirit agreed to double the 2014 PSUs granted to Lawson from 25,353 to 50,706 and the 2015 PSUs from 23,744 to 47,488.  Lawson retained the ability to vest in these unvested PSUs at up to 200%, as if he were an active employee.  (*Id.*)

Spirit disputes this and argues that the Retirement Agreement did not double the 2014 and 2015 PSUs, but rather that Exhibit A reflects "assumed" vesting of the 2014 and 2015 PSUs at 200%.  (Ex. 4, Marnick Tr. 158:11–163:2.)  No language in the contract supports Spirit's interpretation of Exhibit A.  Quite the opposite.  Exhibit A expressly states that it is a listing of Lawson's *unvested* LTIP holdings.  And in any event, the vesting of the 2014 or 2015 PSUs could not have been calculated as of the effective date of the Retirement Agreement.[21]  The plain language of Exhibit A indicates that Lawson was entitled to 503,288 LTIP shares based on the actual performance of Spirit during the tracking periods for his PSUs.[22]  Inclusive of the cash

---

[21] Under the terms of Spirit's LTIP program, performance cannot be certified for the purpose of calculating PSU payouts until the end of the three-year anniversary of each PSU grant.  (*See* Ex. 62.)

[22] Spirit certified that the 2014 PSUs would pay out at 200%, the 2015 PSUs would pay out at 192.5%, and the 2016 PSUs would pay out at 100%.  (Exs. 72 and 85 at 54 n.4 (2014 PSUs); Exs. 84 and 87 at 56 n.4 (2015 PSUs); Exs. 86 and 89 at 60 n.3 (2016 PSUs).)  Lawson held 50,706 unvested 2014 PSUs, 47,488 2015 PSUs, and 31,370 unvested 2016 PSUs.  Lawson's 2014 PSUs entitled him to 101,412 shares, his 2014 PSUs entitled him to 91,414 shares, and

awards that Spirit failed to make, Lawson's total damages are approximately $50.7 million, accounting for prejudgment interest.  (Ex. 95 at 2.)

Even if the Court disregarded the plain language of the Retirement Agreement and instead were to accept Spirit's interpretation that the Retirement Agreement did not double Lawson's holdings of unvested 2014 and 2015 performance shares, Lawson still suffered substantial damages from Spirit's breach.  In this alternative scenario—which represents the minimum possible damage amount—Lawson still would have been entitled to 406,815 shares based on the actual performance of Spirit.  Lawson's expert calculated that he would have suffered damages of approximately $41.5 million under this scenario, including prejudgment interest.  (Ex. 95 at 2.)

Spirit has not offered an alternative damages calculation.  Instead, Spirit argues that Lawson suffered no damages because he was indemnified by Elliott.  (PTO at 18, ¶ 4(b)(5).) Spirit is wrong.  When Elliott indemnified Lawson, Elliott retained a right of subrogation.  (Ex. 47 at § 9.)  Elliott acted as an insurer to Lawson against possible breach by Spirit, and the collateral source rule prevents Spirit from benefitting from its own breach.[23]  The collateral source rule applies to breach of contract actions when the plaintiff has been indemnified and the indemnitor has a subrogation right.[24]

Elliott's subrogation right ensures that there is no risk of double recovery by Lawson because he must repay Elliott any recovery he receives in this lawsuit up to the indemnification

---

his 2016 PSUs entitled him to 31,370 shares.  Adding these amounts to his holdings of 279,032 time-based restricted shares results in 503,288 shares.

[23] *Lexington Ins. Co. v. Western Roofing Co.,* 316 F. Supp. 2d 1142, 1152 (D. Kan. 2004) ("[B]enefits received by the plaintiff from a source wholly independent of and collateral to the wrongdoer will not diminish the damages otherwise recoverable from the wrongdoer.").

[24] *Id.* at 1152–53; *see also Presbyterian Manors, Inc. v. Simplexgrinnell, L.P.,* No. 09-2656-KHV, 2010 WL 3880027, at *8 n.74 (D. Kan. Sept. 28, 2010) ("The collateral source rule appears to apply in a breach of contract case involving a subrogation interest.").

amount.[25]  (Ex. 47 at § 9.)  But Spirit would receive a windfall if it were permitted to breach the Retirement Agreement and then shift its payment obligations to a third party.[26]  Thus,  Spirit's assertion that Lawson's damages are reduced by payments he received from Elliott is meritless.[27] It is irrelevant that the subrogor, Lawson, not the subrogee, Elliott, is the plaintiff.[28]

Lawson has made a sufficient *prima facie* demonstration of each element of his breach of contract claim, for which he bears the burden of persuasion.  And Spirit cannot raise a genuine dispute as to any of the facts supporting Lawson's prima facie case.  The only dispute concerns Spirit's non-compete affirmative defense, as to which Spirit has the burden of proof, and as to which Spirit cannot meet its burden.

## III.   SPIRIT HAS FAILED TO DEMONSTRATE THAT LAWSON BREACHED THE NON-COMPETE PROVISION IN HIS RETIREMENT AGREEMENT.

Spirit has not demonstrated, and cannot demonstrate, facts from which the Court as the trier of fact could conclude that the non-compete provision prohibited Lawson's service to Elliott. To do so, Spirit must show that enforcement of the provision under the circumstances protects its legitimate business interests, does not impose an undue burden on Lawson, and is not injurious

---

[25] *Lexington*, 316 F. Supp. 2d at 1153 (explaining that the point of subrogation is to prevent double recovery by a plaintiff).

[26] *Metoyer v. Auto Club Family Ins. Co.*, 536 F. Supp. 2d 664, 667 (E.D. La. 2008) ("[The] defendant should not be allowed to benefit from the outside benefits provided for the plaintiff.").

