# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

LARRY A. LAWSON,

*Plaintiff,*

vs.                                              Case No. 18-1100-EFM

SPIRIT AEROSYSTEMS, INC.,

*Defendant.*

## MEMORANDUM AND ORDER

Before the court are three motions seeking to exclude the testimony of four proposed expert witnesses. Plaintiff Larry Lawson proposes to use the testimonies of Dr. William Rogerson (Ph.D.) and Dr. Daniel Dennies (Ph.D.) to establish that defendant Spirit and Arconic were not in the same "business," and thus his association with the effort to join Arconic's management was not a breach of the Retirement Agreement. Defendant Spirit proposes to use the testimony of Richard Aboulafia to show that such a breach occurred. Lawson also proposes the testimony of Dr. Kevin Murphy (Ph.D.) to support his damages claims. For the reasons stated herein, the motions to exclude are denied.

## Daubert Standards

Federal Rule of Evidence 702 governs expert testimony:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

(a)      the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
(b)      the testimony is based on sufficient facts or data;

(c)     the testimony is the product of reliable principles and methods; and

(d)     the expert has reliably applied the principles and methods to the facts of the case.

Rule 702 imposes a "gatekeeping role" upon the district court to ensure that expert testimony is relevant and reliable.[1] To fulfill this role, the district court must "make specific factual findings on the record which are sufficient for an appellate court to review the trial court's conclusion concerning whether the testimony was scientifically reliable and factually relevant."[2]

The first step of the district court's gatekeeping inquiry is to determine whether the expert "has a reliable basis in the knowledge and experience of his or her discipline."[3] District courts have broad discretion to determine whether a proposed expert may testify.[4] To be qualified, "[a]n expert must possess 'such skill, experience or knowledge in that particular field as to make it appear that his opinion would rest on substantial foundation and would tend to aid the trier of fact in his search for truth.'"[5] An expert who "possesses knowledge as to a general field" but "lacks specific knowledge does not necessarily assist the jury."[6]

The second step of the Court's gatekeeping inquiry is to determine if the expert's proffered testimony is reliable. To be reliable, the expert's testimony must be based on sufficient facts and data. The Tenth Circuit recently explained this requirement:

---

[1] *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).

[2] *Bitler v A.O. Smith Corp.*, 400 F.3d 1227, 1232 (10th Cir. 2005) (citing *Dodge v. Cotter Corp.*, 328 F.3d 1212, 1223 (10th Cir. 2003)).

[3] *Bitler*, 400 F.3d at 1232-33 (quoting *Daubert*, 509 U.S. at 592, 113 S.Ct. 2786) (internal quotation marks and alterations omitted).

[4] *United States v. Nichols*, 169 F.3d 1255, 1265 (10th Cir. 1999).

[5] *Rodgers v. Beechcraft Corp.*, 759 F. App'x 646, 658 (10th Cir. 2018) (quoting *LifeWise Master Funding v. Telebank*, 374 F.3d 917, 928 (10th Cir. 2004)).

[6] *City of Hobbs v. Hartford Fire Ins. Co.*, 162 F.3d 576, 587 (10th Cir. 1998) (citation omitted).

> The Supreme Court's decision in General Electric v. Joiner offers a good illustration of the requirement that expert testimony must be based on sufficient facts or data. The Court held that the district court did not abuse its discretion in rejecting expert opinions that plaintiff's exposure to toxins caused his lung cancer because the opinions were based on animal studies that could not be extrapolated to humans. Opinion evidence need not be admitted when it "is connected to existing data only by the ipse dixit of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered."[7]

The Tenth Circuit also explained how Rule 703 works in conjunction with the sufficient facts and data requirement of Rule 702.

> Federal Rule 703 complements Rule 702(c). It provides that "facts or data in the case that the expert has been aware of or personally observed" may be the basis for the expert's opinion and need not be admissible "[i]f experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject."[8]

The reliability inquiry also requires a "preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue."[9] In making this determination, the district court must focus on the expert's methodology rather than the expert's conclusions.[10] A court may consider the following factors in determining whether an expert's methodology is valid:

> (1) whether the opinion or theory is susceptible to testing and has been subjected to such testing; (2) whether the opinion or theory has been subjected to peer review; (3) whether there is a known or potential rate of error associated with the methodology used and whether there are standards controlling the technique's

---

[7] *Rodgers*, 759 F. App'x at 658 (quoting *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997)).

[8] *Id*. (quoting Fed. R. Evid. 703) (alterations in original).

[9] *Id*. at 659 (quoting *Daubert*, 509 U.S. at 592-93, 113 S.Ct. 2786).

[10] *Id*. (citing *Daubert*, 509 U.S. at 595, 113 S.Ct. 2786).

operation; and (4) whether the theory has been generally accepted in the scientific community.[11]

These factors are not exclusive.[12] "Regardless of the specific factors at issue, the purpose of the *Daubert* inquiry is always 'to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.'"[13]

The third and last step of the district court's gatekeeping function requires the court to analyze "whether [the] proposed testimony is sufficiently relevant to the task at hand."[14] "Relevant evidence 'means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.'"[15] Even if the expert's evidence is scientifically valid and follows reliable methodologies, it might not be relevant to the issue at hand.[16]

The party offering the expert testimony bears the burden of showing that the expert's testimony is admissible.[17] Ultimately, "rejection of expert testimony is the exception rather than the rule."[18] While *Daubert* makes the court the gatekeeper for expert testimony, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of

---

[11] *Hoffman v. Ford Motor Co*., 493 F. App'x. 962, 974 (10th Cir. 2012) (citing *Daubert*, 509 U.S. at 593-94, 113 S.Ct. 2786).

