IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

LARRY A. LAWSON,

                    Plaintiff,

          vs.                                    Case No. 18-1100-EFM

SPIRIT AEROSYSTEMS, INC.,

                    Defendant.

MEMORANDUM AND ORDER

Larry Lawson, the former CEO of Spirit Aerosystems, filed suit alleging Spirit breached its obligation to pay him the sums due him under the Retirement Agreement they had entered into in 2016. The case proceeded to a bench trial commencing on June 15, 2021. For the reasons discussed below, the Court enters judgment in favor of Plaintiff Lawson.

# Findings of Fact

"In an action tried on the facts without a jury or with an advisory jury, the court must find the facts specially and state its conclusions of law separately."[1] The Court

---

[1] Fed. R. Civ. Pr. 52(a)(1).

makes the following findings of fact, each being supported by at least a preponderance of the evidence.

## Background

1.      Lawson has a bachelor's and a master's degree in electrical engineering. He did some postgraduate work in engineering, and attended the Harvard Advanced Management Program, and is an MIT fellow. Before he became the CEO of Spirit, he had worked for McDonnell Douglas, Recon Optical, Martin Marietta, and Lockheed.

2.      In early 2013, an executive search firm contacted Lawson to ask about his interest in becoming Spirit's CEO. During his career, Lawson had been acquainted with the Conquistadors, a group of the top 200 executives in the aerospace industry. Through that group, which met twice a year, Lawson had meet Spirit board members Bob Johnson, Paul Fulchino, and Chuck Chadwell. Lawson knew that Spirit was a commercial aerostructures company, which he found interesting because it was different from his prior, defense-oriented work. Lawson met with the Spirit board, which stated that the company had performance issues, incurring a $600 million loss the previous quarter.

## Employment Agreement

3.      Ultimately, Spirit extended an offer to Lawson, which resulted in an Employment Agreement signed on March 18, 2013.[2] In reaching this agreement,

---

[2] Exh. 3.

Lawson was represented by counsel. Lawson read the agreement before signing it, and he understood its terms.

4.      Lawson understood that to be a CEO was to run a company, to be responsible for the operations, the financials, the talent, and customer relationships, of Spirit. In exchange, he would receive a salary, along with short-term incentives (stock shares based on the year of performance) and longer-term incentives (based on the performance of the company). Paragraph 4(e) of the agreement prohibited Lawson from divulging any confidential or proprietary Spirit information.

5.      Under the Employment Agreement, Lawson was paid a base salary, an additional 10% discretionary bonus, participation in a non-qualified Deferred Compensation Plan, a one-time bonus of restricted stock, and participation in both a Short-Term Incentive Plan (STIP) and Long-Term Incentive Plan (LTIP).

6.      On May 8, 2013, the Spirit board approved the first of several Long-Term Incentive Plan (LTIP) awards to Lawson as part of his compensation. The LTIP was typical of CEO compensation, by providing additional compensation in the form of stock, based upon Spirit's relative performance, which Lawson could not monetize until some time later, and which would increase in value with the value of Spirit. Once an award vested, Spirit was obliged to deliver the stock.

7.      For 2013, Lawson received 192,031 shares as a part of the LTIP, with one third of the shares vesting between two and three years later, another third between three and four years, and the final third after four years. The LTIP award was based on

400% of Lawson's base salary, based on the then-current price of $20.83 per share. Lawson also received a further 96,016 shares as a part of his sign-on bonus.

8.      Lawson received similar awards in 2014, 2015, and 2016. Thus, Lawson received the following LTIP share awards, with the current stock price as indicated:

| Year | shares | price |
|------|--------|-------|
| 2013 | 192,031 | $20.88 |
| 2014 | 103,260 | $33.175 |
| 2015 | 94,115 | $48.81 |
| 2016 | 117,855 | $43.375 |

9.      In addition, Lawson also earned and received performance-based awards of Sprit common stock (Performance Shares). These awards amounted to 25,353 shares in 2014, 23,744 shares in 2015, and 31,370 shares in 2016.

10.      Paragraph 4(c) of the Employment Agreement, the crux of the present dispute, is entitled "Non-Compete." The paragraph states in relevant part:

> [N}either you nor any individual, corporation, partnership, limited liability company, trust, estate, joint venture, or other organization or association ('Person') with your assistance nor any Person in which you directly or indirectly have any interest of any kind (without limitation) will, anywhere in the world, directly or indirectly own, manage, operate, control, be employed by, serve as an officer or director of, solicit sales for, invest in, participate in, advise, consult with, or be connected with the ownership, management, operation, or control of any business that is engaged, in whole or in part, in the Business, or any business that is competitive with the Business or any portion thereof, except for our exclusive benefit. You will not be deemed to have breached the provisions of this Section 4(c) solely by holding, directly or indirectly, not greater than 2% of the outstanding securities of a company listed on a national securities exchange.

11.      Recital A of the Employment Agreement provides:

> We are engaged in the manufacture, fabrication, maintenance, repair, overhaul, and modification of aerostructures and aircraft components,

4

and market and sell our products and services to customers throughout the world (together with any other businesses in which Spirit may in the future engage, by acquisition or otherwise, the "*Business*").

12.     Section 10(e) of the Agreement limits the construction of the agreement based on section headings, and any construction of the agreement for or against either Spirit or Lawson:

**Headings**   The headings in this Agreement are for reference purposes only and will not in any way affect the meaning or interpretation of any provision of this Agreement. No provision of this Agreement will be interpreted for or against either party on the basis that such party was the draftsman of such provision, and no presumption or burden of proof will arise disfavoring or favoring either party by virtue of the authorship of any provision of this Agreement.

13.     Aerostructures are the large aircraft structures which Spirit provides, markets, and sells to its customers, such as fuselages, nacelles, pylons, and flight control surfaces such as flaps and slats. Aircraft components are individual structural parts that make up the aerostructures.

## Lawson at Spirit

14.     After taking the job at Spirit, Lawson undertook a comprehensive review of its position, which revealed significant financial challenges. Lawson identified three programs which were losing money (the 787 project, the A350 project, and the Gulfstream G650 and G280 project). Lawson undertook a number of initiatives, requiring a comprehensive transformation of the company. Part of this transformation involved the replacement of many top Spirit executives. During Lawson's tenure, the

company instituted a comprehensive overhaul which identified problems and increased product quality.

15.     During this time, Spirit substantially increased the amount of cash generated by its sales. The company's stock increased markedly during Lawson's first two years, with his top to bottom transformation of the company benefiting both Spirit and the value of Lawson's compensation package.

16.     At the end of 2015, Spirit's board indicated it wished to offer Lawson a three-year extension to his contract. Lawson told the board that he wanted to retire before the end of 2016.

17.     Board members tried to convince Lawson to stay, but when he adhered to his decision, the board brought on Tom Gentile as Chief Operating Officer, with the intention of have Gentile replace Lawson as CEO some time in 2016.

18.     Gentile joined Spirit in March or April of 2016. Lawson believed that October or later would be a good time for the transition, but Gentile wanted to take over sooner.

19.     At the May meeting, the board told Lawson that he should go home and let Gentile run the business. Other than meeting with shareholders to reassure them about the transition, the board wanted Lawson to stay home until his official retirement date.

20.     Lawson discussed possible post-retirement work with board members Bob Johnson and Paul Fulchino, and mentioned that he might be interested in the job

held by Ray Conner, the president of Boeing. Johnson told Lawson that would be wonderful, and that Lawson's skills would be perfect for the issues Boeing had.

21.     Lawson also remarked to Johnson and to Samantha Marnick, Spirit's Chief Administration Officer, that he would like to secure board positions.

## The Retirement Agreement

22.     Lawson and Spirit entered into a Retirement Agreement on June 7, 2016, which provided that Lawson would resign on July 31, 2016. Lawson also agreed to provide consulting services to Spirit for a further two years. Lawson testified that under this provision he would give whatever support, managerial or technical, which was requested by Spirit.

23.     The compensation in the agreement was the result of negotiation between the parties. For the most part, the agreement rolled forward benefits in (as of yet unvested) shares which had been previously designated for Lawson.

24.     Lawson knew that the Retirement Agreement extended his opportunity to recover incentive awards provided by the Employment Agreement which were then unvested, and which would otherwise terminate upon his departure from Spirit.

