**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS**

LARRY LAWSON,

     *Plaintiff,*

  vs.

SPIRIT AEROSYSTEMS, INC.,

     *Defendant.*

Case No. 18-1100-EFM

**MEMORANDUM AND ORDER**

Plaintiff Larry Lawson, the former Chief Executive Officer of aerostructures manufacturer Defendant Spirit AeroSystems, Inc, brought the present action seeking to recover the value of stock credited to him under an incentive plan.  After Plaintiff left his employment and engaged with hedge fund Elliott Associates to help in its proxy fight against the management of another aerostructures company, Arconic, Defendant invoked a non-competition condition precedent in Plaintiff's agreements with the company, and deemed the compensation forfeit. After a bench trial on Plaintiff's claims, the Court found in favor of Plaintiff.[1]  On appeal, however, the Tenth Circuit determined that Plaintiff had in fact violated the restrictive covenant, Paragraph 4 of the Employment Agreement.[2]  The sole remaining issue in the case, following

---

[1] *Lawson v. Spirit AeroSystems, Inc.*, 2021 WL 4870984 (D. Kan. 2021) (*Lawson I*).

[2] *Lawson v. Spirit AeroSystems, Inc.*, 61 F.4th 758, 768 (10th Cir. 2023) (*Lawson II*).

remand from the Tenth Circuit, is whether Paragraph 4 is unenforceable as contrary to Kansas law.

## I.        Factual and Procedural Background

Paragraph 4(c) of the Employment Agreement between Plaintiff and Defendant contains the relevant restrictions on post-Spirit work by Plaintiff.  As noted earlier, the Tenth Circuit concluded that Plaintiff's employment by Elliott violated the terms of Paragraph 4(c).

In reaching this conclusion, the Tenth Circuit agreed with Defendant that Paragraph 4(c) "unambiguously made Mr. Lawson's compliance with the covenant a condition to his future payments and vesting of stock awards."[3]  However, the court detected "an anomaly in the covenant itself," in that it not only operated as a condition for receipt of the deferred stock benefits, "[b]ut . . . also subjected Mr. Lawson to remedies such as damages, accounting, disgorgement of profits, and an injunction."[4]  The covenant thus served "dual functions," that is, first as a "condition on future payments" and second as a means of "restraining competition" by "prohibit[ing] Mr. Lawson from working for competitors even though Spirit doesn't seek to enforce these prohibitions."[5]

The Tenth Circuit observed that the enforceability of the covenant could depend on an assessment of whether the two functions were severable.[6]  If severable, and "the covenant serves only as a condition to future payments, rather than as a restraint against competition, there may

---

[3] *Id*. at 767.

[4] *Id*.

[5] *Id*.

[6] *Id*. at 768 ("[R]esolution of this issue could directly affect the enforceability of the covenant").

be no public policy to inhibit enforcement."[7]  That is, the covenant would not be subject to the "fact-intensive inquiry" for reasonableness applicable to "traditional covenants not to compete" under Kansas law.[8]

Several provisions in the relevant Agreements bear particularly on the issue on severability.  Paragraph 4(f) of the Employment Agreement states that a breach under Paragraph 4 "cannot adequately be compensated by money damages," and that as a result Spirit "will be entitled, in addition to any other right or remedy available to us (including, but not limited, to an action for damages, accounting, or disgorgement of profit), to an injunction restraining such breach or a threatened breach and to specific performance of such provisions."

Paragraph 9 provides for arbitration of disagreements, providing that each party would pay its respective attorney fees.  Subparagraph 9(d) states that that "notwithstanding anything to the contrary in this Section, the parties will have the right in a proper case to obtain temporary restraining orders and temporary or preliminary injunctive relief from a court of competent jurisdiction."

Paragraph 10(g) expressly provides that provisions of the Employment Agreement found to be invalid may be severed:

> ***Invalidity of Provisions***  If a court of court of competent jurisdiction declares that any provision of this Agreement is invalid, illegal, or unenforceable in any respect, then in lieu of such illegal, invalid, or unenforceable provision the court may add as a part of this Agreement a legal, valid, and enforceable provision as similar in terms to such illegal, invalid, or unenforceable provision as is possible. If such court cannot so substitute or declines to do so substitute for such illegal, invalid, or unenforceable provision (i) such provision will be fully severable; (ii)

---

[7] *Id*. at 767.

[8] *Id*. (citing *Weber v. Tillman*, 259 Kan. 457, 913 P.2d 84, 90 (1996); *Victaulic Co. v. Tieman*, 499 F.3d 227, 230 (3d Cir. 2007).

this Agreement will be construed and enforced as if such illegal, invalid, or unenforceable provision had never comprised a part hereof; and (iii) the remaining provisions of this Agreement will continue in full force and effect and not be affected by the illegal, invalid, or unenforceable provision or by its severance herefrom. The covenants in this Agreement will each be construed to be a separate agreement independent of any other provision of this Agreement, and the existence of any claim or cause of action of yours against us, predicated on this Agreement or otherwise, will not constitute a defense to the enforcement by us of any covenants in this Agreement.

Plaintiff's rights and obligations under the Employment Agreement were incorporated into the parties' June 7, 2016 Retirement and Consulting Agreement and General Release.

Paragraph 8 of the Retirement Agreement provides that Plaintiff "agrees that he shall continue to be bound by the terms and conditions of Paragraph 4 of the Employment Agreement, the terms of which are incorporated by reference; provided, however, that [Plaintiff] further acknowledges and agrees that the noncompetition and non-solicitation provisions as set forth under Paragraphs 4(c) and (d) of the Employment Agreement shall be extended to the end of the Consulting Term." Paragraph 11 of the Retirement Agreement repeats the point: "[A]ll obligations and rights arising under Paragraph 4 of the Employment Agreement, which, as modified by Paragraph 7 of this Agreement, are incorporated by reference herein, shall not be superseded and shall remain in full force and effect."