[27] ████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
██████████████████████████████████████████████

[28] *See id.* at 670 (collateral source rule applied in breach of contract action where plaintiff was subrogor, not subrogee)

to the public welfare.  Because Spirit cannot meet this burden, the non-compete defense fails as a matter of law.  Lawson is therefore entitled to judgment on his breach of contract claim.

The non-compete provision is set forth in Section 4(c) of Lawson's Employment Agreement, which is incorporated into his Retirement Agreement.[29]  Both agreements are governed by Kansas law.  (PTO at 2, ¶ 1(d).)  Section 4(c) is entitled "*Non-Compete*" and provides:

> Neither [Lawson] nor an individual, corporation, partnership, limited liability company, trust, estate, joint venture, or other organization or association ("Person") with [Lawson's] assistance nor any Person in which [Lawson] directly or indirectly [has] any interest of any kind (without limitation) will, anywhere in the world, directly or indirectly own, manage, operate, control, be employed by, serve as an officer or director of, solicit sales for, invest in, participate in, advise, consult with, or be connected with the ownership, management, operation, or control of any business that is engaged, in whole or in part, in the Business, or any business that is competitive with the Business or any portion thereof, except for our exclusive benefit.  (Ex. 15 at § 4(c).)

The Employment Agreement defines the term "Business" as follows:

> We are engaged in the manufacture, fabrication, maintenance, repair, overhaul, and modification of aerostructures and aircraft components, and market and sell our products and services to customers throughout the world (together with any other businesses in which Spirit may in the future engage, by acquisition or otherwise, the "Business").  (*Id.* at Recital A.)

Spirit contends that Lawson breached the non-compete provision by "(1) having an interest in Elliott, Arconic's largest shareholder, via the Consulting Agreement and/or Indemnification Agreement; (2) consulting with and advising Elliott regarding Elliott's investment in, ownership of, and management of Arconic; and/or (3) assisting Elliott in its attempt to install its preferred nominees to Arconic's Board of Director and install Lawson as Arconic's

---

[29] Section 7 of Lawson's Retirement Agreement incorporates the non-compete clause by reference and extends its application for a period of two years after the Retirement Date, until July 31, 2018.  (Ex. 24 at § 7.)

CEO." (PTO at 12.) Spirit does not contend that Elliott makes, markets, or sells aerostructures, or that Lawson was employed by, or provided services for, Arconic.

### A.    The Summary Judgment Burden Shifting Analysis Applies to Spirit's Non-Compete Defense.

Spirit bears the burden of proof as to its defense that Lawson violated the non-compete provision. This Court has previously held that Lawson's compliance with the non-compete provision was a condition precedent to Spirit's payment obligations under the Retirement Agreement. (ECF No. 25 at 12.) And as the Kansas Court of Appeals has explained:

> Parties to a contract can place conditions precedent upon their performance, but they cannot escape liability simply by saying the conditions have not been met. . . . A complaining party must affirmatively show that '(1) the condition precedent actually failed and (2) because of such failure, the contract will not be performed.'[30]

Here, Spirit is the "complaining party" alleging that the condition precedent failed and must "affirmatively show that the condition precedent actually failed."[31] Spirit has not done so.

Because Lawson does not have the burden of persuasion as to the alleged breach of the non-compete provision, the summary judgment burden-shifting analysis applies.[32] With respect to his motion for summary judgment, Lawson's 'burden' with respect to Spirit's defense "may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support" Spirit's defense.[33] The burden then shifts to Spirit, which must "set forth specific facts from which a rational trier of fact could find for" it.[34] To successfully oppose summary judgment, Spirit must bring forward more than a mere scintilla of evidence in support

---

[30] *Source Direct, Inc. v. Mantell*, 19 Kan. App. 2d 399, 407, 870 P.2d 686 (1994).

[31] *Id.*; *Cravotta v. Deggingers' Foundry, Inc.*, 42 Kan. App. 2d 700, 708, 215 P.3d 636 (2009) (following *Source Direct*).

[32] *Celotex*, 477 U.S. at 325.

[33] *Id.*; *see also Adler*, 144 F.3d at 670 (following *Celotex*, 477 U.S. at 325); *see also Bank Midwest, N.A. v. Millard*, No. 10-2387-JR, 2012 WL 4359060 (D. Kan. Sept. 24, 2012) (entering summary judgment on affirmative defenses based on defendant's lack of evidence).

[34] *Libertarian Party of N.M. v. Herrera*, 506 F.3d 1303, 1309 (10th Cir. 2007) (quotation marks omitted).

of its position.[35]   Spirit cannot "create a genuine issue of material fact with unsupported, conclusory allegations."[36]

Here, based on the undisputed facts, Spirit cannot raise a genuine issue that 1) Lawson's agreement with Elliott, a minority investor, to serve as a candidate for CEO of Arconic—in connection with Elliott's proxy contest—was prohibited by the non-compete provision as an impermissible "interest" in an organization (Elliott) that allegedly "invest[s]" in a company engaged in the Business; or 2) Lawson's role in the proxy contest—agreeing to be considered by Arconic as a CEO candidate if Arconic's board agreed to replace Kleinfeld—was prohibited by the non-compete provision as impermissible "assistance" to Elliott with an investment in a company engaged in the Business.  (Ex. 15 at § 4(c).)  Spirit has failed to adduce any facts from which a reasonable trier of fact could conclude that such an application of the non-compete provision is reasonable.  On the contrary, if the non-compete provision were somehow interpreted to apply to Lawson based on these facts, it would be so broad and all-encompassing as to be unenforceable under well-established principles of Kansas law, and in accordance with this Court's interpretation of the Business.