[12] *Id*. (citing *Daubert*, 509 U.S. at 594, 113 S.Ct. 2786).

[13] *Dodge*, 328 F.3d at 1222-23 (quoting *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999)).

[14] *Bitler*, 400 F.3d at 1234 (internal quotation marks and citation omitted)

[15] *Id*. (quoting Fed. R. Evid. 401).

[16] *Id*.

[17] *United States v. Nacchio*, 555 F.3d 1234, 1241 (10th Cir. 2009) (citing *Ralston v. Smith & Nephew Richards, Inc*., 275 F.3d 965, 970 n.4 (10th Cir. 2001)).

[18] Fed. R. Evid. 702, advisory committee's notes to 2000 amendments.

proof" remain "the traditional and appropriate means of attacking shaky but admissible evidence."[19]

Because motions by both parties argue that an opponent's expert presents opinions which are irrelevant under the prior rulings of the court, a brief review of the issues in the action, and the court's rulings, may be helpful.

Under Paragraph 4(c) of the Employment Agreement (later adopted into his Retirement Agreement), Lawson agreed that for two years after leave Spirit, he would not:

> directly or indirectly own, manage, operate, control, be employed by, serve as an officer or director of, solicit sales for, invest in, participate in, advise, consult with, or be connected with the ownership, management, operation, or control of any business that is engaged, in whole or in part, in the Business, or any business that is competitive with the Business or any portion thereof, except for our exclusive benefit.

The Agreement explicitly defines Spirit's "Business" as:

> the manufacture, fabrication, maintenance, repair, overhaul, and modification of aerostructures and aircraft components, and market and sell our products and services to customers throughout the world (together with any other businesses in which Spirit may in the future engage, by acquisition or otherwise, the 'Business').

The court first construed this provision in resolving the Spirit's motion to dismiss the action. In its August 20, 2018 Order, the court rejected the possibility that another corporation would be deemed to be in the same "business" as Spirit simply because Spirit might produce or market the same products in the future. Rather, the Agreement

> must be interpreted on an ongoing basis; when Spirit does engage in a new business, then it becomes part of the "Business." Rather than providing a static definition, the parties clearly intended for "the Business" to have a definition capable of evolving over time.

---

[19] *Daubert*, 509 U.S. at 596 (citation omitted)

Accordingly, the plain language of the Employment Agreement must be read to mean that "the Business" refers to the *specific* products and services provided, marketed, or sold by Spirit at the time of contracting, as well as the products and services Spirit later chooses to provide, market, or sell, if and when Spirit chooses to do so.[20]

On April 16, 2021, the court denied the parties' cross-motions for summary judgment. The court determined that "the term 'Business' as defined in the parties' agreements is ambiguous and that extrinsic and parol evidence may therefore be used to clarify the ambiguity."[21] As to the two key elements of Lawson's performance of the contract and Spirit's breach, the court identified numerous remaining questions of material fact. Common to both issues was whether Lawson's (or Elliott's and Arconic's) actions "fell within the notion of 'Business' as defined in the Employment Agreement."[22]

The court denied the motions to strike, many of which raised arguments similar to those in the present motions. The court resolved these as motions to strike rather than *Daubert* motions, but the court also stressed that, given the early stage of the proceedings, "similar concerns [as to expert reliability] are reduced where "[t]here is no independent fact-finder who requires shielding from inadmissible evidence and improper opinions at this stage in the proceedings."[23] "This is especially true, the court observed, "since this case will not be tried before a jury."[24]

---

[20] Order, Dkt. 25, at 15-16 (emphasis in original).

[21] Order, Dkt. 511, at 21.

[22] *Id*. at 22-23.

[23] Order, Dkt. 511, at 18-19 (citing *Wallace B. Roderick Revo. Living Trust v. XTO Energy*, No. 08-1330-EFM (D. Kan. May 4, 2016).

[24] *Id*.

*Daubert* gate-keeping, after all, serves to "prevent the jury" from hearing unreliable scientific evidence.[25] Because the doctrine is "designed to protect juries [it] is largely irrelevant in the context of a bench trial."[26] "There is less need for the gatekeeper to keep the gate when the gatekeeper is keeping the gate only for himself."[27]

## 1. William Rogerson

Spirit has moved to exclude the opinions of Dr. William Rogerson, a professor of economics at Northwestern University, who has submitted a Report stating generally that Spirit and Arconic are not competitors. Spirit argues that Rogerson's assessment of the aerospace market should be excluded because (1) he is not qualified to render the opinion, (2) his conclusions are irrelevant to the issues in the case, (3) his opinions are unreliable and would not assist the trier of fact.