25.     In exchange, Spirit agreed to pay Lawson (1) $150,000 in annual consulting fees, (2) a Separation Payment of $1,274,000, (3) a $1,115,000 STIP award, and (4) credit his account a further $ 2,000,000 under a nonqualified deferred compensation plan. In addition, Lawson would "continue to vest (as if he were an active employee) in

the awards previously granted to him" under the LTIP and the 2013 Omnibus Incentive Plain (OIP), as set out in an Exhibit A, which provided:

### UNVESTED LTIP/OIP LTIP AWARDS

| Year of Award | Unvested Shares as of July 31, 2016 |
|---|---|
| 2013 | 64,010 |
| 2014 | 85,126 |
| 2015 | 110,235 |
| 2016 | 149,225 |
| **TOTAL** | 408,596 |

26.    At the time of his resignation, Lawson held 359,499 unvested LTIP Shares reflecting a mix of Time-Based Shares and Performance Shares. The Time-Based Shares were scheduled to vest in installments over a period of three to four years from the date they were granted; the Performance Shares were scheduled to vest on the three-year anniversary of the grant dates, and the number of vesting shares depended on the then current market value of the shares at the time the grant was given.[3]

27.    Paragraph 2(g) of the Retirement Agreement provides:

> The Executive acknowledges that his continuing entitlement to payments and/or vesting under this Paragraph 2 shall be conditioned upon his reaffirmation of this [Retirement] Agreement through the Retirement Date, his cooperation in providing the Transition Services, and his continuing compliance with Paragraphs 4, 6, 7, 10(a) and 15 of the Agreement. The Executive's failure to execute a reaffirmation of this Agreement through the Retirement Date or failure to cooperate in providing the Transitions Services, or any violation of Paragraphs 4, 6,

---

[3] At the time of his resignation, Lawson held 279,032 Time-Based Shares and a Target amount of 80,467 Performance Shares. The 408,596 LTIP Shares shown in Retirement Agreement Exhibit A assumes that the 2014 and 2015 Performance Shares vested at 200% of the Target amount, and 2016 Shares at 100%.

7, 10(a) or 15 by the Executive, shall terminate the Company's obligation to continue to make payments and to continue vesting of awards in accordance with Paragraph 2.

28.    Paragraph 17 provides that both Lawson and Spirit had "participated jointly in the negotiation and preparation of this Agreement," that both parties had access to counsel, and that "[a]ccordingly … no rule of construction shall apply," and "any uncertainty or ambiguity shall not be interpreted," for or against either party.

29.    The Retirement Agreement (Paragraph 2) also obliged Lawson to provide or be prepared to provide consulting services in exchange for consulting fees. Lawson satisfied this requirement by his responses to Spirit's requests after his retirement.

30.    Under Section 7, "the noncompetition … period[] as set forth under Paragraph[] 4(c) … of the Employment Agreement shall be extended" for two years after the retirement date, that is until July 31, 2018.

## Elliott and the Arconic Proxy Contest

31.    On September 11, 2016, Lawson wrote to Marnick that he had been asked to do some consulting work for L3, a primarily defense-oriented, Tier 1 maker of electronics. Lawson wrote:  "Spirit does not compete with them but I needed to check in with you and also the status of my clearance." Marnick responded: "That's great Larry, Spirit is fine with you doing that for as long as we don't have a competitive situation. If that becomes the case, we will let you know."

32.    A few days later, Lawson again contacted Marnick, asking for contacts who might help him in being appointed to corporate boards. After Marnick suggested

some larger executive search firms, Lawson asked about smaller firms. Marnick responded, "I think you are best with the larger firms A & D [aerospace and defense] contacts." She also suggested that Lawson speak to some Spirit board members for referrals to other companies.

33.     As the result of one of these contacts, Lawson spoke on December 1, 2016 with Adam Katz, an analyst of Elliott Management, an investment firm managing approximately $25 billion in total assets. Elliott had come to believe that Arconic was underperforming, and that new leadership was needed. Arconic is the successor of Alcoa, Inc. (the Aluminum Company of America), after that company had spun off its mining and smelting arm, Alcoa Corporation, in 2016.

34.     Acting on this belief, Elliott had begun to acquire a substantial share of Arconic stock. In December, 2016, Elliott owned approximately 11.1% of the common stock of Arconic, a company then valued at more than $10 billion.

35.     Although Elliott became the largest single shareholder in Arconic, it never owned a majority of that company's stock. During the 2017 proxy contest, it increased its holdings, ultimately holding 13.2% of the stock by March 9.

36.     Katz told Lawson that Elliott wanted to place some additional directors on Arconic's board, with a view to replacing the company's CEO, Klaus Kleinfeld. Katz said the nominations would be hostile, and Lawson indicated his interest in the serving as a nominee to the Arconic board. Lawson scheduled a January 10, 2017 meeting with Elliott in New York City, and mentioned the possible nomination to Spirit Chief Operating Officer Samantha Marnick.

10

37.     Early on the morning of the 10th, before his meeting with Katz, Marnick emailed Lawson that Tom Gentile and the Spirit board were "concerned about Arconic for various reasons," and asked for him to call her.

38.     Lawson met with Katz and other Elliott managers later that day. Katz explained Elliott's thinking on Arconic, and Lawson would later write that he agreed "[o]n the broader path forward" for Arconic. Based on Marnick's email from the morning, Lawson warned Katz that Spirit might have a problem with his serving as a nominee for the Arconic board. Katz later emailed to others at Elliott that he had spoken with Lawson, who "is interested, but has to make sure no Spirit conflicts," and emailed Lawson that "we're (via counsel) happy to assist in any conversation with Spirit."

39.     On January 11, 2017, Lawson wrote to Katz that he had contacted Spirit, and "[t]hey are doing a review but their initial reaction was that they believed there was a potential overlap," based upon Arconic's "stated strategy to compete in the parts fabrication market." He thought this came out of competing with the Precision Cast Parts (PCP).[4] In view of the upcoming Sprit board meeting, Lawson wrote that Elliott should expedite its efforts to reach out to Spirit, and "I might suggest an engagement with lawyers at some point soon."

40.     On January 19, Elliott's counsel contacted the counsel for Spirit, asking if Spirit would agree either that the type of "subcomponent" products made by Arconic

---

[4] PCP, then a subsidiary of Berkshire Hathaway, is a large Tier 3 producer of parts cast, forged or machined from aluminum and titanium. PCP enjoys large advantages of scale, and provides products to the entire aircraft industry, including Spirit. The tier structure of the aerostructure market is explained *infra*, Finding ¶¶ 63-67.

would not be deemed a "component" under the Employment Agreement, or that Spirit would waive the restrictive covenant. Katz also commissioned Bain & Company to do a competitive analysis. In an email sent the evening of Friday, January 20, Katz asked, "Can you put together *no more* than 3 slides demonstrating that Arconic does not compete with Spirit AeroSystems?" He added that "This is incredibly important. We need to get these done this weekend."

41. Matthew Waterbury of Bain responded the next day with a general statement that "Spirit is far more customer than competitor for Arconic." He explained that the two companies were not "directly competitors for much, if any of their respective businesses," but added that "the story is slightly nuanced." "Spirit assembles structures from components, and Arconic provides raw materials and components." He wrote that Spirit's main competitors were commercial aircraft Original Equipment Manufacturers (OEMs), and that with respect to fuselages and wings, there was "[n]o competition in these areas." Waterbury noted that "it is possible that pylons and nacelles are slightly different, in that Arconic can and does provide most (all?) of the sheet, structural and fasteners needed for a pylon assembly."

42. On January 22, a Bain "Spirit vs. Arconic" comparison was sent to Tom Gentile, the CEO of Spirit. This report, based on a review of all available public information, including Spirit's publicly filed SEC 10-K forms, concluded that that "Spirit is an Arconic customer, and does not consider Arconic a significant competitor."

43. On January 26, 2017, Spirit's general counsel told Elliott that Spirit had examined Arconic's lines of business and its operations, and concluded that if Lawson

served on the Arconic board, "or otherwise provide services directly or indirectly to Arconic," he would violate the terms of the Retirement Agreement. Spirit also refused to issue any waiver.

44.     Lawson told Elliott that he would not agree to serve as an Elliott nominee "unless Spirit changes its current position."

45.     On January 30, Elliott flew Lawson by charter to New York to discuss another role in the proxy fight—as a potential CEO of Arconic, serving as the public face of Elliott's proxy fight. Elliott prepared a Consulting Agreement and an Indemnification Agreement, under which Lawson was paid $1 million, and provided $100,000 per month for consulting services. Elliott also agreed to pay Lawson $3 million if he did not become the CEO of Arconic.