The Retirement Agreement gave additional, bargained-for benefits to Plaintiff beyond the continued conditional right to received the deferred stock compensation, under which that Plaintiff would "continue to vest (as if he were an active employee)" in the stock incentive program. Defendant also agreed to give Plaintiff a severance payment of $1,274,000, and an annual consulting fees of $150,000. Under Paragraph 2(g), Plaintiff agreed that this "continuing entitlement to payments and/or vesting . . . shall be conditioned upon . . . his compliance with Paragraphs 4, 6, 7, 10(a) and 15 of the Agreement."

Like the Employment Agreement, the Retirement Agreement contains a severability provision, Paragraph 8:

> If any provision of this Agreement shall be found by a court of competent jurisdiction to be invalid or unenforceable, in whole or in part, then such provision shall be construed and/or modified or restricted to the extent and in the manner necessary to render the same valid and enforceable, or shall be deemed excised from this Agreement, as the case may require, and this Agreement shall be construed and enforced to the maximum extent permitted by law, as if such provision had been originally incorporated herein as so modified or restricted, or as if such provision had not been originally incorporated herein, as the case may be. The parties further agree to seek a lawful substitute for any provision found to be unlawful; provided, that, if the parties are unable to agree upon a lawful substitute, the parties desire and request that a court or other authority called upon to decide the enforceability of this Agreement modify the Agreement so that, once modified, the Agreement will be enforceable to the maximum extent permitted by the law in existence at the time of the requested enforcement.

Finally, under Paragraph 14, Plaintiff agreed to "indemnify and hold harmless the [Defendant] from and against all claims, damages, demands, judgments, losses, costs and expenses, including attorneys' fees, or other liabilities of any kind or nature arising out of said breach."

## II.    Legal Standard

Pursuant to Federal Rule 52(a), "[i]n an action tried on the facts without a jury or with an advisory jury, the court must find the facts specially and state its conclusions of law separately."[9] These "findings and conclusions may be stated on the record after the close of the evidence or may appear in an opinion or a memorandum of decision filed by the court."[10] This Court issued

---

[9] Fed. R. Civ. P. 52(a).

[10] *Id.*

extensive findings of fact following the trial of the action,[11] and those findings are adopted and incorporated here, as augmented by the additional findings set forth in the present Order.

## III.    Analysis

Following remand, the Court invited argument on the issues remaining in the action. Both parties submitted additional briefs, followed by responses.  Plaintiff argues that the provisions reflecting the dual functions are not severable.  Further, he contends, whether or not severable, both functions of the contract are subject to review for reasonableness, and further the clause is unreasonable and hence unenforceable under the circumstances of the case.

Defendant argues that the provisions are severable, but even if not, the clause is reasonable and enforceable under Kansas law.

### A.   The condition precedent is easily severable from the remainder of the covenant's enforcement mechanisms.

Plaintiff argues that severance is permitted under Kansas law only if it may be easily accomplished, and only if the provisions severed address wholly separate employment interests. Accordingly, Plaintiff argues that severance cannot be accomplished here, where both of the "dual functions" generally serve the same interest of limiting competition.

However, this overstates the actual holdings of the two cases cited, respectively, for these contentions.  In *Miller v. Foulston, Siefkin, Powers & Eberhardt*,[12] the court observed.

> Even if the provisions relating to retirement benefits were illegal, they are easily severable from the rest of the contract.  A contract that contains valid and invalid provisions in which the lawful provisions can be easily severed will be upheld as to the lawful portion.  *Henshaw v. Smith*, 102 Kan. 599, Syl. ¶ 1, 171 P. 616 (1918).  As a general rule, if possible, a court should sustain the legality of

---

[11] *Lawson I*, 2021 WL 4870984,  at *1-14.

[12] 246 Kan. 450, 790 P.2d 404 (1990).

contracts in whole or in part when they are fairly entered into by the parties. The court should not seek loopholes and technical grounds for defeating the intended purpose of the contract but, instead, public policy encourages the freedom to contract, which should not be interfered with lightly. *Foltz v. Struxness*, 168 Kan. 714, 721-22, 215 P.2d 133 (1950).[13]

The *Miller* court merely concluded that an "easily severable" contract provision can in fact be severed. The decision does not say that severance is available *only* if it is "easy" to do so.

The historical precedents behind *Miller* do not support the conclusion advocated by Plaintiff. As indicated in the quoted passage, *Miller* relied on the early case of *Henshaw v. Smith*. That case does not say that severance may be employed only if it is "easy." Instead, it states that "[i]f a contract contains provisions some of which are valid and some of which are invalid, and the lawful matter can be readily severed from that which is unlawful, the lawful portion of the contract will be upheld."[14] *Henshaw* in turn relied on the even earlier decision of the Supreme Court of the Territory of Kansas in *Fackler v. Ford*.[15] *Fackler* recognizes the relief of severance without any suggestion of an "easiness" or "readiness" requirement, stating simply that "a contract, part of which may be repugnant to law, and against public policy, a part not being so, may be divided, and so much as may be unexceptionable, enforced."[16]

The same is true for the second case cited by Plaintiff, *Servi-Tech, Inc. v. Olson*[17] for the proposition that the court can only sever clauses that serve distinctly different purposes or appear

---

[13] 790 P.2d at 413.

[14] 171 P. at 616 syl ¶. 1.