## B.   Spirit Cannot Demonstrate That Application of The Non-Compete Provision is Reasonable Under the Circumstances.

To assert that Lawson failed to comply with a condition precedent by breaching the non-compete provision, Spirit has the burden to show that it would be reasonable to apply the provision under the circumstances.  Spirit failed to meet this burden. The contract clause at issue here, Employment Agreement § 4(c), is a noncompetition covenant, which, under Kansas law is

---

[35] *Vitkus v. Beatrice Co.*, 11 F.3d 1535, 1539 (10th Cir. 1993).

[36] *Tapia v. City of Albuquerque*, 170 F. App'x. 529, 533 (10th Cir. 2006); *see also Bradbury Co. v. Teissier-duCros*, 413 F. Supp. 2d 1209, 1223 (D. Kan. 2006) (on certain trade secret claims, the plaintiff could not survive summary judgment by making "general and conclusory statements" that its individual trade secrets "were not known or readily ascertainable in the industry").

"strictly construed against the employer."[37]   Kansas courts apply non-compete provisions only "if the restraint is reasonable under the circumstances and not adverse to the public welfare."[38] Kansas courts analyze the answers to four questions to determine a non-compete provision's reasonableness based on each case's facts and circumstances: (1) Does the non-compete provision protect a legitimate business interest of the employer? (2) Does the non-compete provision create an undue burden on the employee? (3) Is the non-compete provision injurious to the public welfare? (4) Are the time and territorial limitations contained in the non-compete provision reasonable?[39]   Under this standard, and based on the undisputed facts, the non-compete cannot be interpreted to prohibit Lawson's agreement to be considered as a potential CEO candidate for Arconic.   Spirit has no legitimate business interest in blocking Lawson from being Arconic's CEO, much less merely announcing his willingness to take the job if it were offered.   Lawson never worked directly or indirectly for a competitor of Spirit.   Absent actual employment by a competitor, Spirit's repudiation of $38 million in retirement benefits (without interest) is not only unduly burdensome, it is arbitrarily punitive and can serve no public interest.

1.   <u>Application of the Non-Compete Provision Under the Circumstances Does Not Protect Spirit's Legitimate Business Interests.</u>

Interpreting the non-compete provision as Spirit proposes, to prohibit Lawson from being identified as a potential CEO candidate by an investment firm that did not control Arconic, would violate the established principle that only "legitimate business interest[s] may be protected" by a non-compete provision.[40]   Customer contacts, special training of employees, trade secrets,

---

[37] *Weber v. Tillman*, 259 Kan. 457, 462, 913 P.2d 84 (1996).
[38] *Idbeis v. Wichita Surgical Specialists, P.A.*, 279 Kan. 755, 762, 112 P.3d 81 (2005); *Weber*, 259 Kan. at 462.
[39] *Weber*, 259 Kan. at 464.
[40] *Weber*, 259 Kan. at 462; *Wichita Clinic, P.A. v. Louis*, 39 Kan. App. 2d 848, 854,185 P.3d 946 (2008).

confidential business information, loss of clients, goodwill and reputation, seeing that contracts with clients continue, and referral sources generally qualify as legitimate business interests.[41]

"Whether a restrictive covenant serves to protect an employer's legitimate interests is a question of law over which [a] court's review is unlimited."[42] "[Non-compete] restrictions must be no greater than necessary to protect the employer's interests."[43] The question is not whether the restriction is necessary to protect legitimate business interests generally, but rather whether it is necessary to protect a legitimate business interest as applied to Lawson in this case.[44] "If the sole purpose [of the non-compete provision] is to avoid ordinary competition, it is unreasonable and unenforceable."[45]

Here, the undisputed facts demonstrate that application of the non-compete provision as Spirit asks would not protect Spirit's legitimate interests for three independently sufficient reasons:  (a) Lawson's only role was to be available to Elliott as a potential CEO candidate if Arconic's board agreed to consider him, (b) Elliott never had control over Arconic, and (c) Spirit has failed to demonstrate that Arconic is a competitor in the Business.

> (a) *Lawson's Agreement with Elliott to Remain Available as a Potential CEO Candidate Did Not Harm Spirit's Legitimate Business Interests.*

*First*, applying the non-compete to prohibit Lawson's agreement with Elliott would not protect Spirit's legitimate business interests because his role—remaining available as a potential CEO candidate—did not and could not on its own result in harm to Spirit's legitimate business interests.  Spirit appears to contend that Lawson's mere willingness to become Arconic's CEO if

---

[41] *Idbeis*, 279 Kan. at 767; *Weber*, 259 Kan. at 467.
[42] *Idbeis*, 279 Kan. at 766.
[43] *Allen, Gibbs & Houlik, L.C. v. Ristow*, 32 Kan. App. 2d 1051, 1059, 94 P.3d 724 (2004).
[44] *Id.*
[45] *Weber*, 259 Kan. at 462.  "Ordinary competition" is the sort of competition that a stranger with no protectable, inside information about a company could generate.  *Mowery Clinic, L.L.C. v. Hofer*, 122 P.3d 838, 2005 WL 3098729 at *2 (Kan. Ct. App. 2005) ("[A] restrictive covenant on employment may not be used to prevent a former employee from engaging in ordinary competition of the kind a stranger could generate.")

asked, and his agreement to let Elliott publicize his willingness, somehow implicated Spirit's interests.  (PTO at 9–12.)  Spirit's position has no basis in the law.  In making himself available as a potential candidate for the CEO of Arconic, subject to the limitations of a Side Agreement, Lawson did not threaten Spirit's financial position, its proprietary information, its customer relationships, its goodwill, or any other legitimate business interest.[46]  And given Arconic's swift rejection of him as a CEO candidate, it is clear Lawson never even had the opportunity to do so.[47]

Lawson's only duty was to be available to Elliott as a CEO candidate.  He simply did not give Elliott information about Spirit or Arconic that would have "assisted" Elliott with its investment in Arconic because the investment predated Elliott's relationship with Lawson.  (Ex. 6, Katz Tr. at 276:10–23.)  Elliott began investing in Alcoa Inc.—the predecessor of Arconic— in 2015, and Lawson was irrelevant to the initial investment decision.  (*Id.* at 30:6–31:17, 276:10– 23; Ex. 2, Miller Tr. at 25:22–25.)[48]  Nor did Lawson provide assistance with Elliott's position in Arconic after the initial investment.  (Ex. 6, Katz Tr. at 30:6–44:9.)