With respect to Rogerson's qualifications, Spirit stresses that he has listed his areas of expertise as "industrial organization, competition policy, antitrust economics, defense procurement, and telecommunications"—and not, specifically, any experience in the aerospace industry. The defendant further contends that, Rogerson could not have acquired the necessary learning and expertise, as he acknowledged in his deposition that he spent only 80 or so hours preparing his report and rebuttal.

---

[25] *Daubert*, 509 U.S. at 597, 113 S. Ct. at 2798.

[26] *Deal v. Hamilton Cnty. Bd. of Educ.*, 392 F.3d 840, 852 (6th Cir. 2004).

[27] *United States v. Brown*, 415 F.3d 1257, 1269 (11th Cir. 2005).

Dr. Rogerson, the Charles E. and Emma H. Morrison Professor of Economics at Northwestern University, and has twice served as Chair of its Economics Department. He is the Co-Director of the Center for the Study of Industrial Organization at Northwestern, and the Research Director for Antitrust Economics and Competition Policy at the Center on Law, Business and Economics at Northwestern's Pritzker School of Law. He received his bachelor's degree in economics in 1976 from the University of Alberta, and a Ph.D. in 1980 in Social Sciences from the California Institute of Technology.

Rogerson has served as a consultant to numerous government or government related agencies, including the Institute for Defense Analysis, the Logistics Management Institute, the Office of the Secretary of Defense (Program Analysis and Evaluation), and the RAND Corporation. From 1998 to 1990, he was the Chief Economist at the Federal Communications Commission.

Rogerson has extensive experience in industrial organization and competition. While Spirit contends that Rogerson lacks experience in the aerospace industry, his deposition indicated that he consulted, either with the United States government or private entities, on seven major aerospace industry mergers from 1990 to 2008, including antitrust and competition issues.[28]

More importantly, Spirit has not shown how a lack of particularized experience in the aerospace industry in general, or a pre-existing familiarity with both Spirit and Arconic should disqualify him from testifying. Lawson did not designate Rogerson as an expert in the aerospace

---

[28] Dep. at 41-42, 57-58.

industry, but in competition. The court in its April 16 Order specifically recognized the extent of competition as a material fact dispute between the parties.[29]

Spirit next contends that Rogerson's opinions are irrelevant because they are inconsistent with the court's prior construction of the restrictive covenant. In particular, Spirit notes Rogerson's conclusion that "[f]irms in an industry compete with one another if they produce products or services that potential purchasers view as being substitutes for one another." Aerospace products are specifically contracted for and specifically engineered, which means that manufacturers are usually the sole source for a given product.

According to the defendant, Rogerson's focus on head-to-head competition (or rather its absence) "ignores the constantly changing and blurring lines between buyers and sellers" in the aerospace market.[30] And Spirit argues that that a violation of the Employment Agreement may arise when Spirit and another company market similar "types" of products, and thus Rogerson's focus on head-to-head competition as to specific products is contrary to the law of the case.

With respect to the "constantly changing and blurring lines" in the aerospace industry, Spirit does not independently establish this as a fact beyond dispute. Rather, it simply cites to its response to a *requested* finding of fact in Lawson's summary judgment motion.[31] But the court declined to make any factual finding on the issue in its Order of April 16, with the result that the issue remains within the "many remaining genuine disputes of material fact."[32]

---

[29] *See* Order, Dkt. 511, at 23 (including, among remaining factual questions, "whether, and to what extent, Arconic was a competitor of Spirit; [and] whether, and to what extent, Arconic's business overlapped with Spirit's….").

[30] Dkt. 510, at 12-13.

[31] Dkt. 468, Statement of Fact ¶ 48; Dkt. 445, at 14.

[32] Order, Dkt. 511, at 22.

Spirit supports its contentio,n that the marketing of overlapping types of products falls within the covent, by pointing to both this court's August 20, 2018 Order denying in part Spirit's motion to dismiss, as well as a subsequent ruling by Magistrate Judge Mitchell. Neither order provides conclusive support for Spirit's argument.

In her ruling, Judge Mitchell simply sought to construe the earlier August 20, 2018 Order for purposes of resolving a discovery dispute. She did not independently construe the terms of the Employment Agreement. Further, "[a] magistrate judge's ruling on a nondispositive matter does not constitute the law of the case."[33]

With respect to the court's earlier ruling, Spirit correctly notes that at one point the Order states that the term "Business" encompasses "those businesses that manufacture the same types of aircraft components that Spirit does."[34] However, this statement occurs early in the court's extended discussion of the Employment Agreement, and fails to acknowledge the ultimate conclusion of the court — that the focus of the inquiry as to "Business" should be on "the *specific* products and services provided, marketed, or sold by Spirit at the time."[35]

This section of the 2018 Order was largely concerned with the general construction of the restrictive covenant, and in particular the *timing* of any alleged overlap in business. The court held that Lawson was precluded from working for another firm only "if and when" Spirit begins producing products made by that firm, and thus that hypothetical or future competition between

---

[33] *See Taverna Imports, Inc. v. A&M Wine & Spirits*, 2020 WL 6498242, at *6 (S.D. Fla. Nov. 2, 2020) (citing cases).