46.     Under the Indemnification Agreement, Elliott would compensate Lawson for any losses due to his participation in the proxy contest, including any action by Spirit for breach of the Retirement Agreement.

47.     In exchange for such compensation, Elliott is subrogated to Lawson's rights. Paragraph 9(a) of the Indemnification Agreement, entitled "Subrogation," provides that "[i]n the event of payment under this Agreement, Elliott shall be subrogated to the extent of such payment to all of the rights of recovery of [Lawson]." Lawson is obligated to "execute all papers reasonably required" to give effect to the subrogation. Lawson credibly testified that he is "pursuing this case … pursuant to [his] obligations to subrogate," that he has assigned his claim to Elliott, and that he will "have to turn the money over to the extent [he] [has been] indemnified" by Elliot.

48.     On January 31, the same day that Lawson signed the Consulting and Indemnification Agreements, Elliott publicly announced that it "has engaged Mr. Lawson as a consultant on its investment in Arconic," and expressed support for Lawson as "a leading candidate to become the Company's CEO." Elliott repeated this message to Arconic's shareholders, stating that Lawson "has the ideal set of skills needed to turnaround Arconic's woefully and continually underperforming business."

49.     Two days later, Spirit gave notice to Lawson's counsel that he was in breach of Section 7 of the Retirement Agreement, stating that future payments would be cancelled and that Lawson was obliged to pay back amounts previously paid under the Agreement. Spirit made no explanation beyond stating that the January 31 announcement was an "egregious violation" of the non-compete clause. Spirit made no further payments of amounts due under the Retirement Agreement.

50.     After receiving some media training from Elliott, Lawson spoke with five of the larger institutional investors in Arconic. In his talks, Lawson did not present any specific strategy for Arconic. He explained his history and management style, but declined to offer direct criticism of Arconic's CEO Klaus Kleinfeld, and stressed that he wanted 100 days to assess the problems and correction.

51.     Shortly after the announcement of the proxy contest, the value of Arconic increased roughly 35%. On April 11, Elliott released a presentation entitled "A New Arconic," which cited "the largest immediate appreciation in stock for any company subject to a proxy contest in at least a decade" as graphic evidence in support for its proxy contest.

52.     Lawson's relation with the management and leadership of Arconic were adversarial. The campaign was brutal and vitriolic; Lawson was personally attacked.

53.     Lawson did not actually direct, manage, control or influence Arconic; he provided no services or assistance to Arconic. Indeed, Lawson and Elliott were adverse to Arconic. While Lawson would have had influence and control over Arconic *if he became its CEO*, this possibility was subject to multiple layers of contingency:  (1) Elliott would have had to win the brutal proxy fight and place a number new directors on the board, (2) the new board would have to vote to remove Kleinfeld, and (3) the new board would then have to pick Lawson as new CEO—out of all the available candidates and notwithstanding Lawson's serving as the face of one side in the bitterly personal proxy battle.

54.     The chances of all of these events occurring were remote, and in fact none of these occurred. After Kleinfeld sent a threatening communication to a principal officer of Elliot, the existing Arconic board realized Kleinfeld had gone too far and forced his resignation. On May 22, 2017, the proxy contest was settled with Elliott placing three directors on the fifteen-member board (and Arconic management two). In the end, Lawson was not even included in the final group of three candidates for the CEO position.

55.     Elliott invested in Arconic, but it did not manage, direct, or control Arconic, and did not provide any services or assistance to Arconic during the relevant time period. The proxy contest occurred precisely because the existing Arconic board stood behind Kleinfeld, and believed his performance as CEO was satisfactory.

56.     Not only were the three nominees from Elliott's slate added to the board a minority, they were also genuinely independent, and in no way bound or obligated to support either Elliott or Lawson. Indeed, one of the "Elliott" nominees who was added to the both the Arconic board and the CEO search committee ultimately supported another CEO candidate. Once Lawson was dropped from the running, the new Arconic board ignored Elliott's fallback choice, and selected as CEO another candidate whom Elliott had actively recommended against. The chance of Lawson becoming CEO were always remote, and, in the words of Katz, the odds of Elliott succeeding in its contest "was low and got lower" over the course of the bitter proxy campaign.

57.     Lawson role was simply to be "the alternative to Kleinfeld." He did not own, manage, operate or control Elliott, or have any direct or indirect interest in Elliott during the relevant time period.

58.     Notwithstanding the January 31 Consulting Agreement, Lawson did not actually offer any advice to Elliott on how to invest in Arconic. He had no say or input into Elliott's investment decisions, and offered no material assistance to Elliott in how it conducted the proxy fight.

59.     Nor did he commit, either to Elliott or potential investors, to any definite policy if he were to become Arconic's CEO. In his consultations with Elliott, Lawson merely confirmed elements of his biographic history taken from publicly available sources. Occasionally, Katz ran information by Elliott for his response, but this was largely a courtesy and there is no evidence that Lawson ever offered any substantial help for Elliott's proxy fight. To both Elliott and potential investors, Lawson simply

stressed his general managerial philosophy, asking for a hundred days after being made CEO, to determine what was wrong at Arconic, and how to fix it.

60.     Lawson testified credibly that he did not of take directions or instructions from Elliott. He made the same point during meetings with investors and during his interviews with the Arconic CEO search committee—that he had been employed by Elliott to serve as a possible CEO, but was otherwise committed to no definite policy.

61.     With no disrespect to the plaintiff, his position as the face of the proxy fight amounted to nothing more than that he was not Klaus Kleinfeld.

## The Aerostructures Market

62.     At the top of the commercial aerostructure market are Boeing and Airbus, the two Original Equipment Manufacturers (OEMs), which compete with each other to sell airplanes to airlines. The supply chain below the OEMs is conventionally divided into four tiers. Spirit focuses on building very large aerostructures and emphasizing its manufacturing efficiencies derived from large facilities and skilled workforce.

63.     Spirit is considered a Tier 1 aerostructure supplier, which provides major structures (fuselage systems, wing systems, and structural elements like pylons and nacelles) directly to the OEMs. The hallmark of a Tier 1 supplier is design capability, sometimes done in conjunction with the OEMs. Spirit separated from Boeing in 2005 and took over long-term contracts for the large aerostructural work for the Boeing 737, 747, 767, and 777 aircraft. The separation agreement provided Spirit this work for the

life of these models, absent a default on their part. These aircraft models have a long life expectancy, typically 20 to 25 years. Almost all of Spirit's revenues comes from its supply of large aerostructures to the two OEMs, for which it faces no competition under its long-term contracts. [5]

64.    At the bottom of the aerostructure market are Tier 4 producers. Tier 4 producers supply raw materials or partially fabricated raw materials, such as forging, castings, extrusions and other hardware. In the case of Arconic, much of its product is large roll aluminum products, which it sells (as a Tier 4 supplier) to aerospace companies, but also to the automotive and construction industries. Tier 4 producers do not design products.

65.    Tier 3 companies produce make-to-print parts and components used for producing aerostructures. Tier 3 producers do not design products.

66.    Tier 2 companies supply aircraft parts and subassemblies, such as an aircraft doors, pumps, or hydraulic systems. Tier 2 producers do not design products.

67.    Any given company may participate in more than one tier at a given time.

68.    In producing large aerostructures, Spirit has an inherent advantage in competing against the internal divisions of the OEMs, because its costs are lower, and it is better at speed-to-market production. At the same time, Spirit has advantages over

_____

[5] Plaintiff's Expert Dr. William Rogerson persuasively described the tiered nature of the aerostructures market. *See* Tr. VI. 149-52; 154-55, 175-77 (Rogerson). This terminology is also commonly used in the industry, and is frequently used within the internal documents of Spirit and Alcoa/Arconic. *See* Exh. 203 (Spirit 2017 Paris Air Show Supplier 360 Profiles), at 22937; Exh. 546 (Alcoa 2016 Spirit Overview), at 27271; Exh. 654A (Spirit Boeing Contol Surfaces Focus Factories RFI), at 38909.

lower-tier potential competitors because of the advantages of incumbency – its possession of long-term supply contracts with the OEMs, as well as its large facilities, large production capacity, and skilled workforce.