[15] McCahon 21, 1858 WL 3136, 1 Kan. (Dassler's Ed. 463) (1858), *aff'd*, 65 U.S. 322 (1860).

[16] 1858 WL 3136, at *6.

[17] 2017 WL 3839418 (D. Kan. 2016).

in entirely separate clauses. In that case, the court held that a non-solicitation clause was enforceable, while holding that a separate non-competition clause was overbroad.[18] *Servi-Tech* did not discuss or address the issue of severance (the word does not appear in the opinion), it merely granted that relief where there happened to be explicitly separate clauses in the contract, and a similar non-competition clause written by the same plaintiff had been previously held to be unenforceable.[19]

Neither case holds that "easy" splitting of contract is a fundamental requirement of severance, or that severance is permitted only if the clauses in question address different employment interests or appear in entirely separate contract clauses. Rather, severability should be decided in light of the key point from *Miller*, that is, a court must sustain the parties' agreement "if possible," given the "freedom to contract, which should not be interfered with lightly."[20]

Moreover, even if "easy" severance was somehow a requirement of Kansas law, the Court finds that this standard is met, and severance may be accomplished here. The restrictive functions arising from Paragraph 4(c) are quite distinct, offering both a carrot and stick disincentivizing Plaintiff from working with actual or potential competitors. These functions, as the Court explains below, are appropriately subject to markedly different standards of enforceability, in recognition of a different weighing of relevant public policy. The stick would

---

[18] *Id*. at *5 ("[T]he Court holds that the 'no competition' clause is too broad in scope and does not enforce it. The 'no solicitation' clause is reasonable and justified by a legitimate business interest, and therefore it is enforceable.").

[19] *Id*. at *4 (citing *Servi-Tech, Inc. v. Schmidt*, 2013 WL 12106876, at *3 (D. Kan. 2013).

[20] *Miller*, 790 P.2d at 413.

have to be reasonable; the carrot, at least given the circumstances of the present case, is not subject to such reasonableness standard. Indeed, Plaintiff's free and voluntary consent to the bargain is sufficient, given the primacy of freedom of contract.

The touchstone for severability under Kansas law is the intention of the parties. "The general rule is that whether or not a contract is entire or indivisible is one of construction to be determined by the court according to the intention of the contracting parties as ascertained from the contract itself and upon a consideration of all the circumstances surrounding the making of it."[21] Courts from other jurisdictions have agreed that a key indicator of the parties' intent as to severability is the inclusion of express language assenting to that result.[22] Consistent with this general understanding, this court has given particular weight to the existence of a such a clause in deciding the issue of severance.[23]

As set forth earlier, the relevant agreements contain broad severability clauses. Under the Employment Agreement, if a court determines that "any provision" in the Agreement is unenforceable, the court is authorized to alternatively "add [an] enforceable provision as similar in terms . . . as is possible," or alternatively to enforce the remainder of the Agreement, the challenged provision being deemed "fully severable." The Retirement Agreement similarly

---

[21] *Crawford v. Surety Inv. Co.*, 91 Kan. 748, 139 P. 481, 484 (1914) (citations omitted).

[22] *See Yates v. Royal Consumer Prods.*, 2022 WL 3365075, at *7 (W.D. Ky. 2022) ("By including this severability clause in the contract, the parties have signaled their intent for provisions to be interpreted as severable whenever possible.") (citation omitted); *Figueredo-Chavez v. RCI Hosp. Holdings, Inc.*, 2022 WL 457848, at *6 (S.D. Fla. 2022) ("The presence of a severability clause is evidence that the parties intended for the contract to be severable."); *Baeza v. Superior Court*, 201 Cal. App. 4th 1214, 1230, 135 Cal. Rptr. 3d 557 (Ct. App. 2011) (Severability "clauses evidence the parties' intent that, to the extent possible, the valid provisions of the contracts be given effect, even if some provision is found to be invalid or unlawful.").

[23] *See Radiologix, Inc., v. Radiology & Nuclear Med., LLC*, 2017 WL 5007143, at *34 (D. Kan. 2017) ("[E]ven if the covenants not to compete—standing alone—create an unlawful employment relationship between plaintiffs and the physicians, the Physician Employment Agreements contain a severability clause.").

- 9 -

provides for severance of "any provision" which might be deemed unenforceable "in whole or in part."  The remainder of the Agreement may be then enforced "as if such provision had not been originally incorporated," and "to the maximum extent permitted by law."

As noted in the Tenth Circuit's decision, Defendant has disavowed any intention of employing the secondary, prohibitive or trade-restraining function against Plaintiff.  It has made no claim for damages against Plaintiff in the present action, and has never brought any claim seeking to enjoin Plaintiff from any employment, including his work with Elliott relating to the Arconic proxy fight.

Plaintiff argues, however, that the conditional benefit and prohibitive functions should not be severed, citing the fact that Defendant mentioned the possibility of injunctive relief in one February 2, 2017 communication sent by counsel for Defendant to Plaintiff's attorney.  In that letter, counsel stated that Plaintiff's "engagement by Elliot constitutes an egregious violation of Section 7 of the Agreement."  As a result, "we are notifying you that Mr. Lawson has forfeited any continuing entitlement to payments, any continuing COBRA premium supplement payments, and any vesting, as provided for under Section 2 of the Agreement."

Plaintiff is correct that, in the concluding paragraph of the letter, counsel also wrote:

> Spirit reserves the right to prove additional actual damages for which Mr. Lawson may have further liability.  Spirit is reviewing other possible actions against Mr. Lawson, including but not limited to, injunctive relief to prevent him from performing any services for Elliot and for Arconic."