Although Elliott initially considered adding Lawson to its slate of director nominees,[49] after Spirit advised it that Spirit would view his service on the Arconic board as a breach, Elliott and Lawson decided to limit his role to serving as a candidate for Arconic CEO.  (Ex. 7, Lawson Tr. at 231:3–20; Ex. 6, Katz Tr. at 280:8–284:11.)  As such, Lawson merely served as the public face of the campaign.  (Ex. 7, Lawson Tr. at 140:6–18.)  Lawson's sole service to Elliott was to remain available to Elliott and the broader investment community to answer questions on his

---

[46] *Idbeis*, 279 Kan. at 767; *Digital Ally, Inc.*, 2017 WL 1545671, at *8; *see also Life Image, Inc. v. Shockman*, 272 F. Supp. 3d 231 (D. Mass. 2017) (rejecting claim that potential "indirect" competition was a breach of a non-compete where the employee was not actually involved in competitive behavior and represented that she would recuse herself from any arguably competitive situation).

[47] *Digital Ally, Inc.*, 2017 WL 1545671, at *9 (declining to enforce a non-compete where the employee was not in a position to use any information that would threaten the company's business interests).

[48] "Larry was not relevant to an investment decision.  He was not involved in our determination of whether or not Arconic -- the risk-reward for an investment in Arconic shares made sense."  (Ex. 6, Katz Tr. at 276:10–23.)

[49] Ex. 6, Katz Tr. at 38:17–40–24; 69:19–70:11, 90:9–91:14.

background, leadership style, and vision—effectively presenting a counterpoint to the then-current Arconic CEO.  (Ex. 54; *see also* Ex. 7, Lawson Tr. at 283:13–291:5; Ex. 6, Katz Tr. at 280:8–284:11.)

In meetings with Arconic shareholders, Lawson talked in general terms about how Arconic's stock should be performing and explained his willingness to serve as CEO.  (Ex. 6, Katz Tr. at 280:8–284:11; 290:12–291:12.)  Lawson also met periodically with Elliott.  (Ex. 88 at 7–8.)   Some of these meetings were social in nature, while others involved high-level discussions of his leadership style and his corporate successes.[50]  (Ex. 6, Katz Tr. at 226:9–229:18; Ex. 2, Miller Tr. at 72:6–19; Ex. 7, Lawson Tr. at 74:24–81:10.)  Lawson never met with the management or board of Arconic before the settlement of the proxy contest, and afterward, his only interaction with Arconic was in two perfunctory interviews with members of the CEO search committee.

At no point during the proxy contest or in his interviews with the Arconic search committee did Lawson ever (i) offer Elliott investment advice with respect to Arconic; (ii) provide information about Spirit's Business to Elliott, to Arconic, to any Arconic shareholders or to the media;[51] (iii) offer Arconic any advice or strategic analysis about its business; or (iv) solicit Spirit

---

[50] Lawson also had one dinner with Chris Ayers, one of Elliott's nominees for the Arconic board.  (Ex. 6, Katz Tr. at 258:14–260:14.)  This was Lawson's only meeting with a member of the Elliott slate of director nominees.  (*Id.*)

[51] Several months after Spirit breached the Retirement Agreement, Lawson shared two emails with Adam Katz that he had inadvertently retained upon leaving Spirit.  The emails were sent by an Airbus employee to Lawson during his tenure as Spirit's CEO.  Spirit contends that this was a breach of the Retirement Agreement that independently supports its decision to withhold payment from Lawson.  (PTO at 16.)  Spirit is barred from asserting this as a failed condition precedent, given its prior breach of the Retirement Agreement.  *Teran v. GB Int'l, S.p.A.*, 652 F. App'x 660, 669 (10th Cir. 2016) (a party cannot seek to enforce a contractual right if it is in prior breach of the contract).  And in any event, these shared emails would not justify withholding payments from Lawson, as they contain stale, largely public information and were shared for the innocuous purpose of demonstrating to Elliott how Lawson improved Spirit's relationship with Airbus.  In the first email, sent on March 12, 2015, an Airbus executive thanks Lawson for participating in an award ceremony and commends the companies' partnership.  (Ex. 81.)  The other email, an October 6, 2013 message from the same executive, discusses issues with Spirit's performance earlier in Lawson's tenure.  (Ex. 82.)  The emails did not reveal information about the nature of Spirit's business as of 2017, and anything they revealed about Spirit's past relationship with Airbus was largely public knowledge by the time

employees—whether current or former—to assist him with either his Elliott engagement or any future position with Arconic.  (Ex. 7, Lawson Tr. at 299:3–305:10, 308:16–312:20; Ex. 6, Katz Tr. at 226:9–229:18.)  In fact, on February 17, 2017, Lawson entered into a Side Agreement with Elliott, confirming that he was only asked to remain available as a potential CEO candidate and representing that he would not take any action that even arguably would put Spirit's interests at risk.  (Ex. 54 at 2.)  The Side Agreement was shared with Spirit on February 21, 2017.  (*Id.* at 1–3.)