[34] Dkt. 25, at 14.

[35] Order, Dkt. 25, at 16 (emphasis in original).

Spirit and another company is not a bar to employment. The clause only bars employment where there is a contemporaneous overlapping manufacture or marketing of the same products.

But the Order did not resolve, and was not intended to resolve, the *degree of product similarity* required. As Spirit notes, one portion of the Order discusses overlapping production of the same "type" of products. Another portion, cited by Lawson, provides that employment is barred if Spirit and another company are making or marketing the same "specific" products. Given the preliminary stage of the litigation, the court did not attempt to further define how similar the "specific" product must be. This reticence is supported by the more recent conclusion, after discovery and the parties' extensive summary judgment briefing, that the clause remains ambiguous.[36]

Accordingly, for purposes of resolving the present *Daubert* motions, the court does not consider the degree of product similarity a closed matter. With respect to the present motion, the head-to-head analysis provided by Rogerson is a reasonable consequence of his determination that aerospace companies compete to become the sole supplier of particular products. As a result, this assessment naturally focuses on the existence of actual competition. The court finds that the testimony is relevant to an issue—the construction of the restrictive clause in the Employment Agreement—which the court has determined is ambiguous.

Next, Spirit argues that Rogerson opinion is unreliable because he merely relied on and summarized documents provided to him by counsel (including SEC reports and an internal Spirit "360 analysis") or research supplied by the Cornerstone consulting firm, and that he allegedly looked at the wrong time frame, examining the state of the industry from February 2017 to July

---

[36] Order, Dkt. 511, at 21.

2018. Spirit also complains that Rogerson's opinion is unreliable for failing to acknowledge a variety of evidence including marketing materials, the existence of seven similar products[37] by both Spirit and Arconic, that fact that both companies have the some of the same manufacturing equipment, that they did in one instance engage in head-to-head competition for Boeing work in January, 2017, and that Rogerson discounts the importance of components sold by Spirit in the aftermarket.

The court finds no reason to find Rogerson's opinion is unreliable on these grounds. First, Spirit has failed to demonstrate that an expert is subject to *per se* exclusion simply because he has relied on documents supplied by counsel. In fact, the rule is to the contrary.[38] Nor does it appear that Rogerson is taking out of context or merely repeating information from a small ground of selected documents, such as Spirit's 360 analysis and SECE filings. Rather, Rogerson's deposition and report (Dkt. 457-1) reflect an attempt to integrate a huge volume of materials into his specific conclusions about the extent of competition between Spirit and Arconic. The report indicates that that he conducted some independent research and he twice spoke with Dr. Daniel Dennies, plaintiff's product expert.

Moreover, a detailed review of Rogerson's Report indicates that he did consider the issues now cited by Spirit, such as the seven overlapping products,[39] the manufacturing machinery of Spirit and Arconic,[40] and aftermarket production.[41] He simply doesn't agree with

---

[37] Depending on how they are counted, the overlapping products are sometimes numbered as six, and sometimes seven.

[38] *Harris v. Heubel Material Mahndling*, Inc., No. 09-1136-EFM, 2010 WL 3270094, at *4 (D. Kan. Aug. 17, 2020) ("the federal rules of evidence contemplate an expert's reliance on information provided by others").

[39] Report, at ¶¶ 58-68; Dep. at 174-75.

[40] Report, at ¶¶ 72-74.

Spirit that these facts warrant a different result, and explains the reasons for his conclusions. To the extent Spirit argues Rogerson errs, its argument is properly addressed to the weight of the evidence.[42]

Spirit has failed to show that any substantial error in the research materials supplied by Laurien Gilbert, and Emre Udayan, the two Cornerstone consultants, or why their product should be considered suspect. Rogerson testified that he has used Cornerstone researchers on prior occasions.[43] Gilbert has a Ph.D. in economics and is an experienced research assistant at Cornerstone; Udayan has a senior position at the firm.[44] Gilbert and Udayan provided their research to Rogerson based on his instructions,[45] and he oversaw their work.[46] The information gathered is typical to what economists use in evaluating the extent of competition.[47]

An expert may testify on the basis of information reasonably relied on by experts in the field; "[w]e do not require an expert to base his or her opinions on independent data collection or field research."[48] It is not atypical for an economist to rely on information collated or collected by others, and the material relied on by Rogerson is sent out in the extensive Appendix B to his report. This information includes pleadings, depositions, publicly-available documents, and

---

[41] *Id.* at ¶¶ 76-78.

[42] *See In re EpiPen Marketing*, No. 17-2785-DDC, 2020 WL 1164869, at *4 (D. Kan. March 10, 2020) (finding plaintiffs' criticisms of expert's methodology went to weight rather than admissibility)

[43] Rogerson Dep. at 16-17.

[44] *Id.* at 20.

[45] *Id.* at 23.

[46] Report, Dkt. 475-1, at 3.

[47] *Id.* ¶ 28.