69.     The aircraft manufacturing industry does not use broadly accepted, standardized vocabulary.[6]

## The Business of Spirit

70.     Spirit designs, engineers and manufactures large commercial aircraft structures such as fuselages, nacelles (including thrust reversers), struts or pylons, wing structures and flight control surfaces. It also makes additional products which go into these larger structures.

71.     Spirit really has only two customers, Boeing and Airbus. Over 95% of Spirit's revenue comes from these two OEMs.

72.     Spirit has stated in its official public disclosures that:

> We have entered into long-term supply agreements with Boeing and Airbus, our two largest customers, making us the exclusive supplier for most of the products covered by those contracts. Our supply agreements with Boeing provide that we will continue to supply essentially all of the products we currently supply to Boeing for the life of the current aircraft programs, including commercial derivative models. The principal supply agreements we have entered into with Boeing make us Boeing's exclusive source for substantially all of the products covered by the agreements.

---

[6] Summary Judgment Order, Dkt. 511, at 21.

73.    Spirit had a similar arrangement with Airbus as to central fuselage section of the programs with the A350.

74.    In its public disclosures, Spirit was required to identify its principal competitors. In its 2014 SEC 10-K, Spirit stated:

> Although we are one of the largest independent non-OEM aerostructures suppliers, based on annual revenues, with an estimated 19% share of the global non-OEM aerostructures market, this market remains highly competitive and fragmented. Our primary competition currently comes from either work performed by internal divisions of OEMs or other first tier-suppliers and direct competition continues to grow.
>
> Our principal competitors among OEMs include Boeing, Airbus (including their wholly-owned subsidiaries Stelia Aerospace and Premium Aerotec GmbH), Embraer Brazilian Aviation Co, Alenia Aemlacchi, and United Technologies Corporation. Our principal competitors among non-OEM aerostructures suppliers are Aernnova, Aircelle S.A., Fuji Heavy Industries, Ltd., GKN Aerospace, Kawasaki Heavy Industries, Inc., Mitsubishi Heavy Industries, Nordam, Sonaca, Triumph Group Inc., Latecoere S.A. and Nexcelle.

75.    As noted earlier, while Spirit does face competition from the internal divisions of OEMs, it has a strong advantages. The Disclosure notes that Spirit has a "strong incumbent position on the products we currently supply to Boeing and Airbus, forged by long-standing relationships and long-term supply agreements." Because of the long-term contracts, Spirit's competitive advantages such as its 17 million square feet of manufacturing space and its established machining and tooling, and the disruptive effects of switching suppliers, it simply is not economical for larger OEMs to attempt to change their existing contracts with Spirit.

76.     Spirit enjoys strong competitive advantages against competition from other Tier 1 suppliers. In its 2014 Form 10-K, Spirit wrote:

> We also believe it would be cost prohibitive for other suppliers to duplicate our facilities and the over 20,000 pieces of equipment that we own or operate. The combined insurable replacement value of all the buildings and equipment we own or operate is $6.7 billion, including $2.6 billion for buildings, $2.4 billion for equipment that we own, and $1.7 billion for other equipment used in the operation of our business.

77.     Spirit had no strategy to become a supplier of either global rolled aluminum sheets, or fasteners, the two products it purchased from Arconic.

78.     According to its 2014 Annual Report to the SEC, Spirit is:

> one of the largest independent non-OEM aircraft parts designers and manufacturers of commercial aerostructures in the world, based on annual revenues, as well as the largest independent supplier of aerostructures to Boeing. In addition we are one of the largest independent suppliers of aerostructures to Airbus. Boeing and Airbus are the two largest aircraft OEMs in the world. Aerostructures are structural components such as fuselages, propulsion systems and wing systems for commercial and military aircraft….
>
> We derive our revenues primarily through long-term supply agreements with Boeing and Airbus. For the twelve months ended December 31, 2014, approximately 83% and 10% of our net revenues were generated from sales to Boeing and Airbus, respectively. We are currently the sole-source supplier of 97% of the products we sell to Boeing and Airbus, as measured by the dollar value of the products sold.

79.     In the same document, Spirit identified "Our Products" —

> We are organized into three principal reporting segments:  (1) Fuselage Systems, which includes forward, mid and rear fuselage sections; (2) Propulsion Systems, which includes nacelles, struts/pylons and engine structure components; and (3) Wing Systems, which includes wing components, flight control surfaces and other miscellaneous structural parts…. All other activities fall within the All Other segment, representing less than 1% of our net revenues for the twelve months

ended December 31, 2014, principally made up of sundry sales of miscellaneous services, tooling contracts, and sales of natural gas through a tenancy-in-common with other companies that have operations in Wichita, Kansas.

## The Business of Arconic

80.     Arconic is primarily engaged in the production of rolled aluminum product and fasteners. The company is one of Spirit's largest suppliers of rolled aluminum (which Spirit modifies to make aircraft skins) and fasteners. These rolled aluminum parts were designed by engineers at Boeing and Spirit, not Arconic. The fasteners are sophisticated nuts and bolts that hold together larger aerostructures.

81.     Spirit earned about $6 billion in revenue in 2016. During that time it spent about $4 billion on supplies, out of which $165 million was paid to Arconic. Arconic's $165 million in sales to Spirit represent a small fraction percent of Arconic Aerospace's $10 billion of total revenue. As a supplier to Spirit, Arconic's sales were much smaller than that of PCC, at $400 million.

82.     Contemporary Spirit documents do not show that the company considered Arconic to be an active competitor of Spirit. The defendant conducts a "Spirit 360" analysis of other aerospace companies, and the 360 Report for Arconic in 2016 represented that the "Current State of [the] Relationship … between Arconic and Spirit is good and they are strategic partners in fasteners and skins." As a part of its "Future Strategy" analysis, the document recognizes the relationship was "[n]ot competitive on castings and forged products," and recommended that Spirit "[c]ontinu[e] to keep competitive threats on fasteners and skins to lever reductions in

price" — that is, that Spirit would put pressure on Arconic. Overall, the document stated that "the relationship [with Arconic] remains strong."

83.     Arconic did not, during the relevant time period, actually pressure Spirit to make price concessions. If anything, the pressure went in the other direction. When the contract for aluminum skins expired in September, 2017, the contract was extended after Arconic agreed to price concessions sought by Spirit.

84.     As noted earlier, Spirit did not publicly identify Arconic as a competitor in its Form 10-K statements. Arconic's Form 10-Ks do not identify Spirit as a competitor.

85.     Spirit recognized that Lawson's role in the proxy contest did not then present a competitive threat. While concerned about ongoing price negotiations between Spirit and Arconic, Gentile acknowledged in his testimony that, during the proxy fight, this was merely "a possible future threat."

86.     Spirit's 360 Report on Arconic demonstrates that the company was not considered a present-day competitive threat. The Report's "Strengths, Weakness, Opportunities and Threats" (SWOT) assessment of Arconic observes that Arconic was the only source for rolled aluminum skins and for many fasteners, the only "Threat" identified relating to supply was a "[l]ong-term price creep," not contemporary demands for price concessions.

## The Parties' Interpretation of the Employment Agreement

87.     Lawson's testimony that he did not believe Arconic was a competitor of Spirit, because it was a supplier, and because like other Tier 1 producers it had no design capacity, was credible. It is also corroborated by Spirit's own documents (including SEC statements) and common understanding of the term "competition." While Spirit suggests that Lawson's communications with Marnick and Spirit shows some doubt on his part, all it really reveals is Lawson's reasonable efforts to avoid a dispute.

88.     Similarly, Spirit's 2017 declaration that the nomination of Lawson to the Arconic board would violate the Retirement Agreement is not conclusive nor entitled to particular weight. Notwithstanding the supposedly intensive review of the Spirit-Arconic relationship by teams of executives undertaken in January 2017, at trial Spirit was only able to product a few documents (such as the Spirit 360 report) which had actually been generated months before Lawson's involvement with Elliott. That report essentially shows Arconic as a "partner" rather than an active competitor. Most importantly, the Retirement Agreement does not give Spirit the unilateral right to interpret the Agreement or determine the existence of a breach.

89.     The only trial witnesses with personal knowledge of the parties' intent at the time of the Employment Agreement were Lawson and Samantha Marnick (Currently the Spirit Chief Operating Officer, at the time of the Employment Agreement, Marnick served as Senior Vice-President, Chief Administration Officer).