However, the Court finds this communication is insufficient to grant the relief of withholding severance.  First, again as noted, the Kansas law provides for upholding the contract "if possible."  Second, by its express terms the letter was not an indication that an injunction was likely or imminent.  It merely indicated that it was a "*possible* action" which Defendant was

*thinking* about.  Read in context, the only direct action undertaken by the February 2 letter was announcing that the carrot (Plaintiff's "continuing entitlement to payment") was being withdrawn.

That Defendant was only taking action with respect to the condition precedent is confirmed in a letter sent on its behalf less than a week after the February 2 letter cited by Plaintiff.  In a February 8 letter, Ms. Ann Arcadi wrote on behalf of Defendant to state that "Mr. Lawson's work for Elliott . . . is clearly prohibited" under the terms of Paragraph 4.  Thus, she wrote, "Spirit is rightfully withholding payments and vesting at this time."

This exercise of its right under the condition precedent was the only action then undertaken by Defendant.  Arcadi makes no mention of attempting to enjoin Plaintiff's employment by Elliott.  She states that "Spirit is concerned" that Plaintiff might divulge confidential or proprietary Spirit information, and suggests if that was the case Defendant might seek damages, but such a claim was expressly based upon Plaintiff's general "common law duties relating to the non-disclosure" of such information.  That is, even the hypothetical claim for damages based upon revealing confidential information (a claim that Defendant has not advanced subsequently) was not tied to Plaintiff's contractual obligations under the Retirement Agreement.

Just as importantly, the course of the proxy context over the next few months confirms the conclusion that Defendant was not seeking to enjoin Plaintiff from working with Elliott.  Month after month, the proxy contest proceeded without any interference by Defendant.  Despite many communications back and forth between the parties, Plaintiff has produced nothing in the way of any actual demand for monetary damages or any effort to actually secure an injunction.

- 11 -

And it is not as if Plaintiff's relationship with Elliott was somehow secret, or there were some circumstances that might have lulled Defendant into deferring an action for injunctive relief. As Adam Katz of Elliott testified, this proxy battle was a "public fight . . . basically a political campaign." During this time, Lawson received media training, put together talking points which he employed in meetings with Arconic shareholders, and generally served as "the face of the proxy contest." This very public fight extended from its announcement on January 31, 2017 to May 22, 2017, when Elliott and Arconic announced an agreement to end the contest.

Throughout that very public fight, and up to the present, the only weapon actually employed by Defendant was the termination of Plaintiff's access to his accumulated stock incentives—the conditional benefit function contained in the Agreements. The parties expressly agreed to severance of any unenforceable provision, and the Court finds no circumstance in the case which would support disregarding that joint intention.

Whether or not Defendant might have sought to enforce Paragraph 4 by an action for damages or for injunctive relief is a hypothetical inquiry which the Court need not resolve. The Court finds that the conditional precedent function is severable from other hypothetical enforcement mechanisms. Whether the use of such hypothetical forms of relief would have would be proper under Kansas law is irrelevant. Plaintiff, a knowledgeable and experienced corporate officer, agreed to all the provisions contained in the Agreements, and also agreed that a court may properly sever "any provision" which might be deemed unenforceable.

Thus, the question becomes whether the application of the condition precedent was consistent with Kansas law.

**B.      The condition precedent function is enforceable, whether or not it is reasonable.**

The rules in Kansas relating to the contractual restrictions on the scope of subsequent employment were summarized in *Weber v. Tillman*.[24]   In reaching its conclusion, the *Weber* court made the preliminary observation:

> A noncompetition covenant ancillary to an employment contract is valid and enforceable if the restraint is reasonable under the circumstances and not adverse to the public welfare.  The rationale for enforcing a noncompetition covenant is based on the freedom of contract.   However, it is well settled that only a legitimate business interest may be protected by a noncompetition covenant.  If the sole purpose is to avoid ordinary competition, it is unreasonable and unenforceable.  Additionally, noncompetition covenants included in employment contracts are strictly construed against the employer.[25]

In deciding whether a given covenant is unreasonable under Kansas law, courts look to the following factors:

> (1) Does the covenant protect a legitimate business interest of the employer? (2) Does the covenant create an undue burden on the employee? (3) Is the covenant injurious to the public welfare? (4) Are the time and territorial limitations contained in the covenant reasonable? The determination of reasonableness is made on the particular facts and circumstances of each case.[26]

But while occasionally finding certain restrictive covenants unlawful, the Kansas Supreme Court has specifically cautioned that "[i]t is the duty of the courts to sustain the legality of contracts in whole or in part when fairly entered into, if reasonably possible to do so, rather

---

[24] 259 Kan. 457, 913 P.2d 84 (1996).

[25] *Id.*, 913 P.2d at 89 (citations omitted).

[26] *Id.* at 90.

- 13 -

than to seek loopholes and technical legal grounds for defeating their intended purpose."[27] "[T]he paramount public policy is that freedom of contract is not to be interfered with lightly."[28] Freedom of contract remains the "driving force" behind Kansas law on the enforcement of restrictive covenants.[29]

Kansas courts have recognized the validity of predicating an award of future benefits upon compliance with a contract conditions.[30]  Plaintiff, as noted earlier, argues that even considered separately as a condition precedent, the restrictive covenant may enforced only to the extent it is reasonable.  To support this contention, Plaintiff relies in particular on two decisions, one from Kansas and another from Delaware.

The first, *Varney v. Pottroff*,[31]  has little resemblance to the covenant at issue in this action.  It is true that in that case the court addressed a restrictive covenant which it noted was "not a traditional covenant not to compete."[32]  But the resemblance ends there.  As the court explained, while the covenant did not expressly *prohibit* departing accountant shareholders from working with former clients of the firm, it required any such accountant to pay a substantial percentage of his or her new earnings to the firm.