There is no genuine dispute as to any of the foregoing facts.  Spirit therefore cannot demonstrate that Lawson's relationship with Elliott harmed or even implicated its interests. Preventing Lawson from entering into this sort of arrangement, which did not affect Spirit's business interests, "would produce absurd results, in the sense of results that the parties, presumed to be rational persons pursuing rational ends, are very unlikely to have agreed to seek. . . .  The broadest possible reading of the non-compete would preclude all sorts of innocuous behavior, making the agreement overbroad and unenforceable."[52]  Spirit's interpretation of the non-compete provision is akin to a restriction preventing Lawson from taking on any role with any company with a connection to the aerospace industry, without regard to actual competition.  Such an interpretation expands the scope of the clause far greater than necessary to protect Spirit's business interests, and is contrary to law.[53]  The better view—the one supported by Kansas law

---

they were shared with Katz.  (*E.g.*, Ex. 19 at 8–9, 13, 15–16.)  These two emails hardly justify Spirit's decision to withhold Lawson's retirement benefits.

[52] *E.T. Products, LLC v. D.E. Miller Holdings, Inc.*, 872 F.3d 464, 470 (7th Cir. 2017).

[53] *Allen, Gibbs & Houlik, L.C. v. Ristow*, 32 Kan. App. 2d 1051, 1058–59, 94 P.3d 724 (2004) (declining to enforce non-compete and noting, "if we choose to enforce this clause, [the employee] could work virtually nowhere"); *Digital Ally, Inc. v. Corum*, No. 17-cv-02026, 2017 WL 1545671, at *11 (D. Kan. Apr. 28, 2017) (non-compete was when "it prevents [the employee] from working in any capacity for any company who one might consider plaintiff's competitor"); *Mowery Clinic, L.L.C. v. Hofer*, 122 P.3d 838, 2005 WL 3098729, at *2 (Kan. Ct. App. 2005) ("[A] contract provision which unreasonably prohibits the practice of medicine without demonstrating an unfair effect upon a former employer's legitimate business interests cannot be enforced as written.").

and this Court's prior ruling on the scope of Spirit's Business—is that Lawson's role with Elliott did not violate the non-compete provision.[54]

Because Spirit cannot reasonably argue that Lawson's actual activities threatened its legitimate business interest, the only argument it can make is that Lawson somehow was preparing to compete with Spirit by making himself available to serve as Arconic's CEO, but this argument fails as well. For one thing, the argument wrongly assumes that Arconic is in the Business, which it is not.[55] For another, preparing to compete is not a valid basis to assert a non-compete defense.[56] The non-compete clause simply does not prohibit what Lawson did for Elliott.

(b) *Elliott Never Owned, Operated, Managed or Controlled Arconic.*

*Second*, Elliott's lack of control over Arconic also means that its investment did not threaten any legitimate business interests that Spirit could lawfully seek to protect through a non-compete clause that prevented Lawson's agreement with Elliott. As the Kansas Court of Appeals has explained, taking a non-controlling financial position in an entity that arguably competes with the subject business is not enough under the law to trigger a restrictive covenant, and former employees who work for investors that "do not take active roles in the management" of the arguably-competitive entity cannot be held in violation of a covenant not to compete because such employees are not engaged actual competition.[57] This is the law in Kansas, and it is the majority

---

[54] If the Court determines that the clause, as written, applies to such a relationship, the scope of the clause must be equitably reduced. *Mowery Clinic, L.L.C. v. Hofer*, 122 P.3d 838, 2005 WL 3098727 (Kan. Ct. App. 2005)

[55] *See infra*, Argument Point III.B.1.(c).

[56] *See MQ Associates, Inc. v. North Bay Imaging, LLC*, 270 F. App'x 761, 764 (11th Cir. 2008) (a non-compete cannot be extended to "merely preparing to compete.").

[57] *Jensen Int'l., Inc. v. Kelley*, 29 Kan. App. 2d 836, 841–42, 32 P.3d 1205, 1209–10 (2001). In *Jensen*, the applicable non-compete clause precluded the subject individuals from owning any business that produced the same type of product as the company protected by the clause, or from assisting any other person or business from conducting the business of the company. The individuals bound by the clause formed an entity that leased buildings to an enterprise that was in the same business as the company, but the court found they did not breach the non-compete clause because "they *did not take active roles in the management of these businesses or share profits*." *Id*. (emphasis added).

rule among the states.[58]   Under this rule, Lawson's affiliation with Elliott simply was not a violation of the non-compete clause.

At all relevant times, Elliott held less than 15% of the outstanding shares of Arconic and could not dictate or even meaningfully influence the decision-making of its board or management team.  (Ex. 77.)  And Elliott's lack of control over Arconic was not merely hypothetical; rather, it was demonstrated by Arconic's rejection of any attempt by Elliott to assert any measure of control.  The very fact that Elliott was compelled to wage a hostile proxy fight demonstrates its lack of control.  And even though Spirit has consistently emphasized that Elliott was Arconic's largest shareholder,[59] the relative size of Elliott's position did not make it more likely that its suggestions would be implemented.   On the contrary, Arconic's incumbent board and management team bitterly opposed Elliott's suggestions for improving the company and Lawson's candidacy for CEO.[60]

Arconic's incumbent board maintained its support for Kleinfeld, the incumbent CEO, until April 17, 2017, the day it was publicly revealed that he had sent an unauthorized letter threatening Elliott's founder.  (Ex. 68.)  It was this letter, and not the size of Elliot's position, its suggestions during the proxy contest, or any actions taken by Lawson, which led to Kleinfeld's resignation. (*Id.*)   Indeed, the board specifically stated that the action was not being taken in response to Elliott's arguments during the proxy contest.  (*Id.*)  And even after Kleinfeld resigned and the proxy contest neared its end, Arconic continued to oppose Elliott and Lawson.  (*Id.*)  As such, Lawson's minimal activities during the proxy contest—meeting with shareholders and Elliott

---

[58] *Id.*
[59] PTO at 12, 16.
[60] Arconic went so far as to implement a "poison-put" and a shareholder voting agreement which effectively made it *impossible* to implement Elliott's suggestions.

personnel—had no impact on the management of Arconic or the decision making of its board of directors.