[48] *Jaasma v. Shell Oil Co.*, 412 F.3d 501, 514 (3d Cir. 2005).

internal corporate documents. Rogerson's testimony is not inadmissible under *Daubert* or Rule 702 on the cited grounds.[49]

Finally, the court finds no fatal error in the supposedly wrong time frame employed by Rogerson. His assessment looks from the time Lawson started with the Arconic project to end of the restrictive period. Spirit has not shown that any larger or wider time frame would be somehow more appropriate, or that such a time frame would likely have produced a different result to Rogerson's conclusions.

## 2. Daniel Dennies

Dennies is a metallurgical professional engineer, and has experience in "materials, manufacturing processes, and testing methods, as well as design, testing, and failure analysis." Spirit contends Dennies's opinions are irrelevant, arguing that his focus on specific products is an attempt to construe "Business" as defined in the Employment Agreement, despite having acknowledged that he has no experience in "the business aspect of the aerospace industry." The defendant further argues that his testimony is unreliable, as Dennies performed no technical review of the seven allegedly overlapping products, which would have required technical engineering drawings, and ignored important evidence, such as the fact that both companies produced airplane seat tracks.

The court finds the evidence is not excludable. The witness's focus on specific products is not at variance with the orders of the court in the case, or the proper construction of the

---

[49] *See AngioDynamics, Inc. v. C.R. Bard, Inc.*, 2021 WL 1792394, at *43 (N.D.N.Y. May 5, 2021) ("experts have wide latitude with respect to the data on which they rely").

Employment Agreement. As noted above, in resolving the motion to dismiss the court explicitly determined that "Business" under the Employment Agreement includes a focus on "*specific* products" of Spirit and any company employing Lawson.[50]

Dennies did not examine technical drawings of the disputed parts. Lawson argues this is simply because Spirit refused to produce the drawings. Indeed, one explicit conclusion advanced in Dennies's Report is that, because the documents which Spirit did produce are not "specific technical engineering documents," there is no basis for any one finding actual similarity in the products.[51] Dennies did examine non-technical documents, invoices and marketing materials. From these materials, Dennies reached the opinion that the seven parts were not substantially identical.

The seven allegedly overlapping products are: (1) seat tracks, (2) fan cowl doors and hinges, (3) lavatory access panels, (4) spoilers/flaps, (5) structural hook pressure relief, (6) trailing edge flaps, and (7) ailerons and wing ribs. Dennies concludes that both Spirit and Arconic may have both listed airplane products with these general names, but an individualized examination of all the available documents fails to show that the actual products are actually the same. The products were most likely either actually different, or were products which Arconic sold to Spirit, which Spirit then integrated the part into a larger aerostructure and sold to another customer. Hence, Dennies concludes, Spirit and Arconic were not competitors as to any of these parts.

Of course, as noted above, Spirit objects to Dennies testifying as to "competition" on the grounds that the Executive Agreement does not explicitly mention the term, and Dennies is not

---

[50] Order, Dkt. 25, at 16 (emphasis in original).

[51] Report, Dkt. 469-82, at 11.

15

an expert in economics. But the court's Order of April 16 expressly identifies the extent of competition between Arconic and Spirit as one of the remaining material issues of fact.[52] And Dennies's express definition of "competition" as stated in his report, "two or more independent, qualified manufacturers of the same specific part for an aircraft,"[53] is consistent with the court's prior observation that the focus should be on specific products.

Moreover, while Dennies does sometimes use the term "competitor," the overwhelming focus of his Report is an individualized assessment of each of the seven allegedly overlapping parts, and the documentation for the claim that they are the same or similar. Dennies's use of the term does not warrant his exclusion as a witness. And, to the extent Dennies may use the term at trial, the court can recognize that his expertise lies in product rather than economic analysis.

The other issues raised by Spirit are matters which go to the weight to assign Dennies's testimony rather than a basis for exclusion. For example, as with Rogerson, Spirit argues that Dennies used the wrong time frame for his analysis. But, as with Rogerson, the defendant fails to show how the time frame selected was erroneous, or would have likely yielded a different result.

Spirit takes as an example of the supposed errors in Dennies's analysis his failure to account for the fact that both Arconic and Spirit produced titanium seat track. However, Dennies does address the issue, concluding that, for aircraft other than the Boeing 787, Spirit and Arconic "were fabricating parts with the same name but for different aircraft and from two different metal alloys," with Spirit producing aluminum tracks and Arconic titanium tracks.[54] Spirit did install

---

[52] Order, Dkt. 511, at 23.

[53] Report, at 3.

[54] *Id.*, at 12.

titanium tracks in the 787, but these were actually made by Arconic, with the result that Arconic was acting as a supplier to Spirit.

Finally, Spirit argues that the testimony of Dennies should excluded because it contradicts that of Rogerson. The court finds no substantial contradiction. Rogerson focuses on the absence of head-to-head competition as showing that Spirit and Arconic are not in the same business. Dennies's testimony addresses the degree of similarity between the products of Spirit and Arconic.

### 3. Richard Aboulafia

Lawson moves to exclude Dr. Richard Aboulafia's opinions on three grounds. First, he argues that Aboulafia is an industry analyst without any specific training or expertise in competition or product engineering. Second, he argues that Aboulafia's opinions, which focus on the potential for competition between Spirit and Arconic rather than actual competition are irrelevant and contrary to the court's prior construction of the restrictive covenant in the Employment Agreement. Finally, Lawson argues that Aboulafia's "vertical silo" theory is not grounded on sufficient facts or reliable methods.