90.     Lawson credibly testified that he understood the non-compete clause to preclude him from either (1) working or providing services for, or owning, managing, operating, controlling, or directly holding more than 2% of the outstanding securities in a company in the Business, or (2) working or providing services for an entity that owns, manages, operates, or controls a company in the Business. Lawson credibly testified that he did not participate in such employment. Finally, Lawson credibly testified that he did not understand the clause to preclude him from working for any of the approximately 100 suppliers of Spirit, or prevent him from working for another company simply because there was some overlap in the products of that company and Spirit.

91.     The court does not find credible the interpretation of the Employment Agreement by Samantha Marnick. Marnick testified that Paragraph 4(c) precluded Lawson from any employment which "could somehow harm Spirit," and from working from any company which indicates "they're going into the business … [i]n the future," or that that "ha[s] the capability perhaps to do that [produce aerostructures and components]" sometime in the future. Marnick testified that the term "interest," as used in the non-compete covenant, is not restricted to an ownership or economic interest, but includes even an indirect benefit, such as responding with interest to a prospective offer of employment, and the Agreement bars Lawson from working for any company which loans money to a company such as Arconic. Marnick deemed Arconic as out of bounds because it was a Spirit supplier.

92.     Marnick did not discuss her expansive understanding of the Agreement with Lawson at any relevant time. Further, the claim that the Lawson was barred from any indirect relationship with any company which might have (even if unknown to Lawson) the capability to produce or supply some aircraft part at some future time is an interpretation which finds no purchase in the language of the Agreement itself, in common understandings of the language in the Agreement, or in generally accepted economics.

93.     Similarly, Gentile's theory that Arconic is a competitor of Spirit because both companies operate in the same "profit pool" is not an interpretation which either arises from the language of restrictive covenant or has any grounding in the communications between the parties at the time of the Employment Agreement. Further, such an interpretation clashes with general understandings of competition, as set forth below. The mere chance or risk that a supplier may increase costs and become more profitable does not make it a "competitor."

## Alleged Competition

94.     As noted earlier, almost all of Spirit's sales for its aerostructures are to OEMs under long term contracts for specific models of aircraft. In addition, no new aircraft models were launched during the non-compete period.

95.     Defendant's evidence was essentially restricted to showing that Arconic was *capable* of producing some similar aerostructure products.

96.     During the relevant time period, Spirit did not consider Arconic an active threat.

97.     Aerostructure components are specially-designed and not interchangeable for similar products on different aircraft. Although there is some evidence that Arconic has marketed or sold some aerostructure parts such as pylons, wing ribs, and wing spars, Arconic did not actually make particular aerostructures or aircraft components that Spirit also made, despite some similarity in the name of products. Despite the enormous record, there is no example of Spirit competing against Arconic as to any particular component. For example, while Kevin Matthies, the Spirit's Chief Technology Officer, identified photos of aerostructural products from Arconic marketing materials, he also acknowledged that he cannot specifically tie those parts to ones produced by Spirit.

98.     In January 2017, Boeing invited suppliers to a conference the following Month to discuss its Focus Factory initiative. Spirit and Arconic were among the companies that supplied information in response. These responses, cited by Spirit, are not an example of actual and contemporaneous competition. The Focus Factory initiative was apparently quickly abandoned. Boeing never followed up the preliminary solicitation by issuing a request for quote or request for proposal.

99.     In responding to the request for information, Arconic merely supplied some information on its recurring costs; but it did not actually make the referenced Boeing parts at the time. Arconic would have needed to make additional cost and capital expenditure estimates before deciding to respond to any request for proposal—a

27

choice rendered moot by Boeing's pulling the plug on the project later in 2017. In addition, to take this work away from Spirit, Boeing would have had to breach its existing contracts with Spirit. The Spirit executive who testified about the initiative acknowledged he viewed other companies with "paranoia," considering what might happen "[e]ven though legally it [the Boeing contract] was solid."

100.    In May 2018, Spirit representatives visited the Arconic Technology Center in connection with a potential Joint Development Agreement between the companies. During the trip, Spirit learned that Arconic had developed a 3-D printing capability and the ability to produce advanced fuselage skins. The information obtained during the JDA is not evidence of actual and contemporaneous competition. Spirit's representative testified the fuselage skin and 3D-printing technologies did not show competition with Spirit as to an existing product, but reflected Arconic's "capabilities," a demonstration in which Arconic only showed only the "capability to do it in the future." Spirit's executive testified he was not worried about Arconic taking any specific Spirit product, as this was a "collaborative" demonstration which "was more about them being a supplier" rather than a competitor.

101.    Spirit's third-party production initiative, under which it considered selling products it made internally, was not actual competition with its supplier Arconic. These efforts were abandoned after Spirit recognized that other supply pricing strategies were more economic.

102.    Spirit's professed concerns about its supplier Arconic's ability to negotiate prices does not establish actual competition. Gentile was concerned that Arconic was

"looking to consolidate other suppliers" and worried that it "was going to try to pursue a similar strategy" to that employed by the far larger supplier PCC. However, Gentile acknowledged that he does not know if Arconic actually carried through a plan to consolidate Tier 2 suppliers, and that Arconic actually sought price concessions (as to fasteners) only in 2020—long after the end of the restriction on Lawson's employment.

103.    The buyer-seller relationship is not considered to be competition, either in ordinary usage or among economists. Although buyers and sellers may bargain over price, both parties also have a strong cooperative interests which are not present between competitors.

## Conclusions

104.    In the light of these findings and all the evidence in the case, during the time period when the non-compete clause was in effect, the Court finds:

105.    Lawson complied with the terms of the non-complete clause, and all other terms in the Employment and Retirement Agreements.

106.    Lawson was not himself in the Business during this time, and did not provide services for an entity that owned, managed, operated, or controlled an entity in the Business.

107.    Elliott was not in the Business.

108.    Arconic did not produce the same aerostructures or aircraft components as Spirit.

109.    Arconic was a supplier of Spirit.

## Damages

110.    As large as it was, the Retirement Agreement was not an unearned windfall for Lawson. As Gentile himself recognized, given Lawson's service as CEO, the compensation package was "fair" and not "excessively generous," as "he was paid out the shares that he'd *already earned* but had not vested yet."

111.    The Retirement Agreement required Spirit to compensate Lawson by paying (a) $228,461.43 for Consulting Services, (b) $666,400 in Separation Payments, (c) a STIP Payment of $1,115,000, and (d) LTIP shares in the following amounts:

### Time-Based Shares

| Grant Date | Shares Granted | Unvested as of 2/2/17 | Vesting Date |
|---|---|---|---|
| 2/7/15 | 94,115 | 31,368 | 2/7/17 |
| 2/9/16 | 117,855 | 39,285 | 2/9/17 |
| 5/8/13 | 192,031 | 64,010 | 5/8/17 |
| 5/8/14 | 103,260 | 34,420 | 5/8/17 |
| 2/7/15 | 94,115 | 31,379 | 2/7/18 |
| 2/9/16 | 117,855 | 39,285 | 2/9/18 |
| 2/9/16 | 117,855 | 39,285 | 2/9/19 |

### Performance Shares

| Grant Date | Target Award | Ultimate Award | Vesting Date |
|---|---|---|---|
| 5/8/14 | 25,353 | 50,706 | 5/8/17 |
| 2/7/15 | 23,744 | 45,707 | 2/7/18 |
| 2/9/16 | 31,370 | 31,370 | 2/9/19 |

112.    Spirit did not make these required payments. Plaintiff's Expert Dr. Keven Murphy testified credibly to the value of the 406,815 LTIP shares which were not paid to Lawson. This calculation was based on the closing price of the stock on each prospective vesting date. The value of the LTIP stock in Time-Based and Performance Shares which was not delivered to Lawson is shown below:

### Time-Based Shares

| Vesting Date | Shares Vesting | Vesting Price ($) | Vesting Value ($) |
|---|---|---|---|
| 2/7/17 | 31,368 | 56.35 | 1,767,587 |
| 2/9/17 | 39,285 | 55.91 | 2,196,424 |
| 5/8/17 | 64,010 | 52.99 | 3,391,890 |
| 5/8/17 | 34,420 | 52.99 | 1,823,916 |
| 2/7/18 | 31,379 | 90.34 | 2,834,779 |
| 2/9/18 | 39,285 | 86.84 | 3,411,509 |
| 2/9/18 | 39,285 | 94.21 | 3,701,040 |

### Performance Shares

| Vesting Date | Ultimate Award | Vesting Price ($) | Vesting Value ($) |
|---|---|---|---|
| 5/8/17 | 50,706 | 52.99 | 2,686,911 |
| 2/7/18 | 45,707 | 90.34 | 4,129,170 |
| 2/9/16 | 31,370 | 94.21 | 2,955,368 |

113.    Spirit thus failed to deliver LTIP shares worth $28,898,594 at the time of vesting. Coupled with his other losses for consulting service payments, separation payments, and STIP payment, Lawson suffered losses in the amount of $30,908.455.