---

[27] *Id*. (further citations and quotations omitted).

[28] *Foltz*, 215 P.2d at 139.

[29] *Varney v. Potroff*, 275 Kan. 20, 59 P.3d 1003, 1015 (2002) (citation omitted).

[30] *See Sweet v. Stormont Vail Reg'l Med. Ctr*., 231 Kan. 604, 647 P.2d 1274, 1280 (Kan. 1982) (employee was not entitled to receive payment after termination, due to her failure to comply with employer's condition precedent to payment).  *See also Mirrow v. Barreto*, 2003 WL 22451987, at *2 (10th Cir. 2003) (determining a contractual benefit "conditioned upon" compliance unambiguously created a condition precedent).

[31] 275 Kan. 20, 59 P.3d 1003 (2002).

[32] 59 P.3d at 1015.

The court held that such a draconian provision was subject to a reasonableness requirement, given the punitive nature of the covenant. Such provisions "in which former employees are required to compensate former employers for services provided to former clients serve the same purpose as covenants not to compete," and "are not immune to review for reasonableness."[33]   All of the decisions cited in *Varney* involve former partners who were required to affirmatively pay specified sums to their former employers as liquidated damages.[34] The cited authorities unsurprisingly considered such affirmative payment requirements to be the functional equivalent to damages.[35]   Neither *Varney*, nor any of the cases cited in that decision, involved a condition precedent, where the relevant provision does not directly prohibit the reemployment or force the employee to essentially lose all the benefits of his new employment. *Varney* simply provides no support for Plaintiff's argument that *all* economic disincentives from alternative employment are subject to *Weber*'s reasonableness requirement.

The other case cited by Plaintiff, *Ainslie v. Cantor Fitzgerald L.P.*,[36] at least does address a restrictive covenant in the form of a conditional right to future payments, and did hold that the

---

[33] *Id*. at 1016, 1017.

[34] *See id*. (citing *Philip G. Johnson & Co. v. Salmen*, 211 Neb. 123, 317 N.W.2d 900 (1982), *Peat Marwick Main & Co. v. Haass*, 818 S.W.2d 381, 385-86 (Tex.1991); *Foti v. Cook*, 220 Va. 800, 807, 263 S.E.2d 430, 454 (1980); *Dobbins, DeGuire & Tucker, P.C. v. Rutherford, MacDonald & Olson*, 218 Mont. 392, 708 P.2d 577, 578 (1985) (terminated employees to compensate firm 100 percent of the gross fees billed by the firm to that client over the 12 months prior to termination if terminated employee services the same client within 12 months of termination; remanded case for determination of whether covenant was reasonable); *Follmer, Rudzewicz & Co. v. Kosco*, 420 Mich. 394, 362 N.W.2d 676, 683-84 (1984) (employment agreement requiring terminated employee to pay employer for use of confidential information)).

[35] *Id*. at 1016 (quoting *Foti*, 220 Va. at 807 (characterizing obligations to affirmatively pay a former employer as "damages provisions")).

[36] 2023 WL 106924 (Del. Ch. 2023).

- 15 -

covenant was subject to reasonableness review.  However, the Court finds that *Ainslie* provides no substantial persuasive authority or guidance under the circumstances of this case.

*Ainslie* has limited weight not merely because it is an unpublished decision of the Delaware Chancery Court.  First, the Chancery Court explicitly adopted what it acknowledged was the minority view, as "employee choice is the majority approach."[37]  Under that majority "employee choice" approach, "courts should not review forfeiture-for-competition provisions for reasonableness" so long as the agreements were voluntarily entered into.[38]

Further, the January 4, 2023 Chancery Court decision was rendered almost two months before the Tenth Circuit's resolution of Plaintiff's appeal in this case.  The *Ainslie* decision thus would have been available well before the Tenth Circuit's opinion.  Yet that opinion not only took no notice of *Ainslie*, the Tenth Circuit favorably cited the very same majority-view employee choice authority[39] which *Ainslie* rejected.[40]

But *Ainslie* not only carries very little precedential weight.  Its reasoning from authority is also unpersuasive.  The Chancery Court concluded that it "must make a public policy determination as to whether the condition [precedent] restrains trade and so should be evaluated

---

[37] *See id.* at \*21 and n. 173 (citing *Rochester Corp. v. Rochester*, 450 F.2d 118, 123-23 (4th Cir. 1971) ("The strong weight of authority holds that forfeitures for engaging in subsequent competitive employment, included in pension retirement plans, are valid, even though unrestricted in time or geography.") (citing cases).

[38] *Id.* at \*21.

[39] *Morris v. Schroder Cap. Mgmt. Int'l*, 7 N.Y.3d 616, 825 N.Y.S.2d 697, 859 N.E.2d 503, 506 (2006)

[40] *Cf. Lawson II*, 61 F.4th at 768 (favorably citing *Morris* as holding that "the general disfavor of noncompete provisions doesn't apply when an employer conditions receipt of postemployment benefits upon compliance with a restrictive covenant") with *Ainslie*, 2023 WL 106924 at \*21 n. 167 (acknowledging *Morris* as upholding the majority view).

for reasonableness."[41]  In making that policy decision, the Delaware court did not rely on cases actually addressing similar conditions precedent.

Rather, *Ainslie* relied on an analogy to Delaware decisions subjecting liquidated damages clauses to reasonableness review.[42]   Neither of the two cited cases involve a conditional forfeiture, and are distinctly lacking in relevance.  In the first, *Faw, Casson & Co. v. Halpen*,[43] a Delaware Superior Court decision, the relevant contract clause required an accountant to pay his former employer "one hundred percent" of any fees billed to a client of his former firm.[44]  The trial court subjected the clause to a reasonableness scrutiny without any explanation, and without any hint that a similar test should apply to conditional precedents.