A settlement agreement between Elliott and Arconic ended the proxy contest on May 22, 2017. (Ex. 76.) As part of the settlement, Arconic agreed to include Lawson as a candidate who would be considered by the newly-formed search committee of the Arconic board, but Arconic did not designate him as the presumptive CEO or even among the leading candidates.[61] (*Id.*) The settlement merely stated that he would be considered by the CEO search committee. (*Id.*)

Arconic honored its statement that the search committee would consider Lawson, as he was one of the many candidates that the board interviewed for the position of CEO. (Ex. 1, Collins Tr. at 38:17–24.) But the company went no further than that. The search committee gave him only cursory consideration. (*Id.* at 53:3–12.) Lawson met with Arconic's executive search firm once (Ex. 78), and met with members of the search committee twice. (Ex. 79; Ex. 80 at 931.) One member of the search committee who interviewed Lawson, Art Collins, testified that he was barely even aware of Lawson's candidacy prior to his interview and only knew his name and the fact that he was Spirit's former CEO. (Ex. 1, Collins Tr. at 37:2–38:14.) Collins does not recall Elliott ever making a pitch to the search committee in favor of Lawson, or explaining why it was backing Lawson as a CEO candidate. (*Id.* at 61:5–17.) Indeed, even the board members who were originally part of Elliott's slate rejected Lawson's candidacy. Thus, it is clear that Elliott never had control over Arconic or the ability to select its CEO.

Because Elliott never controlled Arconic, Spirit's attempts to prevent Lawson from working for Elliott did nothing to protect Spirit's legitimate business interests. This point

---

[61] Notably, only one of Elliott's director nominees was designated to serve on the search committee. (Ex. 76.) And each of Elliott's nominees had signed independence agreements confirming that they would act in the best interest of Arconic, not at Elliott's behest, meaning that there is no genuine dispute that Elliott lacked influence over the search committee.

becomes obvious when one considers the contrasting case of an investment firm that does directly control an allegedly competing business.  For example, in *Ardurra Group, Inc. v. Gerrity*[62], the court held that a non-compete applied to a private equity firm based on the control it could exert over its portfolio companies, which were in the same business as the complaining company.[63]  The court emphasized that the private equity firm "*acquires or starts infrastructure businesses and will provide money, advice, industry introduction, client contacts, and industry expertise to help these businesses succeed.*"[64]  These portfolio businesses "could be in direct competition" with the complaining company.[65]  Thus, a former employee of the complaining company was barred from working for the private equity firm, as his work was likely to benefit the competing portfolio companies controlled by the firm.[66]

By contrast, the non-compete does not apply here because Elliott never controlled Arconic or any other portfolio companies that could be competitive with Spirit.  The sole investment at issue is a minority position of less than 20%.  (Ex. 77.)  This position did not give Elliott the ability to dictate or even meaningfully influence the management of Arconic, as evidenced by the proxy contest and its outcome.  Moreover, Lawson was only engaged by Elliott, and never provided any services to Arconic.  Under these facts, Lawson never had the ability to take part in the management of Arconic, and he therefore did not breach his non-compete obligations.[67]

(c) *Arconic is Not in the Business.*

*Third*, Spirit has failed to show that application of the non-compete provision would protect a legitimate business interest because it has not adduced facts sufficient to show that

---

[62] 19-cv-3238, 2019 WL 6698208 (E.D. Pa. Dec. 9, 2019).
[63] *Id.* at *4–5.
[64] *Id.* (emphasis added).
[65] *Id.* at *2.
[66] *Id.* at *4–5.
[67] *Jensen Int'l.,* 29 Kan. App. 2d at 841–42.

Arconic is a competitor in the Business.  This Court has already held that, for Arconic to be in the Business, it must make, market, or sell the same or similar products that Spirit makes.  (ECF No. 25 at 14, 16.)  The Court's interpretation of the Business is the law of the case.[68]

The Court's interpretation is also consistent with Kansas law, which requires non-compete restrictions to be "no greater than necessary" to protect Spirit's legitimate interests.[69]  Limiting the scope of the non-compete to the actual lines of business in which Spirit is engaged, as the Court has already done, protects Spirit's legitimate interests but does not insulate it from ordinary competition.  Preventing a former employee from working for an *actual competitor* protects Spirit's relationships with customers, its trade secrets, and its confidential business information from legitimate threats.[70]  Spirit's theory of overlap, however, is much broader.  Spirit contends that Arconic is a competitor principally because Arconic has the *potential capability* to make, manufacture or sell the same parts as Spirit.  Indeed, its expert witness, Richard Aboulafia, repeatedly testified that his view of competition does not rely on, or even evaluate, whether any particular products were competitive between Spirit and Arconic during the term of the non-compete. (Ex. 13, Aboulafia Tr. at 133:24–134:4.)[71]  Aboulafia believes that every company in the aerostructures supply chain is in potential competition with every other company, regardless of actual business overlaps.  (*Id.* at 98:19147:2–150:25.)  Accordingly, Aboulafia's report on purported "competition" between Spirit and Arconic includes no specific, supported allegation that Arconic produced, marketed, or sold a competing product that was similar to any of Spirit's

---

[68] *Monsour's Inc. v. Menu Maker Foods, Inc.*, No. 05-1204-JTM, 2008 WL 941212, at *4 (D. Kan. Apr. 7, 2008). ("[O]nce issues are decided by the court, those issues should not be relitigated or reconsidered unless they are clearly erroneous or unless some manifest injustice has been imposed.")

[69] *Allen, Gibbs & Houlik, L.C. v. Ristow*, 32 Kan. App. 2d 1051, 1059, 94 P.3d 724 (2004).