The court denies the plaintiff's motion. Aboulafia does not have particularized experience or training in antitrust issues or product engineering. But this is not an action alleging infringement of antitrust laws; it is a claim for breach of a contract which the court has expressly determined is ambiguous. How Lawson and Spirit, both extremely knowledgeable and experienced participants in the aerospace industry, would have understood the contract is a critical element of the case. As an expert in the aerospace industry, Aboulafia appears well-positioned to given information as to such understandings.

Aboulafia has served as an analyst in the aerospace industry for 33 years. He is the Vice President of Analysis at Teal Group, a leading aerospace market analysis consultancy. He writes and edits the group's forecasting tool, "World Military and Civil Aircraft Briefing," which addresses 135 aircraft programs and markets. He is employed regularly by aerospace companies, including most prime and many second- and third-tier contractors in the United States, Europe, and Asia. He advises financial institutions about the industry, and writes regular columns in *Aviation Week & Space Technology* magazine and at Forbes.com. He was also written articles for other publications, including the *Wall Street Journal*, *Slate*, AIAA's *Aerospace America*, the *Financial Times*, and *Professional Pilot.*

The court also finds that Aboulafia's opinions are relevant. As noted earlier, in resolving the parties' summary judgment motions the court concluded that there are extensive factual issues remaining as to the extent of competition and business overlap between Spirit and Arconic.[55] Lawson correctly observes both that Aboulafia's term "vertical silo" appears to be a construction of the witness, rather than a term generally within the aerospace industry, and that to some extent Aboulafia's report appears to focus on hypothetical competition rather than actual competition. As noted earlier, in resolving the motion to dismiss, the court construed the term "Business" to mean Spirit's existing products, or new products "if and when" they are made, marketed, or sold.

Nevertheless, the court denies plaintiff's motion to exclude. The term "vertical silos" may not be common parlance in the aerospace industry, but then, that industry is primarily devoted to building airplanes, not seeking to construe ambiguous language from one executive's

---

[55] Order, Dkt. 511, at 23.

employment contract. And while the term may have been coined by Aboulafia, the concept is not unique to him. Aboulafia expressly analogizes the term to the distinct treatment of "major supplier groupings" in a leading industry authority.[56]

In Aboulafia's view, the standard division of the aerospace industry into tiers is useful, but fails to capture the dynamic nature of the industry, and the growth of some firms into multiple tiers.[57] Although some of his Report does appear to reflect future or hypothetical competition between companies, his analysis also addresses present-tense competition existing "on an ongoing basis," in which "the larger companies within the aerostructure silo are constantly competing with each other for new work."[58] For Aboulafia, given the nature of the industry, competition exists at the bidding process for a given aerostructure, rather than for specific parts it comprises.

> At least for Tier 1 and Tier 2 level structures and components, these suppliers will often, barring performance issues or unexpected circumstances, have the contractual right to continue to produce the subcontracted parts in the work packages for a long period of time, up to the life of the airplane program, and will often be the sole provider of such work packages. For this reason, after the work is awarded to the supplier, competition occurs infrequently for the exact same part on the exact same airplane program. Accordingly, competing within the aerospace industry is not limited to the infrequent instances where companies build precisely the same part for precisely the same program. Indeed, any attempt to describe competitiveness in the aerospace manufacturing industry in this limited way would essentially mean that there are no competitors in the industry, which is obviously not reality.[59]

Economic forces are driving firms outside of their tiers, expanding up and down the standard supply chain. Aboulafia examined the history of both Spirit and Arconic, finding just such

---

[56] Kevin Michael, *AeroDynamic*, (Am. Inst. Aeronautics and Astronautics, 2018). *See* Report at 4 n. 4.

[57] Report, at 4.

[58] *Id*. at 6-7.

[59] *Id*. at 8.

expansion.[60] The two companies are "similarly situated" in their ability to produce products for other companies, and "market to common customers that they can manufacture the same types of structures and components."[61] Aboulafia concludes:

> Suppliers' competitive concerns lie beyond head-to-head bidding for specific parts made for specific airplane programs and the rare instance where a suppliers provide the exact same part for the exact same airplane program. Properly placed in the context of the aerospace manufacturing industry, and more specifically, the aerostructures vertical silo, Spirit and Arconic engage in intense competition. They have overlapping manufacturing capabilities, vertical integration strategies, and marketing campaigns that result in both companies attempting to obtain the broadest possible work packages from the available airplane programs in direct conflict with each other.[62]

Lawson, of course, challenges Aboulafia precisely because his opinion does not (like Rogerson and Dennies) focus on head-to-head competition as to specific parts.[63] However, while the existence (or absence) of head-to-head competition as to specific parts may be probative of a violation (or compliance) with the restrictive covenant, it may not be dispositive. Additional questions raised by the plaintiff go to the weight of the proposed testimony.

The goal of the court is to give effect to the parties' agreement, and the court expressly concluded in its most recent Order that "the aircraft manufacturing industry does not utilize broadly accepted, standardized vocabulary," and that "terms and phrases can reasonably be

---

[60] *Id*. at 12-15.