114.    Plaintiff has not been fully compensated for this $30.9 million loss by Elliott, which paid him $26,363,891.80 under the Indemnification Agreement.

115.    Spirit has presented no alternative calculations which would support any different conclusion as to the amount of damages owed.

## Conclusions of Law

### Prior Rulings

1.  In this diversity action alleging breach of contract, the court applies Kansas law.[7]

2.  To prevail on a claim for breach of contract under Kansas law, the plaintiff must show "(1) the existence of a contract between the parties; (2) sufficient consideration to support the contract; (3) the plaintiff's performance or willingness to perform in compliance with the contract; (4) the defendant's breach of the contract; and (5) damages to the plaintiff caused by the breach."[8]

3.  The court has determined that Lawson bears the burden of proof for each of the elements of his claim.[9] The court also determined that Spirit had the burden to prove its condition precedent affirmative defense. [10]

4. The court has also previously determined as a matter of law that

_____

[7] *See Klaxon Co. v. Stentor Elec. Mfg.*, 313 U.S. 487, 496 (1941).

[8] *Van Brunt v. Jackson*, 212 Kan. 621, 512 P.2d 517, 520 (1973).

[9] Summary Judgment Order, Dkt. 511, at 19. *See State ex. rel. Stovall v. Reliance Ins.*, 278 Kan. 777, 789, 107 P.3d. 1219 (2005).

[10] *Id*. at 21.

the plain language of the Employment Agreement must be read to mean that "the Business" refers to the *specific* products and services provided, marketed, or sold by Spirit at the time of contracting, as well as the products and services Spirit later chooses to provide, market, or sell, if and when Spirit chooses to do so.[11]

5. Thus, the restrictive clause targets the products actually made by Spirit, or products which Spirit makes in the future, if and when such products are actually produced. The court concluded that a contrary interpretation would both render some of the language in the definition superfluous, and would also prevent the plaintiff from being able to make an informed decision about which prospective employers to avoid.[12] A focus on actual competition arising from Spirit's actual work is also warranted given the Agreement's explicitly Spirit-centric definition:  Business is what "[w]e are engaged" in — making and selling and marketing "our products."

## Breach of Contract Elements

6.  The parties have stipulated to the first two elements; only the last three elements are in issue.[13]

7.  Lawson performed and was willing to performed under the Agreements. The evidence establishes Lawson provided consulting services when Spirit asked.

---

[11] Dkt. 25, at 16.

[12] *Id.* at 14-16. In any event, as noted *infra*, the court need not resolve whether Arconic was or was not in the *Business*.

[13] Pretrial Order, Dkt. 429 ¶¶ 2(a)(3) & (4).

8.   Other than its claim Lawson violated Paragraph 4(c), Spirit has presented no evidence that Lawson otherwise violated other provisions in the Agreements, such as the prohibition on the misuse of confidential information.

9.   The bar in Paragraph 4(c) of the Employment Agreement may be divided into three elements:  (1) a Prohibited Actor, (2) a Prohibited Action, and (3) a Prohibited Object, and may be presented thus:

[1]    neither you, nor any individual, corporation, partnership, limited liability company, trust, estate, joint venture, or other organization or association ("Person") with your assistance, nor any Person in which you directly or indirectly have any interest of any kind (without limitation)

[2]    will, anywhere in the world, directly or indirectly own, manage, operate, control, be employed by, serve as an officer or director of, solicit sales for, invest in, participate in, advise, consult with, or be connected with

[3]    the ownership, management, operation, or control of any business that is engaged, in whole or in part, in the Business, or any business that is competitive with the Business or any portion thereof, except for our exclusive benefit.

10.   Although some of these elements are internally disjunctive (for example, the Prohibited Actor element includes Lawson, or an entity he invests in, or an entity he assists), Paragraph 4(e) is not violated if one of these three linked elements is missing.

11.   Lawson did not have an interest in Arconic.

12.  Spirit argues that Lawson had an interest in Elliott, based on his contractual rights.[14] An "interest" is '[t]he most general term that can be employed to denote a right, claim, title or legal share in something."[15] But, like his *employment* with Elliott, this interest merely creates a potential Prohibited Actor for further analysis. There is no evidence at all that Lawson had any "interest" in terms of contract rights with Arconic.

13.  Lawson was employed by Elliott, but Elliott was not in the Business.

14.  With respect to Arconic, the only entity even arguably in the Business, Lawson served solely as a *potential* CEO, his relations with the existing Arconic management were adversarial and bitterly contested, and he did not own, control, manage, invest in, or influence that business.

15.  Elliott did not *control* Arconic. Under Kansas law, "control" reflects the right to manage or govern another.[16] During the relevant time period, Elliott did not manage or govern Arconic.

16.  This conclusion is also buttressed by Gentile's testimony, who candidly characterizes Elliott as trying to "influence" rather than "control" Arconic.[17] But "influence" is not a prohibited action under Paragraph 4(c). In any event, the actions of

---

[14] Resp. at ¶ 51.

[15] *Russello v. United States*, 464 U.S. 16, 21 (1983). *See, e.g., In re Dynamic Tooling Sys.*, 349 B.R. 847, 854 (Bankr. D. Kan. 2006) (stating that the term "'[i]nterests' includes contractual rights").

[16] *See Shelman v. Western Cas. & Sur.*, 1 Kan. App. 2d 44, 49, 562 P.2d 453, 458, *op. approved,* 564 P.2d 152 (Kan. 1977) ("The word 'control' has no strict or technical definition which necessarily excludes all others," but "is synonymous with superintendence, management, or authority to direct, restrict, or regulate") (internal quotations and citations omitted).

[17] Tr. IV. 168-70 (Gentile).

Elliott (and even more so Lawson) did not even rise to this low level. The proxy contest arose precisely because Arconic's management rejected Elliott's advice (which centered on removing Kleinfeld), and the existing Arconic board "dug in its heels" in favor of Kleinfeld. The proxy context was resolved months after Spirit repudiated its obligations under the Retirement Agreement. And Elliott did not *win* the proxy contest, Kleinfeld yielded the field by escalating the personal attacks to a level the existing Arconic board was unwilling to countenance. And Elliott's "success" in the contest was to simply to place three new directors on the 15-member Arconic board, who promptly showed they were indeed independent directors by rejecting Elliott's CEO suggestions.

17. Elliott did not *own*, *manage*, or *operate* Arconic. "Ownership" under Kansas law implies a right to own, use or control.[18] Elliott was a minority shareholder in Arconic, holding at most around 13% of that company's common stock. As just noted, Elliott had no right to use or control the Arconic.

_____

[18] In *Nickelson v. Bell*, 53 Kan. App. 2d 8, 12–13, 382 P.3d 471, 475 (2016), the Kansas Court of Appeals observed generally:

> Turning to more general definitions, Black's Law Dictionary defines owner as "[s]omeone who has the right to possess, use, and convey something; a person in whom one or more interests is vested." BLACK'S LAW DICTIONARY 1280 (10th ed. 2014). Similarly, the ordinary meaning of the term own is "to have or hold as property [or to] possess." WEBSTER'S NINTH NEW COLLEGIATE DICTIONARY 843 (9th ed. 1991). And when explaining the "doubleness of meaning" imbedded in the word ownership, Bryan Garner explains that "ownership ... implies the right of control over an object, quite apart from any actual or constructive control." *Garner's Dictionary of Legal Usage* 649 (3d ed. 2011). Quoting from a treatise, he continues: "'While it is usual to speak of *ownership of land*, what one owns is properly not the land, but rather the rights of possession and approximately unlimited use, present or future.'" *Garner's Dictionary of Legal Usage* 649.

18. Elliott did *invest* in Arconic, but it did not invest in Arconic "*with your* [i.e., Lawson's] *assistance*." The evidence is clear that Lawson simply served as the face of the proxy contest. Elliott's substantial investments in Arconic began before, and lasted well after, Lawson's service. The evidence is unrefuted that during the proxy contest, Elliott took no advice from Lawson as to the size or timing of its Arconic investments.