The punitive nature of the restrictive covenant in the second case, *Lyons Insurance Agency v. Wark*,[45] was even harsher: the relevant clause required the insurance account executive to pay her former firm 150% of commissions earned with from former client of the firm.[46]  The court observed generally that liquidated damages cluses can be "problematic where they operate as a penalty or forfeiture," since they may be "potentially-unreasonable restraints on competition, and on ex-employees' interests in earning a living," and as a result such clauses may be limited

---

[41] 2023 WL 106924, at *9.

[42] *Id*. at *23-24.

[43] 2001 WL 985104 (Del. Super. 2001).

[44] *Id*. at *2.

[45] 2020 WL 429114 (Del. Ch. 2020).

[46] *Id*. at *2 (contract with brokerage provided that former employee working firm's former clients "shall pay to Lyons an amount equal to 1.5 times the Moved Business").

"to avoid oppression."[47]  Again, the contract at issue did not involve a conditional future benefit, and the court proceeded to application of the reasonableness standard without any suggestion that such as standard would apply in all cases disincentivizing subsequent employment.[48]

Even aside from the unpersuasive analogy to liquidated damages cases, *Ainslie* is ultimately irrelevant here because of its radically different factual circumstances.  The court in that case subjected the restrictive covenant to reasonableness inquiry after noting various factors which suggested it would result in a "particularly inequitable" forfeiture.[49]  That is, the court determined that the general policy of freedom of contract was inapplicable where there was "oppression in employment contracts"[50] serving to inhibit the "free[dom] to earn a living."[51]

The *Ainslie* court identified numerous badges of "oppression" in the case before it.  The defendant in that case was a world-wide brokerage business which had sought to enforce restrictive covenants against six former partners.  Under the relevant clauses prohibiting competition, the former partners forfeited additional compensation (ranging from $201,179 to $5.4 million) the firm held in their respective capital accounts.

In deciding to subject these clauses to reasonableness review, the court stressed that the anticompetition clause was "broad and vaguely defined,"[52] indeed so much so that it was

---

[47] *Id*. at *1, *4.

[48] *See id*. at *4.

[49] *See* 2023 WL 10624, at *24. *See also id*. at *22 n. 175

[50] *Id*. at *22 n. 175 (quoting *Lyons Agency*, 2020 WL 429114, at *4).

[51] *Id*. at *22.

[52] *Id*. at *18.

"possible, if not likely, that a former partner will engage in it accidentally or unknowingly"[53] The agreements were in fact "so broad that it appears it would be difficult, and so vague that it would be risky, for former [] partners to find employment in or adjacent to the financial services field."[54]  This was exacerbated by the fact that the agreements gave the firm's Managing General Partner the unilateral right, in his "sole and absolute discretion" to withhold benefits.  That is, the firm was not required to "establish[] Plaintiffs actually breached the agreement before a factfinder."[55]  Finally, the court stressed that the former partners "did not have the opportunity to negotiate any aspect of the LP Agreement: it was provided on a take-it-or-leave-it basis as a condition of joining the Partnership."[56]

The present case is radically different.  Plaintiff was not some mid-level engineer designing aircraft stabilizers, forced to sign a standard employment contract.  The Employment and Retirement Agreements were individually crafted for Plaintiff as Defendant's CEO.  Both agreements were the product of back-and-forth active negotiations between sophisticated and knowledgeable parties, both acting on the advice of counsel, or with the express opportunity to receive such advice.  The parties agreed, and the Court finds, that the parties had equal bargaining power.

As a sophisticated and successful CEO, there was never the slightest danger that Plaintiff would be blindsided by Defendant's potential application of the restrictive covenants contained

---

[53] *Id*. at *25.  *See also id*. at 18 ("Under these standards, it is highly possible that a partner could unknowingly engage in a Competitive Activity").

[54] *Id*. at *20.

[55] *Id*. at *5, *20.

[56] *Id*. at *25.  *See also id*. at *25 n. 196 (observing the restrictive coventant appeared in "a form agreement," with each of the six plaintiffs being subjected to "an ndentical version").

in the Retirement Agreement.  Each time Plaintiff considered subsequent employment, he carefully and actively sought out Defendant's opinion as to whether the employment might endanger his deferred stock options.  In each earlier instance, Defendant had no objection.  When Defendant did object to Plaintiff's potential involvement with Elliott's attempted takeover of Arconic, Plaintiff of course disagreed—but was also careful to insist to Elliott that he would proceed only if the hedge fund agreed to indemnify him.

Nor was there any danger that Plaintiff would be deprived of a living during the operative term of the Retirement Agreement.  That Agreement otherwise provided a comfortable income for severance and for consulting income.  Nor was Plaintiff (in reality) even required forego the value of the accrued stock, given Elliott's indemnification agreement.

The decision that Plaintiff's actions violated Paragraph 4 was not the unilateral, unreviewable whim of a single executive at his former employer, as in *Ainslie*.  Of course, Plaintiff (and Elliott) disagreed with Defendant's conclusion that Plaintiff's participation in the proxy contest for Arconic would violate his obligations under the Retirement Agreement, but the fact of the violation was not dependent merely on the whim Defendant's management.  The evidence relating the violation has been reviewed by this Court and the Tenth Circuit, and the existence of the violation is not longer in issue.