[70] *Mowery Clinic, L.L.C. v. Hofer*, 122 P.3d 838, 2005 WL 3098729 (Kan. Ct. App. 2005)

[71] "Q. You think it matters whether or not the products were in production as of July 31, 2018?
MR. JACKSON: Objection. Vague.
A. No."

products during the term of the non-compete.  Aboulafia's opinion is representative of Spirit's theory of competition.  ████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

Spirit's preferred interpretation of the non-compete provision to include Arconic and Spirit as competitors in the same Business is overbroad and cannot apply as a matter of law.  First, non-competes are not intended to protect against hypothetical future competition, or preparing to compete.[72]  And second, if the non-compete prevents Lawson from working for any companies that merely have the capabilities to make products that Spirit makes, but do not actually compete with Spirit, it precludes "ordinary competition" of the type a stranger could generate.[73]  Kansas law, and general principles of non-compete interpretation, do not permit such an application.

Spirit's alternative theories of competition, pursuant to which any company that uses similar business processes, uses the same types of machines, commits capital to similar technologies, has a similar customer base, negotiates contracts with Spirit, or supplies products to Spirit is alleged to be in the Business (PTO at 14–15), are similarly overbroad under the Court's interpretation of the Business and under general principles of law.[74]

In *E.T. Products,* the Seventh Circuit rejected a plaintiff manufacturing company's request to prevent defendant individuals from working for a distributor of the company, explaining:

> We're talking about a non-compete agreement after all.  Staying true to its name, it was written with the express purpose of preventing [defendants] from using their knowledge or relationships "to compete with" [the plaintiff company].  And a firm whose sole conduct in the relevant market consists of distributing one

---

[72] *See MQ Associates, Inc. v. North Bay Imaging, LLC*, 270 F. App'x 761, 764 (11th Cir. 2008) (a non-compete cannot be extended to "merely preparing to compete.").

[73] *Mowery Clinic, L.L.C. v. Hofer*, 122 P.3d 838, 2005 WL 3098729 (Kan. Ct. App. 2005).

[74] *Jensen Int'l., Inc. v. Kelley*, 29 Kan. App. 2d 836, 839–840, 32 P.3d 1205 (2001) (company that "cuts, breaks, shears raw steel for customers . . . as part of raw steel sales" is not a competitor of a company that "fabricates" steel products by joining pieces of raw steel together); *E.T. Products, LLC v. D.E. Miller Holdings, Inc.*, 872 F.3d 464, 470 (7th Cir. 2017).

> manufacturer's product plainly isn't that manufacturer's competitor.   The [defendants'] assistance during this period can't possibly violate the agreement.[75]

The reasoning of the Seventh Circuit applies with equal force against Spirit's wide-ranging interpretation of the Business.  Companies do not compete with Spirit simply by negotiating supply contracts, developing research and technologies, or using similar types of machines and processes.  *Id.*  Competition exits when two companies make, market, or sell the same or similar types of products.  (ECF No. 25 at 14–16.)  Thus, Spirit's theories of overlap—whether based on similar machines, customers, technologies, or other capabilities—fail as a matter of law.  (*Id.*)

Moreover, Spirit cannot identify any specific products that both companies make, market, or sell, because there is no such evidence in the record.  The purported product "overlaps" identified by Spirit fall within three groups: (1) the product categories identified in Exhibit A to its second and third amended responses to Lawson's First Set of Interrogatories; (2) the products listed in Exhibit B to its second and third amended responses to Lawson's First Set of Interrogatories, which are parts that Arconic and Spirit both sell to Boeing; and (3) the products identified by Arconic in response to Spirit's request to disclose any products it makes markets or sells within a set of broadly identified product categories.[76]  Spirit had the burden to introduce evidence establishing that any of the Arconic and Spirit products it identified within these groups are actually similar to each other, but it has failed to do so.

With respect to the products listed in Exhibit A to the Spirit's Response to Lawson's First Interrogatories, Spirit's corporate representative, Kevin Matthies, testified that the list was prepared, in large part, based on Arconic marketing documents.  (Ex. 5, Matthies Individual Tr.

---

[75] *E.T. Products, LLC*, 872 F.3rd at 470.

[76] Although discovery has closed, Spirit insists that these categories are mere selections and that there are additional documents that may show Arconic is in the Business.  Vaguely hinting that unspecified evidence may support its defense is insufficient to satisfy Spirit's burden.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50 (1986) (internal citations omitted).

at 22:20–26:19.)  And although Matthies testified that the way to determine whether two products are competitive is by reviewing whether they both can meet the need of the OEM,  (Ex. 9, Matthies 30(b)(6) Tr. at 69:10–25), he did not engage in an analysis to compare the functions of the Spirit and Arconic parts listed in Exhibit A, nor did he inquire as to the aircraft on which they could be installed.  (*Id.* at 192:14–198:5).  Rather, Exhibit A merely shows that Arconic holds itself out as providing aircraft parts with certain names.  (*Id.* at 190:12–198:15.)  On this record, there is no way to determine whether the purportedly overlapping products shown on Exhibit A are in fact the same or even remotely similar.  (ECF No. 25 at 14, 16.)

As to the list of products shown on Exhibit B to Spirit's second and third amended responses to Lawson's First Interrogatories, Spirit concedes that all of these parts are, in fact, manufactured by Arconic.  (Ex. 8, Rabe Tr. at 83:3–85:8.)  Even if both Spirit and Arconic both sell these products to Boeing and other OEMs, Spirit is acting as Arconic's distributor with respect to these parts.  And the non-compete cannot apply to a distributor relationship.[77]

Finally, for each of the six product categories for which Arconic acknowledged that it made some component, there is no evidence in the record that would allow the Court to determine that these components are similar enough to fall within the ambit of the non-compete.  Arconic merely confirmed that it makes a component that fits within certain broad labels provided by Spirit.  But each Arconic component is uniquely designed for the aircraft on which it is used.  (Ex. 12, Roggenburk Day 2 Tr. at 332:4–19.)  In fact, Arconic's corporate representative testified that, although Arconic makes products that fit within each of the six categories, he does not know whether any of those products could be sold to other customers or used on other planes, apart from the ones for which they are designed.  (Ex. 10, Roggenburk Day 1 Tr. at 78:3–16; 79:20–

---

[77] *E.T. Products, LLC v. D.E. Miller Holdings, Inc.*, 872 F.3d 464, 470 (7th Cir. 2017).