[61] *Id*. at 16.

[62] *Id*. at 17.

[63] Lawson also argues (Dkt. 526, at 7) that Aboulafia lacks economic expertise, and thus cannot reliability testify about market share and competition, citing decisions such as *Berlyn v. Gazette Newspapers*, 214 F.Supp.2d 530, 536 (D. Md. 2002). In *Berlyn*, the court excluded a proposed expert who lacked any training in antitrust or economic analysis from testifying as to the relevant product market. But the court there expressly addressed the issue in the technical context of "relevant market *in antitrust analysis*." *Id*. at 537 (emphasis added). As noted above, the court here addresses not an antitrust action, but a contract— and the likely construction of the contract's language by persons experienced in the aerospace industry. Given this  broader perspective, Aboulafia's experience in the industry may be helpful.

interpreted by industry insiders to mean widely varying things," with the ultimate a result the restrictive covenant "is ambiguous and that extrinsic and parole evidence may therefore be used to clarify the ambiguity."[64] The court then concluded that broad issues of material fact exist as to the degree of competition and business overlap between Spirit and Arconic. Aboulafia's report and testimony appears to provide evidence relevant to the inquiry.

Finally, the plaintiff argues that Aboulafia's opinions are not tied to specific facts or reliable methods. However, Aboulafia grounds his opinion on a variety evidence, including Spirit documents, Arconic documents, publicly available information, and witness testimony. The motion to exclude is hereby denied.

### 4. Kevin Murphy

To help establish the amount of his damages, Lawson proposes to use the opinion testimony of Dr. Kevin Murphy. Dr. Murphy has extensive experience in economics and executive compensation.[65] Spirit argues that Murphy's expert testimony should be excluded because his opinion in not based on his economic expertise. Instead, it contends, he merely

---

[64] Order, Dkt. 511, at 21.

[65] The court summarized Dr. Murphy's qualifications in its Order of April 16, 2021 (Dkt. 511, at 13-14):

> Murphy is a professor of finance at the University of Southern California Marshall School of Business. He holds a Ph.D. in Economics from the University of Chicago. For over 36 years, Murphy has studied executive compensation and incentive structures, including authoring more than 50 academic publications on the topic. He has advised the SEC in promulgating disclosure rules relating to management compensation, and in 2009, was the U.S. Treasury Department's Special Master of Executive Compensation, in charge of approving compensation for executives at firms that received funds via the Troubled Asset Relief Program. He has also testified before the U.S. House of Representatives Financial Services Committee and presented at the Board of Governors of the Federal Reserve.

supplies mathematical calculations based on "post-vesting trading" information. Defendant argues that as a matter of law, Lawson's damages are fixed and easily calculable from the date of the alleged breach.[66] Spirit also argues more generally that damages are in any case inappropriate, as Lawson made more with his consulting agreement than he would have made under the Retirement Agreement.

Pursuant to the Retirement Agreement effective on July 31, 2016, Lawson was contractually entitled to $150,000 per year for two years for consulting and transition services, his then-current base salary of $1,274,00 and COBRA benefits for a year, a bonus payment of $1,115,000, and $2,000,000 in deferred compensation credit. He was also given, "as if he were an active employee," the opportunity to vest 408,596 unvested Long-Term Incentive Plan shares. These LTIP shares would included (1) time-based restricted stock, which would vest in scheduled installments over a period of three to four years, and (2) performance share units (PSUs).

The court will deny the motion to exclude. The calculation of the plaintiff's damages requires more than simple mathematical calculation. The values of the PSUs are determined by Spirit's total shareholder return (TSR) in relation to other aerospace companies over a three year period. The PSU's may also vest at multiples of their target, depending on the relevant TSR.

As noted earlier, Spirit argues that Murphy cannot testify as an expert, and that his opinions reflect simple mathematical calculations, citing in support *Jayhawk Capital Mgmt. v.*

---

[66] Defendant cites decisions such as *Kearl v. Rausser*, 293 Fed. Appx. 592, 606–07 (10th Cir. 2008) ("the date of breach is not only central to the calculation of damages, but it is often the only real issue of the jury to decide on damage. After the date of breach has been determined, calculating damages frequently becomes a simple math problem").

*LSB Industries.*[67] In that case, the court concluded that proposed testimony as to the plaintiffs' damages for undelivered common stock would not be considered expert testimony as it "does not appear to involve specialized knowledge but instead seems to be a straightforward mathematical calculation."[68] However, the single instance of multiplication in *Jayhawk Capital* bears little resemblance[69] to the complicated structure of Lawson's compensation package as to the timing and valuation of the undelivered LTIP stock. Further, the *Jayhawk Capital* court ultimately allowed the witness to give lay testimony as his calculations, stressing that "the trial is to the bench, and Defendants will be able to question [him] during trial. To the extent [his] testimony may go into specialized knowledge or involves flawed mathematical calculations, Defendants may point this out to the Court."[70] The same result is appropriate here.