19. Finally, Elliott was not *connected with* Arconic, given the language, context, and purpose of the non-compete clause. The term "connected with" requires a reasonable link in light of the interests under protection.[19] Further, this final, catch-all phrase must be construed in light of the other explicitly enumerated Prohibited Actions, such as ownership, management, or control. Kansas follows the doctrine of *noscitur a sociis*, "one is known by one's associates," under which

> the meaning of a word of phrase which may be obscure or doubtful when considered in isolation may be clarified or ascertained by reference to those words or phrases with which it is associated [and] that, taken in context, a word may have a broader or narrower meaning than it might have if used alone.[20]

Here, the "associates" all denote strong powers of dominion or authority such as *ownership* or *control*. Elliott owned 13% of Arconic, and it did not attempt to acquire the

---

[19] *See National Gypsum v. State Empl. Sec. Bd. of Rev.*, 244 Kan. 678, 687, 772 P.2d 786, 792 (1989) (statute suspending unemployment compensation benefits to persons fired for misconduct "connected with" their employment requires a showing that the misconduct had a reasonable relationship to employer's interests).

[20] *Young Partners LLC .v Board of Educ., Unif. Sch. Dist. No. 214*, 284 Kan. 397, 408, 160 P.3d 830, 840 (2007) (citation and internal quotation omitted). S*ee also Straub v. BNSF Ry. Co.*, 909 F.3d 1280, 1287 n.8 (10th Cir. 2018) (citing *Yates v. United States*, 574 U.S. 528, 543 (2015)). The doctrine serves to "to avoid ascribing to one word a meaning so broad that it is inconsistent with its accompanying words " *Gustafson v. Alloyd Co.*, 513 U.S. 561, 576 (1995).

majority of Arconic's stock. The most it could hope for was adding some independent voices to the Arconic board. At the time Spirit repudiated the contract Elliott was locked in a poisonous fight with Arconic's management—the very *opposite* of influence, management or control.[21]

20. None of the arguments advanced by Defendant warrant a contrary conclusion. Spirit argues the Agreement should not be construed in Lawson's favor, contending no ambiguity exists, that the parties agreed to neutral construction, and that the restrictive clause is a conditional benefit rather than a covenant not to compete.[22] None of these contentions is persuasive. The court has already determined that as to the key definition of Business, the contract is ambiguous,[23] a conclusion only confirmed by the wildly different contract interpretations offered at trial by Lawson and Marnick.

21. Spirit's argument that Paragraph 4(c) should be considered a condition precedent rather than a covenant not to compete,[24] and hence the Agreement should not

---

[21] A broad interpretation of "connection," unmoored to the other language of the clause or to the reasonable interests involved, would also render superfluous the express prohibition of investing "with your [Lawson's] assistance"—since *any* investment in a Prohibited Entity (assisted or unassisted) would automatically be "connected" with that company.

[22] Dkt. 592, ¶¶ 26-31.

[23] Dkt. 511, at 21.

[24] The claim is subject to doubt. First, to the extent that Paragraph 4(c) bars employment not just with Spirit's competitors but with any other company which makes (or as Spirit would have it, is capable of making) a product similar to one made by Spirit, this simply means that the burden on Lawson is *more* onerous than a standard non-compete. Second, the relevance of Spirit's continuing benefit/condition precedent distinction is of doubtful application where the effect of the agreement was to hold hostage benefits which, as Spirit's subsequent CEO acknowledged, Lawson had earned. Third, the Retirement Agreement does not in fact restrict the use of the term "competition" to the headings. Indeed, the term is integral to the most specific provision governing Lawson's continuing obligation after his retirement. Paragraph 7

be construed in Lawson's favor, is not controlling. The findings of fact set forth above are supported by a preponderance of the evidence; the court reaches these conclusions of law without resort to any rule of construction for or against any party.

22. Because the facts fail to show a Prohibited Act by a Prohibited Actor, it is irrelevant whether Arconic was a Prohibited Object.

23. Lawson's actions did not violate Paragraph 4(c).

24. Spirit breached the Retirement Agreement by failing to pay Plaintiff the sums due under the Agreement. Defendant's argument that Plaintiff cannot recover for all the sums due under the Retirement Agreement because he did not advance a separate claim for anticipatory repudiation is not compelling. Spirit's February 2, 2017 letter unilaterally declaring that Lawson had "forfeited any continuing entitlement to payments" under the Retirement Agreement explicitly repudiated its remaining obligations.[25] The statement is sufficiently definite as to be reasonably interpreted mean that it would stop any further payments to Lawson.[26] As the repudiation lacked

---

provides that it is "the *noncompetition* and non-solicitation *period*s as set forth under Paragraphs 4(c) and (d) of the Employment Agreement [which] shall be extended to the end of the Consulting Term." However, as noted above, the issue is not decisive. The court employs no rule of construction against Spirit in finding that Plaintiff has met his burden of showing that he complied with the relevant provisions of the Employment and Retirement Agreement.

[25] Exh. 137.

[26] RESTATEMENT (SECOND) OF CONTRACTS, § 250, cmt. b.

justification, Spirit breached the Agreement, and the Plaintiff was entitled to recover for the remaining payments.[27]

## Damages

25. Payment of monetary damages is appropriate notwithstanding Elliott's indemnification of Lawson, as the evidence shows Lawson is obligated to repay Elliott.[28] Kansas law provides that the damages for breach of contract may be reduced by the amount of compensating benefits the plaintiff may have received from a third party.[29] However, this "benefits rule" cited by Spirit is premised on the concern that the failure to offset in certain circumstances "would permit the plaintiff to obtain

---

[27] *See id. at* § 243(2) ("a breach by non-performance accompanied or followed by a repudiation gives rise to a claim for damages for total breach"), cmt. b. Contrary to Spirit's argument (Dkt. 592, at 39-40), Lawson has not advanced a separate and untimely anticipatory repudiation claim. The plaintiff's claim, explicitly stated in the Pretrial Order (Dkt. 429, ¶ 4(a), at 17) is a breach of contract in that he performed all conditions and "Spirit had no basis to repudiate its payment and share issuance obligations."

[28] Finding of Fact ¶ 47.

[29] *See King Grain Co. v. Caldwell Mfg. Co.*, 820 F.Supp. 569, 573-74 (D. Kan. 1993*). See also Anderson v. Rexroad*, 180 Kan. 505, 306 P.2d 137 (1957); *Raney v. Total Fitness Athletic Ctr.*, No. 92, 670 2005 WL 214255, *4 (Kan.Ct.App. May 20, 2005).

*unreasonable damages.*"[30] That prospect of does not arise here given Elliott's right of subrogation, and the benefits rule does not reduce the recovery.[31]

26. Plaintiff is entitled to prejudgment interest at the Kansas statutory rate. The authorities cited by Spirit[32] against an award of interest do not involve Kansas law and in any event fall far short of the mark. Spirit invokes a general encyclopedia of the law,[33] which establishes nothing more than the general rule that an insurance company's subrogation rights are defined by what it paid its insured.[34] The same authority later clarifies: "Prejudgment interest is not recoverable *on unliquidated damages* that an insurer seeks in a subrogation action."[35] This court has observed that in an appropriate case, prejudgment interest at the Kansas statutory rate may be appropriately awarded.[36]

---

[30] *Wichita Fed. Sav. & Loan Ass'n v. Black*, 245 Kan. 523, 540-41, 781 P.2d 707, 719 (1989) (emphasis added), citing *Macon–Bibb County Water & Sewerage Auth. v. Tuttle/White Constr*. 530 F.Supp. 1048, 1055 (M.D. Ga.1981) (superseded by statute on other grounds as stated *in RTC v. Fleischer*, 257 Kan. 360, 892 P.2d 497 (1995)). In *King Grain*, the prospect of double recovery by the bailee of damaged grain arose because the plaintiff had settled with its insurer, which expressly disclaimed "subrogation rights in any recovery by plaintiff." 820 F.Supp. at 573.

[31] *See Lexington Ins. Co. v. Western Roofing Co.*, 316 F.Supp.2d 1142, 1153 (D. Kan. 2004) (rejecting reduction of damages where subrogation right existed and there "no suggestion that either [the insurer or insured] will potentially enjoy a windfall double recovery"). Here, the only prospect of an unfair windfall would be if Spirit were allowed to keep the rewards Lawson had earned.

[32] Dkt. 594, Resp. at 29-30.