Some of the equitable considerations noted in *Ainslie* are also reflected in Kansas decisions involving restrictive covenants.  Those decisions have not involved highly-paid executives occupying the highest rungs of corporate governance.  Rather, Kansas cases addressing the validity of restrictive covenants have typically involved individual professional

workers and middle level employees—physicians,[57] barbers,[58] accountants,[59] tax preparers,[60] and crop consultants[61] as well as workers likely to have direct and personal knowledge of the employer's customers, including salesmen or sales managers.[62]

---

[57] *Weber*, 913 P.2d at 87 (dermatologist); *Foltz*, 215 P.2d at 137 (contract barred surgeon from engaging in the practice of medicine for 10 years within 100 miles of Hutchison, trial court reduced this radius to 5 miles).

[58] *Pohlman v. Dawson*, 63 Kan. 471, 65 P. 689 (1901).  The court enforced the restrictive covenant after observing the personal nature of the service rendered:

> While a barber no longer practices surgery or extracts teeth, his vocation depends for success on the skillful sharpening of his blade and the dexterity of its use. It differs essentially from a commercial pursuit.  The patrons of a mercantile establishment are generally indifferent concerning the ability and experience of a clerk or proprietor, whose dealings with them are chiefly confined to quoting prices, and separating from the stock such quantities of goods as the customer buys.  The owner may sell out to another and set up again for himself in the same business near by, yet purchasers find what is suitable to their wants still exposed for sale by the new proprietor at the old stand.  Like the surgeon or dentist, when the barber moves he attracts to himself those having confidence in his ability; and, the greater his professional skill, the more difficult it is to alienate from him those to whom his services have given satisfaction.

*Id*. at 690.

[59] *Varney*, 59 P.3d at 1017 (requiring compensation by accountant working with former clients was reasonable).

[60] *Doan Fam. Corp. v. Arnberger*, 62 Kan. App. 2d 769, 522 P.3d 364, 373 (2022) (reversing trial court's decision to reduce non-competition period from two years to one, emphasizing that "the noncompete clause did not prevent Arnberger from offering tax preparation services during that two-year period; she just could not provide those services to or otherwise solicit Doan's clients"); *H & R Block, Inc. v. Lovelace*, 208 Kan. 538, 493 P.2d 205, 212-13 (1972) (holding a covenant barring formeer franchisee from offering tax preparation services for five years—without any geographic limitations—was unreasonable, as this was "a service activity of a local nature, that is, one generally sought and obtained by the customer locally").

[61] *Servi-Tech, v. Olson*, 2017 WL 3839418, at *5 (D. Kan. 2107) (reasonable to enforce noncompete covenant for 24 months after termination of employment).

[62] *ConvergeOne, Inc. v. Logicalis, Inc*., 2022 WL 2791177, at *9 (D. Kan. 2022) (enforcing covenant prohibiting workers, including an account manager, a sales director, and a "Solutions Architect" who provided support to account managers, "from working for a competitor in the same or similar capacity as they worked for" their former employer); *Hibu, Inc. v. Pec*k, 2017 WL 5483440, at *5 (D. Kan. 2017) (finding former sales manager had not violated restrictive covenant*); Electri-Rep., Inc. v. Zurek*, 2016 WL 5871827, at *4 (D. Kan. 2016) (convenant employed reasonable restrictions on employment by former sales representative); *E. Distribut. Co. v. Flynn*, 222 Kan. 666, 567 P.2d 1371 1378-79(1977) (enforcment of anticompetition covenant against former liquor route salesman).

Common to and underlying these Kansas decisions is the concern that restrictive covenants are typically imposed by an employer upon a mid-level employee whose bargaining power is substantially greater than the employee.[63] Further, enforcement of an restrictive covenant may serve to bar an individual person from earning a living.[64] Of particular concern is the danger that that the average, individual employee would be barred entirely from his chosen profession,[65] and thus would not be able to provide for his or her family:

> The average, individual employees has little but his labor to sell or to use to make a living. He is often in urgent need of selling it and in no position to object to boiler plate restrictive covenants placed before him to sign. To him, the right to work and support his family is the most important right he possesses. His individual bargaining power is seldom equal to that of his employer. Moreover, an employee ordinarily is not on the same plane with the seller of an established business. He is more apt than the seller to be coerced into an oppressive agreement. Under pressure of need and with little opportunity for choice, he is more likely than the seller to make a rash, improvident promise that, for the sake of present gain, may tend to impair his power to earn a living, impoverish him, render him a public charge or deprive the community of his skill and training. The seller has the proceeds of sale on which to live during his period of readjustment. A seller is usually paid an increased price for agreeing to a period of abstention. The abstention is a part of the thing sold and is often absolutely necessary in order to secure to the buyer the things he has bought. Usually the

---

[63] *Hardy v. Prof'l Ins. Mgmt*, 1996 WL 35070396, at *4 (Kan. Ct. App. 1996) ("Kansas courts have recognized that employees suffer from a lack of bargaining power when entering into restrictive covenants.") (citation ommitted).

[64] *See Lawson II*, 61 F.4th at 768 n. 11 (distinguishing traditional restrictive covenants which "benefit the employer at the expense of the former employee's ability to earn a livelihood") (quoting *Allegis Grp., Inc. v. Jordan*, 951 F.3d 203, 212 (4th Cir. 2020)); *Doan Fam.*, 522 P.3d at 383 (Atcheson, J., dissenting) (traditional noncompete clauses "run counter to a public good in freely permitting workers to earn a living"); *American Fid. Assurance Corp. v. Leonard*, 81 F. Supp. 2d 1115, 1122 (D. Kan. 2000) ("Defendant is not prohibited from pursuing a livelihood in his chosen profession; he is merely prohibited from directly or indirectly soliciting plaintiff's customers in the limited area in which he established a close, personal relationship with the customers through his employment with plaintiff."); *Hardy*, 1996 WL 35070396, at *4 (because "an employee usually has little but his labor to sell," he "is often in urgent need to sell that labor . . . to earn a living"); *Puritan-Bennet Corp. v. Richter*, 235 Kan. 251, 679 P.2d 206, 211 (1984) enforcement of an unreasonable covenant would "infringe upon [the former employee]'s right to earn a living").