25; 91:11–22; 104:16–107:4.)  Spirit has failed to adduce any evidence that these products are functionally similar to any products Spirit makes, manufactures and sells.  (ECF No. 25 at 14, 16.)  In fact, Lawson's aerospace industry expert, Dr. Dennies, has explained that, based on the information produced in discovery, *none* of the parts identified by Arconic are actually similar to Spirit's parts.  (Ex. 94 at 8–16.)  Although Arconic's components might fall within the broad product categories identified by Spirit, they are not the same as Spirit's aerostructures.  The undisputed facts do not establish that Arconic is in the Business, and, for this reason as well, Spirit cannot demonstrate that Lawson threatened its legitimate business interests.

### 2.   The Remaining Non-Compete Factors Support Summary Judgment.

The other reasonableness factors also counsel against enforcement of Spirit's overly broad interpretation of the non-compete provision.  Those factors are 1) whether the non-competition clause imposes an undue burden on the employee, 2) the reasonableness of the time and territory restrictions in the clause, and 3) whether the clause is injurious to the public welfare.[78]  First, enforcement of the non-compete provision would impose an undue burden on Lawson.  In evaluating the burdens imposed on an employee by a non-competition clause, Kansas courts look to the time and territorial restrictions of the clause, and whether the employee is effectively prohibited from practicing their chosen profession altogether.[79]  The undue burden analysis is coextensive with the inquiry into the reasonableness of the time and territory restrictions in the non-compete.[80]

Here, if the non-compete provision covered Lawson's relationship with Elliott, it would impose unreasonable restrictions on Lawson and unduly deprive him of his retirement benefits

---

[78] *Weber v. Tillman*, 259 Kan. 457, 464, 913 P.2d 84 (1996).
[79] *Digital Ally, Inc.*, 2017 WL 1545671, at *10–11.
[80] *See id.*

merely for agreeing to be considered for a job he never got.  The non-compete applies "anywhere in the world,"[81] and, according to Spirit, is not limited to companies in actual competition with Spirit.  Rather, Spirit's interpretation would grant it the right to cancel Lawson's earned retirement benefits if he engaged, in any capacity, with any company that had even a non-controlling financial position in any business in the aerostructures supply chain.[82]  On Spirit's interpretation, Lawson did not have the ability to apply his skills as an aerospace executive anywhere in the world without losing the retirement benefits to which he is entitled.  This is clearly an undue burden under Kansas law, notwithstanding the two-year period.[83]  Kansas courts enforce non-competes when the restrictions are limited to a specific region and still allow the employee to engage in their chosen profession.[84]

Finally, enforcement of the non-compete provision would be injurious to the public welfare.  As an initial matter, non-competition agreements are "not anywhere to be looked upon with favor" because they are restraints on trade.[85]  Moreover, the broad reading of the non-compete provision favored by Spirit would produce absurd results, contrary to what the parties intended and contrary to the public welfare.[86]  If the provision is applied as Spirit requests, it would mean that companies in Kansas are permitted use such clauses not for their intended purpose of protecting legitimate business interests, but instead to insulate themselves from the consequences of their own compensation decisions by cancelling rightfully-earned severance whenever they fear that severance will result in criticism.  Lawson did not agree to a non-compete

---

[81] Ex. 15 at § 4(c).

[82] ███████████████████████████████████████████████████████████████
███████████████████

[83] *Digital Ally, Inc.*, 2017 WL 1545671, at *10–11 (finding undue burden where two-year non-compete restrictions were not limited by territory or service); *see also Allen, Gibbs & Houlik, L.C. v. Ristow*, 32 Kan. App. 2d 1051, 1058, 94 P.3d 724 (2004) ("[If we chose to enforce this clause, [the employee] could work virtually nowhere.").

[84] *Weber v. Tillman*, 259 Kan. 457, 465–66, 913 P.2d 84 (1996).

[85] *W. W. Roller & Co. v. Ott*, 14 Kan. 609, 616 (1875).

[86] *E.T. Products, LLC v. D.E. Miller Holdings, Inc.*, 872 F.3d 464, 470 (7th Cir. 2017).

clause of the scope that Spirit seeks to enforce.  No reasonable person would foresee or agree to such an application upon entering a non-compete agreement, and granting Spirit such an ability would hinder the right of Kansas employees to pursue their chosen professions without the threat of arbitrary reprisal by their former employers.

## **CONCLUSION**

For the reasons set forth above, the Court should grant summary judgment in favor of Lawson.

Respectfully submitted,

/s/ F. James Robinson Jr.
F. James Robinson Jr. SC #11589
HITE, FANNING & HONEYMAN L.L.P.
100 N. Broadway, Suite 950
Wichita, KS 67202
robinson@hitefanning.com
Telephone: 316-265-7741
Facsimile: 316-267-7803

Martin L. Seidel (*pro hac vice*)
James C. Dugan (*pro hac vice*)
Ravi Chanderraj (*pro hac vice*)
Joseph T. Niczky (*pro hac vice*)
WILLKIE FARR & GALLAGHER LLP
787 Seventh Avenue
New York, NY 10019
mseidel@willkie.com
jdugan@willkie.com
rchanderraj@willkie.com
jniczky@willkie.com
Telephone: 212-728-8000
Facsimile: 212-728-8111

*Counsel for Plaintiff Larry A. Lawson*