Similarly, Spirit's argument that Lawson's damages are easily determinable based on the date of the alleged breach rests on cases which bear little resemblance to the present action. Thus, in *Simon v. Electrospace Corp.*, the court observes as a general matter that damages for the nondelivery of stock "is determined by the loss sustained or gain prevented at the time and place of breach."[71] At the same time, the court noted that there was nothing unique or unusual about the 25,605 shares in issue, and that "their value, the record shows, was precisely determinable on the public market, namely, at $10 per share."[72]

---

[67] No. 08-2561-EFM, 2011 WL 1626581, at *8-9 (D. Kan. April 28, 2011).

[68] *Id.* at *8.

[69] The evidence proposed by the *Jayhawk* plaintiffs was intended to show that they "did not receive an additional 510, 437 common shares [which] they would have been able to sell [for] an average price of $23.93 a share, resulting in approximately $12 million in damages." *Id.*

[70] *Id.* at *9.

[71] 28 N.Y.2d 136, at 145, 269 N.E.2d 21, at 26 (1971) (citations omitted).

[72] 28 N.Y.2d at 145-46, 269 N.E.2d at 26.

In *Kearl v. Rausser*, the Tenth Circuit—applying Utah law—observed that "[a]fter the date of breach has been determined, calculating damages frequently becomes a simple math problem."[73] But "frequently" is not "always," and there is little simplicity in the calculation of the damages claimed by Lawson, which involve shares of different types, vesting at different times, based upon values relative to future corporate performance. In *Kearl*, the court considered both Utah and New York law,[74] and concluded that the damages awarded by the jury for non-delivered stock could not be sustained where it had been given zero "guidance as to temporal limitations on the defendant's liability."[75]

> The district court's instructions erroneously permitted plaintiffs to pursue a damages theory at trial that had no connection whatsoever to the date of breach. Instead of seeking to measure their losses as of the date of Dr. Rausser's breach, plaintiffs were free under the jury instructions given to argue for damages months and even years after any possible breach date. Indeed, plaintiffs' damages theory valued the stock as of the dates of Dr. Rausser's sales and, for the stock he retained, the date of trial.[76]

Spirit advanced many of these arguments in its motion to strike section of Murphy's report. In denying the motion, the court on April 16 observed that because the case "will not be tried before a jury," Spirit "can rest assured that the Court is capable of discerning which evidence is relevant and reliable and assigning weight accordingly."[77]

---

[73] 293 Fed.Appx. 592, 604 (10th Cir. 2008).

[74] As to Kansas law, which controls in the present action (Pretrial Order, at 2), Spirit cites in passing only *Empire Mfg. v. Empire Candle, Inc.*, 273 Kan. 72, 41 P.3d 798 (2002) which did not involve the nondelivery of stock, and which notes that "[t]he general rule is that damages are to be measured as of the date of the breach."

[75] *Id*. at 604.

[76] *Id*.

[77] Order, Dkt. 511, at 19.

24

Moreover, the court also expressly concluded that the issue was not subject to resolution prior to trial given the conflicting evidence:

> While the amount of unpaid cash is well-defined and undisputed, the proper valuation of the LTIP shares of Spirit common stock remains disputed. The parties have presented conflicting evidence and expert reports explaining the commonly used valuation methods for such executive compensation plan stock awards, resulting in widely differing share price valuations. For instance, the shares can be valued when awarded, vested, or sold. *What timing and valuation technique* was to be used in the present case—and *what is commonly used in the industry*—is a *crucial, factual determination about Lawson's potential damages.*[78]

(Emphasis added).

Spirit also argues that Lawson should receive no damages at all, because his $32.6 million he received from working with Elliott exceeded any amount that he might recover under the Retirement Agreement. To the plaintiff's contention that his agreement with Elliott obliges him to indemnify Elliott any amounts recovered in this lawsuit, Spirit responds that "it is unclear" if the indemnification agreement actually applies, or indeed that "Lawson intends to give Elliott anything at all."[79]

Yet Spirit indirectly acknowledges that this is not in substance a true *Daubert* argument as to Murphy's qualifications, by arguing in its Reply that that "no expert testimony, whether from Murphy or otherwise, is needed in connection with the disputed issue of whether Lawson was damaged at all."[80] The defendant's argument seeks to define the scope of plaintiff's damages as a matter of law, and is properly presented by a motion for summary judgment.  Indeed, Spirit did precisely that in its prior summary judgment motion, making the same argument and citing

---

[78] *Id*. at 24.

[79] Reply, Dkt. 528, at 2.

[80] *Id*. at 2-3.

the same authorities.[81] As noted earlier, the court declined to grant the relief sought, finding that there were "multiple genuine disputes of material fact about Lawson's damages."[82]

The defendant has failed to show that Murphy's calculations reflect simple mathematical calculations, that they are unreliable or otherwise inadmissible, or that they yield a result which would be contrary to Kansas law.

**IT IS THEREFORE ORDERED** this 4th day of June, 2021, that the parties' Motions to Exclude (Dkt. 508, 510, 513) are hereby **DENIED**.

**IT IS SO ORDERED.**

*Eric F. Melgren*

ERIC F. MELGREN
UNITED STATES DISTRICT JUDGE

---

[81] Dkt. 433, at 47-48.

[82] Order, Dkt. 511, at 24.