[33] 46A C.J.S. INSURANCE § 2074. Spirit also cites *Zurich Am. Ins. v. Wis. Physicians Servs. Ins.*, 306 Wis. 2d 617, 743 N.W.2d 710, 720 (Wis. Ct. App. 2007), a case which was explicitly based on Wisconsin statutory insurance law, W.S.A. 628.46.

[34] The only Kansas authority cited by C.J.S. is plainly distinguishable. *See id*. (citing *State v. Hinkley*, 13 Kan. App.2d 417, 777 P.2d 857 (1989) (discussing the authority of court in a criminal sentencing to assign restitution under state statute)).

[35] 46A C.J.S INSURANCE at § 2074 (emphasis added).

[36] *See First Specialty Ins. Corp. v. Novapro Risk Solutions*, 468 F. Supp. 2d 1321, 1343 (D. Kan. 2007) ("an award of prejudgment interest is necessary and appropriate to rule First Specialty whole,

27. Spirit presents no valid argument that the sums due under the Retirement were not liquidated. Nor could it reasonably do so, having moved before trial to exclude the testimony of Plaintiff's expert Dr. Murphy on the grounds, in part, that Lawson's losses could be established by "basic mathematical calculations without assistance form any expert or fact witness."[37]

28. Because Lawson's damages are liquidated, he is entitled to prejudgment at an annual rate of 10%, starting from when the amounts became due.[38]  For damages which are liquidated, Kansas provides by statute that a creditor is entitled to prejudgment interest at a rate of 10 percent per annum.[39] "Typically, that 10% interest compounds annually."[40] The decision to award prejudgment interest is committed to the discretion of the court.[41]

---

*especially* since the amounts in question are liquidated"). Similarly, in *Yousuf v. Cohlmia*, 741 F.3d 31, 48 (10th Cir. 2014), the court concluded that a subrogated insurer seeking contribution for legal defense costs was not entitled to recover prejudgment because "attorney fees in this context are subject to a reasonableness determination by the fact finder and thus are not liquidated." Such a conclusion would be unnecessary if a subrogated party can *never* recover prejudgment interest.

[37] Dkt. 508, at 10.

[38] K.S.A. 16-201. *See Gruber v. Est. of Marshall*, 59 Kan. App.2d 297, 323, 482 P.3d 612, 630 (2021) ("A claim becomes liquidated when both the amount due and the date on which such amount is due are fixed and certain, or when the same become definitely ascertainable by mathematical calculation.").

[39] K.S.A. 16-201.

[40] *See Hale v. Emporia State Univ.*, No. 16-4182-DDC, 2020 WL 5038785, at *11 (D. Kan. Aug. 26, 2020), *recon. denied*, 2020 WL 7770929 (D. Kan. Dec. 30, 2020) (citing *Mathiason v. Aquinas Services*, 187 F.Supp.3d 1269, 1278 (D. Kan. 2016) (awarding prejudgment interest on plaintiff's back pay award at the Kansas statutory rate of ten percent, compounded annually); *Leidel v. Ameripride Services*, 276 F.Supp.2d 1138, 1147 (D. Kan. 2003) (ordering that prejudgment interest is compounded annually); *Rahn v. Junction City Foundry, Inc.*, 161 F.Supp.2d 1219, 1241 (D.Kan.2001) (awarding prejudgment interest at the Kansas statutory rate of ten percent, K.S.A.

29.  Thus, through the beginning of the trial on June 15, 2021, Plaintiff is entitled to prejudgment interest in the following amounts:

|  | Award Due ($) | Interest ($) |
|---|---|---|
| 2016 Bonus | 1,115,000 | 572,076 |
| Consulting Services | 228,461 | 93,946 |
| Separation Payments | 666,400 | 319,024 |
| LTIP Time-Lapse | 19,127,145 | 7,813,719 |
| Performance Shares | 9,771,449 | 3,583,506 |
| *Total* | 30,908,455 | 12,382,272 |

30.  For the period between June 15, 2021 and the entry of Judgment, Plaintiff is entitled to additional prejudgment interest in the amount of $11,860 per day.[42]

31.  After Judgment and prior to payment by Defendant, Plaintiff is entitled to post-judgment interest at the rate of 4.25%.[43]

32. As noted above, Defendant's claim that Lawson suffered no actual damages is unsuccessful under the actual facts of the case, which show Elliott is subrogated to Lawson's recovery.

---

§ 16–201). *See also Solis v. Merrill*, No. 08-4083-SAC, 2009 WL 10688147, at *6 (D. Kan. Nov. 24, 2009) ("an appropriate rate of prejudgment interest is the 10% rate set out in … K.S.A. § 16-201 … compounded annually").

[41] *See First Media Ins. Specialists v. OneBeacon Insurance*, No. 10-2501-EFM, 2015 WL 2062857, at *14 (D. Kan. May 4, 2015).

[42] Tr. III. 272 (Murphy); Exh. 247-5.

[43] *See* K.S.A. § 16-204; Finance Rates, State of Kansas Secretary of State, https://sos.ks.gov/business/finance-rates.html (last accessed Oct. 17, 2021).

33. Plaintiff was not fully compensated by Elliott for the damages caused by Spirit's breach.[44] Accordingly, independent of Elliott's right of subrogation, the Lawson remains the proper party for bringing this action.[45]

34. Further, Spirit's argument that Lawson suffered no damages is more properly characterized as an assertion that Lawson is not the real party in interest in the action. Any such argument has not been properly placed before the court and has been waived.[46] The decision not to raise a real party in interest claim was a deliberate choice of Defendant, made for strategic advantage. At the June 11 pretrial hearing, Spirit agreed:

> we didn't raise it [real party in interest] as a specific claim, but if in our motions to summary judgment we made that very clear, that without Elliott as an actual party in this case, with a claim against summary judgment, the only party you can look at to determine damages is Mr. Lawson. He is the only party in the case seeking money damages from Spirit. And he himself did not suffer any damages. If Elliott had joined the action and had sued Spirit in connection with that indemnification agreement, Your Honor, I would not be able to have that conversation with you.[47]

That conscious, strategic decision was also candidly acknowledge in Defendant's opening statement:

---

[44] Finding of Fact, ¶ 114.

[45] *See Fid. & Deposit Co. of Maryland v. Shawnee State Bank*, 13 Kan. App. 2d 182, 185, 766 P.2d 191, 194 (1988) (collecting cases).

[46] *Hall v. Life Care Centers of Am., Inc.*, No. 16-2729-JTM-KGG, 2018 WL 3377212, at *6 (D. Kan. July 11, 2018) ("failure to timely raise a real-party-in-interest defense operates as a waiver"); *Ross-Williams on behalf of Sprint Nextel Corp. v. Bennett*, 55 Kan. App. 2d 524, 550, 419 P.3d 608, 627 (2018) ("objections to whether a party is the real party in interest do not involve subject matter jurisdiction and may be waived").

[47] June 11, 2021 Hearing, Dkt. 593, Tr. at 56.

> [H]ad we filed a real party interest motion, which we discussed … let's just say we filed that motion at the very beginning, Your Honor would have allowed substitution and that sort of thing.
>
> …. We knew that was -- if they wanted to, if they wanted to restyle their case, that was easily fixable.[48]

As noted above, the evidence shows that Elliott is indeed subrogated to Lawson's recovery. The Court finds that by deliberately avoiding filing a motion which might have easily resolved the issue, Defendant has waived any claim that Plaintiff has not in fact the party injured by the breach.

35. Plaintiff is entitled to recover from Spirit $30,908,455, the amount it owed Lawson under the Retirement Agreement.

36. Because these damages are liquidated, Plaintiff is entitled to prejudgment interest in the amount of $12,382,272 through June 15, 2021 and $11,860 per day up to the date of Judgment.

37. Accordingly, in light of Conclusions of Law ¶¶ 35 and 36, Judgment shall be entered in favor of Plaintiff in the amount of $44,785,087.

38. Following Judgment, Plaintiff is entitled to interest at the rate of 4.25 percent.

39. In light of these findings and conclusions, the Court denies Spirit's request for its attorney fees in the present action.

**IT IS ACCORDINGLY ORDERED** that the court finds in favor of Plaintiff and against Defendant. Judgment should be entered in accordance with terms of this Order.

---

[48] Tr. I. at 48.

**IT IS SO ORDERED**.

Dated this 19th day of October, 2021.

This case is closed.

ERIC F. MELGREN
UNITED STATES DISTRICT COURT