[65] *Puritan-Bennett*, 679 P.2d at 211 (aviation engineer faced restrictions so comprehensive they "would virtually bar appellant from the practice of his profession").

employee gets no increased compensation for agreeing to the abstention; it is usually based on no other consideration than the employment itself.[66]

In addition, reasonableness may be required where enforcement of the covenant would deprive a specific location of needed professional services.[67]

Just as the badges of oppression identified in *Ainslie* are absent in this case, so also are the various rationales identified in Kansas as grounds for requiring a show of reasonableness. Competition has not been harmed, as there was no evidence any corporation ever went leaderless because of the restrictive covenant in Plaintiff's Employment Agreement. Plaintiff actually did serve as the face of Elliott's proxy campaign. The shareholders of Arconic were allowed to freely chose whether Arconic should adopt new leadership, and there was no shortage of CEO candidates for Arconic after Elliott and Arconic's management agreed to settle the proxy fight.

Plaintiff is not the average, individual employee. He is an extremely intelligent and sophisticated corporate executive, and served with as the CEO of one of the largest corporations in the United States. He entered into the Employment and Retirement Agreements knowingly and voluntarily. The Agreements were the product of back-and-forth bargaining by the parties. Plaintiff was used to seeking the advice of counsel in his personal legal affairs.

As noted before, the facts establish that Plaintiff was not precluded from seeking to serve on other corporate boards after he left Defendant. Defendant expressly consented to a variety of

---

[66] *H & R Block*, 493 P.2d at 211 (nationwide tax preparation company attempted to bar former franchisee from conducting a tax preparation business in Yates Center, Kansas) (quoting, as "trenchantly stated," *Arthur Murray Dance Studios of Cleveland v. Witter*, 105 N.E.2d 685, 62 Ohio Law Abs. 17 (Ohio Com. Pl., 1952)).

[67] *See Foltz*, 215 P.2d at 139 (upholding restriction after noting trial court's finding that "the city of Hutchinson is no more in need of further doctors and surgeons than many other communities of like and similar circumstances," and concluding "[t]here is no attempt at monopoly here. Every other physician and surgeon is at liberty to practice within the territory involved."). *See also id*. (citing *Wilson v. Gamble*, 180 Miss. 499, 177 So. 363, 366 (1937) (upholding restriction as "the number of physicians in Greenville is amply sufficient for the rendition of necessary medical services to the citizens thereof")).

specific board opportunities and provided assistance and suggestions for Plaintiff in his search for such positions.  Defendant only raised an objection when Plaintiff proposed working with Elliott to serve as a board member (and later as CEO nominee) with Arconic, a major commercial aerostructure manufacturer, and a major customer (and sometime competitor) of Defendant.  Further, there is no evidence at all that Plaintiff would have been barred from returning to the industry he worked in before joining Defendant, that is, in defense aerospace.

Plaintiff was not involuntarily terminated by Defendant from the CEO position.  To the contrary, as Plaintiff himself testified, Defendant's Board of Directors was happy with his performance and wanted him to continue as CEO.  It was Plaintiff who informed the Board that he wanted to leave his position by around October 2016.  It was only after this announcement, and Plaintiff was already halfway out the door, that the Board asked Plaintiff to step down a few months early.  As noted earlier, the Retirement Agreement that was then crafted for Plaintiff was a voluntary agreement between knowledgeable and sophisticated parties.

Under the facts of the case, the conditional benefit function of the restrictive covenant did not thwart Plaintiff's ability to either earn a living or provide for his family.  Again, Plaintiff carefully insulated himself by signing both a lucrative consulting agreement with Elliott, and an agreement that Elliott would indemnify him for any loss he might suffer as a result of his employment by Elliott.

In sum, none of the rationales adopted by Kansas courts for disfavoring restrictive covenants is applicable here.

A court may appropriately uphold conditional benefit provisions as applied to "well compensated, high-level professionals who were given *the option* to join the program during their employment and, following separation, had the *further choice* of whether to receive

payments *or* to compete with [their former employer]."[68]  Plaintiff has presented no persuasive authority for a contrary result.  The Court finds the present case offers no grounds for departure from the "paramount public policy" of Kansas—freedom of contract.

The condition precedent function of the Agreements has already been reviewed for reasonableness—by the parties, when they entered into those contracts.  The Court finds no basis in law or equity for second-guessing that assessment, substituting its own assessment of what is reasonable.  The condition precedent is enforceable.

Given these conclusions, the Court need not resolve the additional arguments presented by the parties, and will enter Judgment in favor of Defendant.  The Court also finds that the issues presented by the mandate are sufficiently clear that oral argument would not materially assist in the resolving the matter.  Accordingly, the Court denies the parties' requests for such argument.  (Docs. 627, 630).

**IT IS THEREFORE ORDERED** that the Court finds for Defendant, and dismisses Plaintiff's claim for relief.  The Motions for Oral Argument (Docs. 627, 630) of Plaintiff and Defendant are denied.

**IT IS SO ORDERED**.

Dated this 15th day of June, 2023.

ERIC F. MELGREN
CHIEF UNITED STATES DISTRICT JUDGE

---

[68] *Allegis Grp., Inc. v. Jordan*, 951 F.3d 203, 211 (4th Cir. 2020).